## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————
                                              )
**ERLIN EVER MENCIAS AVILA,**                 )
                                              )
            *Plaintiff,*                       )
                                              )     Civil No. 1:15-cv-02135
**v.**                                        )
                                              )     Jury Trial Demanded
**METROPOLITAN POLICE DETECTIVE**             )
**MATTHEW DAILEY,**                           )
                                              )
**FOUR UNIDENTIFIED METROPOLITAN**            )
**POLICE DEPARTMENT OFFICERS,**               )
                                              )
            *Defendants.*                      )
—————————————————————)

## FIRST AMENDED COMPLAINT

1.      Plaintiff Erlin Ever Mencias Avila brings this action against Defendants Metropolitan Police Detective Matthew Dailey and Four Unidentified Metropolitan Police Department (MPD) Officers under 42 U.S.C. § 1983 seeking relief for violations of the Fourth Amendment's prohibition against unreasonable search and seizure and the Fifth Amendment's due process clause.

2.      On or around September 10, 2014, Four Unidentified MPD Officers questioned Mr. Mencias regarding an altercation that occurred earlier that day. After truthfully answering the Four Unidentified MPD Officers' questions, Mr. Mencias was threatened with arrest for failing to provide information he did not have. After the Four Unidentified MPD Officers' conduct was observed by a witness, Mr. Mencias was not arrested. Instead, the Four Unidentified MPD Officers seized Mr. Mencias's van and its contents, which he needs for his work as a contractor. The seizure was made without explanation or warrant. At the direction of Detective Dailey, the MPD retained the van for about 16

1

months, despite the lack of evidentiary value of the van or its contents in any criminal investigation.

3.       Additionally, the Four Unidentified MPD Officers and Detective Dailey failed to provide Mr. Mencias with timely or sufficient notice explaining what legal grounds they had for seizing his van and its contents, or how he could challenge the legality of the seizure and the retention of his van and its contents, either at the time of seizure or at any time after. Only after this lawsuit was filed did the Defendants provide, through counsel, Mr. Mencias with information regarding how he could recover his van.

4.       Finally, the Four Unidentified MPD Officers applied MPD's procedures inequitably towards Mr. Mencias when they seized his property and held it for an excessive amount of time. The inequitable application of law had no rational basis and was due to the Four Unidentified MPD Officers' personal animosity towards Mr. Mencias.

5.       When this case was originally filed, Mr. Mencias's van and its contents had not been returned. On January 7, 2016, counsel for Defendants informed counsel for Mr. Mencias that the van and its contents were available for release.

6.       On January 13, 2016, Mr. Mencias recovered his van and its contents.

## JURISDICTION

7.       This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3).

## PARTIES

8.       Plaintiff Erlin Ever Mencias Avila resides at 3106 Kelliher Road, Hyattsville, MD 20782.

9.      Defendant Metropolitan Police Detective Matthew Dailey is a detective with the Metropolitan Police Department in the Fourth District.

10.     Defendants Four Unidentified Metropolitan Police Department Officers are unidentified police officers, including an "Officer Jordan," likely from the Fourth District, who seized Mr. Mencias's van and its contents on or around September 10, 2014.

## FACTS

11.     Mr. Mencias is a construction contractor, and his construction work provides all of his income.

12.     Mr. Mencias owns a 1999 Chevrolet Express van with Vehicle Identification Number 1GCDM19W1XB14097 ("the Van"), which he uses daily for his contracting business.

13.     Mr. Mencias additionally uses the Van to carry and transport various tools and materials for his construction work.

14.     On or about September 10, 2014, Defendants Four Unidentified MPD Officers seized the Van and the tools within it, which included at least the following: two compressors; a chop saw; electric drills; three or four jigsaws; three or four other saws; electric sanders; a power converter; a Mercury outboard motor; a toolbox with additional tools and parts for tools; plumbing tools; and a portfolio containing personal and confidential paperwork, digital video recordings, and a passport ("the Tools") (collectively, "the Property").

