## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

————————————————————————

**ERLIN EVER MENCIAS AVILA,**

        *Plaintiff,*

v.

**METROPOLITAN POLICE DETECTIVE
MATTHEW DAILEY,**

        *Defendant.*

————————————————————————

Civil No. 1:15-cv-02135

Jury Trial Demanded

## SECOND AMENDED COMPLAINT

1.    Plaintiff Erlin Ever Mencias Avila brings this action against Defendant Metropolitan Police Detective Matthew Dailey under 42 U.S.C. § 1983 seeking relief for violations of the Fourth Amendment's prohibition against unreasonable search and seizure and the Fifth Amendment's due process clause.

2.    On September 6, 2014, Mr. Mencias stopped a fight at a restaurant. To prevent further violence, Mr. Mencias drove one of the men involved in the altercation away from the scene in Mr. Mencias's work van. The individual Mr. Mencias took from the scene was a laborer Mr. Mencias had met and worked with that day and whom he knew only as "Luis." The police officers and detectives who responded to the scene of the fight, including Detective Dailey, determined that Luis may have committed an assault. Later that night, the police located Mr. Mencias's van and, on Detective Dailey's instruction, seized the van, believing that the van might contain evidence that would help them identify Luis and determine his whereabouts. Detective Dailey subsequently obtained a search warrant, searched Mr. Mencias's van, and removed the items that had evidentiary

value. Although the van and its contents had no evidentiary value following the search, the police continued to hold Mr. Mencias's van for 16 months, depriving him of the use of his van and tools, which Mr. Mencias needed for his work as a contractor. Detective Dailey refused to initiate the process for release of Mr. Mencias's van in order to pressure Mr. Mencias to provide information as to the identity and whereabouts of Luis—information that Mr. Mencias did not have.

3.      Detective Dailey failed to provide Mr. Mencias with timely or sufficient notice of the basis for the seizure of Mr. Mencias's van and its contents, or how Mr. Mencias could challenge the legality of the seizure and the retention of his van and its contents, either at the time of seizure or at any time after. The only "process" Mr. Mencias was informed of for retrieving his van was to provide information to the police that Mr. Mencias did not have. Only after this lawsuit was filed did Detective Dailey, through counsel, provide Mr. Mencias with information regarding how he could recover his van and tools.

4.      When this case was originally filed, Mr. Mencias's van and its contents had not been returned. On January 7, 2016, counsel for Detective Dailey informed counsel for Mr. Mencias that the van and its contents were available for release. On January 13, 2016, Mr. Mencias recovered his van, but many of the tools that had been in the van were either missing or damaged. During the time that his van and tools were held by the police, Mr. Mencias suffered lost income and incurred expenses to replace the seized property.

**JURISDICTION**

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3).

## PARTIES

6.      Plaintiff Erlin Ever Mencias Avila resides at 3106 Kelliher Road, Hyattsville, MD 20782.

7.      Defendant Matthew Dailey is a Detective Grade II with the Metropolitan Police Department (MPD). Detective Dailey is assigned to MPD's Fourth District.

## FACTS

8.      Mr. Mencias is a construction contractor, and his construction work provides all of his income.

9.      Mr. Mencias owns a 2001 Chevrolet Express van with Vehicle Identification Number 1GCFG15W011190192 ("the Van"), which he used daily for his contracting business.

10.     Mr. Mencias additionally used the Van to carry and transport various tools and materials for his construction work.

11.     On or about September 6, 2014, Detective Dailey instructed Officer Justin Jordan to seize the Van and the tools within it, which included at least the following: two compressors; a chop saw; electric drills; three or four jigsaws; three or four other saws; electric sanders; a power converter; a Mercury outboard motor; a toolbox with additional tools and parts for tools; plumbing tools; and a portfolio containing personal and confidential paperwork, digital video recordings, and a passport ("the Tools") (collectively, "the Property").

12.     As of the date of the original Complaint, neither Detective Dailey nor MPD had returned any of the Property.

13.     Mr. Mencias is a native Spanish-speaker. While he understands some English, his preferred language is Spanish.

**Altercation at El Torogoz**

14.     On or about September 6, 2014, Mr. Mencias went to work on a construction project as part of his business. As part of that project, he hired two day laborers, including a man who gave his name only as "Luis."

15.     Mr. Mencias worked on the construction project for the entire day with Luis, the other day laborer, and Olvin Nunez, a plumber.

16.     Following the conclusion of the work, at or around 6:30 PM, Mr. Mencias, Mr. Nunez and Luis went to El Torogoz, a restaurant located at 4231 9th Street, NW, Washington, DC 20011.

