## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ERLIN EVER MENCIAS AVILA,**

        Plaintiff,

v.

**MATTHEW DAILEY,**

        Defendant.

Civil No. 1:15-cv-02135-TSC

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Erlin Ever Mencias Avila moves for partial summary judgment on his claim under 42 U.S.C. § 1983 based on violation of his Fourth Amendment rights. Specifically, Mr. Mencias moves for summary judgment on the issue of Defendant Matthew Dailey's liability under § 1983 for violating Mr. Mencias's right to be free from unreasonable seizures under the Fourth Amendment. Attached with this motion are a memorandum of points and authorities in support of the motion, a statement of undisputed material facts, supporting declaration, exhibits, and a proposed order.

Respectfully submitted,

/s/ Patrick Llewellyn
Patrick Llewellyn (DC Bar No. 1033296)
*Admitted Pro Hac Vice*[1]
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Phone: (202) 661-6701
Fax: (202) 662-9634
Email: Patrick.Llewellyn@law.georgetown.edu

---

[1] Mr. Llewellyn became a member of the DC Bar on July 8, 2016, and his application for admission to this Court is pending.

/s/ Michael T. Kirkpatrick
Michael T. Kirkpatrick (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
Phone: (202) 588-7728
Fax: (202) 588-7795
Email: mkikrpatrick@citizen.org

/s/ Dennis A. Corkery
Dennis A. Corkery (D.C. Bar No. 1016991)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, Suite 400
Washington, DC 20036
Phone: (202) 319-1000
Email: Dennis_Corkery@washlaw.org

*Attorneys for Plaintiff*

August 12, 2016

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ERLIN EVER MENCIAS AVILA,**

      Plaintiff,

v.

                               Civil No. 1:15-cv-02135-TSC

**MATTHEW DAILEY,**

      Defendant.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Supreme Court has recognized that "a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons." *Segura v. United States*, 468 U.S. 796, 812 (1984) (citing *United States v. Place*, 462 U.S. 696 (1983)). That is what happened here. After Plaintiff Erlin Ever Mencias Avila (Mr. Mencias) broke up a fight and drove one of the participants from the scene to prevent further violence, Defendant Matthew Dailey (Det. Dailey) seized Mr. Mencias's work van and the tools inside and held them until he could obtain a warrant and search the van for evidence as to the identity of the individual who had been a passenger in the van. Det. Dailey obtained a warrant, searched the van, and removed the items of evidentiary value. From that point forward, Det. Dailey no longer had probable cause to seize the van and tools, but he failed to release Mr. Mencias's property—which Mr. Mencias desperately needed for his work as a home improvement contractor—for over 15 months. Because probable cause dissipated following the search, and Det. Dailey had no legitimate reason to continue his seizure of Mr. Mencias's van and tools, and any government interest in retaining the van and tools was outweighed by Mr.

Mencias's possessory interest, the seizure became unreasonable and violated Mr. Mencias's Fourth Amendment rights.

There is no genuine dispute as to any material fact regarding Mr. Mencias's Fourth Amendment claim and he is entitled to judgment as a matter of law. Thus, Mr. Mencias moves for partial summary judgment as to Det. Dailey's liability under § 1983 for violating Mr. Mencias's Fourth Amendment rights by subjecting him to an unreasonable 15-month seizure of his van and tools. For the reasons explained below, the Court should enter judgment in favor of Mr. Mencias on his Fourth Amendment claim and proceed to trial to determine his damages.[1]

## BACKGROUND

Mr. Mencias is a home improvement contractor. Plaintiff's Statement of Undisputed Material Facts (Undisputed Facts) ¶ 1. On September 6, 2014, Mr. Mencias was working on a project at 3913 Blaine Street NE, Washington, DC. Mr. Mencias was excavating the basement by removing dirt to install drainage pipes, and bringing in gravel. Undisputed Facts ¶ 2. Mr. Mencias was assisted by three other workers: a plumber named Olvin Nuñez, and two day laborers Mr. Mencias had hired that morning in the parking lot of a Home Depot. Undisputed Facts ¶ 3. One of the day laborers called the other "Luis." Undisputed Facts ¶ 4. Mr. Mencias does not recall the name of the other worker. Mr. Mencias had not previously met or worked with either of the day laborers. Undisputed Facts ¶ 4.

---

[1] Mr. Mencias has also brought a claim under § 1983 for violation of his due process rights under the Fifth Amendment because he was never provided the information he would have needed to seek release of his van and tools and was, in fact, misinformed as to what he needed to do to get his property back. Mr. Mencias does not move for summary judgment on his due process claim because there are fact disputes that may preclude summary judgment. For example, Mr. Mencias's due process claim is premised in part on improper notice, and there are disputes regarding what Mr. Mencias was told and when. Further, should the Court grant summary judgment to Mr. Mencias on his Fourth Amendment claim, the Court would not need to reach the due process claim.