15.     As of the date of the original Complaint, Defendants had not returned any of the Property.

16.     Mr. Mencias is a native Spanish-speaker. While he understands some English, his preferred language is Spanish.

**Altercation at El Torogoz**

17.     On or about September 10, 2014, Mr. Mencias went to work on a construction project as part of his business. As part of that project, he hired a day laborer, a man who gave his name only as "Luis."

18.     Following the conclusion of the work, at or around 6:30 PM, Mr. Mencias and Luis went to El Torogoz, a restaurant located at 4231 9th Street, NW, Washington, DC 20011.

19.     After arriving at the restaurant, Mr. Mencias and Luis eventually became separated, with Mr. Mencias inside the restaurant and Luis outside of it.

20.     At some point, Mr. Mencias saw that Luis was in an altercation with between three and five other people outside the restaurant, and the altercation ended with Luis on the ground, being beaten by the three to five other people.

21.     Mr. Mencias went outside and told the people beating Luis to stop beating him, helped Luis get on his feet, and ushered Luis away from the people attacking him.

22.     At no point did Mr. Mencias assault or physically engage any of Luis's attackers.

23.     Upon information and belief, this fight was recorded on video by a female bystander.

24.     In order to escape Luis's attackers, Mr. Mencias and Luis entered the Van and drove to another restaurant, Ache Lounge, located at 441 Kennedy Street, NW, Washington, DC 20011.

25.     Mr. Mencias parked the Van near Ache Lounge, on the same side of the street as Ache Lounge.

26.     Shortly after their arrival at Ache Lounge, Mr. Mencias and Luis separated.

27.     Luis did not tell Mr. Mencias where he was going and Mr. Mencias did not know where Luis went after their separation.

28.     Since separating at the restaurant on or about the night of September 10, 2014, Mr. Mencias has not seen or had any further communication with Luis.

29.      Mr. Mencias stayed at Ache Lounge for approximately an hour after he and Luis separated.

### Defendants Seize the Van Without Explanation

30.     While at Ache Lounge, Mr. Mencias noticed there were several police officers standing around the Van.

31.     Mr. Mencias exited Ache Lounge, and began walking away from where the Van was parked. Mr. Mencias planned to get a taxi home because he had been drinking and thought he should not drive.

32.     Three blocks from Ache Lounge, the Four Unidentified MPD Officers approached Mr. Mencias.

33.     One of the Four Unidentified MPD Officers asked Mr. Mencias if the Van by Ache Lounge belonged to Mr. Mencias.

34.     Mr. Mencias affirmed to the Four Unidentified MPD Officers that the Van belonged to him.

35.     One of the Four Unidentified MPD Officers told Mr. Mencias that he was in trouble, and attempted to put Mr. Mencias in handcuffs.

36.     Mr. Mencias backed away from the officer attempting to handcuff him, and was not handcuffed.

37.     Mr. Mencias asked the Four Unidentified MPD Officers why he was being arrested.

38.     One of the Four Unidentified MPD Officers responded that Mr. Mencias was being arrested because Mr. Mencias had been involved in the altercation earlier that night at El Torogoz.

39.     Mr. Mencias explained to the Four Unidentified MPD Officers that he had not been involved in the altercation.

40.     One of the Four Unidentified MPD Officers asked Mr. Mencias who was involved in the altercation.

41.     Mr. Mencias told the Four Unidentified MPD Officers that Luis had been involved in the altercation.

42.     Mr. Mencias further explained to the Four Unidentified MPD Officers that he had driven Luis from El Torogoz to Ache Lounge to protect Luis from his assailants.

43.     During the encounter between the Four Unidentified MPD Officers and Mr. Mencias, a bystander approached the Four Unidentified MPD Officers and objected to their behavior towards Mr. Mencias.

44.     The Four Unidentified MPD Officers appeared irritated and told the bystander to leave, which he did.

45.     One of the Four Unidentified MPD Officers then told Mr. Mencias that they were going to tow the Van.

46.     Mr. Mencias asked why the Van was being towed, but the Four Unidentified MPD Officers did not offer an explanation for why they were taking the Van.

47.     Rather, one of the Four Unidentified MPD Officers yelled at Mr. Mencias, told him he was in trouble, and told him to leave.