17.     After arriving at the restaurant, Mr. Mencias and Mr. Nunez became separated from Luis, with Mr. Mencias and Mr. Nunez inside the restaurant and Luis outside of it.

18.     At some point in the evening, Mr. Nunez pointed out to Mr. Mencias that Luis was involved in an altercation outside of the restaurant.

19.     After paying their tabs, Mr. Mencias and Mr. Nunez went outside the restaurant and observed Luis arguing with the owner of El Torogoz and the owner's wife, with the owner holding a hammer.

20.     Although Mr. Mencias did not see all of the altercation, Mr. Mencias did see Luis on the ground and another customer and the owner, who was now wielding a long rod, charge at Luis.

21.     Mr. Mencias ran between the attackers and Luis and held up his hands in a defensive posture to break up the fight and prevent injury to Luis. Mr. Mencias pulled Luis away from the attackers and took Luis to the Van.

22.     Some bystanders, the owner—still holding the rod—and the owner's wife followed Mr. Mencias and Luis towards the Van.

23.     Luis appeared agitated to Mr. Mencias after the altercation, but Mr. Mencias was able to put Luis in the passenger seat of the Van.

24.     After Luis was put in the passenger seat of the Van and while Mr. Mencias was walking around to the driver's side of the Van, Luis grabbed a metallic object from the Van and scraped it across the street to create sparks and scare his attackers.

25.     Mr. Mencias does not know what object Luis scraped across the ground.

26.     Mr. Mencias told Luis not to fight anymore because they had paid their bills and should just leave.

27.     Luis then re-entered the Van, and Mr. Mencias drove towards Ache Lounge, located at 441 Kennedy Street, NW, Washington, DC 20011, to separate Luis from his attackers and prevent further fighting.

28.     At no point did Mr. Mencias assault or physically engage any of Luis's attackers.

29.     While driving towards Ache Lounge, Mr. Mencias asked Luis why he had been fighting.

30.     Luis told Mr. Mencias that Luis had responded to something that the owner's wife had said in a way that upset the owner, so the owner grabbed a hammer.

31.     Mr. Mencias parked the Van near Ache Lounge.

32.     After Mr. Mencias and Luis exited the Van, Mr. Mencias and Luis separated.

33.     Luis did not tell Mr. Mencias where he was going and Mr. Mencias did not know where Luis went after their separation.

34.     Mr. Mencias stayed at Ache Lounge for approximately an hour after he and Luis separated.

### Detective Dailey Responds to El Torogoz

35.     After Mr. Mencias drove Luis away from the altercation at El Torogoz, patrol officers from MPD were called to respond.

36.     Detective Dailey and Detective William Xanten were called to El Torogoz by the patrol officers, who were completing the initial investigation.

37.     Upon arrival at El Torogoz, Detective Dailey was told that an assault had occurred and that the suspect—Luis—had chased people around with a knife and that someone was struck with a chair. Detective Dailey was also told the suspect left the scene as a passenger in a work van.

38.     Detective Dailey reviewed security camera footage inside El Torogoz with the restaurant owner.

39.     After reviewing the security camera footage, Detective Dailey was aware that Mr. Mencias had not participated in the altercation, and that Mr. Mencias's only role was breaking up the fight and removing one of the individuals from the scene.

40.     After reviewing the security camera footage, Detective Dailey assisted Detective Xanten in wrapping up interviews with witnesses.

41.     Detective Dailey and Detective Xanten returned to the Fourth District station to investigate the information witnesses had provided about the van.

42.     While at the Fourth District station, Detective Dailey and Detective Xanten were notified that the Van had been found on Kennedy Street, and they subsequently went to that location to observe the Van.

### Detective Dailey Orders the Seizure of the Van

43.     Mr. Mencias left Ache Lounge and began walking towards Georgia Avenue to get a taxi home because he had been drinking and thought he should not drive.

44.     While walking towards Georgia Avenue, Mr. Mencias was stopped by MPD officers, including Officer Jordan, at around the 800 block of Kennedy Street NW.

45.     The MPD officers questioned Mr. Mencias. Detective Dailey and Detective Xanten arrived and participated in the questioning.

46.     Mr. Mencias affirmed that the Van belonged to him.

47.     Mr. Mencias was told he was in trouble, and one of the officers attempted to arrest Mr. Mencias.

48.     Mr. Mencias backed away from the officer attempting to put Mr. Mencias in handcuffs, and Mr. Mencias was not arrested.

49.     Mr. Mencias asked the MPD officers why he was being arrested.

50.     Mr. Mencias was told that he had been involved in the altercation at El Torogoz.

51.     Specifically, Detective Dailey told Mr. Mencias that he was investigating an assault with a deadly weapon and that witnesses had seen Mr. Mencias leave with the suspect, who had been identified by the witnesses as the attacker.