After work, Mr. Mencias, Mr. Nuñez, Luis, and the other day laborer left the worksite in Mr. Mencias's van. Undisputed Facts ¶ 5. Mr. Mencias dropped off the other day laborer at the Georgia Avenue/Petworth Metro station, and Mr. Mencias, Mr. Nuñez, and Luis went to El Torogoz Restaurant at 4231 9th Street, NW, Washington, DC. Undisputed Facts ¶ 5. Mr. Mencias parked his van in front of the restaurant, and he and Mr. Nuñez and Luis went inside. Undisputed Facts ¶ 6. At some point that evening, Luis went outside to the patio area in front of the restaurant while Mr. Mencias and Mr. Nuñez remained inside. Undisputed Facts ¶ 6.

While Mr. Mencias and Mr. Nuñez were inside El Torogoz, there was an altercation outside the restaurant involving Luis and the restaurant's owner, the owner's wife, other restaurant staff, and customers. Undisputed Facts ¶ 7. Luis is alleged to have brandished a knife, and security camera footage of the incident shows Luis throwing a stanchion and a chair, with the latter striking a customer. Undisputed Facts ¶ 8. The security camera footage also shows the owner of the restaurant holding a hammer, and later a metal rod as he charges at Luis. Undisputed Facts ¶ 9.

When Mr. Mencias realized that there was a fight outside the restaurant involving Luis, he rushed outside. Undisputed Facts ¶ 10. The first thing Mr. Mencias recalls seeing is Luis on the ground with a group of about six individuals approaching Luis in a menacing fashion. Undisputed Facts ¶ 11. Mr. Mencias jumped in between Luis and the approaching group in an effort to stop the fight and prevent any further violence. Undisputed Facts ¶ 12. Mr. Mencias raised his hands in a defensive posture and told the crowd: "Hey, don't fight. This is over." Undisputed Facts ¶ 12. Luis was agitated and wanted to continue fighting, but Mr. Mencias ushered Luis into his van and told him to stop fighting. Undisputed Facts ¶ 13. Mr. Mencias then went around to the driver's side of his van and got in, but Luis got out of the passenger seat of

the van with a metal object and scraped it across the sidewalk to create sparks. Undisputed Facts ¶ 13. At the time, Mr. Mencias did not know what metallic object Luis had scraped across the sidewalk, but he later surmised that it was either a nail remover or electrical pliers. Undisputed Facts ¶ 14. After scraping the tool across the sidewalk, Luis got back in the van, and Mr. Mencias drove Luis away from the scene to prevent further violence. Undisputed Facts ¶ 15. Mr. Mencias believed that Luis would have been seriously injured had he not intervened. Undisputed Facts ¶ 16.

Mr. Mencias drove to the 400 block of Kennedy Street, NW, and parked his van near Ache Lounge, 441 Kennedy Street NW. Undisputed Facts ¶ 17. During the drive, Mr. Mencias asked Luis what had caused the fight, and Luis stated that he had argued with the owner and the owner's wife and that the owner had assaulted him because the owner was offended by something Luis had said to the owner's wife. Undisputed Facts ¶ 18. Mr. Mencias and Luis parted ways, and Mr. Mencias entered Ache Lounge. Undisputed Facts ¶¶ 19–20.

Officers from the Metropolitan Police Department of the District of Columbia (MPD) went to El Torogoz in response to reports of a fight, arriving after Mr. Mencias had stopped the fight and removed Luis from the scene. Undisputed Facts ¶ 21. MPD Officer Richard Geiger was the responding officer, and he was accompanied by Officer Justin Jordan. Undisputed Facts ¶ 22. They conducted initial interviews of the witnesses at El Torogoz and reviewed security camera footage. Undisputed Facts ¶ 23. They concluded that Luis was a suspect in an assault with a deadly weapon, and Officer Geiger radioed officers throughout the Fourth District to be on the lookout for a van matching the description of Mr. Mencias's van that witnesses had provided to Officer Geiger. Undisputed Facts ¶ 23.

MPD Detectives Matthew Dailey and William Xanten responded to El Torogoz, and took over the investigation from Officers Geiger and Jordan. Undisputed Facts ¶ 24. Det. Dailey was the lead detective on the case. Undisputed Facts ¶ 25. Detectives Dailey and Xanten interviewed the witnesses at El Torogoz and reviewed the security camera footage. Undisputed Facts ¶ 26.