48.     At all times during his encounter with the Four Unidentified MPD Officers, Mr. Mencias denied any involvement in the altercation.

49.     The Four Unidentified MPD Officers did not tell Mr. Mencias where they were taking the Van.

50.     The Four Unidentified MPD Officers did not tell Mr. Mencias the process by which he could regain possession of the Van.

51.     The Four Unidentified MPD Officers did not tell Mr. Mencias where he should go to attempt to regain possession of the Van.

52.     The Four Unidentified MPD Officers did not tell Mr. Mencias when he would be able to regain possession of the Van.

53.     The Four Unidentified MPD Officers did not tell Mr. Mencias how he could challenge the police's decision to seize the Van.

54.     The Four Unidentified MPD Officers did not give Mr. Mencias any paperwork, ticket, or any other written communication.

55.     At no point during this encounter did the Four Unidentified MPD Officers ask to search the Van.

56.     At no point did the officers present a warrant for the search or seizure of the Van.

57.     At all times the officers spoke to Mr. Mencias in English only.

58.     Upon information and belief, the officers did not have a warrant to search or seize the Van.

59.     Upon information and belief, the Van had no evidentiary value in any criminal investigation arising from the altercation at El Torogoz.

60.     Upon information and belief, the Tools had no evidentiary value in any criminal investigation arising from the altercation at El Torogoz.

**Mr. Mencias's Initial Attempts to Get His Van Back**

61.     The day after the seizure, on or about September 11, 2014, Mr. Mencias went to the MPD Fourth District Station, located at 6001 Georgia Ave. NW ("Georgia Ave. Station"), to request the return of his Property.

62.     The officer Mr. Mencias spoke with at the Georgia Ave. Station told him to go to a different MPD station located at 750 Park Rd. NW ("Park Rd. Station").

63.     That same day, Mr. Mencias went to the station at Park Rd.

64.     At the Park Rd. Station he was given the phone number and name of Detective Dailey, and was told to contact Detective Dailey to see about getting his Van.

65.     Mr. Mencias called Detective Dailey, who told Mr. Mencias to come back to the Georgia Ave. Station the following day.

66.     Two days after the seizure, on or about September 12, 2014, Mr. Mencias returned to the Georgia Ave. Station and asked to speak with Detective Dailey.

67.     The officer he spoke with told Mr. Mencias to go to the Park Rd. Station and ask for "Officer Jordan."

68.     The officer he spoke with told Mr. Mencias that "Officer Jordan" works with Detective Dailey.

69.     Mr. Mencias again went to the Park Rd. Station, and asked to speak with "Officer Jordan." An officer Mr. Mencias recognized as one of the Four Unidentified MPD Officers told him to follow him back to the Georgia Ave. Station.

70.     Mr. Mencias asked the officer if he was "Officer Jordan," but the officer would not tell him.

71.     Upon information and belief, the officer who Mr. Mencias followed back to the Georgia Ave. Station is "Officer Jordan."

72.     The officer whom Mr. Mencias recognized as one of the Four Unidentified MPD Officers, "Officer Jordan," arrived at the Georgia Ave. Station and brought Mr. Mencias into an interrogation room.

73.     Three additional officers whom Mr. Mencias did not recognize joined them in the interrogation room.

74.     One of the officers spoke Spanish, and translated for the other officers.

75.     The officers asked Mr. Mencias about Luis, including asking for Luis's name, address, and whereabouts.

76.     Mr. Mencias explained that he had no information about Luis because Mr. Mencias had only met Luis the day of the altercation and had not seen Luis since.

77.     The officers told Mr. Mencias that if he did not tell them where Luis was, they would not return the Property.

78.     The officers told Mr. Mencias that if he was lying, they would put Mr. Mencias in jail.

79.     Mr. Mencias insisted that he did not have any information about Luis and that he just wanted to get the Property back.

80.     The officers interrogated Mr. Mencias for about four hours.

81.     After the interrogation was over, the officers told Mr. Mencias to leave, reemphasizing that if he did not tell them where Luis was, he would not be given the Property back.