52.     Mr. Mencias then explained that he had not fought anyone, but that the restaurant owner and other patrons attacked Luis, and Mr. Mencias intervened to break up the fight.

53.     The MPD officers then asked Mr. Mencias where Luis was.

54.     Mr. Mencias explained he did not know where Luis was and had no information about Luis because he had merely hired him for one day of work.

55.     While Mr. Mencias was speaking with the MPD officers, a bystander, Jose Romero, approached the MPD officers and objected to their behavior towards Mr. Mencias.

56.     Detective Dailey told Mr. Mencias that his Van was being seized.

57.     Detective Dailey made the decision to seize the Van as evidence, and directed Officer Jordan to do so.

58.     Detective Dailey told Mr. Mencias that he could get the Van back by providing information about Luis.

59.     Mr. Mencias had no additional information about Luis to provide.

60.     Neither Detective Dailey nor any other MPD officer explained to Mr. Mencias why the Van was being seized, other than to state that it was evidence.

61.     Neither Detective Dailey nor any other MPD officer told Mr. Mencias where the Van was being taken.

62.     Neither Detective Dailey nor any other MPD officer informed Mr. Mencias of the process for getting the Van back, other than by providing information about Luis.

63.     Neither Detective Dailey nor any other MPD officer provided Mr. Mencias with written notice of any kind regarding the seizure of the Van.

64.     Neither Detective Dailey nor any other MPD officer provided Mr. Mencias with contact information for themselves or MPD.

65.     At no point during this encounter did Detective Dailey or any other MPD officer ask Mr. Mencias for consent to search the Van.

66.     At no point did Detective Dailey or any other MPD officer present a warrant to Mr. Mencias for the search or seizure of the Van.

67.     At all times, Detective Dailey and the other MPD officers spoke in English to Mr. Mencias.

### Mr. Mencias's Initial Attempts to Get His Van Back

68.     On or about September 10, 2014, Mr. Mencias went to the Fourth District police station on Georgia Avenue (Georgia Avenue Station) to inquire about the Van.

69.     At the Georgia Avenue Station, Mr. Mencias was instructed to go to the Fourth District police sub-station on Park Road (Park Road Station) because the MPD officer who had seized the Van was at that station.

70.     Mr. Mencias then went to the Park Road Station, but he was told to come back the next day.

71.     On September 11, 2014, Mr. Mencias returned to the Park Road Station with Olvin Nunez to inquire about the Van.

72.     When Mr. Mencias arrived at the Park Road Station, Officer Jordan recognized Mr. Mencias.

73.     Officer Jordan asked Mr. Mencias where Luis was.

74.     Mr. Mencias truthfully responded that he still did not know where Luis was.

75.     Officer Jordan then told Mr. Mencias to follow him to the Georgia Avenue Station.

76.     This conversation with Officer Jordan was in English and was not translated into Spanish.

77.     At the Georgia Avenue Station, Mr. Mencias was interrogated by Detectives Collis Timlick and Michael Bridgett and Officers Jordan and Washington.

78.     This interrogation was videotaped.

79.     During the interrogation, Officer Washington purported to translate for Mr. Mencias, but did not always fully or accurately translate the conversation.

80.     During the interrogation, Mr. Mencias was told the Van was seized as evidence.

81.     Throughout the interrogation, Detective Timlick asked Mr. Mencias for information about Luis.

82.     Mr. Mencias explained that he did not have any additional information about Luis and had only hired Luis for the day on the day of the altercation.

83.     Mr. Mencias explained that he wanted to retrieve the Van and the Tools from MPD.

84.     Detective Timlick told Mr. Mencias that Mr. Mencias would have to provide additional information about Luis to obtain the Van or the Tools.

85.     Mr. Mencias provided all of the information he had about Luis, but neither the Van nor the Tools were returned to him.

86.     During and after the interrogation, Mr. Mencias was not provided with any information about any process for obtaining the Van or the Tools, other than being told that the Van and Tools would be returned if Mr. Mencias provided information about Luis.

87.     During and after the interrogation, Mr. Mencias was not provided with written notice of any kind regarding the seizure of the Van or how to get the Van or the Tools back.

## The Search of the Van

88.     On or about September 13, 2014, Detective Dailey spoke with Assistant United States Attorney John Giovanelli regarding obtaining a search warrant to search the Van.

89.     On September 18, 2014, Detective Dailey emailed a search warrant application to Mr. Giovanelli for the Van, including an affidavit prepared by Detective Dailey.

90.     The search warrant application requested a search warrant for the Van in order to search for personal items of Luis, clothing, mail matter, identification, and DNA evidence to assist in identifying and locating Luis.