Later that evening, an MPD officer observed Mr. Mencias's van, parked and unoccupied, in the 400 block of Kennedy Street, NW. Undisputed Facts ¶ 27. Officer Jordan and Detectives Dailey and Xanten went to that location and observed the van. Undisputed Facts ¶ 28. They did not enter or search the van but looked inside through the windows. Undisputed Facts ¶ 29. Having concluded that the suspect in the incident at El Torogoz had been a passenger in the van, Det. Dailey decided to seize the van so that it could later be searched for evidence to help identify the suspect. Undisputed Facts ¶ 30.

Before Mr. Mencias's van was seized and towed from the scene, Mr. Mencias left Ache Lounge and walked on Kennedy Street NW towards Georgia Avenue. Undisputed Facts ¶ 31. Mr. Mencias intended to hail a taxi on Georgia Avenue to take him home. Undisputed Facts ¶ 32. He did not go to his van after he left Ache Lounge because he had been drinking and decided that he should not drive. Undisputed Facts ¶ 32. Approximately four MPD members,[2] including Officer Jordan and Detectives Dailey and Xanten, questioned Mr. Mencias in the 800 block of Kennedy Street, NW, regarding the incident at El Torogoz and the identity of Mr. Mencias's passenger. Undisputed Facts ¶ 33. Mr. Mencias explained that he had not been involved in the fight, but had stopped the fight and removed Luis from the scene to prevent further violence or injury. Undisputed Facts ¶ 34. The MPD members questioned Mr. Mencias regarding the

---

[2] MPD "member" refers to a "sworn or civilian MPD employee or MPD Reserve Corps Member" and is the term generally used by MPD to refer to its employees. Metropolitan Police Department General Order 201.26, attached as Exhibit J at 2.

identity and whereabouts of Luis, but Mr. Mencias did not have the requested information. Undisputed Facts ¶ 35. The MPD members told Mr. Mencias that his van was going to be towed. Undisputed Facts ¶ 36. Mr. Mencias protested, and the police informed Mr. Mencias that he might avoid having his van towed, or get it back sooner, if he provided information that would help the police apprehend Luis. Undisputed Facts ¶ 37. Mr. Mencias did not have the requested information, and Det. Dailey, having concluded that Mr. Mencias was uncooperative, had the van towed to the Fourth District impound lot. Undisputed Facts ¶ 38.

Officer Jordan was the seizing officer, but he seized the van at Det. Dailey's direction. Undisputed Facts ¶ 39. Officer Jordan completed a PD Form 81, indicating that the van had been seized as evidence. Undisputed Facts ¶ 40. Officer Jordan also made an entry in the Fourth District property book. Undisputed Facts ¶ 40. Mr. Mencias was not provided with any documents related to the seizure of his van and tools. Undisputed Facts ¶ 41. Mr. Mencias was not provided with a receipt, or a case number, or any written information about the process for recovering his property. Undisputed Facts ¶ 41. At the time the van was seized, it was Mr. Mencias's only vehicle for both work and personal purposes. Undisputed Facts ¶ 42. The van also contained numerous tools that Mr. Mencias used in his contracting business. Undisputed Facts ¶ 43.

Det. Xanten made an entry in the Fourth District property book asking to be contacted if Mr. Mencias visited the Fourth District to inquire about his van and tools. Undisputed Facts ¶ 44. Detectives Dailey and Xanten knew that that there were a lot of tools in the van that were valuable and would be costly to replace, and which Mr. Mencias needed for his work. Undisputed Facts ¶ 45. Thus, Detectives Dailey and Xanten thought that Mr. Mencias would come to the Fourth District to see about getting his van back, and perhaps talk to the detectives

about the identity of the passenger in his van. Undisputed Facts ¶ 46. According to Det. Xanten, he and Det. Dailey had a plan to use Mr. Mencias's expected inquiry about his van as an opportunity to seek information about the identity and whereabouts of their suspect in the incident at El Torogoz. Undisputed Facts ¶ 47.

As expected, beginning soon after the seizure of his van, Mr. Mencias visited the Fourth District station and the Park Road substation to inquire about the return of his van and tools. Undisputed Facts ¶ 48. Mr. Mencias was not provided with any specific information regarding his van and tools until September 11, 2014. On September 11, 2014, Mr. Mencias encountered Officer Jordan at the Park Road substation and inquired about his van. Undisputed Facts ¶ 49. Officer Jordan instructed Mr. Mencias to meet him at the Fourth District station. Undisputed Facts ¶ 49. At the Fourth District station, Mr. Mencias was interviewed by MPD Detectives Collis Timlick and Michael Bridgett, and Officer Jordan. Undisputed Facts ¶ 50. Officer Washington was also present and served as a Spanish-language interpreter for some of the questions and answers. Undisputed Facts ¶ 50. The interview was videotaped. Undisputed Facts ¶ 50.