82.     The officers failed to provide Mr. Mencias with any information on how to get the Property back.

83.     The officers failed to provide Mr. Mencias with any information on how to challenge the seizure or retention of the Property.

84.     The officers failed to provide Mr. Mencias with any information on why they were holding the Property.

85.     After going to the police station, Mr. Mencias was very discouraged and did not believe he would be able to get the Property back.

86.     Mr. Mencias did not know of any further actions he could take in order to try to regain possession of the Property.

87.     Approximately two months later, Mr. Mencias returned to the Georgia Ave. Station and asked about having the Van returned and to speak with Detective Dailey.

88.     Mr. Mencias was given multiple phone numbers to call, which he tried calling many times, but was unable to contact anyone at the phone numbers he was provided.

89.     Two days later, Mr. Mencias returned to the Georgia Ave. Station and asked to speak with Detective Dailey or Officer Jordan, but was not allowed to speak with anyone.

90.     The following day, Mr. Mencias again called Detective Dailey.

91.     Over the phone, Detective Dailey asked Mr. Mencias for Luis's whereabouts.

92.     Mr. Mencias again explained that he did not know, and that he did not know anything about Luis.

93.     Detective Dailey told Mr. Mencias that if Mr. Mencias did not have any information, he would not get the Van back unless the police caught Luis.

94.     Detective Dailey also said that the police could keep the Van and sell it because the Van was part of a crime.

95.     Five or six months after the Van was seized, Mr. Mencias returned to the Georgia Ave. Station and asked why the Van had not been returned.

96.     He was not given any additional information.

97.     With the exception of his interrogation, Mr. Mencias only communicated in English with the MPD.

### Mr. Mencias's Attempt to Initiate Legal Proceedings to Get the Property Back

98.     In early March 2015, after multiple attempts to get the Van back from the police, Mr. Mencias went to DC Superior Court to ask for the return of the Property.

99.     Clerks in the court informed Mr. Mencias that he was a witness in a grand jury proceeding, and that, if he wanted to get the Property back, he could have an attorney appointed to represent him.

100.    On March 13, 2015, a clerk completed an "Application for the Appointment of Counsel by Material Witness" for Mr. Mencias.

101.    The clerk told Mr. Mencias that the attorney being appointed to him would help him get the Property back.

102.    Shortly after March 13, 2015, Mr. Mencias was told that he had been appointed an attorney named John Machado to represent him in the grand jury proceeding.

103.    Mr. Mencias called Mr. Machado, and explained his situation.

104.    Mr. Machado told Mr. Mencias that he would text him an address so that Mr. Mencias could meet with him in person.

105.    Mr. Machado texted Mr. Mencias an address, but did not indicate whether it was in Northeast, Northwest, Southeast, or Southwest DC.

106.    Mr. Mencias texted and called Mr. Machado, asking for additional information about the address, but Mr. Machado never responded.

107.    Mr. Mencias has been unable to communicate further with this attorney, despite repeatedly calling the attorney and leaving multiple voicemails.

108.    Mr. Mencias returned to the Courthouse and requested appointment of a different attorney, but none has been appointed.

109.    Mr. Mencias' communications with members of the clerk's office were all in English.

### **Washington Lawyers' Committee Initially Unable to Recover the Van**

110.    On behalf of Mr. Mencias, Evelyn Núñez, paralegal with the Washington Lawyers' Committee, attempted to contact the attorney appointed to Mr. Mencias, leaving him multiple voicemails, but was unable to reach him.

111.    Ms. Núñez lso contacted the U.S. Attorney's Office for the District of Columbia (DC USAO) on Mr. Mencias's behalf.

112.    On or about August 17, 2015, Kara Traster, an attorney at the DC USAO, told Ms. Núñez that the Van was being held as evidence in a criminal proceeding.

113.    Ms. Traster did not explain why the Van was being held as evidence or how Mr. Mencias could get the Van returned.

114.     Ms. Traster did not explain how Mr. Mencias could challenge the seizure or retention of the Van.

115.     On November 2, 2015, Ms. Núñez again contacted the DC USAO regarding the Van.

116.     During this conversation, Ms. Traster explained to Ms. Núñez that she believed the DC USAO was at a point in the case where the Van could be released.