91.     Mr. Giovanelli approved the search warrant on September 18, 2014, and sent it back to Detective Dailey.

92.     On September 19, 2014, Detective Dailey took the search warrant to the Superior Court of the District of Columbia to have the warrant approved by a judge.

93.     On that same day, a DC Superior Court Judge approved the search warrant.

94.     After having the search warrant approved, Detective Dailey made arrangements to have the Van searched.

95.     On September 23, 2014, Detective Dailey led the search of the Van.

96.     Other MPD officers participated in the search, including Officer Shymansky and Detective Savoy.

97.     In the course of the search, a knife, four beer cans, and a Honduran passport were removed from the Van.

98.     The MPD officers searched the front, passenger compartment of the Van.

99.     The MPD officers looked in the back of the Van but did not search the back of the Van because Detective Dailey knew that Luis had been in the front, passenger compartment of the Van.

100.    During the search, all items of evidentiary value were removed from the Van.

101.    Both before and after the search, none of the Tools in the back of the Van had any evidentiary value in the investigation of the alleged assault with a deadly weapon committed by Luis.

102.    After the search of the Van, none of the remaining Tools or other items in the front, passenger compartment of the Van had any evidentiary value in the investigation of the alleged assault with a deadly weapon committed by Luis.

103.    After the search of the Van, the Van did not have any evidentiary value in the investigation of the alleged assault with a deadly weapon committed by Luis.

104.    At no point did Detective Dailey or any other MPD officer contact Mr. Mencias to inform him that the Van would be or had been searched.

105.    At no point did Detective Dailey or any other MPD officer mail a copy of the search warrant to Mr. Mencias.

106.    At no point did Detective Dailey or any other MPD officer provide Mr. Mencias with a copy of the search warrant in any way.

107.    In the alternative, Detective Dailey left a copy of the search warrant in the Van while the Van was still in police custody.

108.    During the search, Detective Dailey became aware that there were valuable items in the Van.

109.    Detective Dailey did not remove the valuable items for safekeeping during or after the search of the Van.

110.    Detective Dailey did not direct any other MPD officer to remove the valuable items from the Van during or after the search of the Van.

111.    Detective Dailey never informed Officer Jordan that the search of the Van had been completed.

112.    Following the search of the Van, the Van and the Tools remained in MPD custody because Detective Dailey wanted to obtain additional information from Mr. Mencias about Luis.

**Mr. Mencias's Additional Attempts to Recover the Property Are Unsuccessful**

113.    After the interrogation on September 11, 2014, Mr. Mencias began visiting the Fourth District station about once a week to ask about the Van and the Tools.

114.    At some point, Mr. Mencias began visiting Fourth District station only about once per month, and eventually stopped visiting altogether, because he was unable to get additional information on how to retrieve the Van or the Tools.

115.    The only additional information Mr. Mencias was provided during these weekly and monthly visits was a phone number to call for information about the Van. Mr. Mencias was never able to speak with anyone at that number about retrieving the Van or the Tools.

116.    Mr. Mencias was thereafter encouraged by his friend, Jose Romero, to try again to retrieve the Van and the Tools.

117.    In either early March or late February 2015, Mr. Mencias returned to the Fourth District station with Mr. Romero.

118.   Mr. Mencias again asked for information about the Property and told the MPD officer he spoke with that he would go to court if the Property was not returned.

119.   The MPD officer told Mr. Mencias to contact Detective Dailey and gave Mr. Mencias the phone number for Detective Dailey.

120.   Mr. Mencias called Detective Dailey and left a voicemail.

121.   On or about March 3, 2015, Detective Dailey returned Mr. Mencias's call.

122.   Detective Dailey asked Mr. Mencias for information about Luis.

123.   Mr. Mencias truthfully responded that he had no additional information about Luis.

124.   Detective Dailey told Mr. Mencias that MPD could continue to hold the Van if Mr. Mencias did not provide information about Luis.

125.   Detective Dailey told Mr. Mencias that MPD could sell the Van if Mr. Mencias did not provide information about Luis.

126.   Detective Dailey told Mr. Mencias to come to the Fourth District station so that he could give him paperwork related to the recovery of the Van and the Tools.

127.   After speaking with Mr. Mencias, Detective Dailey contacted the United States Attorney's Office for the District of Columbia (DC USAO) and requested a grand jury subpoena for Mr. Mencias.

128.   On March 4, 2015, Assistant United States Attorney Christopher Bruckmann emailed a grand jury subpoena for Mr. Mencias to Detective Dailey.