The goal of the interview was to obtain information as to the identity of the individual that Mr. Mencias drove away from the incident at El Torogoz. Undisputed Facts ¶ 51. During the interview, Det. Timlick told Mr. Mencias that his van and tools would be released if Mr. Mencias provided information that would lead the police to Luis. Undisputed Facts ¶ 52. Officer Jordan emphasized that the way for Mr. Mencias to get his van back was to provide information about Luis's identity or whereabouts. Undisputed Facts ¶ 53. Mr. Mencias explained that he had no such information. Undisputed Facts ¶ 54.

On September 23, 2014, Det. Dailey searched Mr. Mencias's van pursuant to a search warrant. Undisputed Facts ¶ 55. On the search warrant affidavit, Det. Dailey stated that he had probable cause to believe Mr. Mencias's van contained evidence that would assist MPD in identifying and locating the suspect in the incident at El Torogoz. Undisputed Facts ¶ 56. Specifically, Det. Dailey sought to search the van for a knife, personal items of Luis, clothing, mail matter, identification, and DNA evidence that would assist in identifying and locating Luis. Undisputed Facts ¶ 56. During the search, Det. Dailey found and removed 1 passport, 4 beer cans, and 1 knife. Undisputed Facts ¶ 57. The passport bore the name "Josue Nahun Diaz Matute." Undisputed Facts ¶ 58. MPD retains the items removed from Mr. Mencias's van during the search of September 23, 2014. Undisputed Facts ¶ 59. After the search of September 23, 2014, Mr. Mencias's van was not searched again. Det. Dailey admits that, following the search of the van and removal of the passport, beer cans, and knife, he does not know what evidentiary value the remaining items in Plaintiff's van had. Undisputed Facts ¶ 60.

Following the search of September 23, 2014, and the removal of the items of evidentiary value, Det. Dailey did not initiate the process for releasing Mr. Mencias's property. Undisputed Facts ¶ 61. As explained by the United States Attorney's Office for the District of Columbia (USAO-DC):

> MPD determines all dispositions of property that they seize during any investigation. The USAO-DC has no authority to dispose of and/or retain property seized. This authority rests solely with MPD. When MPD makes the decision to release seized property, they will present an MPD Form 81c to a supervisor in our office to sign indicating that the USAO-DC has no objection to that release and that said property is not needed to be retained as evidence.

Declaration of USAO-DC, attached to Undisputed Facts as Exhibit B. Thus, although MPD members are required to consult with the USAO-DC before releasing property, it is the MPD that initiates the process by completing the PD Form 81-C and sending it to the USAO-DC for sign-off.

8

Undisputed Facts ¶ 71. Det. Dailey admits that when property has been seized as evidence to allow for a search and the search is concluded, MPD fills out a PD Form 81-C and sends it to the USAO-DC for sign-off, but Det. Dailey did not do so in this case because he wanted to speak with Mr. Mencias before releasing the van and tools. Undisputed Facts ¶¶ 72–73. Det. Dailey did not request the USAO-DC sign-off to release Mr. Mencias's van and tools until more than a year later, in late November 2015. Undisputed Facts ¶¶ 73, 90.

Mr. Mencias continued to contact the Fourth District police station from time to time to inquire about the process for recovering his van, but his efforts were futile. Undisputed Facts ¶ 74. At some point, Mr. Mencias was given a telephone number to call to inquire about his van, but when he tried to call he encountered an automatic answering system, was placed on hold, and was never able to speak to anyone about retrieving his property. Undisputed Facts ¶ 75. Det. Dailey had no communication with Mr. Mencias during October 2014 through February 2015. Undisputed Facts ¶ 76. Although the case remained open, there was little activity. Undisputed Facts ¶ 77.

On or about March 3, 2015, Mr. Mencias left a voice message for Det. Dailey inquiring about his van. Undisputed Facts ¶ 78. Det. Dailey returned the call and spoke to Mr. Mencias, again asking for information about the identity and whereabouts of Luis. Undisputed Facts ¶ 79. Mr. Mencias again told Det. Dailey that he did not have such information. Undisputed Facts ¶ 79. During this conversation, Det. Dailey asked Mr. Mencias to come to the Fourth District station. Undisputed Facts ¶ 80. Mr. Mencias did so, and was served with a subpoena to appear before a grand jury on March 13, 2015. Undisputed Facts ¶ 80. Mr. Mencias appeared as instructed at 555 4th Street, NW, and was assisted with filling out an application for appointment of counsel, which he was directed to submit at 500 Indiana Avenue, NW. Undisputed Facts ¶ 81.