117.     Ms. Traster told Ms. Núñez she would have her supervisor send over the necessary forms to the MPD that day to have the Van released.

118.     Ms. Traster told Ms. Núñez to contact Detective Dailey at the MPD to arrange for the release of the Van.

119.     On November 4, 2015, Ms. Núñez attempted to contact Detective Dailey but was told he was not in the office that day. She left a message for Detective Dailey and was told he would return her phone call the next day when he was in the office.

120.     After receiving no response from Detective Dailey, Ms. Núñez called again on November 9, 2015, but was unable to reach Detective Dailey. She left another message and was told he would return the phone call the next day when he was in the office.

121.     On November 19, 2015, Ms. Núñez contacted Detective Dailey, who explained he still lacked the necessary forms from the DC USAO to release the Van.

122.     No one from the DC USAO or MPD contacted Ms. Núñez about the Van after this date.

### <u>Mr. Mencias Recovers the Property</u>

123.     On December 10, 2015, Mr. Mencias, through counsel, filed his original Complaint against the Defendants.

124.    On January 7, 2016, counsel for the Defendants informed counsel for Mr. Mencias that the Van and its contents had been available for release since November 26, 2015.

125.    Until the January 7, 2016, conversation between counsel, Mr. Mencias had not received any information on how to retrieve the Property even though it had been available for release since November 26, 2015.

126.    Upon information and belief, property owners do not receive any notice from MPD once property being held by MPD as evidence is available to be released.

127.    On January 13, 2016, Mr. Mencias, along with Ms. Núñez and counsel, went to MPD's Blue Plains Impound Lot, located at 5001 Shepherd Parkway, SW, Washington, DC.

128.    Upon arrival at the Blue Plains Impound Lot, Mr. Mencias was directed by a security officer to first go to the MPD's nearby office located at 17 DC Village Lane, SW, Washington, DC.

129.    At the 17 DC Village Lane Office, Mr. Mencias, through counsel, requested the officers present, Susie Smith and Mike Sutton, process the release of the Van.

130.    Ms. Smith and Mr. Sutton searched for the Property in their system by using Mr. Mencias's name but were unable to identify any property held under his name.

131.    Ms. Smith and Mr. Sutton searched for the Van by using the VIN but were unable to identify any vehicles held under that VIN.

132.    Counsel for Mr. Mencias then presented Ms. Smith and Mr. Sutton with a completed PD 81-C form regarding the release of the Van that had been sent by counsel for the Defendants.

133.    Ms. Smith and Mr. Sutton were then able to locate the Van in their system using the "Register Number" on the PD 81-C form, a number that had never previously been provided to Mr. Mencias.

134.    Upon information and belief, property owners whose property has been seized as evidence do not ordinarily receive the "Register Number" or the PD 81-C from MPD.

135.    After locating the Van in their system, Ms. Smith and Mr. Sutton asked Mr. Mencias if his registration was current. Mr. Mencias responded that it was not current as he had not had possession of the Van for over a year.

136.    Ms. Smith and Mr. Sutton informed Mr. Mencias that he could not drive the Van out of the impound lot without current registration and would need to have the Van towed.

137.    Mr. Mencias returned to the Blue Plains Impound Lot and subsequently arranged and paid for the Van to be towed from the Blue Plains Impound Lot.

138.    Upon inspection, Mr. Mencias ascertained that the Van also contained the majority of the Tools. The missing Tools include but may not be limited to one bag of approximately seventy mechanical tools and one car jack.

139.    Counsel for the Defendants represented to counsel for Mr. Mencias that the District of Columbia is no longer holding any of the Property as evidence.

140.    Approximately sixteen months passed between the initial seizure of the Property and Mr. Mencias's recovery of the Property.

**Damages**

141.    Mr. Mencias has incurred significant costs because of the seizure of the Property.

142.    Prior to their seizure, Mr. Mencias used the Van and the Tools daily in his construction work.

143.    After their seizure, Mr. Mencias was forced to buy replacement tools at a substantial cost in order to maintain his business.