129.   After Mr. Mencias's conversation with Detective Dailey, on or about March 4, 2014, Mr. Mencias went to the Fourth District station and was given the grand jury subpoena by Detective Dailey.

130.    The subpoena required that Mr. Mencias appear at 555 4th Street, NW, on March 13, 2015.

131.    Detective Dailey told Mr. Mencias that Mr. Mencias would get additional information about how to retrieve the Property at that time.

132.    On March 13, 2015, Mr. Mencias went to 555 4th Street, NW, as instructed by the subpoena.

133.    When Mr. Mencias arrived for the grand jury, he was not asked to testify or provide any additional information.

134.    Instead, Mr. Mencias was instructed to complete paperwork for the appointment of an attorney.

135.    Mr. Mencias believed the attorney was being appointed to assist Mr. Mencias in obtaining the Van and the Tools.

136.    Mr. Mencias completed the paperwork—an "Application for the Appointment of Counsel by Material Witness"—for the appointment of an attorney at 555 4th Street, NW, with the assistance of someone there. Mr. Mencias then took the completed paperwork to DC Superior Court, where he was assigned attorney John Machado.

137.    Mr. Mencias spoke with Mr. Machado once regarding his case, but Mr. Mencias was never able to contact him again.

138.    All of Mr. Mencias's communications with Detective Dailey; persons at 555 4th Street, NW; and DC Superior Court were in English and not translated into Spanish.

139.    Following March 13, 2015, at no point did Detective Dailey contact Mr. Mencias about appearing before the grand jury.

140.    Following March 13, 2015, at no point did any other MPD officer or any person from the DC USAO contact Mr. Mencias about appearing before the grand jury.

141.    Following March 13, 2015, at no point did Detective Dailey contact Mr. Mencias to request additional information from Mr. Mencias.

142.    Following March 13, 2015, at no point did any other MPD officer or any person from the DC USAO contact Mr. Mencias to request additional information from Mr. Mencias.

143.    After being unable to contact Mr. Machado for about a month, on or about April 7, 2015, Mr. Mencias returned to DC Superior Court to request the appointment of a different attorney.

144.    Mr. Mencias was never appointed a different attorney.

**Washington Lawyers' Committee Initially Unable to Recover the Van**

145.    In July 2015, on behalf of Mr. Mencias, Julia Garrison, a law student intern at the Washington Lawyers' Committee (WLC), attempted to contact AUSA Christopher Bruckmann regarding the Van and the Tools. Ms. Garrison was unable to obtain any information regarding the Van.

146.    On August 17, 2015, Evelyn Núñez, a paralegal with the WLC, attempted to contact AUSA Kara Traster regarding the Van and the Tools, but she was unable to reach Ms. Traster.

147.    On August 18, 2015, Ms. Núñez contacted Ms. Traster by phone.

148.    Ms. Traster told Ms. Núñez that the Van was being held as evidence in a criminal proceeding, but she did not explain why the Van was being held or how Mr. Mencias could recover the Van or how Mr. Mencias could challenge its seizure.

149.    Ms. Traster explained that the earliest she could reach out to Detective Dailey regarding the Van would be August 31, 2015.

150.    Ms. Traster asked Ms. Núñez to facilitate a meeting between Mr. Mencias, Mr. Machado, and the DC USAO. However, Ms. Traster never followed up on this request.

151.    Ms. Núñez attempted multiple times to contact Mr. Machado but was unable to reach him.

152.    On November 2, 2015, Ms. Núñez again contacted Ms. Traster by phone.

153.    Ms. Traster explained that the DC USAO was at a point in the case where the Van could be released.

154.    Ms. Traster told Ms. Núñez that Ms. Traster would have her supervisor send over the forms to have the Van released.

155.    Ms. Traster told Ms. Núñez to contact Detective Dailey to arrange the release of the Van.

156.    On November 4, 2015, Ms. Núñez attempted to contact Detective Dailey by phone, but was unable to reach him and left a voicemail.

157.    On November 9, 2015, Ms. Núñez attempted to contact Detective Dailey by phone, but was unable to reach him and left a voicemail.

158.    On November 19, 2015, Ms. Núñez was able to contact Detective Dailey regarding the release of the Van.

159.    Detective Dailey said that he lacked the necessary forms to release the Van.

160.    After speaking with Detective Dailey on November 19, 2015, Ms. Núñez attempted to contact Ms. Traster.

161.    Ms. Núñez was unable to reach Ms. Traster, but left a voicemail explaining that Detective Dailey had said that he did not yet have the necessary forms to release the Van.

162.    No one from the DC USAO or MPD, including Detective Dailey, contacted Ms. Núñez about the Van after November 19, 2015.