Attorney John Machado was appointed to represent Mr. Mencias, but after Mr. Mencias spoke to Mr. Machado by telephone, he did not hear from Mr. Machado again, and Mr. Mencias was never asked to return to testify before the grand jury. Undisputed Facts ¶ 82. Following his appearance at 555 4th Street NW on March 13, 2015, Mr. Mencias did not receive any additional communications from Det. Dailey or anyone else at MPD regarding his van and tools or the investigation regarding Luis, except through his representatives at the Washington Lawyers' Committee for Civil Rights and Urban Affairs (WLC) and undersigned counsel. Undisputed Facts ¶ 84.

Mr. Mencias's representatives from the WLC contacted Det. Dailey in November 2015 to request the return of Mr. Mencias's property. Undisputed Facts ¶ 85. Det. Dailey referred Mr. Mencias's representatives to the USAO-DC. Undisputed Facts ¶ 85. On November 19, 2015, AUSA Kara Traster informed Det. Dailey that the case was closed and requested that Det. Dailey initiate the process for releasing Mr. Mencias's van by preparing a PD Form 81-C. Undisputed Facts ¶ 86. Det. Dailey did so, but despite having been told that the case was closed, Det. Dailey sought to persuade the USAO to seek a warrant for Mr. Mencias's arrest, explaining that Mr. Mencias was Det. Dailey's "only avenue at identifying the suspect in this case." Undisputed Facts ¶¶ 87–88, 90. The USAO declined to seek an arrest warrant. Undisputed Facts ¶ 89. On November 26, 2015, Det. Dailey prepared the PD Form 81-C. Undisputed Facts ¶ 90. He sent it to the USAO to sign-off confirming that it did not object to MPD's release of Mr. Mencias's property, and the USAO promptly did so. Undisputed Facts ¶ 90. Despite the property being available for release as of about November 26, 2015, Det. Dailey took no action to inform Mr. Mencias that his property was available. Undisputed Facts ¶¶ 91, 93. Rather, Mr. Mencias

learned that his property was available for release on January 7, 2016, after this lawsuit was filed, when Det. Dailey's counsel informed Mr. Mencias's counsel. Undisputed Facts ¶ 94.

On January 13, 2016, Mr. Mencias retrieved his van from MPD's Blue Plains Impound Lot and had it towed to his home. The van was in poor condition and many of Mr. Mencias's tools were missing or damaged. Undisputed Facts ¶ 95.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law." *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006). A dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). The Court "must view all of the evidence in the light most favorable to the nonmoving party." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

## ARGUMENT

**Detective Dailey Violated Mr. Mencias's Fourth Amendment Right to Be Free from Unreasonable Seizures While Acting Under Color of State Law.**

Section 1983 provides "a remedy for the deprivation of federal constitutional and statutory rights by any person under color of state law." *DuBerry v. Dist. of Columbia*, --- F.3d ----, No. 15-7062, 2016 WL 3125217, at *3 (D.C. Cir. June 3, 2016). Section 1983 does not provide substantive rights but rather "a method of vindicating federal rights elsewhere conferred." *Davis v. Dist. of Columbia*, 800 F. Supp. 2d 28, 32 (D.D.C. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). As such, there are two elements of a § 1983 claim: (1) deprivation of

a right provided by federal law (2) by a person acting under color of state law, which includes the District of Columbia. *Jackson v. Ponds*, 534 F. Supp. 2d 29, 31 (D.D.C. 2008).

Det. Dailey violated Mr. Mencias's Fourth Amendment rights while acting under color of state law by continuing his seizure of Mr. Mencias's van and tools after probable cause had dissipated. Although Det. Dailey's initial seizure of the van may have been reasonable, the retention of the van and tools for 15 months following the search of the van and the removal of the items of evidentiary value rendered the seizure unreasonable. Because Det. Dailey was responsible for initiating the process to release the van and tools and failed to do so until November 2015, he is directly responsible for the unreasonable seizure of the van and tools.

A. Detective Dailey's seizure of the van and tools became unreasonable in violation of the Fourth Amendment following the search of the van.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. For Fourth Amendment purposes, a seizure "occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Miller*, 799 F.3d 1097, 1102 (D.C. Cir. 2015) (emphasis omitted) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Additionally, a warrantless seizure "must be predicated on particularized probable cause." *Barham v. Ramsey*. 434 F.3d 565, 573 (D.C. Cir. 2006).

As the Supreme Court has made clear, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 134 S. Ct. 2473, 2482 (2014). To determine whether a seizure is reasonable, a court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Johnson v. Dist. of Columbia*, 528 F.3d 969, 974 (D.C. Cir. 2008) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). Further,

the Fourth Amendment requires an objective assessment of the "reasonableness" of a seizure. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011). "Of course, a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons." *Segura v. United States*, 468 U.S. 796, 812 (1984) (citing *Place*, 462 U.S. 696); *see also Jacobsen*, 466 U.S. at 124 ("[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'").