144.    After the seizure, Mr. Mencias was forced to rent a replacement van to maintain his business. He rented a replacement van for two weeks, at a substantial cost.

145.    Eventually, Mr. Mencias was forced to buy a replacement van, at a substantial cost.

146.    Mr. Mencias was required to pay to tow the Van from the Blue Plains Impound Lot.

147.    The Van incurred damage as a result of the initial seizure and/or during the MPD's retention of the Property. The damage to the Van includes but is not limited to rain damage to the interior of the Van; unusable battery, alternator, and start motor; blown rear tires; internal cooling system damage; broken ignition switch; and damaged doors.

148.    Some of the Tools were damaged by the initial seizure and/or during the MPD's retention of the Property. The damaged Tools include but are not limited to two packets of electric drills, two framing pistols, a table saw, and a chop saw.

149.    The Tools that were stolen and/or lost during the initial seizure and/or during the MPD's retention of the property include but may not be limited to one bag of approximately seventy mechanical tools and one car jack.

150.    Because of losing the Property, Mr. Mencias has incurred a substantial loss of income.

## FIRST CLAIM FOR RELIEF

### Violation of the Fourth Amendment Protection Against Unreasonable Seizure

### Pursuant to 42 U.S.C. § 1983

151.   The Fourth Amendment prohibits "unreasonable searches and seizures of property by the government."

152.   A seizure that is lawful at its inception may nevertheless violate the Fourth Amendment if the manner of its execution unreasonably infringes the possessory interests protected by the Fourth Amendment.

153.   Mr. Mencias has a strong possessory interest in the Van and the Tools as they are necessary to perform his job.

154.   Mr. Mencias has continually asserted his possessory interest by speaking with MPD officers on multiple occasions about returning his Property, as well as attempting to regain the Property at the DC Superior Court.

155.   The Four Unidentified MPD Officers and Detective Dailey have effected a complete infringement on this possessory interest by completely denying Mr. Mencias the use of his Property for over a year.

156.   The Four Unidentified MPD Officers did not have probable cause to search the Van and therefore their initial seizure was not lawful.

157.   In the alternative, even if the Four Unidentified MPD Officers had probable cause to search the Van and could therefore effectuate a brief seizure to fully search the vehicle, on information and belief, Defendants never searched the Van after seizing it.

158.   Even if Defendants did search the Van, Defendants did not do so in a timely manner such as to be reasonable under the Fourth Amendment.

159.     If and when a search of the Van was conducted, the Defendants would have been aware that the Van had no continuing evidentiary value which would justify its continued seizure.

160.     If and when a search of the Van was conducted, the Defendants would have been aware that the contents of the Van, including the Tools, had no continuing evidentiary value which would justify its continued seizure.

161.     Defendants had no legitimate interest to justify continuing the seizure for over a year.

162.     Defendants had no legitimate interest to justify continuing the seizure after the criminal investigation had concluded.

163.     Defendants had no legitimate interest in failing to promptly inform Mr. Mencias once the Property was available for release.

164.     In the alternative, Defendants had, at most, a de minimis interest in their possession of the Property for over a year.

165.     Upon information and belief, Detective Dailey made the decision to retain the Property after the initial seizure.

166.     Upon information and belief, Detective Dailey did not take any action to effectuate the release of the Property until November 19, 2015.

167.     By seizing Mr. Mencias's property for over a year with no benefit to the government, the Four Unidentified MPD Officers and Detective Dailey have violated Mr. Mencias's constitutional right to be free from unreasonable seizures.

168.     42 U.S.C. § 1983 states that "[e]very person who, under the color of any statute, ordinance, regulation, custom, or usage, of . . . the District of Columbia, subjects . . . any

citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured . . . ."

169.     The deprivation of this right was under the color of state law as it was performed by state agents acting in their official capacity.

### SECOND CLAIM FOR RELIEF

### Violation of the Fifth Amendment's Equal Protection Guarantee Pursuant to 42 U.S.C. § 1983

170.     The Fourteenth Amendment, whose equal protection principles are embodied in and apply to the District of Columbia through the Fifth Amendment's due process clause, states that "[n]o state shall . . . deny to any person within its jurisdiction equal protection under the laws."