### Detective Dailey Attempts to Obtain an Arrest Warrant for Mr. Mencias Prior to Releasing the Van

163.    On November 19, 2015, Ms. Traster sent an email to Detective Dailey, informing him that the DC USAO had closed the case and asking him to send a PD 81-C form for the release of the Van.

164.    The PD 81-C form is an MPD form that is completed by an MPD member to initiate the process for releasing property seized as evidence.

165.    Although MPD presents the PD 81-C form to the DC USAO to ensure the property is not needed as evidence, MPD is the ultimate decision maker as to the disposition of the property.

166.    Detective Dailey was responsible for initiating and completing the PD 81-C form for the Van.

167.    After receiving the email from Ms. Traster requesting the PD 81-C form, Detective Dailey spoke with his supervisors about the case.

168.    Detective Dailey did not want to close the case.

169.    Detective Dailey believed that Mr. Mencias would no longer return to the police station once he had recovered the Property.

170.    Detective Dailey believed he needed leverage in order to obtain additional information about Luis from Mr. Mencias.

171.    Detective Dailey then decided to seek an arrest warrant for Mr. Mencias.

172.    On November 27, 2015, Detective Dailey emailed Mr. Giovanelli regarding Mr. Mencias.

173.    Detective Dailey said that Mr. Mencias had been "uncooperative from the start" and had "blown . . . off" the MPD. Detective Dailey further stated that Mr. Mencias was "an accessory to the crime to include obstructed justice after the fact."

174.    Along with the email, Detective Dailey attached the completed PD 81-C form for the Van and a draft arrest warrant for Mr. Mencias.

175.    On November 30, 2015, Mr. Giovanelli responded to Detective Dailey's email. Mr. Giovanelli declined the arrest warrant.

176.    At no point during this process did Detective Dailey contact Mr. Mencias or Ms. Núñez regarding the Van, including to inform either of them that the PD 81-C form had been requested, completed, and/or signed.

177.    At no point during this process did any other MPD officer or any person from the DC USAO contact Mr. Mencias or Ms. Núñez regarding the Van, including to inform either of them that the PD 81-C form had been requested, completed, and/or signed.

**Mr. Mencias Recovers the Property**

178.    On December 10, 2015, Mr. Mencias, through counsel, filed his original Complaint in this case.

179.    On January 7, 2016, counsel for Detective Dailey informed counsel for Mr. Mencias that the Van and its contents had been available for release since November 26, 2015.

180.    Until the January 7, 2016, conversation between counsel, Mr. Mencias had not received any information on how to retrieve the Property even though it had been available for release since November 26, 2015.

181.    Upon information and belief, property owners should receive notice by certified letter from MPD that property being held by MPD as evidence is available to be released.

182.    Mr. Mencias never received a letter from MPD explaining that the Property was available for release.

183.    On January 13, 2016, Mr. Mencias, along with Ms. Núñez and counsel, went to MPD's Blue Plains Impound Lot, located at 5001 Shepherd Parkway, SW, Washington, DC.

184.    Upon arrival at the Blue Plains Impound Lot, Mr. Mencias was directed by a security officer to first go to the MPD's nearby office located at 17 DC Village Lane, SW, Washington, DC.

185.    At the 17 DC Village Lane Office, Mr. Mencias, through counsel, requested the officers present, Susie Smith and Mike Sutton, process the release of the Van.

186.    Ms. Smith and Mr. Sutton searched for the Property in their system by using Mr. Mencias's name but were unable to identify any property held under his name.

187.    Counsel for Mr. Mencias then presented Ms. Smith and Mr. Sutton with a completed PD 81-C form regarding the release of the Van that had been sent by counsel for Detective Dailey.

188.    Ms. Smith and Mr. Sutton were then able to locate the Van in their system using the "Register Number" on the PD 81-C form.

189.    Upon information and belief, property owners whose property has been seized as evidence do not ordinarily receive the "Register Number" or the PD 81-C from MPD.

190.    After locating the Van in their system, Ms. Smith and Mr. Sutton asked Mr. Mencias if his registration was current. Mr. Mencias responded that it was not current as he had not had possession of the Van for over a year.

191.    Ms. Smith and Mr. Sutton informed Mr. Mencias that he could not drive the Van out of the impound lot without current registration and would need to have the Van towed.

192.    Mr. Mencias returned to the Blue Plains Impound Lot and subsequently arranged and paid for the Van to be towed from the Blue Plains Impound Lot.

193.    Upon inspection, Mr. Mencias ascertained that the Van contained the majority of the Tools. The missing Tools included at least one bag of approximately seventy mechanics tools and one car jack.

194.    Counsel for Detective Dailey represented to counsel for Mr. Mencias that the MPD is no longer holding as evidence any items from the Van other than the knife, four beer cans, and passport removed during the search on September 23, 2014.