There can be no question that Mr. Mencias has a strong possessory interest in his van and tools, and that the seizure interfered with that interest. In other contexts, courts in this district have noted persons' tremendous possessory interests in their vehicles given that it is often their "most valuable possession, as well as his or her primary mode of transportation, and for some, the means to earn a livelihood." *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 100–01 (D.D.C. 2012) (internal quotation marks omitted). Uncontroverted evidence supports all of these conclusions as it regards Mr. Mencias's possessory interest in the van: the van was the only vehicle he owned when it was seized, he used the van to practice his trade, and he relied on his home improvement contracting work for his livelihood. Undisputed Facts ¶¶ 1, 42. Further, Mr. Mencias needed the tools in the van to do his job.

Mr. Mencias concedes that it was likely reasonable for Det. Dailey to seize the van the night of the incident and hold it until a search warrant could be obtained and a search conducted. Det. Dailey had information indicating that an unidentified passenger in the van might have committed a crime. Thus, Det. Dailey likely had probable cause to search the van because there was "a fair probability" that it contained evidence as to the identity of the suspect. *United States v. Grubbs*, 547 U.S. 90, 94 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Thus, it

13

was reasonable to seize the van and hold it until it could be searched. *See Florida v. White*, 526 U.S. 559, 563–65 (1999), *Chambers v. Maroney*, 399 U.S. 42, 51–52 (1970).

On September 23, 2014, Det. Dailey searched the van for any evidence as to the identity and whereabouts of his suspect. Undisputed Facts ¶¶ 55–56. During the search, Det. Dailey removed the items of evidentiary value and MPD retains them to this day. Undisputed Facts ¶¶ 57, 59. Following the removal of those items, neither the van nor the tools had any evidentiary value. Indeed, Det. Dailey has been unable to articulate any legitimate reason for continuing the seizure of the van and tools following the search. Undisputed Facts ¶ 60. Thus, as of September 23, 2014, Det. Dailey's seizure became unreasonable because Mr. Mencias's strong possessory interest in the van and tools far outweighed any minimal government interest in continuing the seizure. *Cf. Jacobsen*, 466 U.S. at 125 (applying the balancing the test and concluding strong government interest in obtaining powder believed to be cocaine justified destruction of small amount of powder given the "*de minimis* impact" of such action on owner's possessory interest). The mere possibility of evidence being found in the van at some point in the future does not establish "a fair probability that . . . evidence of a crime [would] be found in [that] particular place." *Grubbs*, 547 U.S. at 94 (quoting *Gates*, 462 U.S. at 238). Det. Dailey had his opportunity to search the van and seize the items of evidentiary value, and it was unreasonable to continue the seizure once the search had been completed.

Moreover, even if the seizure of the van and tools did not become unreasonable immediately following the search of the van and the removal of all items of evidentiary value, the seizure became unreasonable "as a result of its duration." *Segura*, 468 U.S. at 812. Following the search, the van and tools were not released for over 15 months, even though Det. Dailey admits that the investigation of the incident at El Torogoz was not particularly active.

Undisputed Facts ¶¶ 77, 83, 94–95. Indeed, courts have found that significantly shorter periods of time can render a seizure unreasonable. *See, e.g.*, *Rogers v. Apicella*, 606 F. Supp. 2d 272, 289–90 (D. Conn. 2009) (concluding the seizure of an apartment for 16 *hours* could be unreasonable under *Segura*); *United States v. Kowalczyk*, No. 3:08-05-KI, 2012 WL 3201975, at *25 (D. Or. Aug. 3, 2012) (holding two-month seizure of storage unit to be unreasonable based on its duration). There can be no question then that the 15-month delay between the search of the van—which resulted in the removal of all items of evidentiary value—and the release of the van and tools was unreasonable.

That Mr. Mencias focuses on the reasonableness of the seizure based on its duration rather than the reasonableness of the initial seizure does not bring his claim outside the scope of the Fourth Amendment. As the Fourth Circuit has explained, "[t]he Fourth Amendment regulates all . . . interference [with a person's possessory interest in property], and not merely the initial acquisition of possession." *Mom's Inc. v. Willman*, 109 F. App'x 629, 637 (4th Cir. 2004) (per curiam); *see also Sandoval v. Cnty. of Sonoma*, 72 F. Supp. 3d 997, 1004 (N.D. Cal. 2014) (holding that the Fourth Amendment protects "an individual's interest in possessing property even after it was lawfully seized"). Indeed, the Supreme Court has made clear that one of the central concerns of the Fourth Amendment's protection against unreasonable seizures is the protection of possessory interests in property from government intrusion. *See, e.g.*, *Soldal v. Cook Cnty.*, 506 U.S. 56, at 65–66 (1992) (rejecting the view that unconstitutional seizures require an intrusion on privacy or liberty); *see also Miller*, 799 F.3d at 1102 ("It is well established that the reasonableness of a seizure turns on the nature and extent of the interference with possessory, rather than privacy, interests."). A person's possessory interest in property does not dissipate upon its initial taking by the government. This is especially true in Mr. Mencias's

case: the van and tools were vital for his work and his livelihood, and the deprivation of this property caused him significant economic harm.