171.     Mr. Mencias was intentionally treated differently from others similarly situated, and there is no rational basis for the difference in treatment.

172.     Upon information and belief, the Four Unidentified MPD Officers seized and did not release the Property because of spite that arose as a result of Mr. Mencias's repeated vocal opposition to being detained by the officers.

173.     Upon information and belief, the Four Unidentified MPD Officers seized and did not release the Property to punish Mr. Mencias for not providing information about Luis, despite Mr. Mencias's lack of knowledge regarding Luis.

174.     Upon information and belief, the Four Unidentified MPD Officers, prior to seizing the Van, had already seen the video recording of the altercation at El Torogoz and therefore did not have probable cause to believe Mr. Mencias had committed any crime.

175.    Upon information and belief, MPD officers do not ordinarily seize property where the District of Columbia has no interest or very minimal interest in the property.

176.    Due to the Four Unidentified MPD Officers' inequitable treatment, Mr. Mencias suffered the loss of his property, which he had to replace.

### THIRD CLAIM FOR RELIEF

### Violation of the Fifth Amendment's Procedural Due Process Guarantee Pursuant to 42 U.S.C. § 1983

177.    The Fifth Amendment guarantees the right to be free from the seizure of property by the government except where such deprivation of property is accomplished by due process of law, including notice of the deprivation and a meaningful opportunity to be heard.

178.    In the context of police seizure and retention of property as evidence, due process requires that police give the owner of the seized property written notice at the time of the seizure.

179.    In the alternative, even if due process does not require police to provide written notice at the time of the seizure of evidence, due process requires written notice be provided within a timely manner after the initial seizure.

180.    In the alternative, even if due process does not require police to provide written notice at the time of the seizure of evidence, due process requires some form of notice explaining the grounds for a seizure and the procedure for challenging it.

181.    Due process requires notice to property owners that seized property is available for release.

182.    Additionally, due process requires a prompt and meaningful hearing as to the legality of the deprivation.

183.    At the time they seized the Property, the Four Unidentified MPD Officers did not provide Mr. Mencias with written notice of any kind.

184.    At no point after they seized the property did the Four Unidentified MPD Officers provide Mr. Mencias with written notice of any kind.

185.    At no point did Detective Dailey provide Mr. Mencias with written notice of any kind.

186.    At no point was Mr. Mencias provided with a meaningful opportunity to be heard as to the legality of the seizure of the Property.

187.    Even after Mr. Mencias's property was available for release, Mr. Mencias was not provided with any notice that the property was available until the January 7, 2016, conversation between counsel.

188.    By failing to provide Mr. Mencias written notice and a meaningful opportunity to be heard, the Four Unidentified MPD Officers and Detective Dailey deprived him of his Fifth Amendment guarantee of due process of law.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that this Court:

A.  Declare Defendants' seizure of Mr. Mencias's property to be unlawful;

B.  Declare Defendants' actions to violate the Fourth and Fifth Amendments to the Constitution;

C.  Award Mr. Mencias all appropriate compensatory damages;

D.  Award Mr. Mencias reasonable costs and attorneys' fees pursuant to 42 U.S.C. §

1988(b);

E.  Award Mr. Mencias all other appropriate relief, including, but not limited to,

punitive damages.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all claims presented.


/s/ Michael Kirkpatrick_____
Michael Kirkpatrick (DC Bar # 486293)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 662-9593
Fax: (202) 662-9634
Email: Michael.Kirkpatrick@law.georgetown.edu

/s/ Patrick Llewellyn_____
Patrick Llewellyn (Georgia Bar #235565)
*Admitted Pro Hac Vice*
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 661-6701
Fax: (202) 662-9634
Email: Patrick.Llewellyn@law.georgetown.edu

/s/ Dennis A. Corkery_____
Dennis A. Corkery (DC Bar # 1016991)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, Suite 400
Washington, DC 20036
Phone: (202) 319-1000
Email: Dennis_Corkery@washlaw.org

*Attorneys for Plaintiff*

Dated: January 21, 2016