195.    Approximately sixteen months passed between the initial seizure of the Property and Mr. Mencias's recovery of the Property.

196.    Over fifteen months passed between the search of the Van and Mr. Mencias's recovery of the Property.

**Damages**

197.    Mr. Mencias has incurred significant costs because of the seizure of the Property.

198.    Prior to their seizure, Mr. Mencias used the Van and the Tools daily in his construction work.

199.    After their seizure, Mr. Mencias was forced to buy replacement tools at a substantial cost in order to maintain his business.

200.    After the seizure, Mr. Mencias was forced to rent a replacement van to maintain his business. He rented a replacement van for two weeks, at a substantial cost.

201.    Eventually, Mr. Mencias was forced to buy a replacement van, at a substantial cost.

202.    Mr. Mencias was required to pay to tow the Van from the Blue Plains Impound Lot.

203.    The Van incurred damage as a result of the initial seizure and/or during the MPD's retention of the Property. The damage to the Van includes but is not limited to rain damage to the interior of the Van; unusable battery, alternator, and start motor; blown rear tires; internal cooling system damage; broken ignition switch; and damaged doors.

204.    Some of the Tools were damaged by the initial seizure and/or during the MPD's retention of the Property. The damaged Tools include but are not limited to two packets of electric drills, two framing pistols, a table saw, and a chop saw.

205.    The Tools that were stolen and/or lost during the initial seizure and/or during the MPD's retention of the property include at least one bag of approximately seventy mechanics tools and one car jack.

206.    Because of the seizure and retention of his Property, Mr. Mencias incurred a substantial loss of income.

**FIRST CLAIM FOR RELIEF**

**<u>Violation of the Fourth Amendment Protection Against Unreasonable Seizure</u>**

**<u>Pursuant to 42 U.S.C. § 1983</u>**

207.   The Fourth Amendment prohibits "unreasonable searches and seizures of property by the government."

208.   A seizure that is lawful at its inception may nevertheless violate the Fourth Amendment if the manner of its execution or its duration unreasonably infringes the possessory interests protected by the Fourth Amendment.

209.   Mr. Mencias has a strong possessory interest in the Van and the Tools as they are necessary to perform his job.

210.   Mr. Mencias has continually asserted his possessory interest by speaking with Detective Dailey and other MPD officers on multiple occasions about returning his Property.

211.   Detective Dailey effected a complete infringement on this possessory interest by completely denying Mr. Mencias the use of his Property for over a year.

212.   The only reason for the seizure of the Van was to investigate the alleged assault with a deadly weapon committed by Luis. Specifically, the Van was seized to search for evidence in the Van that would identify the suspect, Luis.

213.   Even if Detective Dailey had probable cause to seize the Van, the probable cause was limited to searching for items involved in the alleged assault with a deadly weapon and that would aid in the identification of Luis.

214.    Following the search of the Van on September 23, 2014, neither the Van nor any of the Property remaining in the Van had any evidentiary value in the investigation of the alleged assault with a deadly weapon.

215.    Following the search of the Van on September 23, 2014, the continued retention of the Property became unreasonable.

216.    MPD is the custodian of property seized by MPD.

217.    The MPD member leading an investigation drives the decision on when to release property.

218.    Under MPD policy, practice, and procedure, the MPD member in charge of the investigation initiates the completion of the PD 81-C form for the release of property.

219.    The MPD member leading an investigation presents the PD 81-C form to the DC USAO to ensure that the property is not needed as evidence, but the MPD is the ultimate decision maker as to the disposition of the property.

220.    Detective Dailey was in charge of the investigation into the alleged assault with a deadly weapon committed by Luis.

221.    At no point did Detective Dailey affirmatively seek authorization to release the Property.

222.    Detective Dailey initiated the process for releasing the Property because he was asked to do so by the DC USAO when the DC USAO informed Detective Dailey that it had closed the case.

223.    Following the search of the Van, no legitimate interest justified the continued retention of the Property.

224.    Detective Dailey failed to initiate the process for returning the Property to Mr. Mencias in order to hold the Property as leverage to obtain information from Mr. Mencias.

225.    By retaining the Property and failing to take any action to effectuate the release of the Property for over 15 months after the Property ceased to have evidentiary value, Detective Dailey violated Mr. Mencias's right to be free from unreasonable seizures.

226.    By retaining the Property and failing to take any action to release the Property after being informed that the DC USAO had closed the case, Detective Dailey violated Mr. Mencias's right to be free from unreasonable seizures.

227.    The deprivation of this right was under the color of state law as it was performed by a state agent acting in his official capacity.