The *Sandoval* case is instructive on this point. There, the police seized the plaintiff's car based on a California statute requiring a 30-day impoundment where the driver has not been issued a driver's license. 72 F. Supp. 3d at 1000. The court first noted that the Fourth Amendment protects a person's possessory interest in property, even after the initial seizure. *Id.* at 1002–04. Even though the initial warrantless seizure was valid, the court went on to hold the 30-day impoundment of the plaintiff's vehicle was unconstitutional. *Id.* at 1006, 1011. The court explained the plaintiff had "a significant interest in possessing the vehicle he owns" and pointed specifically to the fact that the plaintiff missed a week of work as evidence of his strong possessory interest in his car. *Id.* at 1010. The court then weighed his interest against the government's interest in retaining the car and determined the 30-day seizure was unreasonable because the government's justifications did not "stand up to scrutiny." *Id.* at 1011. For example, the government's primary reason for retaining the vehicle for 30 days was to protect the public, but the court concluded this could not be a sufficient justification where the government released the vehicle after 30 days without requiring the plaintiff to "tak[e] any steps to prove that he was safe." *Id.* at 1010–11.

Here, Mr. Mencias's possessory interest in his van and tools was likely even greater as not only did he need his van to get to work, but his van and his tools were vital and necessary to performing his job as a contractor. Undisputed Facts ¶¶ 1, 42. Mr. Mencias lost out on job opportunities because of the lack of his van and tools, and he also was required to replace the van and many of the tools at great expense in order to maintain some income from his business. Further, as in *Sandoval*, Det. Dailey has not provided any justification that can stand up to

scrutiny. The admitted legitimate purpose for seizing the van was to search for evidence that would aid in locating and identifying Luis. Undisputed Facts ¶¶ 30, 56. During the search, all such items were removed from the van. Undisputed Facts ¶ 57. Following that, not even Det. Dailey can articulate what evidentiary value the van and tools had. Undisputed Facts ¶ 60. Surely a nebulous possibility that Det. Dailey might one day have a reason to search the van again does not provide sufficient justification under the Fourth Amendment to render the ongoing seizure reasonable for the following 15 months.

In short, under the Supreme Court's balancing test for determining the reasonableness of seizures, the seizure in this case became unreasonable at the point where the government's interest in retaining the property was outweighed by Mr. Mencias's possessory interest in the van and tools. That point was reached either immediately following the search and removal of all items of evidentiary value, or at some point before the van's return more than 15 months later. Thus, Mr. Mencias was subject to an unreasonable seizure in violation of the Fourth Amendment.

> **B.** Detective Dailey was acting under color of state law and is directly responsible for the unreasonable seizure of Mr. Mencias's van and tools.

As previously noted, a person must have acted under color of state law in order to be liable under § 1983. *Jackson*, 534 F. Supp. 2d at 31. Additionally, the individual sued must have "directly participated in the wrongful acts." *Bennett v. Fenty*, 648 F. Supp. 2d 38, 40 (D.D.C. 2009). In other words, the defendant must be "directly responsible for the constitutional deprivation" or must have given "authorization or approval of such misconduct." *Jeffries v. Dist. of Columbia*, 917 F. Supp. 2d 10, 25 (D.D.C. 2013) (quoting *Ekwem v. Fenty*, 666 F. Supp. 2d 71, 76 (D.D.C. 2009)).

There is no dispute that Det. Dailey was acting under color of state law in this case. Det. Dailey is an MPD member and all of his decisions and actions relating to the seizure and

retention of the van and tools were accomplished while he was "clothed with the authority of state law." *Johnson*, 642 F. Supp. 2d at 4 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). Thus, he may be held liable under § 1983.

Further, there is no dispute that Det. Dailey directly participated in the wrongful acts giving rise to the constitutional violation. Det. Dailey admits that he led the investigation into the incident at El Torogoz, he made the decision to seize the van, he directed Officer Jordan to seize the van, he led the search of the van, and he eventually completed the MPD form authorizing the property clerk to release the van and tools. Undisputed Facts ¶¶ 25, 30, 39, 55, 90. Ultimately, it was Det. Dailey, through his counsel in this case, that informed Mr. Mencias's counsel that the van was available for release. Undisputed Facts ¶ 94. Thus, Det. Dailey was in charge at every stage, from the initial seizure of the van and tools through their release more than 15 months later.