## SECOND CLAIM FOR RELIEF

### Violation of the Fifth Amendment's Procedural Due Process Guarantee Pursuant to 42 U.S.C. § 1983

228.    The Fifth Amendment guarantees the right to be free from the seizure of property by the government except where such deprivation of property is accomplished by due process of law, including notice of the deprivation and a meaningful opportunity to be heard.

229.    In the context of police seizure and retention of property as evidence, due process requires that police give the owner of the seized property written notice at the time of the seizure.

230.    In the alternative, even if due process does not require police to provide written notice at the time of the seizure of evidence, due process requires written notice be provided within a timely manner after the initial seizure.

231.    In the alternative, even if due process does not require police to provide written notice at the time of the seizure of evidence, due process requires some form of notice explaining the grounds for a seizure and the procedure for challenging the seizure.

232.    Due process requires notice to property owners that seized property is available for release.

233.    Additionally, due process requires a prompt and meaningful hearing as to the legality of the deprivation.

234.    On September 6, 2014, the date when Detective Dailey directed the seizure of the Property, Detective Dailey did not provide Mr. Mencias with any notice regarding the reason for the seizure of the Property, where the Property was being taken, or the process for challenging the seizure or obtaining the Property.

235.    On September 6, 2014, the date when Detective Dailey directed the seizure of the Property, no MPD member provided Mr. Mencias with any notice regarding the reason for the seizure of the Property—other than to state it was evidence—where the Property was being taken, or the process for challenging the seizure or obtaining the Property.

236.    On September 11, 2014, the date when Mr. Mencias was interrogated by MPD officers and detectives, Mr. Mencias was not provided with any notice regarding the process for challenging the seizure or obtaining the Property.

237.    At no point did Detective Dailey provide Mr. Mencias with notice of any kind that the Van had been searched pursuant to a search warrant, except through discovery in this lawsuit.

238.    At no point did any MPD member provide Mr. Mencias with notice of any kind that the Van had been searched pursuant to a search warrant, except through discovery in this lawsuit.

239.    At no point did Detective Dailey provide Mr. Mencias with notice of any kind that items had been removed from the Van during the search, except through discovery in this lawsuit.

240.    At no point did any MPD member provide Mr. Mencias with notice of any kind that items had been removed from the Van during the search, except through discovery in this lawsuit.

241.    Even if a copy of the search warrant was left in the Van, such action was not reasonably calculated to apprise Mr. Mencias of the search.

242.    At no point prior to the conversation between counsel on January 7, 2016, did Detective Dailey provide Mr. Mencias with notice of any kind that the DC USAO had closed the case and had consented to the release of the Property.

243.    At no point prior to the conversation between counsel on January 7, 2016, did any MPD member provide Mr. Mencias with notice of any kind that the DC USAO had closed the case and had consented to the release of the Property.

244.    At no point was Mr. Mencias provided with a meaningful opportunity to be heard as to the legality of the seizure of the Property.

245.    The only "process" Mr. Mencias was informed of by Detective Dailey and other MPD members for obtaining the Property was by providing additional information about Luis. This is not the correct "process" for the return of property seized as evidence.

246.    By failing to provide Mr. Mencias any notice regarding the proper process for obtaining his property, providing false information to Mr. Mencias about the "process" for obtaining the Property, failing to provide written notice of any kind to Mr. Mencias, and failing to provide Mr. Mencias with a meaningful opportunity to be heard, Detective Dailey deprived him of his Fifth Amendment guarantee of due process of law.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that this Court:

A.  Declare the retention and continued seizure of Mr. Mencias's property after the search of the Van to be unlawful;

B.  Declare Defendant's actions to violate the Fourth and Fifth Amendments to the Constitution;

C.  Award Mr. Mencias all appropriate compensatory damages;

D.  Award Mr. Mencias reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b);

E.  Award Mr. Mencias all other appropriate relief, including, but not limited to, punitive damages.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all claims presented.

/s/ Michael Kirkpatrick
Michael Kirkpatrick (DC Bar # 486293)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 662-9593
Fax: (202) 662-9634
Email: Michael.Kirkpatrick@law.georgetown.edu

/s/ Patrick Llewellyn
Patrick Llewellyn (Georgia Bar #235565)
*Admitted Pro Hac Vice*
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 661-6701
Fax: (202) 662-9634
Email: Patrick.Llewellyn@law.georgetown.edu

/s/ Dennis A. Corkery
Dennis A. Corkery (DC Bar # 1016991)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, Suite 400
Washington, DC 20036
Phone: (202) 319-1000
Email: Dennis_Corkery@washlaw.org

*Attorneys for Plaintiff*

Dated: May 23, 2016