Det. Dailey attempts to avoid responsibility for the unconstitutional seizure of the van and tools by blaming the USAO-DC, claiming without citation to any authority that the USAO-DC "drives the decision" on when property seized as evidence can be released. Answer to Second Amended Complaint, Doc. 22, ¶ 216. To avoid summary judgment, Det. Dailey must point to more than "'the mere existence of a scintilla of evidence' in support of [his] position" and may not rely solely on "allegations or conclusory statements." *Hayes v. Dist. of Columbia*, 923 F. Supp. 2d 44, 48 (D.D.C. 2013) (quoting *Anderson*, 477 U.S. at 252). At no point has Det. Dailey produced any evidence, other than his own conclusory statements, to support his claim that the USAO-DC "drives the decision" on the release of property seized as evidence.

In contrast, the USAO-DC has provided a sworn declaration in this case explaining that it has no such authority:

> MPD determines all dispositions of property that they seize during any investigation. The USAO-DC has no authority to dispose of and/or retain property seized. This authority rests solely with MPD.

Declaration of USAO-DC, attached to Undisputed Facts as Exhibit B. Further, in response to a subpoena for documents from Mr. Mencias, the USAO-DC explained that "MPD drives the decision on when to release property" as "MPD is the ultimate decision maker as to the disposition of the property." Letter from USAO-DC, attached to Undisputed Facts as Exhibit C, at 3. The position of the USAO-DC is confirmed by the MPD General Order 601.01 on the Recording, Handling, and Disposition of Property Coming into the Custody of the Department (GO 601.01), which states the MPD member seizing the property or leading the investigation "shall be responsible" for obtaining the prosecuting attorney's sign-off on a PD Form 81-C, confirming that the prosecutor does not object to the release of the property. Undisputed Facts ¶ 63. Indeed, the form that is used to authorize the return of property seized as evidence is an MPD form. Undisputed Facts ¶ 64.

Det. Dailey appears to rely on the requirement that MPD members not release property seized as evidence without first consulting the USAO-DC, to conclude that the USAO-DC controls the release of property seized as evidence. However, the requirement that MPD members consult the USAO-DC before releasing such property does not shift responsibility for initiating its release from MPD to the USAO-DC. Rather, the property remains in MPD custody and the MPD member directing the seizure and leading the investigation is responsible for initiating the release of the property once it is no longer needed. Det. Dailey was the MPD member responsible for initiating the process to release Mr. Mencias's van and tools, and his misstatement regarding the role of the USAO-DC cannot create a genuine dispute of material fact. *See United States v. All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d 81, 94

(D.D.C. 2013) (explaining that the nonmovant must "provide evidence that would permit a reasonable jury to find in his favor," and evidence that is "'merely colorable'" or "'not significantly probative'" will not suffice (quoting *Anderson*, 477 U.S. at 249–50)). Moreover, Det. Dailey cannot rely on speculation as to whether the USAO-DC would have objected had he tried sooner to return Mr. Mencias's van and tools, because it is undisputed that Det. Dailey took no action to initiate the release of the property for 14 months after he completed his search of the van, and, in fact, the USAO-DC did not object to the release of the van or tools.

Because Det. Dailey was acting under color of state law and was directly responsible for the continued seizure of Mr. Mencias's van and tools for more than 15 months after the property was no longer needed, Det. Dailey violated Mr. Mencias's Fourth Amendment right to be free from an unreasonable seizure and is personally liable under § 1983.

## CONCLUSION

For the above-stated reasons, the Court should grant partial summary judgment to Mr. Mencias and find Det. Dailey liable under § 1983 for violating Mr. Mencias's Fourth Amendment rights.

Respectfully submitted,

/s/ Patrick Llewellyn
Patrick Llewellyn (DC Bar No. 1033296)
*Admitted Pro Hac Vice*[3]
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Phone: (202) 661-6701
Fax: (202) 662-9634
Email: Patrick.Llewellyn@law.georgetown.edu

/s/ Michael T. Kirkpatrick
Michael T. Kirkpatrick (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
Phone: (202) 588-7728
Fax: (202) 588-7795
Email: mkikrpatrick@citizen.org

/s/ Dennis A. Corkery
Dennis A. Corkery (D.C. Bar No. 1016991)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, Suite 400
Washington, DC 20036
Phone: (202) 319-1000
Email: Dennis_Corkery@washlaw.org

*Attorneys for Plaintiff*

August 12, 2016

---

[3] Mr. Llewellyn became a member of the DC Bar on July 8, 2016, and his application for admission to this Court is pending.