**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ERLIN EVER MENCIAS AVILA,

                 Plaintiff,

v.

MATTHEW DAILEY,

                 Defendant.

Civil No. 1:15-cv-02135-TSC

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Plaintiff Erlin Ever Mencias Avila is a home improvement contractor. Mencias Deposition, Attached as Exhibit H, at 97.

2. On September 6, 2014, Mr. Mencias was working on a project at 3913 Blaine Street NE, Washington, DC. Mr. Mencias was excavating the basement by removing dirt to install drainage pipes, and bringing in gravel. Mencias Deposition, Attached as Exhibit H, at 22–23, 25.

3. Mr. Mencias was assisted by three other workers: a plumber named Olvin Nuñez, and two day laborers Mr. Mencias had hired that morning in the parking lot of a Home Depot. Mencias Deposition, Attached as Exhibit H, at 20, 23.

4. One of the day laborers called the other "Luis." Mr. Mencias does not recall the name of the other worker. Mr. Mencias had not previously met or worked with either of the day laborers. Mencias Deposition, Attached as Exhibit H, at 27–28.

5. After work, Mr. Mencias, Mr. Nuñez, Luis, and the other day laborer left the worksite in Mr. Mencias's van. Mr. Mencias dropped off the other day laborer at the Georgia Avenue/Petworth Metro station, and Mr. Mencias, Mr. Nuñez, and Luis went to El

Torogoz Restaurant at 4231 9th Street, NW, Washington, DC. Mencias Deposition, Attached as Exhibit H, at 30–32; Answer to Second Amended Complaint, Doc. 22, ¶ 16.

6. Mr. Mencias parked his van in front of the restaurant, and he and Mr. Nuñez and Luis went inside. At some point that evening, Luis went outside to the patio area in front of the restaurant while Mr. Mencias and Mr. Nuñez remained inside. Mencias Deposition, Attached as Exhibit H, at 36.

7. While Mr. Mencias and Mr. Nuñez were inside El Torogoz, there was an altercation outside the restaurant involving Luis and the restaurant's owner, the owner's wife, other restaurant staff, and customers. Mencias Deposition, Attached as Exhibit H, at 38–39, 44; Answer to Second Amended Complaint, Doc. 22, ¶¶ 18, 19.

8. Luis is alleged to have brandished a knife, and security camera footage of the incident shows Luis throwing a stanchion and a chair, with the latter striking a customer. Geiger Deposition, Attached as Exhibit G, at 17; Llewellyn Declaration, Attached as Exhibit A, ¶¶ 15(p)–(q); Jordan Deposition, Attached as Exhibit F, at 16.

9. The security camera footage shows the owner of the restaurant holding a hammer, and later a metal rod as he charges at Luis. Llewellyn Declaration, Attached as Exhibit A, at ¶¶ 15(b), (e), (s).

10. When Mr. Mencias realized that there was a fight outside the restaurant involving Luis, he rushed outside. Mencias Deposition, Attached as Exhibit H, at 40–41.

11. The first thing Mr. Mencias recalls seeing is Luis on the ground with a group of about six individuals approaching Luis in a menacing fashion. Mencias Deposition, Attached as Exhibit H, at 43–44.

12. Mr. Mencias jumped in between Luis and the approaching group in an effort to stop the fight and prevent any further violence. Mr. Mencias raised his hands in a defensive posture and told the crowd: "Hey, don't fight. This is over." Mencias Deposition, Attached as Exhibit H, at 46.

13. Luis was agitated and wanted to continue fighting, but Mr. Mencias ushered Luis into his van and told him to stop fighting. Mr. Mencias then went around to the driver's side of his van and got in, but Luis got out of the passenger seat of the van with a metal object and scraped it across the sidewalk to create sparks. Mencias Deposition, Attached as Exhibit H, at 47–50.

14. At the time, Mr. Mencias did not know what metallic object Luis had scraped across the sidewalk, but he later surmised that it was either a nail remover or electrical pliers. Mencias Deposition, Attached as Exhibit H, at 49–50.

15. After scraping the tool across the sidewalk, Luis got back in the van, and Mr. Mencias drove Luis away from the scene to prevent further violence. Mencias Deposition, Attached as Exhibit H, at 50; Answer to Second Amended Complaint, Doc. 22, ¶ 27.

16. Mr. Mencias believed that Luis would have been seriously injured had he not intervened. Mencias Deposition, Attached as Exhibit H, at 56.

17. Mr. Mencias drove to the 400 block of Kennedy Street, NW, and parked his van near Ache Lounge, 441 Kennedy Street NW. Mencias Deposition, Attached as Exhibit H, at 52–54; Answer to Second Amended Complaint, Doc. 22, ¶¶ 27, 31.

18. During the drive, Mr. Mencias asked Luis what had caused the fight, and Luis stated that he had argued with the owner and the owner's wife and that the owner had assaulted him

because the owner was offended by something Luis had said to the owner's wife. Mencias Deposition, Attached as Exhibit H, at 53–54.

19. Mr. Mencias and Luis parted ways. Mencias Deposition, Attached as Exhibit H, at 55; Answer to Second Amended Complaint, Doc. 22, ¶ 32.

20. Mr. Mencias entered Ache Lounge. Mencias Deposition, Attached as Exhibit H, at 55.

21. Officers from the Metropolitan Police Department of the District of Columbia (MPD) went to El Torogoz in response to reports of a fight, arriving after Mr. Mencias had stopped the fight and removed Luis from the scene. Answer to Second Amended Complaint, Doc. 22, ¶ 35.

22. MPD Officer Richard Geiger was the responding officer, and he was accompanied by Officer Justin Jordan. Geiger Deposition, Attached as Exhibit G, at 14–15, 17, 29; Jordan Deposition, Attached as Exhibit F, at 16, 17.

23. Officers Geiger and Jordan conducted initial interviews of the witnesses at El Torogoz and reviewed security camera footage. They concluded that Luis was a suspect in an assault with a deadly weapon, and Officer Geiger radioed officers throughout the Fourth District to be on the lookout for a van matching the description of Mr. Mencias's van that witnesses had provided to Officer Geiger. Geiger Deposition, Attached as Exhibit G, at 17–19, 21–22; Jordan Deposition, Attached as Exhibit F, at 18–19.

24. MPD Detectives Matthew Dailey and William Xanten responded to El Torogoz, and took over the investigation from Officers Geiger and Jordan. Dailey Deposition, Attached as Exhibit D, at 19–20; Answer to Second Amended Complaint, Doc. 22, ¶ 36.

25. Det. Dailey was the lead detective on the case. Dailey Deposition, Attached as Exhibit D, at 19; Xanten Deposition, Attached as Exhibit E, at 19–20; Answer to Second Amended Complaint, Doc. 22, ¶ 220.

26. Detectives Dailey and Xanten interviewed the witnesses at El Torogoz and reviewed the security camera footage. Dailey Deposition, Attached as Exhibit D, at 21; Xanten Deposition, Attached as Exhibit E, at 25–26; Answer to Second Amended Complaint, Doc. 22, ¶¶ 38, 40.

27. An MPD officer observed Mr. Mencias's van, parked and unoccupied, in the 400 block of Kennedy Street, NW. Geiger Deposition, Attached as Exhibit G, at 23; Jordan Deposition, Attached as Exhibit F, at 23.

28. Officer Jordan and Detectives Dailey and Xanten went to the 400 block of Kennedy Street, NW, and observed the van. Dailey Deposition, Attached as Exhibit D, at 24; Answer to Second Amended Complaint, Doc. 22, ¶ 42; Jordan Deposition, Attached as Exhibit F, at 22–23; Xanten Deposition, Attached as Exhibit E, at 27.

29. Officer Jordan and Detectives Dailey and Xanten did not enter or search the van but looked inside. Jordan Deposition, Attached as Exhibit F, at 24; Xanten Deposition, Attached as Exhibit E, at 39.

30. Having concluded that the suspect in the incident at El Torogoz had been a passenger in the van, Det. Dailey decided to seize the van so that it could later be searched for evidence to help identify the suspect. Dailey Deposition, Attached as Exhibit D, at 24–25, 28–29, 57; Xanten Deposition, Attached as Exhibit E, at 29, 40.

31. Before Mr. Mencias's van was seized and towed from the scene, Mr. Mencias left Ache Lounge and walked on Kennedy Street NW towards Georgia Avenue. Mencias Deposition, Attached as Exhibit H, at 57.

32. Mr. Mencias intended to hail a taxi on Georgia Avenue to take him home. He did not go to his van after he left Ache Lounge because he had been drinking and decided that he should not drive. Mencias Deposition, Attached as Exhibit H, at 57.

33. Approximately four MPD members, including Officer Jordan and Detectives Dailey and Xanten, questioned Mr. Mencias in the 800 block of Kennedy Street, NW, regarding the incident at El Torogoz and the identity of Mr. Mencias's passenger. Answer to Second Amended Complaint, Doc. 22, ¶¶ 2, 44, 45, 51; Mencias Deposition, Attached as Exhibit H, at 58; Dailey Deposition, Attached as Exhibit D, at 26; Jordan Deposition, Attached as Exhibit F, at 26; Xanten Deposition, Attached as Exhibit E, at 30, 32.

34. Mr. Mencias explained that he had not been involved in the fight, but had stopped the fight and removed Luis from the scene to prevent further violence or injury. Mencias Deposition, Attached as Exhibit H, at 58.

35. The MPD members questioned Mr. Mencias regarding the identity and whereabouts of Luis, but Mr. Mencias did not have the requested information. Answer to Second Amended Complaint, Doc. 22, ¶ 53; Jordan Deposition, Attached as Exhibit F, at 27; Xanten Deposition, Attached as Exhibit E, at 32.

36. The MPD members told Mr. Mencias that his van was going to be towed. Answer to Second Amended Complaint, Doc. 22, ¶ 56; Mencias Deposition, Attached as Exhibit H, at 60, 62; Jordan Deposition, Attached as Exhibit F, at 29.

37. Mr. Mencias protested, and the police informed Mr. Mencias that he might avoid having his van towed, or get it back sooner, if he provided information that would help the police apprehend Luis. Xanten Deposition, Attached as Exhibit E, at 33–34; Mencias Deposition, Attached as Exhibit H, at 62; Dailey Deposition, Attached as Exhibit D, at 30.

38. Mr. Mencias did not have the requested information, and Det. Dailey, having concluded that Mr. Mencias was uncooperative, had the van towed to the Fourth District impound lot. Dailey Deposition, Attached as Exhibit D, at 31.

39. Officer Jordan was the seizing officer, but he seized the van at Det. Dailey's direction. Answer to Second Amended Complaint, Doc. 22, ¶¶ 11, 57; Dailey Deposition, Attached as Exhibit D, at 31, 39.

40. Officer Jordan completed a PD Form 81, indicating that the van had been seized as evidence. Officer Jordan made an entry in the Fourth District property book. Dailey Deposition, Attached as Exhibit D, at 34; Jordan Deposition, Attached as Exhibit F, at 35, 37; Deposition Exhibit 2, Bates Nos. DC 000045–46, Attached as Exhibit K; Document Bates Nos. DC 000154–155, Attached as Exhibit M.

41. Mr. Mencias was not provided with any documents related to the seizure of his van and tools. Mr. Mencias was not provided with a receipt, or a case number, or any written information about the process for recovering his property. Answer to Second Amended Complaint, Doc. 22, ¶ 63.

42. At the time the van was seized, it was Mr. Mencias's only vehicle for both work and personal purposes. Mencias Deposition, Attached as Exhibit H, at 62, 114.

43. The van contained numerous tools that Mr. Mencias used in his contracting business. Xanten Deposition, Attached as Exhibit E, at 50.

44. Det. Xanten made an entry in the Fourth District property book asking to be contacted if Mr. Mencias visited the Fourth District to inquire about his van and tools. Dailey Deposition, Attached as Exhibit D, at 50–51.

45. Detectives Dailey and Xanten knew that that there were a lot of tools in the van that were valuable and would be costly to replace, and which Mr. Mencias needed for his work. Xanten Deposition, Attached as Exhibit E, at 50; Answer to Second Amended Complaint, Doc. 22, ¶ 108.

46. Detectives Dailey and Xanten thought that Mr. Mencias would come to the Fourth District to see about getting his van back, and perhaps talk to the detectives about the identity of the passenger in his van. Xanten Deposition, Attached as Exhibit E, at 50; Answer to Second Amended Complaint, Doc. 22, ¶ 112; Dailey Deposition, Attached as Exhibit D, at 49.

47. Detectives Xanten and Dailey had a plan to use Mr. Mencias's expected inquiry about his van as an opportunity to seek information about the identity and whereabouts of their suspect in the incident at El Torogoz. Xanten Deposition, Attached as Exhibit E, at 54–56, 61; Answer to Second Amended Complaint, Doc. 22, ¶ 112.

48. Beginning soon after the seizure of his van, Mr. Mencias visited the Fourth District station and the Park Road substation to inquire about the return of his van and tools. Mencias Deposition, Attached as Exhibit H, at 70–72.

49. On September 11, 2014, Mr. Mencias encountered Officer Jordan at the Park Road substation and inquired about his van. Officer Jordan instructed Mr. Mencias to meet him

at the Fourth District station. Mencias Deposition, Attached as Exhibit H, at 73; Jordan Deposition, Attached as Exhibit F, at 48–50.

50. At the Fourth District station, Mr. Mencias was interviewed by MPD Detectives Collis Timlick and Michael Bridgett, and Officer Jordan. Officer Washington was also present and served as a Spanish-language interpreter for some of the questions and answers. The interview was videotaped. Jordan Deposition, Attached as Exhibit F, at 54–55.

51. The goal of the interview was to obtain information as to the identity of the individual that Mr. Mencias drove away from the incident at El Torogoz. Jordan Deposition, Attached as Exhibit F, at 53, 66; Mencias Deposition, Attached as Exhibit H, at 76.

52. During the interview, Det. Timlick told Mr. Mencias that his van and tools would be released if Mr. Mencias provided information that would lead the police to Luis. Mencias Deposition, Attached as Exhibit H, at 76; Llewellyn Declaration, Attached as Exhibit A, at ¶ 16(a).

53. During the interview, Officer Jordan emphasized that the way for Mr. Mencias to get his van back was to provide information about Luis's identity or whereabouts. Mencias Deposition, Attached as Exhibit H, at 76; Llewellyn Declaration, Attached as Exhibit A, at ¶ 16(h); Jordan Deposition, Attached as Exhibit F, at 62–63.

54. Mr. Mencias explained that he had no such information. Mencias Deposition, Attached as Exhibit H, at 77.

55. On September 23, 2014, Det. Dailey searched Mr. Mencias's van pursuant to a search warrant. Answer to Second Amended Complaint, Doc. 22, ¶ 95; Dailey Deposition, Attached as Exhibit D, at 64.

56. On the search warrant affidavit, Det. Dailey stated that he had probable cause to believe Mr. Mencias's van contained evidence that would assist MPD in identifying and locating the suspect in the incident at El Torogoz. Specifically, Det. Dailey sought to search the van for a knife, personal items of Luis, clothing, mail matter, identification, and DNA evidence that would assist in identifying and locating Luis. Dailey Deposition, Attached as Exhibit D, at 57, 65; Answer to Second Amended Complaint, Doc. 22, ¶ 90; Xanten Deposition, Attached as Exhibit E, at 45–46.

57. During the search, Det. Dailey found, and removed from the van, 1 passport, 4 beer cans, and 1 knife. Answer to Second Amended Complaint, Doc. 22, ¶ 97; Dailey Deposition, Attached as Exhibit D, at 66.

58. The passport bore the name "Josue Nahun Diaz Matute." Mencias Deposition, Attached as Exhibit H, at 133.

59. MPD retains the items removed from Mr. Mencias's van during the search of September 23, 2014. Answer to Second Amended Complaint, Doc. 22, ¶ 194; Dailey Deposition, Attached as Exhibit D, at 66–67.

60. Following the search of the van and removal of the passport, beer cans, and knife, Det. Dailey did not know what evidentiary value the remaining items in Plaintiff's van had. Answer to Second Amended Complaint, Doc. 22, ¶¶ 100–103.

61. Following the search of September 23, 2014, and the removal of the items of evidentiary value, Det. Dailey did not initiate the process for releasing Mr. Mencias's property. Answer to Second Amended Complaint, Doc. 22, ¶ 221.

62. MPD General Order 601.1 on the Recording, Handling, and Disposition of Property Coming into the Custody of the Department, reflects MPD policy regarding property

seized as evidence. Dailey Deposition, Attached as Exhibit D, at 33; Deposition Exhibit 1, Bates Nos. MENCIAS 000082–119, Attached as Exhibit I.

63. MPD General Order 601.01 states that the MPD member seizing the property or leading the investigation "shall be responsible" for obtaining the prosecuting attorney's sign-off on a PD Form 81-C, confirming that the prosecutor does not object to the release of the property. Deposition Exhibit 1, Bates Nos. MENCIAS 000082–119, Attached as Exhibit I, at 26.

64. The form that is used to authorize the return of property seized as evidence is an MPD form. Answer to Second Amended Complaint, Doc. 22, ¶ 164; Dailey Deposition, Attached as Exhibit D, at 116.

65. The United States Attorney's Office for the District of Columbia (USAO-DC), has provided a Declaration in this case, a copy of which is attached Exhibit B. Llewellyn Declaration, Attached as Exhibit A, ¶ 1.

66. MPD determines all dispositions of property seized by MPD during any investigation. Declaration of USAO-DC, Attached as Exhibit B, ¶¶ 3–7.

67. The USAO-DC has no authority to dispose of and/or retain property seized. This authority rests solely with MPD. Declaration of USAO-DC, Attached as Exhibit B, ¶¶ 3–7.

68. When MPD makes the decision to release seized property, an MPD member will present a PD Form 81-C to a supervisor in the USAO-DC to sign indicating that the USAO-DC has no objection to release and that the property is not needed to be retained as evidence. Declaration of USAO-DC, Attached as Exhibit B, ¶¶ 3–7.

69. In response to a subpoena for documents from Mr. Mencias, the USAO-DC provided the letter attached as Exhibit C. Llewellyn Declaration, Attached as Exhibit A, ¶ 2.

70. MPD drives the decision on when to release property seized as evidence and MPD is the ultimate decision maker as to the disposition of the property. Letter from USAO-DC, Attached as Exhibit C, at 3.

71. Although MPD members are required to consult with the USAO-DC before releasing property, it is the MPD that initiates the process by completing the PD Form 81-C and sending it to the USAO-DC for sign-off. Letter from USAO-DC, Attached as Exhibit C, at 3; Dailey Deposition, Attached as Exhibit D, at 74–75.

72. When property has been seized as evidence to allow for a search and the search is concluded, MPD fills out a PD Form 81-C and sends it to the USAO-DC for sign-off. Dailey Deposition, Attached as Exhibit D, at 74–75.

73. Det. Dailey did not prepare a PD Form 81-C and send it to the USAO-DC for sign-off for more than a year following the search of Mr. Mencias's van, because he wanted to speak with Mr. Mencias before releasing the van and tools. Answer to Second Amended Complaint, Doc. 22, ¶ 169.

74. Mr. Mencias contacted the Fourth District police station from time to time to inquire about the process for recovering his van. Mencias Deposition, Attached as Exhibit H, at 78.

75. Mr. Mencias was given a telephone number to call to inquire about his van, but when he tried to call he encountered an automatic answering system, was placed on hold, and was never able to speak to anyone about retrieving his property. Mencias Deposition, Attached as Exhibit H, at 78–79.

76. Det. Dailey had no communication with Mr. Mencias during October 2014 through February 2015. Dailey Deposition, Attached as Exhibit D, at 84.

77. Although the case remained open, there was little activity following the search of the van until March 2015 when Mr. Mencias contacted Det. Dailey. Dailey Deposition, Attached as Exhibit D, at 87–88.

78. On or about March 3, 2015, Mr. Mencias left a voice message for Det. Dailey inquiring about his van. Det. Dailey returned the call and spoke to Mr. Mencias. Answer to Second Amended Complaint, Doc. 22, ¶¶ 120, 121; Mencias Deposition, Attached as Exhibit H, at 82–83; Dailey Deposition, Attached as Exhibit D, at 89–90.

79. Det. Dailey asked Mr. Mencias for information about the identity and whereabouts of Luis, and Mr. Mencias again told Det. Dailey that he did not have such information. Answer to Second Amended Complaint, Doc. 22, ¶ 122.

80. During the March 2015 telephone conversation, Det. Dailey asked Mr. Mencias to come to the Fourth District station. Mr. Mencias did so, and was served with a subpoena to appear before a grand jury on March 13, 2015. Answer to Second Amended Complaint, Doc. 22, ¶¶ 129, 130; Mencias Deposition, Attached as Exhibit H, at 87–88; Dailey Deposition, Attached as Exhibit D, at 95, 98.

81. On March 13, 2015, Mr. Mencias appeared as instructed at 555 4th Street, NW, and was assisted with filling out an application for appointment of counsel, which he was directed to submit at 500 Indiana Avenue, NW. Mencias Deposition, Attached as Exhibit H, at 88–92; Answer to Second Amended Complaint, Doc. 22, ¶¶ 132–134.

82. Attorney John Machado was appointed to represent Mr. Mencias, but after Mr. Mencias spoke to Mr. Machado by telephone, he did not hear from Mr. Machado again, and Mr.

Mencias was never asked to return to testify before the grand jury. Mencias Deposition, Attached as Exhibit H, at 93; Answer to Second Amended Complaint, Doc. 22, ¶ 139.

83. Following March 2015, the investigation of the incident at El Torogoz was not particularly active. Dailey Deposition, Attached as Exhibit D, at 105–106, 112, 116.

84. Following his appearance at 555 4th Street NW on March 13, 2015, Mr. Mencias did not receive any additional communications from Det. Dailey or anyone else at MPD regarding his van and tools or the investigation regarding Luis, except through his representatives at the Washington Lawyers' Committee for Civil Rights and Urban Affairs (WLC) and undersigned counsel. Answer to Second Amended Complaint, Doc. 22, ¶ 141.

85. Mr. Mencias's representatives from the WLC contacted Det. Dailey in November 2015 to request the return of Mr. Mencias's property. Det. Dailey referred Mr. Mencias's representatives to the USAO-DC. Answer to Second Amended Complaint, Doc. 22, ¶¶ 158, 159; Dailey Deposition, Attached as Exhibit D, at 112–113.

86. On November 19, 2015, AUSA Kara Traster informed Det. Dailey that the case was closed and requested that Det. Dailey initiate the process for releasing Mr. Mencias's van by preparing a PD Form 81-C. Answer to Second Amended Complaint, Doc. 22, ¶ 163, 222; Dailey Deposition, Attached as Exhibit D, at 114–115; Deposition Exhibit 19, Bates No. DC 000037, Attached as Exhibit N.

87. Det. Dailey sought to persuade the USAO to seek a warrant for Mr. Mencias's arrest, explaining that Mr. Mencias was Det. Dailey's "only avenue at identifying the suspect in this case." Deposition Exhibit 20, Bates No. DC 000126, Attached as Exhibit O; Answer to Second Amended Complaint, Doc. 22, ¶ 171.

88. Det. Dailey believed that Mr. Mencias would no longer return to the police station once he had recovered his property. Answer to Second Amended Complaint, Doc. 22, ¶ 169.

89. The USAO declined to seek an arrest warrant for Mr. Mencias. Answer to Second Amended Complaint, Doc. 22, ¶ 175.

90. On November 26, 2015, Det. Dailey prepared the PD Form 81-C. He sent it to the USAO for sign-off confirming that it did not object to MPD's release of Mr. Mencias's property, and the USAO promptly did so. Dailey Deposition, Attached as Exhibit D, at 125–126; Deposition Exhibit 23, Bates No. DC 000039, Attached as Exhibit L.

91. Mr. Mencias's property was available for release as of about November 26, 2015. Answer to Second Amended Complaint, Doc. 22, ¶ 179.

92. Det. Dailey took no action to initiate the release of Mr. Mencias's property for 14 months after he completed his search of the van. Answer to Second Amended Complaint, Doc. 22, ¶¶ 195, 196, 221.

93. After the PD Form 81-C was completed, Det. Dailey took no action to inform Mr. Mencias that his property was available for release. Answer to Second Amended Complaint, Doc. 22, ¶ 176, 242; Dailey Deposition, Attached as Exhibit D, at 117, 128–129.

94. Mr. Mencias learned that his property was available for release on January 7, 2016, after this lawsuit was filed, when Det. Dailey's counsel informed Mr. Mencias's counsel. Answer to Second Amended Complaint, Doc. 22, ¶¶ 4, 179.

95. On January 13, 2016, Mr. Mencias retrieved his van from MPD's Blue Plains Impound Lot and had it towed to his home. The van was in poor condition and many of Mr.

Mencias's tools were missing or damaged. Answer to Second Amended Complaint, Doc. 22, ¶ 4.

Respectfully submitted,

/s/ Patrick Llewellyn
Patrick Llewellyn (DC Bar No. 1033296)
*Admitted Pro Hac Vice*[1]
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Phone: (202) 661-6701
Fax: (202) 662-9634
Email: Patrick.Llewellyn@law.georgetown.edu

/s/ Michael T. Kirkpatrick
Michael T. Kirkpatrick (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
Phone: (202) 588-7728
Fax: (202) 588-7795
Email: mkikrpatrick@citizen.org

/s/ Dennis A. Corkery
Dennis A. Corkery (D.C. Bar No. 1016991)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, Suite 400
Washington, DC 20036
Phone: (202) 319-1000
Email: Dennis_Corkery@washlaw.org

*Attorneys for Plaintiff*

August 12, 2016

---

[1] Mr. Llewellyn became a member of the DC Bar on July 8, 2016, and his application for admission to this Court is pending.

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ERLIN EVER MENCIAS AVILA,**

        Plaintiff,

v.

**MATTHEW DAILEY,**

        Defendant.

Civil No. 1:15-cv-02135-TSC

---

### Declaration of Patrick Llewellyn

I, Patrick Llewellyn, declare that, based on personal knowledge:

1. Attached as Exhibit B to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of the Declaration of John Giovanelli, Deputy Chief of the Superior Court Major Crimes Trial Section of the United States Attorney's Office for the District of Columbia (USAO-DC).

2. Attached as Exhibit C to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of a letter from Damon Taaffe, Assistant United States Attorney at the USAO-DC.

3. Attached as Exhibit D to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of excerpts from the court reporter's transcript for the deposition of Defendant Matthew Dailey and a letter from the court reporter indicating that Det. Dailey did not read and sign the transcript within the appropriate amount of time.

4. Attached as Exhibit E to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of excerpts from the court reporter's transcript for the deposition of Detective William Xanten.

5.  Attached as Exhibit F to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of excerpts from the court reporter's transcript for the deposition of Officer Justin Jordan.

6.  Attached as Exhibit G to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of excerpts from the court reporter's transcript for the deposition of Officer Richard Geiger.

7.  Attached as Exhibit H to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of excerpts from the court reporter's transcript for the deposition of Plaintiff Erlin Ever Mencias Avila, Mr. Mencias's errata sheets, and Mr. Mencias's signature page under Rule 30 of the Federal Rules of Civil Procedure.

8.  Attached as Exhibit I to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of Metropolitan Police Department General Order 601.01.

9.  Attached as Exhibit J to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of Metropolitan Police Department General Order 201.26.

10. Attached as Exhibit K to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of the PD Form 81 concerning Mr. Mencias's van.

11. Attached as Exhibit L to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of the PD Form 81-C concerning Mr. Mencias's van.

12. Attached as Exhibit M to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of the MPD Fourth District Property Book pages concerning Mr. Mencias's van.

13. Attached as Exhibit N to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of an email from Assistant United States Attorney Kara Traster to Det. Dailey.

14. Attached as Exhibit O to Plaintiff's Statement of Undisputed Material Facts is a true and correct copy of an email from Det. Dailey to Assistant United States Attorneys John Giovanelli and Kara Traster.

15. I have reviewed the security camera footage from El Torogoz on the night of September 6, 2014, that was produced in this case and marked as MENCIAS 000049 for discovery purposes, and I affirm the video contains the following:

   a. At approximately the 1:38 mark, a woman identified as the restaurant owner's wife exits the restaurant and is followed shortly thereafter by the man called "Luis."

   b. Also at approximately the 1:38 mark, a man identified as the restaurant owner exits the restaurant from a different door and is holding a hammer.

   c. Following their exit from the restaurant, a discussion occurs between the restaurant owner's wife and Luis. Near them, there are approximately 6 to 8 other customers and staff standing and sitting.

   d. At approximately the 1:52 mark, the restaurant owner walks over to Luis and his wife, points in the direction of Luis, and appears to enter the conversation.

   e. At approximately the 1:58 mark, the restaurant owner gestures towards Luis with the hammer.

   f. At approximately the 2:13 mark, Luis begins walking towards the restaurant owner, who is off camera.

g.  At approximately the 2:16 mark, Luis pulls an object from his pocket while walking in the direction of the restaurant owner, who remains off camera.

h.  At approximately the 2:20 mark, Luis moves off camera in the direction of the restaurant owner, and the restaurant owner's wife follows him off camera.

i.  At approximately the 2:21 mark, another man who appears to be a customer follows in the direction of the confrontation off camera.

j.  At approximately the 2:29 mark, Luis and the restaurant owner reenter the screen.

k.  At approximately the 2:35 mark, there appears to be an argument between Luis and the restaurant owner, with the restaurant owner's wife standing between them.

l.  At approximately the 2:38 mark, another woman who appears to be a customer or staff person comes on camera from nearby the confrontation.

m.  At approximately the 2:39 mark, the restaurant owner re-enters the restaurant while Luis and the restaurant owner's wife remain outside.

n.  Also at approximately the 2:39 mark, Luis puts something into his pocket.

o.  At approximately the 2:40 mark, another customer approaches Luis and appears to engage in a conversation with him.

p.  At approximately the 2:45 mark, Luis picks up a stanchion and throws it in the direction of the customer who approached him; the stanchion misses the customer and hits a wall or window behind the customer.

q.  At approximately the 2:48 mark, Luis picks up a chair and throws it at the same customer; the chair hits the customer on the head.

4

r.  At approximately the 2:49 mark, the restaurant owner's wife strikes or pulls Luis, causing him to fall to the ground.

s.  At approximately the 2:53 mark, as Luis returns to his feet, the customer that was hit the chair and the restaurant owner, who is now holding with both hands a large metal rod that appears to be about four to five feet long, charge at Luis; as they charge at Luis, there are other persons standing nearby facing Luis, including the owner's wife and the other woman.

t.  At approximately the 2:54 mark, Mr. Mencias jumps between Luis, the customer, and the restaurant owner and is struck by the customer in the process. As Mr. Mencias intervenes, an additional group of three men walk in the direction of the altercation.

u.  At approximately the 2:55 mark, Mr. Mencias, having gotten between the parties, holds his arms and hands up in a defensive posture and backs Luis away from the restaurant owner—continuing to hold the metal rod—and the customer, as well as the rest of the crowd.

v.  At approximately the 2:58 mark, Mr. Mencias and Luis move off camera in the direction of Mr. Mencias's van; some of the crowd follows Mr. Mencias and Luis in that direction off camera.

w.  At approximately the 4:26 mark, Mr. Mencias's van can be seen driving by the front of the restaurant.

16. I have reviewed the video recording of the September 11, 2014, interrogation of Mr. Mencias by MPD officers and detectives produced in this case and marked as DC 000153 for discovery purposes, and I affirm that it contains the following:

a.  Beginning at approximately the 38:18 mark, Detective Collis Timlick can be heard telling Mr. Mencias, "Let me put it to you another way, sir. You need your van; we need the suspect ID'ed. That's a small price to pay to get your van back to tell us who this suspect is."

b.  Beginning at approximately the 39:55 mark, Detective Timlick can be heard telling Mr. Mencias, "Now, I know you seem like a smart man. Do the right thing and tell us who your friend Luis really is."

c.  Beginning at approximately the 40:33 mark, Detective Timlick can be heard telling Mr. Mencias, "The best thing you can do sir is help yourself out. The Metropolitan Police Department has your van, I believe most likely as evidence. It's a procedure that the police department has to go through for you to get your van back. Your van could be held pending a trial, which could be a long time from now. I don't want to see that happen, but if you're not trying to work with us, that might make things very complicated for you to get your van back."

d.  Beginning at approximately the 41:46 mark, Detective Timlick can be heard telling Mr. Mencias, "Look, I'm tired and fatigued, I'm getting ready to leave for the night, I'm only going to talk to you for about another 5 or 10 minutes. If you choose not to talk to me, to try and get that person identified, then I'm going to leave, you're going to leave, and we're still going to have your van."

e.  Beginning at approximately the 1:00:26 mark, Detective Michael Bridgett can be heard telling Mr. Mencias, "Can you do something proactive to find out

6

Luis's information? Because your van may have to be held until we get Luis

so we can match up fingerprints or DNA from your van."

f.   Beginning at approximately the 1:04:24 mark, Detective Timlick can be heard

telling Mr. Mencias, "The faster we find Luis, the faster you stand a chance of

getting your vehicle back."

g.   Beginning at approximately the 1:07:06 mark, Detective Timlick can be heard

telling Mr. Mencias, "The tools are part of the van, the tools stay with the van."

h.   Beginning at approximately the 1:08:10 mark, Officer Justin Jordan can be

heard telling Mr. Mencias, "I explained to him the very first night that the way

for him, how to get your van back, alright. It's been almost a week now and

you've given us nothing to help get your van back."

i.   Beginning at approximately the 1:08:29 mark, Detective Timlick can be heard

telling Mr. Mencias, "You're entitled to talk to your lawyer. That's your

choice but the lawyer can't tell us what to do with a vehicle when it's used to

commit a crime. So just keep that in mind. The point I'm trying to emphasize

to you: the faster we can get Luis, the faster you stand a chance of getting

your van back."

j.   Beginning at approximately the 1:11:46 mark, Officer Washington can be

heard translating a statement from Mr. Mencias to Det. Timlick as, "But I

need the tools." Detective Timlick can then be heard responding to Mr.

Mencias, "I understand that. We also need Luis to be identified.

k.   Beginning at approximately the 1:13:41 mark, Detective Timlick can be heard

telling Mr. Mencias, "I'm sorry that you're losing money because of your

vehicle being taken. But when a vehicle becomes part of that crime, we have a right to take that vehicle. And it all goes back to the faster we can get Luis, and get fingerprints, the faster you stand a chance of getting your vehicle back."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 12, 2016

*/s/ Patrick Llewellyn*
Patrick Llewellyn
Institute for Public Representation
600 New Jersey Ave. NW, Suite 312
Washington, DC 20009
(202) 661-6701
Patrick.Llewellyn@law.georgetown.edu

# Exhibit B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ERLIN EVER MENCIAS AVILA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No.: 15-2135 (TSC) |
| | ) |
| DISTIRCT OF COLUMBIA, *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF JOHN GIOVANNELLI

I, John Giovannelli, declare as follows:

    1.    I am currently employed as an Assistant United States Attorney with the United States Attorney's Office for the District of Columbia ("USAO-DC"), where I hold the title of Deputy Chief, Superior Court Felony Major Crimes Trial Section. I have been authorized to speak on behalf of the USAO-DC in response to the June 2, 2016 subpoena served on this office in the above-captioned matter.

    2.    The June 2, 2016 subpoena seeks testimony on five topics. The topics, and the USAO-DC's responses, are as follows.

    3.    TOPIC 1: "DC USAO's policies, procedures, and practices for retaining property seized as evidence by the Metropolitan Police Department of the District of Columbia (MPD), including but not limited to the retention of vehicles as evidence, the retention of the contents of a vehicle, as evidence, which person or entity is the custodian of all seized property, and which person or entity is the ultimate decision maker as to the disposition of seized property."

*J Giovannelli Decl.- Civil Action No.: 1:15-cv-2135 (TSC)*

    a. USAO-DC'S RESPONSE: USAO-DC has no policies related to seized property as we are not the custodian. MPD determines all dispositions of property that they seize during any investigation. The USAO-DC has no authority to dispose of and/or retain property seized. This authority rests solely with MPD. When MPD makes the decision to release seized property, they will present an MPD Form 81c to a supervisor in our office to sign indicating that the USAO-DC has no objection to that release and that said property is not needed to be retained as evidence. These matters are handled on a case by case basis.

4.     TOPIC 2: "DC USAO's policies, procedures, and practices for releasing property seized as evidence by MPD, including but not limited to the release of vehicles seized as evidence, the release of the contents of a vehicle seized as evidence, which person or entity drives the decision on when to release property, and which person or entity is the ultimate decision maker as to the disposition of seized property."

    a. USAO-DC'S RESPONSE: USAO-DC has no policies related to seized property as we are not the custodian. MPD determines all dispositions of property that they seize during any investigation. The USAO-DC has no authority to dispose of and/or retain property seized. This authority rests solely with MPD. When MPD makes the decision to release seized property, they will present an MPD Form 81c to a supervisor in our office to sign indicating that the USAO-DC has no objection to that release and that said property is not needed to be retained as evidence. These matters are handled on a case by case basis.

5.     TOPIC 3: "DC USAO's policies, procedures, and practices for releasing property seized as evidence to owners who have not been charged with a crime or to owners who are not suspects in a criminal investigation, including but not limited to the release of vehicles seized as

2

evidence, the release of the contents of a vehicle seized as evidence, which person or entity drives the decision on when to release property, and which person or entity is the ultimate decision maker as to the disposition of seized property."

    a. USAO-DC'S RESPONSE: USAO-DC has no policies related to seized property as we are not the custodian. MPD determines all dispositions of property that they seize during any investigation. The USAO-DC has no authority to dispose of and/or retain property seized. This authority rests solely with MPD. When MPD makes the decision to release seized property, they will present an MPD Form 81c to a supervisor in our office to sign indicating that the USAO-DC has no objection to that release and that said property is not needed to be retained as evidence. These matters are handled on a case by case basis.

6.    TOPIC 4: "DC USAO's policies, procedures, and practices for communicating with MPD regarding the release of property seized as evidence, including but not limited to the release of vehicles seized as evidence, the release of the contents of a vehicle seized as evidence, which person or entity drives the decision on when to release property, and which person or entity is the ultimate decision maker as to the disposition of seized property."

    a. USAO-DC'S RESPONSE: USAO-DC has no policies related to seized property as we are not the custodian. MPD determines all dispositions of property that they seize during any investigation. The USAO-DC has no authority to dispose of and/or retain property seized. This authority rests solely with MPD. When MPD makes the decision to release seized property, they will present an MPD Form 81c to a supervisor in our office to sign indicating that the USAO-DC has no objection to that release and that said property is not needed to be retained as evidence. These matters are handled on a case by case basis.

3

*J Giovannelli Decl.- Civil Action No.: 1:15-cv-2135 (TSC)*

7.       TOPIC 5: "DC USAO's policies, procedures, and practices for notifying an owner

that property previously seized by MPD as evidence has been released or is available to be retrieved

by the owner, including but not limited to the release of vehicles seized as evidence, the release of

the contents of a vehicle seized as evidence, which person or entity drives the decision on when to

release property, which person or entity is responsible for notifying property owners that the property

has been released or is available to be retrieved, and which person or entity is the ultimate decision

maker as to the disposition of seized property."

           a.   USAO-DC'S RESPONSE: USAO-DC has no policies related to seized property

                as we are not the custodian.  MPD determines all dispositions of property that

                they seize during any investigation.  The USAO-DC has no authority to dispose of

                and/or retain property seized.  This authority rests solely with MPD.  When MPD

                makes the decision to release seized property, they will present an MPD Form 81c

                to a supervisor in our office to sign indicating that the USAO-DC has no objection

                to that release and that said property is not needed to be retained as evidence.

                These matters are handled on a case by case basis.

Executed this 10th day of June, 2016.

John Giovannelli
Deputy Chief
Superior Court Felony Major Crimes Trial Section
United States Attorney's Office for the
    District of Columbia

4

# Exhibit C



U. S. Department of Justice

Channing D. Phillips
United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

April 26, 2016

**BY FIRST CLASS MAIL**
Michael T. Kirkpatrick
Institute for Public Representation
600 New Jersey Ave., Suite 312
Washington, D.C. 20001

RE:   Third-party subpoena in *Avila v. Metropolitan Police Detective Matthew Dailey, et al.*
No. 15-2135 (TSC)

Dear Mr. Kirkpatrick,

On April 13, 2016, you served a subpoena on this office in the above-referenced civil action in which the United States Attorney's Office for the District of Columbia is a nonparty. The United States Attorney's Office ("USAO") hereby partially objects to the requested production of documents and files in accordance with Federal Rule of Civil Procedure 45(c)(2)(B). Subject to and without waiving those objections, the USAO releases certain responsive documents herewith. The USAO preserves its rights pursuant to Federal Rule of Civil Procedure 45(c)(3) to have the subpoena quashed or modified.

The subpoena demands all non-privileged documents relating to the September 6, 2014 incident involving plaintiff at El Torogoz Restaurant and the investigation into that incident, including any correspondence between the USAO and the D.C. Metropolitan Police Department ("MPD"), and any documents prepared or maintained by three specified Assistant United States Attorneys ("AUSAs"). It also seeks all documents describing the USAO's policies, procedures, and practices for: (i) retaining property seized as evidence by the MPD; (ii) releasing property seized as evidenced by the MPD; (iii) releasing property seized as evidence to owners who have not been charged with a crime or are not suspects in an investigation; (iv) releasing vehicles seized as evidence; and (v) notifying an owner that property previously seized as evidence has been released or is available for retrieval.

We draw your attention to the Department of Justice's regulations regarding production of records in legal proceedings, which appear at 28 C.F.R. § 16.21 *et seq.* A party must comply with those regulations in order for any DOJ employee to be authorized to provide any information or records in response to a subpoena. *See United States, ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

As is discussed in more detail below, the USAO objects to the subpoena in part because it seeks documents prohibited from being provided pursuant to 28 C.F.R. 16.26(b)(1) and (5), and also seeks documents protected by the attorney work product privilege.

### A.   Disclosure of Requested Documents and Files would Violate a Specific Rule

Pursuant to 28 C.F.R. § 16.26(b)(1), in considering whether to make a disclosure pursuant to demand, the USAO must evaluate whether "[d]isclosure would violate a statute . . . or a rule of procedure such as the grand jury secrecy rule, F.R.Cr.P., Rule 6(e)." In the instant request, disclosure of certain documents would violate the grand jury secrecy rule. Courts in this Circuit hold that "Rule 6(e) extends secrecy beyond the transcribed proceedings actually occurring before the grand jury to cover . . . [r]ecords, orders and subpoenas relating to grand jury proceedings . . . to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury." *Moore v. Hartman*, 102 F. Supp. 3d 35, 102-03 (D.D.C. 2015) (quoting Fed. R. Crim. P. 6(e)(6)). Indeed, as the D.C. Circuit has observed, "the scope of the secrecy is necessarily broad . . . encompass[ing] not only the direct revelation of grand jury transcripts but also the disclosure of information which would reveal 'the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of the jurors, and the like.'" *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 869 (D.C. Cir. 1981) (citation omitted). Accordingly, any documents and files subject to the grand jury secrecy rule will be withheld.

### B.   Disclosure of Requested Documents and Files would Reveal Investigative Techniques

The USAO also is required to evaluate whether "[d]isclosure would reveal investigatory records compiled for law enforcement purposes, and would impair enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired." 28 C.F.R. § 16.26(b)(5). *See also Miller v. Holtzmann*, C.A. 95-1231 (RCL/JMF), 2007 WL 779393, at *1-2 (D.D.C. 2007) (explaining that "[t]he law enforcement investigatory privilege is 'designed to prevent disclosure of information that would be contrary to the public interest in effective functioning of law enforcement' and to 'preserve the integrity of law enforcement techniques'"). Pursuant to regulation and the law enforcement investigatory privilege, the USAO is withholding certain nonpublic investigatory records and correspondence between the USAO and MPD regarding the investigation into the September 6, 2014 incident.

### C.   Disclosure of Requested Documents is Protected by the Attorney Work Product Privilege

Given the clearly anticipated legal action between the USAO and the perpetrator of the September 6, 2014 incident, some of the documents and files you seek also are protected by the attorney work product privilege. Consequently, to the extent that the AUSAs may possess records responsive to your requests, they were gathered in preparation for and anticipation of litigation. Disclosing those documents – or even identifying which documents the USAO currently has – would reveal the AUSAs' mental impressions, litigation strategy, and legal theories. Such records deserve the utmost protection from discovery. *See Hickman v. Taylor*,

329 U.S. 495, 510-11 (1947); *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 619 (D.C. Cir. 1997).

*       *       *

Notwithstanding the objections described above, and without waiving any privileges described, the USAO is releasing the Metropolitan Police Department Form 81c issued in this case, by which our office authorized the release of the van at issue. We also are releasing a system-generated email reflecting that a voicemail was left for an AUSA by a witness's attorney.

With respect to Paragraphs 2-6 of the subpoena, which demanded documents describing or setting forth USAO policies on a variety of subjects, we note that the MPD – not the USAO – is the custodian of all seized property. Accordingly, MPD drives the decision on when to release property and/or when to seize it for civil forfeiture. The MPD presents a Form 81c to the USAO to ensure that the property is not needed as evidence, but the MPD is the ultimate decision maker as to the disposition of the property. We are unaware of any USAO policies for processing Form 81c requests other than that they are to be addressed on a case-by-case basis. In sum, we are unaware of any written policies covering the subjects described in the attachment to the subpoena.

Sincerely,

CHANNING D. PHILLIPS
United States Attorney

By:      s/ Damon Taaffe
DAMON W. TAAFFE
Assistant United States Attorney

# Exhibit D

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3    -------------------------------
                                     :
 4    ERLIN EVER MENCIAS AVILA,      :
                                     :
 5             Plaintiff,            :
                                     :
 6       v.                          :   Civil Action No.
                                     :
 7    METROPOLITAN POLICE DETECTIVE  :   1:15-cv-02135-TSC
                                     :
 8    MATTHEW DAILEY, et al.,        :
                                     :
 9             Defendants.           :
                                     :
10    -------------------------------
```

11          Deposition of DETECTIVE MATTHEW DAILEY, a

12    witness herein, at the Georgetown Law Center,

13    Institute for Public Representation, 600 New Jersey

14    Avenue, N.W., Washington, D.C., commencing at

15    9:27 a.m. on Tuesday, May 17, 2016, and the

16    proceedings being taken down by stenotype and

17    transcribed by Catherine B. Crump, a Notary Public in

18    and for the District of Columbia.

19

20

21

22

Detective Matthew Dailey                                      May 17, 2016

Washington, D.C.

1    2014, will you understand what I'm talking about?

2         A.   Yes.

3         Q.   Thank you.  Prior to the September 6,

4    2014 incident, had you had any interactions with Mr.

5    Mencias?

6         A.   No.

7         Q.   Were you the lead detective with regard

8    to the investigation of the September 6, 2014

9    incident?

10        A.   Yes.

11        Q.   What was your shift on September 6,

12   2014?

13        A.   I believe it was the evening shift.

14        Q.   What are the hours of that shift,

15   typically?

16        A.   We responded at 2:30 in the afternoon

17   and we were there until 11 p.m.

18        Q.   Can you walk me through your involvement

19   the night of September 6, 2014 starting with how you

20   first became aware of the incident?

21        A.   From my recollection, we were called to

22   the scene by patrol officers who did an initial

Page 20

1    investigation.

2           Q.    Who were those patrol officers?

3           A.    I don't recall.

4           Q.    When you say you were called to the

5    scene, you went to El Torogoz Restaurant?

6           A.    Yes.

7           Q.    That was the first place you went with

8    regard to the investigation of this incident?

9           A.    Yes.

10          Q.    What time did you arrive at the

11   restaurant?

12          A.    I don't recall.

13          Q.    What information were you provided by

14   the patrol officers who had initiated the

15   investigation?

16          A.    That an assault had occurred and there

17   were multiple complainants, multiple victims,

18   basically, that they had -- the information they had

19   gathered was that there was one suspect who was

20   initially chasing people around with a knife.  A

21   second victim was struck with a metal chair.

22          They had said that the suspect had left the

Detective Matthew Dailey                                    May 17, 2016
Washington, D.C.

1   scene in a van, work van that they had information

2   about, and that was the initial information that they

3   had given me.

4        Q.    Had they interviewed witnesses?

5        A.    Briefly.  As far as -- to my

6   recollection, briefly.

7        Q.    Did they communicate to you what the

8   witnesses had told them?

9        A.    That's essentially what they told me.

10       Q.    So what did you do?

11       A.    When I was on the scene, I was reviewing

12   the camera footage inside the restaurant with the

13   owner of the restaurant.

14       Q.    So the security camera footage, and

15   that's the videotape that's been turned over to us in

16   discovery?

17       A.    Yes.

18       Q.    So once you reviewed the security camera

19   videotape, what else did you do?

20       A.    After reviewing the videotape, I went

21   and accompanied Detective Xanten, who was

22   interviewing the witnesses and complainants.

Page 24

1    guess it was a partial tag of the van.

2          Q.    Back at 4D, were you are able to find

3    any information about the van?

4          A.    I don't recall.

5          Q.    What was the next thing that happened?

6          A.    We were notified that the van was

7    located on the Kennedy Street based on the

8    description that the witnesses provided and the

9    partial tag number.  So we obtained the information

10   from that, were able to identify the registered owner

11   of the van.

12          From that point, we took a picture of the

13   registered owner to the restaurant owners and asked

14   them if they recognized this individual.  They

15   advised that this individual was the driver of the

16   van that was the person who was with the defendant or

17   the suspect in the case.

18          Q.    What did you do next?

19          A.    I believe at that time, they still had

20   the van held on Kennedy Street.  We went to Kennedy

21   Street to observe the van, and now knowing that this

22   person or the registered owner of that particular van

Detective Matthew Dailey                                        May 17, 2016
                            Washington, D.C.

                                                                  Page 25

1    was the same person that drove the van away, we had

2    the van seized as evidence and taken to 4D.

3         Q.     How did you first make contact with Mr.

4    Mencias?

5         A.     One of the patrol officers advised they

6    found the owner of the van and had stopped him

7    further up.  I believe it was closer to 8th or 9th

8    Street than Kennedy.

9         Q.     Do you know what patrol officer it was

10   that so advised?

11        A.     I don't recall.

12        Q.     And how did patrol officer, if you know,

13   identify Mr. Mencias as connected to the van?

14        A.     I don't know how they identified them.

15        Q.     Had you circulated Mr. Mencias' photo,

16   the phot that you took back to the restaurant to show

17   the owners?  Had you circulated that to the patrol

18   officers in the area?

19        A.     No.

20        Q.     So what did you do when you were advised

21   that an officer had located Mr. Mencias at about the

22   800 block or so of Kennedy Street?

Page 26

1       A.      Myself and Detective Xanten went to the

2    location where he was.

3       Q.      Who else was there?

4       A.      There were two patrol officers there.

5       Q.      What were their names?

6       A.      I don't recall.

7       Q.      Do you think it might have been Officer

8    Jordan?

9       A.      I couldn't say for sure.  I don't

10   recall.

11      Q.      Do you know if it might have been

12   Officer Geiger?

13      A.      I don't recall their names.

14      Q.      So when you arrived, there were two

15   patrol officers with Mr. Mencias on the sidewalk when

16   you and Detective Xanten arrived; is that right?

17      A.      Yes.

18      Q.      What happened then?

19      A.      One of the officers who was there

20   translated the conversation in Spanish between myself

21   and Mr. Mencias.  I attempted to get him to come to

22   the Fourth District to talk to us about the offense,

Page 28

1    Mencias, did an individual come out of a nearby

2    restaurant night club and intervene on Mr. Mencias'

3    behalf?

4          A.    Not while I was there.

5          Q.    Were you there at the conclusion of the

6    conversation with Mr. Mencias?  In other words --

7    that's not a very good question.  Let me try again.

8          How did the conversation conclude?

9          A.    By him refusing to speak with me, I

10   ended up leaving.  I was continuing on with my

11   investigation.

12         Q.    Did either of the patrol officers or

13   Detective Xanten remain with Mr. Mencias at that

14   point?

15         A.    Detective Xanten left with me.  As far

16   as the patrol officers, I don't know.

17         Q.    When you arrived to the scene where Mr.

18   Mencias was, the sidewalk at about the 800 block of

19   Kennedy Street, had the decision already been made to

20   seize the van?

21         A.    Yes.

22         Q.    Who made that decision?

1        A.      Essentially, I did, but myself and

2    Detective Xanten.

3        Q.      For what purpose was the van seized?

4        A.      Because we knew that the van was used in

5    the commission of a crime.  We knew that the subject

6    occupied the van.  We didn't know what property was

7    inside the van that belonged to the subject.  So

8    that's why it was seized.

9        Q.      Is it fair to say that you thought there

10   might be evidence in the van that would help you

11   identify the suspect in the incident?

12       A.      Yes.

13       Q.      Were there any other reasons that the

14   van would have been seized?

15       A.      No.

16       Q.      Was Mr. Mencias provided with any kind

17   of receipt when his van was seized?

18       A.      Not to my knowledge.

19       Q.      Was he provided with any kind of written

20   documents or forms?

21       A.      Not to my knowledge.

22       Q.      What was Mr. Mencias told about why his

Page 30

1    van was being seized?

2         A.    As I explained before, he was told that

3    it was seized because it was used in the commission

4    of a crime and it was being taken as evidence.

5         Q.    Was Mr. Mencias told how he could get

6    his van back?

7         A.    Eventually, he was told that.  He was

8    told that night that he needed to come and speak with

9    us, the sooner that he spoke with us, the sooner that

10   he was able to provide any information or we could

11   talk about the investigation, we could work on

12   getting his van back to him.  He was later told on

13   other occasions how the van would be -- how he could

14   get his van back, that it needed to be released by

15   the U.S. Attorney's Office.

16        Q.    Just focusing for now on the night of

17   September 6, 2014, was Mr. Mencias given your contact

18   information with regard to following up to get his

19   van back?

20        A.    I don't recall.

21        Q.    In other words, if he was told you need

22   to come talk to us in order to move the process

Page 31

1    forward to get your van back, was he given any

2    instructions on where to go and who to talk to?

3         A.    I don't recall.  I may have given him my

4    business card, but I don't recall.

5         Q.    Do you know if he was given contact

6    information from any of the officers or detectives

7    involved?

8         MR. CHANG:  Objection.  You can answer.

9         THE WITNESS:  I don't know.

10   BY MR. KIRKPATRICK:

11        Q.    Who seized the van?

12        A.    I believe it was Officer Jordan.

13        Q.    Did he do so on your instruction?

14        A.    Yes.

15        Q.    Where was the van taken?

16        A.    It was taken to the Fourth District

17   impound lot.

18        Q.    And what physically happens to a vehicle

19   that's seized as evidence after it's towed from the

20   scene?

21        A.    It's taken to a secured lot at -- well,

22   depending on where the investigation happens.  In

Page 33

1    document is General Order 601.1 and it's Bates

2    numbered Mencias 82 through Mencias 119.  Detective

3    Dailey, can you tell me what -- what is Exhibit 1?

4         A.   This is the Metropolitan Police

5    Department General Order in reference to recording,

6    handling, and disposition of property coming into the

7    custody of the department.

8         Q.   And does the document we've marked as

9    Exhibit 1, does it reflect MPD policy regarding

10   property seized as evidence?

11        A.   Yes.

12        Q.   Are you aware of any other documents

13   other than Exhibit 1 that reflect MPD policy

14   regarding seizure of property as evidence?

15        MR. CHANG:  Just for the record, you're

16   asking him to speak from his personal knowledge.

17   Right?  Not as MPD generally?

18   BY MR. KIRKPATRICK:

19        Q.   That's right.  So are you aware of any

20   other documents that reflect MPD policy regarding

21   property seized as evidence?

22        A.   Not that I can recall.

Page 34

1        Q.    Were the procedures set forth in Exhibit

2   1 followed with respect to the seizure of Mr.

3   Mencias' van?

4        A.    To my knowledge, yes.

5        Q.    Who completed those tasks?

6        A.    I believe it was Officer Jordan.

7                     [Dailey Exhibit No. 2 was

8                     marked for identification.]

9   BY MR. KIRKPATRICK:

10       Q.    Detective Dailey, I'm handing you what

11  we've marked as Exhibit 2, and for the record, this

12  is DC 45 to 46.  What is Exhibit 2?

13       A.    This is a PD-81.

14       Q.    And was this PD-81 completed by Officer

15  Jordan with respect to the seizure of Mr. Mencias'

16  van?

17       A.    It appears so, yes.

18       Q.    From your review of this PD-81, does it

19  appear to have been completed correctly?

20       MR. CHANG:  Objection.  He's not the author

21  of this document, but you can certainly --

22  BY MR. KIRKPATRICK:

Page 39

1    like that.

2         Q.    In Mr. Mencias' van's case, was that

3    declaration made by you or by Officer Jordan?

4         A.    Well, I was the lead detective on the

5    case.  Myself and Detective Xanten talked with the

6    officers on the scene.  Initially, Officer Jordan

7    would fill out the paperwork and form, but we were

8    saying that this van is evidence in the case.  So,

9    essentially, we identified it as being evidence in

10   the case, so as instructed to, filled out the

11   paperwork as evidence.

12        Q.    How often are you involved in seizing

13   property as evidence?

14        A.    Regularly.

15        Q.    So does it happen every week?  Every

16   month?  Just typically.

17        A.    Several times a week probably, not

18   necessarily with vehicles, but with other types of

19   property.

20        Q.    Did you prepare a report regarding the

21   events of September 6, 2014?

22        A.    Yes.

Page 49

1    as a devised plan to have him come in and speak to us

2    because of the van, no.

3         Q.    But there was an expectation that he'd

4    probably show up at some point asking about his van

5    and tools?

6         A.    I would assume so.

7         Q.    Is holding evidence to attract a subject

8    that you want to interview, is that ever used,

9    essentially, as a strategy to get somebody to come in

10   to talk to you?

11        MR. CHANG:  Objection.  You can answer.

12        THE WITNESS:  Holding evidence as a strategy

13   to have someone speak to us?

14   BY MR. KIRKPATRICK:

15        Q.    Yes.  In other words, is the seizure of

16   evidence ever used, essentially, to attract a subject

17   who you want to interview to come in so that contact

18   can be made and questions can be asked?

19        MR. CHANG:  Objection.  You can answer.

20        THE WITNESS:  I don't believe it's

21   necessarily a strategy.  In this particular case, we

22   needed to speak with him because he was the owner of

Page 50

1   the van.  We needed to speak with him with reference

2   to who was in the van and what belonged to him and

3   what didn't belong to him.  So we didn't know what

4   was evidence and what wasn't at the time as far as

5   regarding the suspect that was inside the van.  So

6   that's why his van was being held as evidence.

7   BY MR. KIRKPATRICK:

8           Q.    Take a look back, if you would, at

9   Exhibit 4, in particular, the last sentence from

10  Detective Xanten.  He indicates that he made an entry

11  in the 4D property book asking that he be contacted

12  if or when Mr. Mencias responded to 4D to inquire

13  about his vehicle being impounded as evidence.

14          Do you see that?

15          A.    Yes.

16          Q.    Do you know why Detective Xanten

17  recorded making that entry into the 4D property book?

18          MR. CHANG:  Objection.

19  BY MR. KIRKPATRICK:

20          Q.    You can answer if you understand the

21  question.

22          A.    Okay.  So that we could talk to Mr.

Page 51

1    Mencias if he did come in.

2           Q.    Had you discussed with Detective Xanten

3    the possibility that seizure of the van might provide

4    an opportunity for further conversation with Mr.

5    Mencias?

6           A.    We discussed that we needed to speak

7    with him as far as the van and its content were

8    concerned.

9           Q.    Where is the 4D property book kept?

10          A.    In the Fourth District station.

11          Q.    Do you know why this property book entry

12   has not been produced in the discovery in this case?

13          A.    I don't know.

14          Q.    Were you involved in any capacity in the

15   September 11, 2014 interview?

16          A.    No.

17          Q.    When did you learn that that interview

18   had taken place?

19          A.    I believe it was the next week after

20   coming -- I was on my day off on September 11th.

21          Q.    Had anybody contacted you before

22   conducting that interview?

Detective Matthew Dailey                                    May 17, 2016

1        A.      Because Detective Timlick didn't have

2    the authority to release the van.

3        Q.      Is it correct to say that the van was

4    seized in order to try to identify the suspect in the

5    incident?

6        A.      Yes.

7        Q.      Do you recall any communications you had

8    with Mr. Mencias from the time of the incident up

9    until the search of the van on September 23, 2014?

10       A.      I don't believe I had any interaction

11   with him.

12       Q.      Do you know if Mr. Mencias had come by

13   the police station more than the September 11th time

14   when he was interviewed?

15       A.      Not to my knowledge.

16       Q.      Did you seek a search warrant to search

17   Mr. Mencias' van?

18       A.      I did.

19       Q.      And what was the purpose of searching

20   the van?

21       A.      To obtain evidence of the offense and

22   evidence that would help us identify the suspect.

1    search officer present to document, photograph, as

2    well as collect any evidence that was recovered from

3    the van.

4          Q.    Who was that officer?

5          A.    Officer Schmanski.

6          Q.    And did you participate in the search?

7          A.    I did.

8          Q.    Were you in charge of the search?

9          A.    I would say so, yes.

10         Q.    Other than Officer Schmanski, did

11   anybody else participate?

12         A.    I believe Detective Savoy and maybe

13   Detective Xanten.  I can't recall, but I'm pretty

14   sure Detective Savoy was there and then Officer

15   Schmanski.

16         Q.    Was Detective Savoy working the case

17   with you?

18         A.    He is another detective in the office

19   and we assist each other on cases.

20         Q.    Do you recall any particular tasks that

21   were completed by Detective Savoy with reference to

22   this investigation?

Page 65

1          A.     Not that I recall.

2          Q.     What were you looking for during the

3     search?

4          A.     We were looking for any property that

5     would, hopefully, identify a suspect, whether that be

6     personal items, identification, also collecting -- I

7     believe we collected beer cans from the van because,

8     essentially, the witnesses told us that they were

9     drinking beers and they threw several beers out of

10    the van as they were driving away.

11         So we were looking for additional evidence in

12    that nature as far as collecting things that we may

13    obtain samples, forensic evidence, DNA, things like

14    that.

15         Q.     Fingerprints perhaps?

16         A.     Fingerprints, knife, DNA samples.

17         Q.     Did you search only the passenger area

18    of the van or did you also search the back of the

19    van?

20         A.     I believe we looked in the back of the

21    van.  We didn't search through it.  We looked for --

22    because we found personal items up front in the

Page 66

1   passenger compartment, and that was the only area of

2   the van that we knew the suspect to be in, was the

3   passenger compartment.

4          Q.    And what was found, specifically?

5          A.    There was a backpack found that had --

6   well, there was personal items of Mr. Mencias in the

7   passenger compartment.  So we knew that that belonged

8   to him, but there was also an additional backpack

9   with a passport, Honduran passport, and other

10  personal items in it in the passenger compartment.

11         Q.    And did you remove the passport?

12         A.    Yes.

13         Q.    Did you also remove four beer cans?

14         A.    Yes.

15         Q.    And one knife?

16         A.    Yes.

17         Q.    Was anything else removed?

18         A.    No.

19         Q.    Where is that material that was removed?

20  The passport, the beer cans, and knife, where is that

21  now?

22         A.    It was seized as evidence.

Detective Matthew Dailey                                          May 17, 2016
                            Washington, D.C.

Page 67

1          Q.     And where was it taken?

2          A.     Well, it was processed by Officer

3    Schmanski and turned over to the Fourth District

4    Property Office.  To my knowledge, property from that

5    point goes to the warehouse, the evidence warehouse.

6          Q.     What did you do after the search was

7    completed?

8          A.     We did -- continued to do the

9    investigation, looking at the individual with the

10   passport to see if that was the suspect involved in

11   the investigation.

12                          [Dailey Exhibit No. 9 was

13                          marked for identification.]

14   BY MR. KIRKPATRICK:

15         Q.     Detective Dailey, we're handing you

16   what's been marked as Exhibit 9.  For the record,

17   this is DC 40.  What is Exhibit 9?

18         A.     This is the search warrant.

19         Q.     And, in particular, the lower half of

20   the search warrant, can you explain to me what that

21   is?

22         A.     That is the search warrant, the return

Page 74

1    in possession and that it was evidence, that we did

2    the search warrant and we recovered several items of

3    evidence, but the owner of the van was refusing to

4    come in and cooperate and talk to us.  The initial

5    conversation was to have him come in to the U.S.

6    Attorney's Office and that's why the grand jury was

7    opened.

8         Q.    When did that conversation take place?

9         A.    I don't recall.

10        Q.    Do you recall how close it was to the

11   search?

12        A.    No, I don't recall.  It wasn't that far

13   from the search, but I don't recall.

14        Q.    Within a few months?

15        MR. CHANG:  Objection.  You can answer.

16        THE WITNESS:  I would assume.  I don't know.

17   I don't recall exactly.

18   BY MR. KIRKPATRICK:

19        Q.    When property has been seized as

20   evidence to allow for a search and the search is

21   concluded, what's the process for releasing the

22   property back to its owner?

1          A.     The U.S. Attorney has to approve the

2     release.   Basically, the process is that we fill out

3     an 81-C.  They sign off on it.  If they have no

4     further need in the case or the investigation, then

5     they will sign off on the 81-C to release it.

6          Q.     When you had your discussion with Mr.

7     Giovannelli following the search, did he indicate

8     that they, the U.S. Attorney's Office, had a

9     continued need for the van?

10         A.     We discussed the case and we found that

11    there was a continued need based on that we wanted to

12    speak with Mr. Mencias before releasing it.

13         Q.     So the continued need was to try to make

14    contact with Mr. Mencias in order to gather further

15    information?

16         A.     Well, further information about the

17    contents of the van, because we didn't know, as I

18    said before, what belonged to him and what may have

19    belonged to the suspect.  Everything that we searched

20    initially was based on what we had from the

21    investigation.

22         The intent was to have Mr. Mencias come in,

Page 84

1        A.    The first -- my first communication with

2    him was, I believe, when I served him the subpoena.

3        Q.    Was that in March of 2015?

4        A.    I believe so, yes.

5        Q.    So there were no communications between

6    you and Mr. Mencias during October, November,

7    December 2014 or January and February of 2015?

8        A.    No.

9        Q.    Do you know whether during those months,

10   Mr. Mencias ever called 4D or tried to call you to

11   ask about his van and tools?

12       A.    I don't know.

13       Q.    You never took any such calls?

14       A.    I didn't, no.

15       Q.    Did you receive any voicemails from him?

16       A.    No.

17       Q.    Do you know whether he came by 4D in

18   person during those months to inquire about his van

19   and tools?

20       A.    I don't know.

21       Q.    Is there a system for logging such

22   visits if somebody comes by to ask about property?

Page 87

1        Q.    And that attorney was Mr. Giovannelli?

2        A.    No.

3        Q.    Who was it?

4        A.    Mr. Giovannelli is the senior.  I guess

5   he's the prosecutor that is in charge of the Fourth

6   District, and then there's a set of attorneys under

7   him that he assigns cases to.  Initially, the case

8   was assigned to -- [pause].

9        MR. CHANG:  Bruckmann.

10       THE WITNESS:  Bruckmann, and then it was

11  later transferred to Kara Traster.

12  BY MR. KIRKPATRICK:

13       Q.    So you would sit with Mr. Bruckmann to

14  interview witnesses?

15       A.    Yes.

16       Q.    Did you do anything else with respect to

17  furthering the investigation prior to serving the

18  subpoena on Mr. Mencias?

19       A.    Other than working with Mr. Bruckmann or

20  Ms. Traster?

21       Q.    Right, exactly.  Other than sitting with

22  them for interviews of witnesses, were there any

Page 88

1    other investigatory tasks that you were involved in?

2         A.    Not that I recall.

3         Q.    How often would you -- and this is

4    before March of 2015 when Mr. Mencias was served.

5    How often would you be involved in investigatory

6    activities having to do with the incident on

7    September 6, 2014?

8         A.    I don't recall how often it was.  I know

9    that I was frequently inquiring with the U.S.

10   Attorney's Office on when we were going to move

11   forward and what we were going to do next, because

12   they are also backlogged in cases, as we are.  So to

13   my knowledge, you know, one may take priority over

14   another, and so it was a matter of scheduling and

15   trying to figure out when the best times to have

16   witnesses come in, you know, scheduling time in the

17   grand jury for witnesses to testify, so those things.

18   It was over a long period of time and trying to get

19   people in and trying to get things done.

20        Q.    Was a suspect ever arrested with respect

21   to the incident?

22        A.    No.

Page 89

1      Q.    Was anyone ever charged with respect to

2  the incident?

3      A.    No.

4      Q.    Did you speak to Mr. Mencias on March 3,

5  2015?

6      A.    On March 3rd?  I don't recall, but I did

7  speak with him when he was served with the subpoena.

8      Q.    How did that come about?

9      A.    I called him.  Actually, he called the

10  Fourth District.  That was one of the times that he

11  inquired about his van, when he was served.  I

12  instructed him to come to the Fourth District so that

13  I could serve him with a subpoena.  That was also

14  translated by a Spanish officer, who once he was

15  served was told that he could come down to the U.S.

16  Attorney's Office; once we were able to talk to him

17  about the van, about his involvement in the

18  investigation, that the U.S. Attorney would be the

19  person that he would need to speak to about his van

20  and whether it would be released.

21               [Dailey Exhibit No. 14 was

22               marked for identification.]

1  BY MR. KIRKPATRICK:

2          Q.    Detective Dailey, you've been handed a

3  document that we've marked as Exhibit 14.  This is

4  DC-. 9 what is it?

5          [Witness peruses exhibit.]

6          THE WITNESS:  This is a supplemental report

7  that I created on March 3rd.

8  BY MR. KIRKPATRICK:

9          Q.    Does this reflect the conversation that

10  you were just describing to us?

11          A.    No.  I must have been recalling

12  something else.  This was a different conversation

13  that I must have had with Mr. Mencias on the phone,

14  because this was translated by the Language Line

15  interpreter.

16          Q.    What was this conversation?

17          A.    This conversation was Mr. Mencias

18  inquiring about his van and what needs to be done so

19  it could be released.

20          Q.    What number did you use to return this

21  phone call from Mr. Mencias?

22          A.    I believe it was my desk phone, which

Page 95

1        Q.    Did you ever tell Mr. Mencias that the

2   police could keep his van and sell it because it was

3   used during the commission of a crime?

4        A.    I don't believe so, no.

5        Q.    In what we've marked as Exhibit 14, you

6   say in here that the nature of the investigation has

7   been explained to him on two separate occasions.

8   What were those occasions?

9        A.    To my knowledge, the two separate

10  occasions were the night of the offense when I

11  initially spoke to him and then also explained to him

12  by Detective Timlick when he came in for the

13  interview.

14       Q.    What did you tell Mr. Mencias about the

15  grand jury investigation?

16       A.    I didn't.

17       Q.    Did you ask Mr. Mencias to come to 4D

18  the following day?

19       A.    If that's when the subpoena was served

20  to him, yes.

21       Q.    Did you tell him the purpose for which

22  you wanted him to come to 4D?

Page 98

1        A.    Yes.

2        Q.    Did you serve Mr. Mencias with this

3   letter and subpoena?

4        A.    I did.

5        Q.    When did you do so?

6        A.    I don't recall the exact date.  There is

7   an additional -- we make a copy of this form that we

8   have -- we give to the person being served.  We give

9   them the blank copy.  We have them sign, saying that

10  they received it.  Then we fill out the

11  documentation, when it was served and the time, and

12  we turn that over to the U.S. Attorney's Office.

13       Q.    Do you retain a copy of that?

14       A.    I don't.

15       Q.    To the best of your recollection, was it

16  served soon after the date that it was generated?

17       A.    Yes.  Yes.

18       Q.    Where did you serve Mr. Mencias?

19       A.    At the Fourth District Station.

20       Q.    Did you have a conversation with him at

21  that time?

22       A.    A brief conversation.

Page 105

1    don't know what their procedures are and how they

2    conduct it.

3          Q.    But is it your understanding that they

4    do reach out to the property owner?

5          A.    I don't know.

6          Q.    After Mr. Mencias appeared at the grand

7    jury sometime in March of 2015, what was your next

8    action, if any, with regard to the investigation of

9    the September 6, 2014 incident?

10         A.    Again, it was still working with the

11   U.S. Attorney's Office and trying to develop

12   witnesses and develop more evidence in the case so

13   that we could move forward.

14         Q.    And was it a particularly active

15   investigation?  Like how much time would you devote

16   to the September 6, 2014 incident in the months

17   following March of 2015?

18         A.    To this particular case, I would have to

19   say that there wasn't a whole lot of action going on,

20   but again, that wasn't my call.  I inquired about it

21   multiple times with the attorney as far as where we

22   were, what we were doing, but as far as scheduling

```
                                                    Page 106
 1   and having people come in and moving forward in the

 2   case, I don't govern the U.S. Attorney's schedule.

 3        Q.    But is it fair to say that there wasn't

 4   much happening?

 5        A.    Yeah.  That's fair to say.

 6        Q.    Again, we've now been at it for two

 7   hours.  It's not a marathon.  So we can take a break.

 8   Would you like a break?

 9        A.    Sure.

10        MR. KIRKPATRICK:  This is a fine place to take

11   a break.  Let's go off the record for about 10

12   minutes.

13        [Recess.]

14                         [Dailey Exhibit No. 17 was

15                         marked for identification.]

16   BY MR. KIRKPATRICK:

17        Q.    Detective Dailey, you've been handed

18   what's been marked as Exhibit 17.  For the record,

19   this is DC 35.  What is it?

20        A.    This is an E-mail from Kara Traster to

21   myself.

22        Q.    When she refers to three ADWs that you
```

Page 112

1    relationship where I can just walk into their office

2    if they're there and say, Hey, what are we doing with

3    this or that.

4          Q.    But it's fair to say that this was not a

5    particularly active investigation?

6          A.    No, it was not.

7          Q.    Did you receive a voicemail from someone

8    from the Washington Lawyers Committee for Civil

9    Rights in November 2015 regarding Mr. Mencias?

10         A.    I remember receiving a phone call.  I

11   don't remember receiving a voicemail.

12         Q.    Tell me about the phone call you

13   remember.

14         A.    A woman called the Fourth District

15   Detectives Office asking for me.  I remember speaking

16   with her.  I don't recall her name.  She advised me

17   that she was an attorney representing Mr. Mencias,

18   and I -- basically, the gist of the conversation was

19   that her client -- there was a grand jury

20   investigation.

21         Her client was dealing with the U.S. Attorney.

22   As far as I knew, we were supposed to -- you need to

Page 113

1    contact the U.S. Attorney's Office.  I can't discuss

2    the case with you.  I can't discuss any facts of the

3    case with her without the presence of the U.S.

4    Attorney.  So I gave her Kara Traster's name and

5    phone number and instructed her to call Ms. Traster

6    in reference to the case.

7         Q.   Do you remember whether she asked you

8    specifically about the release of Mr. Mencias' van?

9         A.   I don't recall specifically her asking

10   that question, but I do recall her -- you know, there

11   was something.  I don't know if it was in reference

12   to the van or what it was in reference to, but I do

13   recall telling her I couldn't discuss, you know, it's

14   not -- maybe it was about a van, if I recall, because

15   I couldn't discuss it with her, that it wasn't up to

16   me, that it was up to the U.S. Attorney's Office and

17   I couldn't discuss the case or any involvement of her

18   client, that she would need to contact the U.S.

19   Attorney's Office.

20        Q.   Did you tell her that you lacked the

21   forms necessary to release Mr. Mencias' van?

22        A.   No.

Page 114

1          Q.     Did you have any other communications

2     with Mr. Mencias or any of his representatives about

3     his van after November 15th or let me say November

4     2015?

5          A.     No.

6          Q.     Do you recall communicating with anyone

7     from the U.S. Attorney's Office regarding Mr.

8     Mencias' van in November of 2015?

9          A.     Ms. Traster and also Mr. Giovannelli.

10         Q.     And what was that communication?

11         A.     It was a few days, I believe, after

12    receiving the phone call and instructing the attorney

13    to call Ms. Traster that I got an E-mail from Kara

14    Traster saying that they have decided to close the

15    case and to send them the PD-81-C so that they could

16    sign off on the release of the van.

17                          [Dailey Exhibit No. 19 was

18                          marked for identification.]

19    BY MR. KIRKPATRICK:

20         Q.     Detective Dailey, you've been handed

21    what we've marked as Exhibit 19, which for the record

22    is DC 37.  What is it?

Page 115

1          A.     This is the E-mail from Kara Traster

2    telling me that they needed the PD-81-C and that they

3    were going to close the case.

4          Q.     And you received this E-mail, I think

5    you said, shortly after you spoke with the woman from

6    Washington Lawyers Committee?

7          A.     Yes.

8          Q.     Did you call Ms. Traster after receiving

9    the E-mail we've marked as Exhibit 19 or visit with

10   her in person?

11         A.     I don't recall.  I don't recall whether

12   I did or not.

13         Q.     Is it typical for an AUSA to ask the

14   investigating detective to send the PD-81C to the

15   U.S. Attorney's Office for signoff?

16         A.     I don't know if typical is the

17   appropriate word.  There really isn't anything

18   typical as far as how the property is released.  I

19   mean, if anything is typical, the U.S. Attorney and

20   the detective have a conversation as far as how the

21   case proceeds.

22            In this particular case, there really wasn't

Page 116

1    anything typical about it as everything was -- as you

2    said before, it was not very active in the case and

3    my trying to get information as far as where we are

4    going, are we moving forward, that's kind of where we

5    were.  So when I got this call out of the blue from

6    his attorney and basically referring her to

7    Ms. Traster, getting an E-mail asking me to send an

8    81C because the case is closed in this particular

9    fashion, it's not typical.

10        Q.    Are the 81C forms typically initiated

11   from the police side and then sent to the U.S.

12   Attorney's Office side?

13        A.    It is an MPD form.  So we fill it out

14   and we get the release done.  So, typically, once

15   evidence is -- we're done with evidence in the case,

16   but it's also a part of a discussion with the U.S.

17   attorney.  We'll ask do we need this any further or,

18   as we did in this particular case, that's why the

19   grand jury was open.  We needed this van still as

20   evidence in the case until they told me it wasn't

21   needed anymore, and then I would release the van or

22   release property.

Page 117

1          Q.      After speaking with Ms. Traster about at

2     least receiving this E-mail, did you contact the

3     woman from Washington Lawyers Committee to let her

4     know the van would be available for release?

5          A.      No, I did not.

6          Q.      And why not?

7          A.      I assume that Ms. Traster had been in

8     touch with her and told her that it was going to be

9     released.

10         Q.      And did you contact Mr. Mencias?

11         A.      I did not.

12         Q.      After receiving this November 19, 2015

13    E-mail we've marked as Exhibit 19, what actions, if

14    any, did you take regarding the September 6, 2014

15    incident?

16         A.      I spoke with my officials in the

17    Detectives Office, informed them that the grand jury

18    case was closed and that there was still aspects of

19    this case that needed to be investigated in my

20    opinion, and my officials instructed me at that point

21    to apply for a arrest warrant for Mr. Mencias for

22    obstruction of justice.

Page 125

1    what's been marked as Exhibit 23 and it's Bates

2    numbered DC 39.  What is Exhibit 23?

3         A.    This is a PD-81C.

4         Q.    So is this a completed PD-81C form that

5    Mr. Giovannelli signed for Mr. Mencias' van?

6         A.    Yes.

7         Q.    And did you receive this with the top

8    portion of the November 30, 2015 E-mail that we've

9    marked as Exhibit 20?

10        A.    I believe so.  I don't know.  I can't --

11   without looking at the E-mail itself, I can't be

12   sure, but it was around the same time.  Yes.

13        Q.    Okay.  Do you know if he sent you the

14   signed-off PD-81C as an E-mail attachment versus, you

15   know, a paper copy?

16        A.    Typically, with Mr. Giovannelli, he'll

17   send it as a scanned copy through the E-mail just

18   because he's in and out of his office all the time.

19   So it's a matter of getting an original signed copy.

20   He'll just E-mail to us and that's sufficient.  So I

21   imagine that he just sent me an E-mail signed copy.

22        Q.    In the upper right-hand copper in Box 2

Page 126

1    of Exhibit 23, it says date initiated and it has

2    9-26-2015.  Is that correct?

3          A.    No.  That's my error.

4          Q.    And is that just, essentially, a

5    typographical error?

6          A.    Because I was looking at the dates

7    between the date that it was recovered and typing it

8    in as far as the date initiated.  So it's supposed to

9    be 11 or November when I sent it in.

10          Q.    Okay.  After receiving the signed PD-81C

11    form, what did you do next?

12          A.    I provided a copy to the property clerk.

13          Q.    Who was the property clerk you provided

14    it to?

15          A.    I believe it was Officer Benson.

16                        [Dailey Exhibit No. 24 was

17                        marked for identification.]

18    BY MR. KIRKPATRICK:

19          Q.    Detective Dailey, you've been handed

20    what's been marked as Exhibit 24.  This is DC 15 and

21    16.  What is this Exhibit 24?

22          A.    This is a supplemental report saying

Page 128

1    reference to the arrest warrant that was applied for.

2         Q.    So as you explained with regard to the

3    81C, this is you uploading the declined arrest

4    warrant into the electronic case system?

5         A.    Yes.

6         Q.    And you did that on December 1, 2015 at

7    about 9:06; is that right?

8         A.    Correct.

9         Q.    After you completed these entries into

10   the case file, what else did you do, if anything,

11   with regard to Mr. Mencias's van?

12        A.    Nothing.

13        Q.    Why didn't you contact Mr. Mencias to

14   let him know that his van was available for release?

15        A.    My assumption was that he was

16   represented by an attorney and that they had been in

17   contact with the U.S. Attorney's Office.  Typically,

18   once they sign off on a release, the van is -- or

19   someone's property is able to be released.  So I had

20   assumed that the attorneys were contacting each

21   other.

22        Q.    In response to Interrogatory No. 2, you

Page 129

1    said that the MPD member investigating the case can

2    also advise the claimant to make arrangements for the

3    return of property with the property clerk.  Did you

4    ever advise Mr. Mencias to make arrangements with the

5    property clerk for return of his van?

6           A.    I never spoke to Mr. Mencias.

7           MR. KIRKPATRICK:  Off the record for a

8    minute.

9           [Mr. Kirkpatrick confers with co-counsel.]

10          MR. KIRKPATRICK:  We're back on the record.

11   I'll pass the witness.

12          MR. CHANG:  No questions.

13          [Whereupon, at 12:10 p.m., the deposition

14   concluded.]

15                          [Signature not waived.]

16

17

18

19

20

21

22

CERTIFICATE OF NOTARY PUBLIC


I, CATHERINE B. CRUMP, the officer before whom the foregoing deposition was taken, do hereby testify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me stenographically and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto nor financially or otherwise interested in the outcome of the action.

_____

CATHERINE B. CRUMP

Notary Public in and for the

District of Columbia

My Commission Expires:  October 31, 2017



**Alderson**
COURT REPORTING

Michael T. Kirkpatrick
Institute for Public Representation
Georgetown University Law Center
600 New Jersey NW
Suite 312
Washington, DC 20001
(202) 661-6582

### NOTICE OF DISPOSITION OF ORIGINAL
### TRANSCRIPT AND/OR ERRATA

Case:              Erlin Ever Mencias Avila v. Metropolitan Police Detective Matthew
Dailey
Deponent's Name:   Dectective Matthew Dailey
Deposition Date:   05/17/2016
Reference Number:  64327

The witness has not read and signed the transcript(s) within the
time allowed by the Federal/State Rules.  Thus, we are forwarding
to you the unsigned Original Transcript.

The witness waived his/her right to read and sign the transcript.
Thus, we are forwarding to you the unsigned Original Transcript.

The signed Original Transcript and/or errata were forwarded to
Alderson Court Reporting.  We are forwarding them to you, the
noticing Attorney.

In the attached sealed envelope(s) you are being provided with:

Signed Original Transcript(s)
Unsigned Original Transcript(s)
Original exhibit(s)
Original Errata

Please do not hesitate to call if we can be of further service to you in this matter.

Thank You,

Alderson Reporting Production Department

1155 Connecticut Avenue NW, Suite 200
Washington, DC 20036

P 202.289.2260
F 202.289.2221

800.FOR.DEPO (367.3376)
ALDERSONREPORTING.COM

# Exhibit E

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    --------------------------------X

4    ERLIN EVER MENCIAS AVILA,          :

5                     Plaintiff,        :
                                              Case No.:
6        v.                            :
                                          1:15-CV-02135-TSC
7    METROPOLITAN POLICE DETECTIVE      :

8    MATTHEW DAILEY, ET AL.,            :

9                     Defendants.       :

10   --------------------------------X

11

12            Deposition of WILLIAM XANTEN

13                 Washington, D.C.

14            Tuesday, June 28, 2016

15                   9:10 a.m.

16

17

18

19

20   Job No.: 65006

21   Pages: 1-68

22   Reported by: Matthew Goldstein

Page 2

```
 1        Deposition of WILLIAM XANTEN, held at:

 2

 3

 4            Georgetown University Law Center

 5            600 New Jersey Avenue, NW

 6            Washington, D.C. 20001

 7            202.661.6582

 8

 9

10

11

12        Pursuant to Subpoena, before Matthew Goldstein,

13   Notary Public in and for the District of Columbia.

14

15

16

17

18

19

20

21

22
```

1  detective will be responsible for following up on

2  everything that I've done in the initial incident.

3      Q.   During the initial incident, would that

4  include writing an initial case report, interviewing

5  witnesses, that kind of stuff --

6      A.   Yes.

7      Q.   -- or correct me if I'm wrong?

8      A.   Yes, that's correct.

9      Q.   I'd like to turn your attention to the

10  events of September 6, 2014.  When I refer to the

11  September 6, 2014, incident or the incident at El

12  Torogoz's, I'm referring to an alleged assault with

13  a deadly weapon at El Torogoz Restaurant, 4231 9th

14  Street, Northwest, on that date.  Do you understand

15  that?

16      A.   Yes.

17      Q.   Now, prior to September 6th, 2014 -- or

18  prior to the September 6, 2014, incident, had you

19  had any interactions with Mr. Mencias?

20      A.   Not to my knowledge.

21      Q.   Who was the lead detective with regard to

22  the investigation of the September 6th, 2014,

Page 20

1    incident?

2        A.    Detective Matthew Dailey.

3        Q.    What was your shift on September 6th,

4    2014?

5        A.    We were working from 2:30 p.m. to 11 p.m.

6        Q.    Can you walk me through your involvement

7    on the night of September 6th, 2014, starting with

8    how you first became aware of the incident?

9        A.    I believe there was a radio run for an

10   assault at that restaurant.  When we confirmed that

11   there was actually an ADW, an assault with a deadly

12   weapon incident, we are required to respond.

13   Detective Dailey and I went down together.  When we

14   got there, we observed the victim.  I don't recall

15   his name.  He was an older Hispanic male.  And he

16   had bleeding to his mouth.  And Detective Dailey and

17   I spoke to a couple of witnesses.  And from our

18   conversations with them, we learned how he came to

19   receive his injuries.

20       Q.    Do you know at about what time it was that

21   you were called to the restaurant?

22       A.    I want to say between 9 and 10 p.m.

Page 25

1   wonder in.  I believe there was some blood but I'm

2   not certain.  There was definitely blood on the

3   victim.  There were quite a few people at the

4   restaurant, but not many of them were willing to

5   speak with us.  Most of them said they didn't see

6   anything.  But I don't have anymore specific recall

7   other than I know I spoke to a woman whose name is

8   in my notes.  And I believe I may have written the

9   victim's name down.  But if you'd like, I can look

10  at those notes and tell you.

11       Q.   We can maybe go back to the notes in a

12  moment.  Let me just rereview what you've testified

13  and make sure that I'm understanding correctly.  The

14  witnesses you spoke to were this woman who was

15  perhaps a part-owner or relative of the owner; is

16  that correct?

17       A.   Yes.

18       Q.   A victim whose mouth was bleeding?

19       A.   Yes.

20       Q.   And a few other witnesses?

21       A.   Yes.

22       Q.   Do you recall who the other witnesses

William Xanten                                                    June 28, 2016
Washington, D.C.

1    were?  What they said?

2         A.   People that were inside or outside the

3    restaurant who observed some of what had transpired.

4         Q.   Other than speaking to the witnesses and

5    observing the stanchion post, did you do anything

6    else at the restaurant?

7         A.   Not that I recall.

8         Q.   Did you review security camera footage at

9    the restaurant?

10        A.   We may have done that.  I know at some

11   point it was done, but I don't specifically recall

12   doing that.

13        Q.   Do you recall if you personally reviewed

14   security camera footage at some point or did someone

15   else review the security camera footage and tell you

16   about it?  Just trying to get an understanding of

17   what you recall.

18        A.   I don't remember.

19        Q.   And what did you do next after all of

20   this?

21        A.   Somebody had gotten a reasonably good

22   description of the vehicle.  The vehicle had some

1    writing on the side of it, a name of a business and

2    a phone number.  And one of the officers, possibly

3    Detective Dailey, broadcast a lookout for that

4    vehicle.  And we were finishing up our work down at

5    that scene on 9th Street and at some point, officers

6    raised us on the radio and said we have that

7    vehicle.  I think it was up in like the 6 or 700

8    block of Kennedy Street, Northwest.  So we responded

9    to that location and it was the exact match of the

10   vehicle that was in the lookout.

11        Q.    Did you respond to the vehicle directly

12   from the restaurant?

13        A.    As I recall, yes.

14        Q.    Just to make sure I have the sequence of

15   events correct.  You were wrapping up at the

16   restaurant?  A lookout was put for a vehicle based

17   on a description.  After officers alerted you and

18   Detective Dailey that the vehicle had been found,

19   the two of you responded to the vehicle?

20        A.    Yes.

21        Q.    And where did you say you believed the

22   vehicle was?

Page 29

1    that had been identified at the restaurant?

2        A.    Yes.

3        Q.    And who made the decision to impound the

4    van?

5        A.    Detective Dailey and I both made that

6    decision.

7        Q.    What was that decision based on?

8        A.    The fact that we believed there was

9    evidence inside the vehicle that would help identify

10   the person who was the suspect in the assault.

11       Q.    And how was the van seized at that -- how

12   was the van seized?  Did the two of you physically

13   seize the van or how did that process work?

14       A.    We called for a crane to come and pick the

15   van up.  And there were several cars.  If I remember

16   correctly, it was about shift change which would

17   have probably been around 10, 10:15, which means

18   midnight officers were coming on and the evening

19   officers were being relieved.

20           There were someone from crime scene who

21   came down to take photographs of the vehicle to

22   document where it was and what condition it was in.

William Xanten                                                    June 28, 2016
Washington, D.C.

Page 30

1    And at some point, a crane arrived.  And I don't

2    know if someone saw what we were doing with the

3    vehicle, but somehow the owner of the vehicle came

4    up to us and started asking questions.

5        Q.   When you arrived at the van initially,

6    were there uniformed officers there as well?

7        A.   Yes.

8        Q.   Do you recall their names?

9        A.   I don't.

10       Q.   Do you recall what they had done at the

11   scene prior -- or did they tell you what they had

12   done at the scene prior to your arrival?

13       A.   Just located it and called us.  I don't

14   believe they talked to anybody or -- I think they

15   just waited for us.

16       Q.   While the van was being -- was it while

17   the van was being prepared to be towed or taken away

18   that's when you said the owner of the van came up to

19   you?

20       A.   Yes.

21       Q.   So was that in the same general vicinity

22   of where the van was located?

Page 32

1      Q.    Were they other officers of the Fourth

2   District then?

3      A.    That were on the scene?

4      Q.    Yes, sir.

5      A.    I don't think so, but I'm not certain.  I

6   know there was a crime scene officer.  I can't

7   remember his name.  I think I would remember it if I

8   heard it.  But I know -- I know he smoked a lot.

9      Q.    Can you describe the conversation that you

10  all had with the owner of the vehicle?

11     A.    Yeah, the gist of the conversation was

12  this your van?  He said, yes.  We said, we're here

13  about an that incident occurred at -- is it El

14  Torogoz?

15     Q.    El Torogoz.

16     A.    -- El Torogoz Restaurant.  And that we

17  needed to know who the person that he gave a ride

18  from the location down on 9th Street was.  He

19  said -- I think it took a while for him to

20  acknowledge that he was there and that he gave

21  someone a ride back.  But he said he didn't know the

22  guy.  We'd been told by someone at the restaurant, I

William Xanten                                                      June 28, 2016
Washington, D.C.

Page 33

1    believe the woman that I was referring to earlier

2    who might be the part-owner, she referred to them as

3    brothers and said that they had been at the

4    restaurant several times before and they always

5    referred to each other as brothers.  We asked about

6    the person that he was with that he gave a ride back

7    from.  And he told us he didn't know the person's

8    name.

9         Q.   Do you -- did he identify himself to you

10   or how did you determine who this person was?

11        A.   I think he told us his name.

12        Q.   What else happened in the conversation?

13        A.   We said we need to know who that person

14   was.  We were told that he's your brother.  He may

15   not be your brother, but you should at least know

16   something about him, a nickname, an address, a phone

17   number, something of that nature.  He became

18   agitated and we told him, you know, that right now

19   your van is evidence.  If you tell us who this

20   person is, we can probably identify -- you know, go

21   make a photo spread of of him, bring some pictures

22   down, you can point him out to us and we'll be on

William Xanten                                                    June 28, 2016
                        Washington, D.C.

                                                              Page 34

1    our way.  And at some point -- I know that he was

2    intoxicated.  And at some point, he yelled at us

3    that he would never tell us who his friend was.

4         Q.    Who was doing the questioning in this

5    conversation?

6         A.    Almost entirely Detective Dailey.

7         Q.    What else happened in the conversation?

8         A.    We -- the defendant became aggressive to

9    the point where we thought that he was going to

10   start assaulting the officers.  He got kind of all

11   puffed up.

12            MR. CHANG:  I'm sorry, whose defendant?

13            THE WITNESS:  I'm sorry, the person who --

14   Mr. Mencias.

15   BY MR. LLEWELLYN:

16        Q.    Mr. Mencias.

17        A.    Yeah.

18        Q.    This was the owner of the vehicle you were

19   talking to?

20        A.    Yes, I'm sorry.  He got in sort of like a

21   fight stance.  Like he was getting ready, fist

22   balled up, kind of got in a stance where we thought

Page 39

1      A.    I think by statue getting aggressive and

2   approaching an officer in a defensive stance would

3   rise to that level.  But he was extremely

4   intoxicated and I think we just decided we'll decide

5   what to do with him after we go through the van and

6   see if we can identify the person who owned the van

7   -- I mean, who was in the van, because there was --

8   I think there were like beer cans on the side that

9   we figured we could get DNA from.  There was I think

10  a backpack of some sort.  Something in there that we

11  thought might be helpful in identifying who the

12  passenger was.

13      Q.    So at the time the decision was made to

14  seize the van, did you determine that there was

15  probably cause to seize the van?

16      A.    Yes.

17      Q.    Was that your determination or Detective

18  Dailey's determination?

19      A.    It was ours together.

20      Q.    Was Mr. Mencias provided with a receipt

21  regarding his seized van?

22      A.    I don't believe he was.

William Xanten                                                    June 28, 2016
Washington, D.C.

Page 40

1        Q.    Was Mr. Mencias provided with any

2   documents or paperwork?

3        A.    I believe he was provided with Detective

4   Dailey's information and where the van was going to

5   be.

6        Q.    Was that on a business card or --

7        A.    It was probably on a business card, but

8   I'm not certain.  Detective Dailey does carry

9   business cards so I'm assuming that's what it was

10  on.

11       Q.    But did you personally give Mr. Mencias

12  any paperwork or documents?

13       A.    No.

14       Q.    And just to be clear, why was -- what was

15  the reason Mr. Mencias was told his van was being

16  seized?

17       A.    Because it had evidence inside of it that

18  could help us identify the person that he drove away

19  from the scene of the assault.

20       Q.    Was Mr. Mencias told how he could get his

21  van back?

22       A.    I don't remember.

1              And the fact that he was going to get a

2    search warrant for the vehicle and maybe we'd get

3    lucky and find some information that would help us

4    either find a photograph of some sort or get some

5    identifying features that could help us to identify

6    him.  And then if we did, put a photo array together

7    to show to the witnesses who said that they would be

8    able to recognize this person if they saw him again.

9         Q.   Other than obtaining a search warrant,

10   what other tasks I guess did you discuss for next

11   steps in this case?

12        A.   Detective Dailey was going to meet with

13   whatever prosecutor was going to be assigned to the

14   case.  At that point, I'm not sure who the

15   supervisor of the Fourth District Major Case Unit

16   was.  I think it was still at the time David

17   Rubenstein, but it could have been the current head

18   which is John Giovannelli.  But I don't remember.

19        Q.   What was the -- what was your plan for

20   identifying the person who had -- the suspect from

21   the assault?

22        A.   Hopefully obtaining some fingerprints or

Page 46

1    DNA from inside the van specifically the passenger

2    side where video showed the suspect getting in.

3         Q.    Anything else?

4         A.    Maybe any documents that might have been

5    located in there that didn't belong to Mr. Mencias

6    that might help us determine who this other person

7    was.

8         Q.    Other than that -- or after that

9    conversation, did you discuss or do anything else

10   regarding that case that day?

11        A.    That day?

12        Q.    Yes, sir.

13        A.    Not that I'm aware of.

14             (Dailey Deposition Exhibit 26 was marked

15   for identification and retained by counsel.)

16        Q.    Detective Xanten, I'm handing you what's

17   been marked as Exhibit 26.  I keep seeing the

18   exhibit names saying Dailey and I am getting

19   confused.  For the record, this is Bates stamped

20   D.C. 43.

21             What is it?

22        A.    This is the page of notes that I took on

William Xanten                                                    June 28, 2016
                        Washington, D.C.

                                                              Page 50

 1    particular case.  Detective Dailey was in charge.

 2    We spoke occasionally about the fact that Detective

 3    Dailey hadn't heard back from Mr. Mencias in quite

 4    some time.  And he found that surprising because

 5    there were a lot of tools in the vehicle that we

 6    imagined were important in his work in doing

 7    whatever he did.  I don't know if it was carpentry

 8    work or tile work or something like that.

 9              But you could tell that they were tools

10    that were not inexpensive that if they had to be

11    replaced would be costly.  And that it would be in

12    his interest to come up and talk to us about getting

13    his van back.  And then possibly talking to us about

14    who the person in the van with him.

15         Q.   Do you recall when these conversations

16    occurred?

17         A.   Over the couple of weeks following the

18    initial incident.

19         Q.   Did you attempt to contact Mr. Mencias?

20         A.   I didn't.

21         Q.   Do you know if Detective Dailey attempted

22    to contact Mr. Mencias?

William Xanten                                                    June 28, 2016
Washington, D.C.

Page 54

1    opportunity to further interview Mr. Mencias about

2    the identity and whereabouts of the suspect from

3    September 6th, 2014?

4            MR. CHANG:  Objection.

5            If you understand, you can answer.

6            THE WITNESS:  I believe the purpose was to

7    secure an opportunity to speak with him voluntarily

8    rather than having him subpoenaed for a grand jury.

9    BY MR. LLEWELLYN:

10       Q.   I believe you just answered this, but just

11   to be clear, were you ever contacted?

12       A.   Not that I recall, no.

13       Q.   Did you discuss with Detective Dailey what

14   to do if Mr. Mencias came by the police station

15   asking about his van or his tools?

16       A.   I don't remember.  I'm sure I did, but I

17   don't recall the substance of it and I wouldn't want

18   to speculate.

19       Q.   Did you discuss with any other MPD member

20   about what to do if Mr. Mencias came by the police

21   station seeking information about his van or his

22   tools?

Page 55

1      A.    Probably not.

2      Q.    If you had those conversations, it was

3 limited to Detective Dailey?

4      A.    More than likely, yes.

5      Q.    Was there a plan to use Mr. Mencias'

6 expected inquiry about his van as an opportunity to

7 seek information about the identity and whereabouts

8 of your suspect in the ADW?

9           MR. CHANG:  Objection.  That's a long

10 question.

11           You can answer.

12           THE WITNESS:  Yes, I believe so.

13 BY MR. LLEWELLYN:

14      Q.    Detective Xanten, I'm handing you -- let

15 me get it marked first.

16           MR. CHANG:  I'm sorry, Patrick, can you

17 repeat that question.  Can you read that question

18 back.

19           (Record read.)

20 BY MR. CHANG:

21      Q.    My question was, was there a plan to use

22 Mr. Mencias' expected inquiry about his van as an

Page 56

1    opportunity to seek information as to the identity

2    and whereabouts of the suspect in the ADW.

3        A.   And I believe that was part of the plan,

4    yes.

5        Q.   Okay.  And that was a plan that you and

6    Detective Dailey had discussed?

7        A.   Yes.

8             (Dailey Deposition Exhibit 27 was marked

9    for identification and retained by counsel.)

10       Q.   Detective Xanten, I'm handing you what's

11   been marked as Exhibit 27.  And for the record, it's

12   D.C. 14.

13            What is it?

14       A.   It's a report I prepared on September 7th,

15   2014.

16       Q.   The document --

17       A.   I'm sorry, and it's referenced to a

18   conversation I had from a woman by the name of

19   Jacqueline Aguilera in reference to the message I

20   may have left for her at some point.  It shows that

21   this was on a Sunday, September 7th.  And I'm off on

22   Sunday and Monday.  So this would have been on my

William Xanten                                                    June 28, 2016
                          Washington, D.C.

                                                          Page 61

1    tools.  I have a picture in my head of seeing those

2    items, but I don't recall if I looked at them

3    directly or if I looked at some photographs of them.

4    But I just remember thinking that's a lot of stuff

5    in the van to not inquire about it.

6         Q.   When you went and looked at the van a

7    couple of days after, you didn't open the van at

8    all?

9         A.   No.

10        Q.   So just looking in through the windows?

11        A.   Yes.

12        Q.   Did you talk with anyone about the search

13   of Mr. Mencias' van?

14        A.   I did talk to Detective Dailey.

15        Q.   And what did you discuss?

16        A.   Some of the items that he had seized from

17   the van.

18        Q.   Do you recall anything else you discussed?

19        A.   Not off the top of my head, no.  I know he

20   mentioned -- I think he said there was a passport

21   among other items that were in the van that didn't

22   belong to Mr. Mencias.

1    DISTRICT OF COLUMBIA )

2

3         I, Matthew Goldstein, Notary Public within

4    and for the District of Columbia, do hereby certify:

5

6         That I reported the proceedings in the

7    within entitled matter, and that the within

8    transcript is a true record of said proceedings.

9

10        I further certify that I am not related to

11   any of the parties to the action by blood or

12   marriage, and that I am in no way interested in the

13   outcome of this matter.

14

15        IN WITNESS WHEREOF, I have hereunto set my

16   hand this 10th day of July, 2016.

17

18   _____

19                Matthew Goldstein

20

21

22

# Exhibit F

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLUMBIA

3    -------------------------------X

4    ERLIN EVER MENCIAS AVILA,          :

5                    Plaintiff,         :

                                          Case No.:
6        v.                            :
                                          1:15-CV-02135-TSC
7    METROPOLITAN POLICE DETECTIVE     :

8    MATTHEW DAILEY, ET AL.,           :

9                    Defendants.       :

10   -------------------------------X

11

12           Deposition of JUSTIN JORDAN

13                Washington, D.C.

14             Tuesday, June 28, 2016

15                  11:13 a.m.

16

17

18

19

20   Job No.: 65007

21   Pages: 1-80

22   Reported by: Matthew Goldstein

Page 2

1          Deposition of JUSTIN JORDAN, held at:

2

3

4          Georgetown University Law Center

5          600 New Jersey Avenue, N.W.

6          Washington, D.C. 20001

7          202.661.6582

8

9

10

11

12       Pursuant to Subpoena, before Matthew Goldstein,

13   Notary Public in and for the District of Columbia.

14

15

16

17

18

19

20

21

22

Page 16

1   you responded to the restaurant?

2        A.   Correct.

3        Q.   All right.  Do you know what time that

4   was?

5        A.   I do not know the exact time.  I do not

6   recall.

7        Q.   What's your best guess?

8        A.   I would say I'd have to review the notes

9   to see exactly what the 251 says.  But I would say

10  probably two to three minutes given travel time is

11  when we got the radio run for it.

12       Q.   Okay.  And tell me what happened when you

13  arrived at the scene.

14       A.   I got on scene.  I recall there being a

15  few complainants.  A few witnesses who all gave a

16  lookout for an individual that threatened them with

17  a knife and he threw a chair, something to that

18  effect, at a crowd of people.  And then they gave a

19  lookout for the individual, their physical

20  appearance for that suspect.  And they also gave a

21  lookout for the vehicle that they observed the

22  suspect get in and then flee the scene in.

1       Q.    Okay.  And who gave you this information?

2       A.    Again, as far as names, I wouldn't -- it

3  was witnesses, various witnesses.  And I believe it

4  was -- I don't recall exactly how many complainants

5  there were in the case, but I know there was more

6  than one.  But we did get a lookout from a

7  complainant and a few witnesses.

8       Q.    Okay.  So this information all came from

9  the witnesses, the civilians, on the scene and not

10  from other police officers?

11      A.    No, we get the information from them

12  first.  That's --

13      Q.    Okay.  Do you recall any of the other

14  police officers who responded to the scene, their

15  names?

16      A.    I do recall Geiger.  I'm not sure if he

17  was riding alone.  I'm sorry, I'm kind of drawing a

18  blank as far as exactly who was there.

19      Q.    Sure.

20      A.    Yeah.

21      Q.    At some point, did Detective Dailey and

22  Detective Xanten arrive on the scene?

Justin Jordan                                                    June 28, 2016
                          Washington, D.C.

                                                              Page 18

1       A.   They responded -- I don't recall seeing

2    them on the scene there.  I do know I saw them later

3    on at the secondary scene of the incident.  But I

4    don't recall seeing them at the restaurant, no.

5       Q.   Okay.  And is the secondary scene where

6    the van was located?

7       A.   Correct.

8       Q.   Okay.  So I want to step back and just

9    concentrate on what happened at the restaurant

10   first.

11      A.   Okay.

12      Q.   After initially interviewing the witnesses

13   to find out what had happened, what else did you do

14   there at the scene of the restaurant?

15      A.   We referred to some video.  I believe

16   there was a CCTV footage of what occurred that

17   night.  We reviewed that -- or took a moment to get

18   the equipment to function properly and get the right

19   time frame.  And once we were able to get that,

20   reviewed the footage.  That's it.

21      Q.   Okay.  So you reviewed the video footage?

22      A.   I did see some of the footage, yes.

Page 19

1      Q.    Okay.   There at the restaurant?

2      A.    Yes.

3      Q.    When you reviewed that security camera

4   footage, were the detectives on scene at the time?

5      A.    I do not recall them being at the

6   restaurant.

7      Q.    Okay.

8      A.    I can say 100 percent that I saw them

9   later on at the secondary scene, but I do not recall

10   them at the restaurant.

11      Q.    Okay.   So after talking to the witnesses

12   and reviewing the security camera footage, what

13   else, if anything, did you do at the restaurant?

14      A.    That's all to the best of my knowledge.

15      Q.    Okay.   Do you know if a call was made for

16   the detectives to arrive or if they just arrived on

17   their own having heard the radio run?

18      A.    I cannot say who called or exactly when

19   they called.

20      Q.    Okay.

21      A.    It is standard for us to call for a

22   detective.   But in reference to that night, I don't

1   said, I do not recall exactly who gave the lookout

2   on the air.  I can't say.

3        Q.   Do you recall hearing that somebody had --

4        A.   I recall hearing the lookout from

5   witnesses on scene and complainants on scene for the

6   individual and the van.

7        Q.   Okay.  At some point, did you become aware

8   that the van had been located?

9        A.   Yes.

10       Q.   How did that happen?

11       A.   I'm not exactly sure.  I don't recall

12  exactly how he got up there or who discovered the

13  vehicle.  But I did respond to that scene.

14       Q.   Did you respond to the scene where the

15  vehicle was directly from the restaurant?

16       A.   To the best of my knowledge, yes.

17       Q.   Okay.  And where was the van located?

18       A.   The van was located somewhere on Kennedy

19  Street.  The exact address I don't recall.

20       Q.   So I just want to make sure I've got

21  everything that you recall.  So you responded to the

22  restaurant, interviewed witnesses, watched security

Page 23

1   camera footage, the lookouts for the van and the

2   suspect went out.  At some point, you heard that the

3   van had been located on Kennedy Street and you left

4   the restaurant and responded to the location of the

5   van.  Have I got that right?

6        A.   Yeah.

7        Q.   Okay.

8        A.   Sounds about right.

9        Q.   Can you remember anything else from the

10  time you arrived at the restaurant until you went to

11  the location of the van that we haven't talked

12  about?

13       A.   No, I cannot.

14       Q.   So tell me what happened when you arrived

15  on Kennedy Street where the van was.

16       A.   Well, having the lookout for the van, we

17  observed the van parked on Kennedy Street.  At some

18  point in time, contact was made with the owner.  I'm

19  not sure if he was just walking around or going to

20  his van, that I don't recall.

21       Q.   Okay.  Before you made contact with the

22  owner, did you do anything with regard to the van in

Page 24

1    terms of looking inside or --

2         A.   The van was not searched.

3         Q.   No.

4         A.   The van was locked.

5         Q.   Who else was on the scene when you were

6    there with the van?

7         A.   I do recall both detectives -- or the

8    detectives.

9         Q.   So Detective Dailey and Detective Xanten?

10        A.   Yes.

11        Q.   Okay.  Were there other uniform officers

12   on the scene?

13        A.   Not that I recall.

14        Q.   So tell me what you did when you arrived

15   where the van was parked.

16        A.   As I had mentioned earlier, at some point

17   in time, contact was made with the owner.

18        Q.   Okay.  Before making contact with the

19   owner, were there any tasks that you were

20   completing?

21        A.   Before our call, we were just trying to

22   stay near the van.  And that's about it.

Page 26

1    recall if he was coming to the van or he confronted

2    one of the other officers or detectives and asked

3    that's my van.  I can't say.

4         Q.   Okay.

5         A.   I don't recall.  I just remember contact

6    being made with him in reference to the van on

7    Kennedy Street.

8         Q.   And who made contact with him?

9         A.   Myself and two detectives.

10        Q.   Dailey and Xanten?

11        A.   Yes.

12        Q.   Were there any other uniform officers

13   there when contact was made?

14        A.   I don't recall anybody else being there.

15        Q.   Okay.  And when contact was made, can you

16   tell me what that conversation was?

17        A.   Once it was established that here's the

18   van, of course, there were -- I'm sorry, you were

19   just asking as far as how did the interview proceed?

20        Q.   Yeah.  What was said and what was the

21   conversation between the officers on the scene

22   including the detectives and Mr. Mencias.

Page 27

 1      A.    Well, we wanted to know who was in the

 2  van.

 3      Q.    The suspect --

 4      A.    Who the van was in reference to say -- I

 5  can't say exactly what time -- what the time frame

 6  was between the original incident when the

 7  complainants and witnesses stated that they saw the

 8  van flee and to when we made contact with the owner.

 9  I don't recall exactly what -- how much time went

10  by, but we were trying to establish where that van

11  was around about the time of the offense and the

12  individuals inside.

13      Q.    Okay.  And what did Mr. Mencias tell you,

14  if anything?

15      A.    Mr. Mencias was extremely confrontational

16  initially and did not assist with the investigation.

17      Q.    Who was asking Mr. Mencias the questions?

18      A.    I know I asked questions as far as, you

19  know, who was in the van, and where was the the van

20  at around about the time of the offense.  As far as

21  I know, the detectives asked questions but I can't

22  -- I don't recall exactly which questions they

Justin Jordan                                                                   June 28, 2016
Washington, D.C.

1   he was definitely a person of interest.

2        Q.   How did the conversation with Mr. Mencias

3   end?

4        A.   How did it end?

5        Q.   Yes.  In other words, you had the

6   conversation where you tried to get information.

7   You testified that he wasn't cooperative.  How were

8   things left?  How did the conversation terminate?

9        A.   Well, at some point in the conversation,

10  we notified him that the van will be placed on the

11  Fourth District property book for evidence in

12  reference to the ADW.  It was explained where it was

13  going and why it was going.

14       Q.   Okay.

15       A.   And that's -- it was kind of short ending.

16       Q.   Yeah.  Had the decision already been made

17  to seize the van prior to making contact with the

18  owner?

19       A.   I do not recall if that was made or who

20  made it.

21       Q.   Regardless of when the decision was made,

22  whose decision was it to seize the van as evidence?

Page 35

1      A.    Just -- I do not recall who exactly called

2   for the tow truck.  Just given how long ago this

3   was, I don't recall every single detail.  But a tow

4   truck was called by someone on the scene.  It was

5   taken to the Fourth District.  I filled out the PD

6   81 in the district and put it on the 4D property

7   book.

8      Q.    Okay.  Was Mr. Mencias provided with a

9   receipt for his van?

10     A.    No, not to my knowledge.

11     Q.    Do you know if he was provided with any

12  paperwork or documents?

13     A.    Not to my knowledge.

14     Q.    Was Mr. Mencias told why his van was being

15  seized?

16     A.    He was notified.

17     Q.    What was he told?

18     A.    He was told that his van was used in the

19  commission of a crime and that we were going to be

20  placing it in the Fourth District for evidence.

21     Q.    Was he told how he could get his van back?

22     A.    As far as what the process was --

Page 37

1    gave Mr. Mencias their business card?

2        A.   I can't say as to whether or not they did.

3        Q.   So once the the tow truck had arrived and

4    took the van away to 4D, what was the next thing

5    that you did?

6        A.   I went to 4D and filled out the PD 81, put

7    it on the property book.

8        Q.   Officer Jordan, I'm going to hand you an

9    exhibit.  This has been previously marked as Exhibit

10   Number 2.

11              (Exhibit 2, Previously Marked.)

12       Q.   And in an earlier deposition, Detective

13   Dailey identified Exhibit 2 as the PD 81 that you

14   completed regarding the seizure of Mr. Mencias' van.

15   Is that what it is?

16       A.   This is the 81 and that is my name and

17   badge, correct.

18       Q.   So you completed this form?

19       A.   I completed the PD 81.

20       Q.   If you look sort of in the -- a little bit

21   above the midway point of page 1 here, it has

22   classification and it says "Evidence"; is that

Page 48

1    should say anything that you were involved in?

2         A.   That night?

3         Q.   Yeah.

4         A.   I don't recall.

5         Q.   Okay.

6         A.   I would need some kind of refresher.

7         Q.   So after you had the van towed and you

8    filled out the paperwork, did you return to patrol?

9         A.   I can check and see what time the report

10   came out and how much time was left in my shift.  I

11   -- I would say yes, but I don't recall exactly what

12   I did after the 81.

13        Q.   And you don't recall doing anything else

14   that night with regard to this case?

15        A.   No, not that I can recall.

16        Q.   So following the events we just talked

17   about of September 6th, 2014, what was your next

18   involvement, if any, in the investigation of this

19   case?

20        A.   Next involvement, I'm unsure of the date

21   -- the date for it.  But Mr. Mencias came by one of

22   the police stations.  And he asked to speak with me.

Justin Jordan                                                    June 28, 2016
                        Washington, D.C.

1    And I directed him up to the detectives' office for

2    an interview.

3         Q.   Okay.  Do you recall when that was?

4         A.   Honestly, I don't.

5         Q.   I mean, how soon after September 6th?

6         A.   I don't recall the date.

7         Q.   And where did Mr. Mencias find you?

8         A.   The Fourth District substation.

9         Q.   Okay.  Is that the Park Road Substation?

10        A.   Yes.

11        Q.   And what was your conversation with

12   Mr. Mencias at the Park Road Station?

13        A.   Well, telling him it's -- implying about

14   his vehicle.  I informed him that once it's

15   evidence, I cannot just give it to you.  And that

16   your best option would be to talk to a detective to

17   assist as much as you can in closing this case out.

18        Q.   And did you assist Mr. Mencias in

19   contacting the detectives?

20        A.   Yes.

21        Q.   Okay.  What did you do?

22        A.   I made contact with the detective up at

Page 50

1    the main station and we made our way up there for an

2    interview.

3        Q.   Who was that detective?

4        A.   Detective Timlick.

5        Q.   And how did you make your way up there

6    from Park Road for the interview?

7        A.   That I don't -- I'm not sure if he was in

8    his own vehicle or exactly how.  I'm not sure how we

9    got there, but I know I took a patrol car.

10       Q.   Okay.  And Mr. Mencias met you up there at

11   4D?

12       A.   I don't recall exactly how we got there.

13   But, yeah, we both ended up eventually in the lobby

14   at 4D and then we went up to the detectives' office.

15       Q.   Okay.  What time of day was that?

16       A.   I was just coming on so it had to be about

17   evening.  Like I said earlier, I believe we

18   started -- back then I believe we started at 21:30.

19   So it had to be around about that time.

20       Q.   Before that day when Mr. Mencias contacted

21   you, had you had any communications with

22   Mr. Mencias?

Justin Jordan                                                    June 28, 2016
Washington, D.C.

Page 53

1    don't recall any discussion concerning that, no.

2    The van goes as evidence because it was used in the

3    commission of a crime.

4    BY MR. KIRKPATRICK:

5        Q.   So do you recall the interview of

6    Mr. Mencias at the Fourth District?

7        A.   I recall being present.  As far as the

8    exact details and specifics of it, no.

9        Q.   Can you just sort of generally walk

10   through what happened?

11       A.   The whole goal of the interview, I can

12   speak as to that, was to obtain any additional

13   information concerning the individual that was

14   observed getting into the van and the van pulling

15   away.

16       Q.   So was the main goal to try to identify

17   the support?

18       A.   The main goal is -- the main goal for MPD

19   was to identify the individual and get as much as

20   detail about what has occurred -- or excuse me, what

21   occurred that night in all parties involved.

22       Q.   Who else was present at the interview?

Page 54

1       A.   I recall Timlick.

2       Q.   Do you recall Detective Bridget being

3    there?

4       A.   I remember a female but I don't know her

5    per se.

6       Q.   Was there another uniformed officer there?

7       A.   Not that I recall.

8       Q.   Do you recall whether the interview was

9    done in Spanish or in English?

10      A.   Excuse me, yeah, there was a -- we did

11   have another -- excuse me, we had another officer

12   there just for any clarification and to assist with

13   any misunderstandings as far as the whole English

14   and Spanish communication.

15      Q.   Okay.  Was that Officer Washington?

16      A.   Yeah, yes.

17      Q.   Did you have any discussion with Detective

18   Timlick or Detective Bridget before going into the

19   interview room to talk to Mr. Mencias?

20      A.   I definitely spoke with Timlick and gave

21   him a rundown of what happened and why we were

22   coming up to the office for interview, so yeah.

Page 55

1      Q.   What did you tell Detective Timlick as

2  best you recall?

3      A.   As best I recall, I just notified him of

4  the initial incident, who the individual was that

5  was coming upstairs for the interview and what his

6  role was.

7      Q.   Okay.  And what did you tell Detective

8  Timlick about Mr. Mencias' role?

9      A.   He was the owner of the van and he was on

10  scene when the offense occurred.

11      Q.   Did you and Detective Timlick -- did you

12  discuss any sort of plan for the interview?

13      A.   No, I don't recall there being an

14  abundance of time to sit down and chat about what we

15  were going to do.  I mean, we had Mr. Mencias

16  waiting.  I'm not sure if he was waiting right there

17  with us or -- no.

18      Q.   Were you aware that the interview was

19  recorded on video?

20      A.   Yeah, all interviews are recorded either

21  video or audio combination.

22      Q.   During the interview, Detective Timlick

Page 62

1       Q.    Okay.  Would it help if we watched that

2    piece of the video to refresh your memory?

3       A.    Yeah, I mean, if it's on video.  I mean --

4       Q.    Yeah.  Let's do that.  Let's go off the

5    record for a minute and set this up.  It will just

6    take a minute.

7       A.    Okay.

8             (Recess from the record.)

9       Q.    So Officer Jordan, while we were off the

10   record, we played a small excerpt from the video of

11   interview.  And, just for the record, that interview

12   is Bates numbered D.C. 153.  And did hearing that

13   small part of the interview there, did that refresh

14   your recollection about the conversation?

15      A.    Yes.

16      Q.    Okay.  So now that you've heard what's on

17   the video, does it refresh your recollection at all

18   about what you told Mr. Mencias on the first night

19   about how he could get his van back?

20      A.    Yes.

21      Q.    And what was that?

22      A.    The best way to get the van back is for

Justin Jordan                                                          June 28, 2016
                            Washington, D.C.

                                                               Page 63

1    the case to be closed out.

2        Q.    Okay.

3        A.    And for him to assist us with anything --

4    any assistance you can give us to close out the case

5    would be helpful in getting your van back.

6        Q.    In closing out the case, do you mean

7    identifying the suspect so an arrest can be made?

8        A.    An arrest is made and the case goes to

9    trial.  And it depends on if the USAO wants to use

10   it for the trial or release it.

11       Q.    Okay.  Was there an expectation that if an

12   arrest could be made of the suspect that at that

13   point, the van and the tools could be returned?

14       A.    Like I said earlier, that it's up to the

15   USAO as to -- they have to sign off on that as far

16   as if it's being released back to the owner or used

17   on the trial or even at the conclusion of the trial,

18   you know, when it's released to the owner.

19       Q.    I'm just wondering when you say "closed

20   out the case," do you mean the final conclusion of

21   the entire criminal prosecution and any appeals?

22       A.    That would have to be dependent on the

Justin Jordan                                                          June 28, 2016
Washington, D.C.

1    go on as far as identifying an individual.  He could

2    have given us an address, name, date of birth, next

3    of kin, Social Security number --

4         Q.   So information --

5         A.   -- last known address, where he works,

6    anything of that nature.  Any pertinent information

7    to identify the individual.

8         Q.   Okay.  But that was what you were looking

9    for was information that would help you identify the

10   suspect in the ADW?

11             MR. CHANG:  Objection.

12             You can answer.

13             THE WITNESS:  Our goal was to identify and

14   get whatever identification we could to identify the

15   individual, yes.

16   BY MR. KIRKPATRICK:

17        Q.   Other than information that would help you

18   identify the individual, was there anything else

19   that you wanted to get from Mr. Mencias?

20        A.   It would have been great to know

21   100 percent what his involvement was or -- I'm not

22   exactly sure.  What exactly is the question, I'm

1   DISTRICT OF COLUMBIA )

2

3          I, Matthew Goldstein, Notary Public within

4   and for the District of Columbia, do hereby certify:

5

6          That I reported the proceedings in the

7   within entitled matter, and that the within

8   transcript is a true record of said proceedings.

9

10         I further certify that I am not related to

11   any of the parties to the action by blood or

12   marriage, and that I am in no way interested in the

13   outcome of this matter.

14

15         IN WITNESS WHEREOF, I have hereunto set my

16   hand this 10th day of July, 2016.

17

18                      _____

19                      Matthew Goldstein

20

21

22

# Exhibit G

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF COLUMBIA

 3                        Civil Action

 4

 5    - - - - - - - - - - - - - - - - - - - - - - - - -

 6    ERLIN EVER MENCIAS AVILA,     :No. 1:15-cv-02135-TSC

 7                                  :

 8           Plaintiff,             :

 9        vs.                       :

10                                  :

11    METROPOLITAN POLICE DETECTIVE:

12    MATTHEW DAILEY, et al.,       :

13           Defendants.            :

14    - - - - - - - - - - - - - - - - - - - - - - - - -

15

16

17           Transcript of deposition of RICHARD GEIGER

18    taken by and before Mary McKeon, Registered

19    Professional Reporter, Notary Public, at Georgetown

20    University Law Center, 600 New Jersey Avenue, N.W.,

21    Washington, D.C. on Wednesday, July 20, 2016,

22    commencing at 9:33 a.m.
```

Richard Geiger                                                              July 20, 2016
Washington, D.C.

Page 14

1    September 6, 2014 incident or the incident at El

2    Torogoz, I'm referring to an alleged assault with a

3    deadly weapon at El Torogoz at 4231 9th Street,

4    Northwest, Washington, D.C.

5           Prior to the September 6, 2014 incident, had

6    you had any interactions with Mr. Mencias?

7        A    No, sir.

8        Q    Who was the lead PD member with regard to

9    the investigation of the September 6th, 2014

10   incident?

11       A    You mean the detective or the -- because I

12   took the report, sir.  But everything after the

13   report for something like an assault with a dangerous

14   weapon, a detective is tasked with investigating

15   that.

16       Q    Well, let's deal with both.  When you say

17   you "took" the report, what does that mean?

18       A    So, I spoke to both complainants, I

19   reviewed video footage on the scene and I authored

20   what's called a PD-251, which is an incident/offense

21   report.

22       Q    So, were you considered the responding

Richard Geiger                                                  July 20, 2016
Washington, D.C.

Page 15

1    officer, then?

2          A     Yes, sir.

3          Q     And who was the lead detective on the case

4    after that point?

5          A     I believe, Detective Dailey.

6          Q     The PD-251, when did you prepare that

7    report?

8          A     That same day.  I don't know exactly what

9    time, but it was after I left the scene, I went back

10   to the district and just typed up the report.

11         Q     So, either the night of September 6th or

12   the early morning of September 7th?

13         A     Yes, sir.

14         Q     Was that PD-251 put in the file for this

15   case?

16         A     I have no idea.

17         Q     If the PD-251 was not in the file, do you

18   know where it would be?

19         A     Yeah.  In the Cobalt system; you call it

20   up.

21         Q     Would you be able to retrieve the PD-251?

22         A     Right now?

Richard Geiger                                                    July 20, 2016
Washington, D.C.

1    get signed out of the book and then you go home.

2            I remember them getting the call for this.

3    So, as soon as I got my car, I went over there,

4    responded and I told the officers on the scene, you

5    know, "I'll take the report.  I'm here for the rest of

6    the night."

7            I spoke with two complainants.  One

8    complainant was female, I remember, and one complainant

9    was a male.

10           One complainant was -- stated to me that they

11   -- something happened inside of El Torogoz that I can't

12   exactly remember, but that that complainant confronted

13   the suspect and the suspect produced a knife and

14   pointed it at them.

15           At that point, another person stepped in and

16   the argument kind of spilled out outside and that

17   suspect proceeded to throw a chair at the other

18   complainant.

19           After the suspect committed the two assaults

20   with dangerous weapons, both the knife and the chair,

21   they jumped in a van.  And I remember it being a very

22   distinct van, because it has a company name on the side

Richard Geiger                                                July 20, 2016
                         Washington, D.C.

1    of it.  I don't know -- I don't recall exactly what the

2    name of the company was on the side, but I remember at

3    the time I gave the lookout for the car.

4          And a "lookout" simply means I went over the

5    fourth district radio and I said the suspect fled in --

6    I don't recall which direction, but he fled in this

7    type of car with the company name on the side.

8       Q    All right.  Let me back up just a bit from

9    where you started.

10         So, you did not receive the original call for

11   this case?

12      A    I don't believe so, sir.

13      Q    When you arrived at El Torogoz, you said

14   there were already officers on the scene?

15      A    Yes, sir; there was several evening

16   officers.

17      Q    Do you recall the names of any of those

18   officers?

19      A    I don't, unfortunately.

20      Q    When you responded to El Torogoz, were you

21   alone or did you have a partner?

22      A    I don't recall.

Page 19

1      Q    Did anyone else from the midnight shift

2   respond to El Torogoz with you?

3      A    Yes, sir.  Officer -- I remember

4   specifically Officer Jordan being there with me.

5   Normally I was riding with him, but I don't know if I

6   was that night.

7      Q    Do you recall the names of any other

8   officers that arrived from the midnight shift?

9      A    To the El Torogoz?  I do not.

10      Q    Did you get any information from the

11   police officers that were on the scene?

12      A    I don't recall.  I remember I spoke to

13   both complainants and the witness myself.  So I don't

14   know what information I got from the officers, but I

15   know I spoke to both complainants and the witness

16   myself.

17      Q    What was Officer Jordan's role while you

18   were speaking with the complainants and reviewing the

19   security footage?

20      A    We were both talking to the complainants

21   and talking to the witness.  I don't know who did

22   what, but I can just say that I spoke to both

Page 21

1        Q    So, I believe you said you spoke with the

2   two complainants?

3        A    Correct.

4        Q    Did you speak with anyone else?

5        A    There was a witness that saw what happened

6   and -- two complainants and the witness.

7        Q    I apologize if I just misunderstood you

8   earlier.  What did the witness have to say about what

9   happened?

10       A    The witness might have been the store

11   owner or the bar owner, because I remember they

12   showed us the video of what spilled out to the

13   outside.  I don't remember the witness's name or

14   their specific role.

15       Q    And I believe you testified earlier after

16   you spoke with the complainants and after you spoke

17   with the witness, you put a lookout for the car?

18       A    Correct, sir.

19       Q    And was that just a description of the car

20   or did you also have a license plate, or what was the

21   lookout?

22       A    We didn't have a specific license plate,

Richard Geiger                                                    July 20, 2016
Washington, D.C.

1   that I can recall.  I remember it being a -- I

2   remember it having a company name on the side, a very

3   distinct company name on the side.

4            And it was a van, not a sedan, not a pickup

5   truck or a box truck, that I can recall.  I remember it

6   being a van and it had a company name on the side.

7       Q    After you put the lookout for the van,

8   what did you do next?

9       A    Just I drew report numbers for assault

10  with a dangerous weapon and then I authored the

11  report.

12      Q    When you say you "drew report numbers,"

13  what does that mean?

14      A    Every time you're classifying an offense

15  or a traffic crash or an arrest or a family

16  disturbance, you draw what's called a report number

17  or central complaint numbers.  And that just means

18  you're documenting what happened in an official

19  report.

20      Q    So, you're assigning a specific number to

21  this unique case, basically?

22      A    Correct, sir.

Page 23

1      Q     So, after you finished El Torogoz and put

2    out the lookout, did you return to the station to

3    author the report?

4      A     At some point during the night, I authored

5    the report.

6      Q     At some point, did you become aware the

7    van had been transported -- or, excuse me -- the van

8    that had transported the suspect away from the scene

9    was parked at the 400 block of Kennedy Street?

10     A     Yes, sir.

11     Q     How did you become aware of that?

12     A     At some point during the night, I don't

13   know if it was directly after or later on, but I know

14   Officer Hayzcheck observed that vehicle on Kennedy

15   Street, parked and unoccupied.

16     Q     Officer who?

17     A     Hayzcheck, H-A-Y-Z-C-H-E-C-K.

18     Q     That's close enough.  You became aware by

19   Officer Hayzcheck putting out a call saying he

20   located the van?

21     A     He came over the fourth district radio

22   advising he had the car.  I didn't go up to see the

Page 29

1       Q    Does that refresh your memory as to if you

2  were alone or with Officer Jordan?

3       A    It does, sir.

4       Q    So, you were with Officer Jordan?

5       A    Correct.

6       Q    What do you mean Sergeant Smith was check

7  off?

8       A    As I previously stated, when you are about

9  to go home, you got to check in with the sergeant.

10  They sign your run sheet and then they let you go

11  home.

12      Q    Next to that, on the left, it looks like

13  it could be R/C and then D-Y-N.  What does that mean?

14      A    That is who had roll call.  So, when you

15  get to work, you don't just go right onto the street.

16  You check with the sergeant, and that would be

17  Sergeant Dyn, and he gives you your assignment.

18      Q    On the second page of your notes, which is

19  DC 128, at the top it appears to be C-1, and then a

20  name, Jose' Plictas.  What are all of those notes?

21      A    So, these are the notes I authored.  So,

22  C-1 would be the complainant that I spoke to, got all

1                    C E R T I F I C A T I O N

2

3           I, Mary McKeon, Registered Professional

4    Reporter and Notary Public for Washington, District of

5    Columbia, do hereby certify I stenographically reported

6    the foregoing proceedings on the date and time

7    indicated after the witness was duly sworn by me.

8           I, further, certify I am not an employee of

9    nor related to nor acquainted with any of the parties

10   to this action and am not financially or otherwise

11   interested in the event of such action.

12

13

14

15

16

17

18

19

20



21

22                            _Mary McKeon, RPR_

                              Mary McKeon, RPR

23

24   My Commission Expires

25   October 14, 2019

# Exhibit H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

_____
                              :
IN THE MATTER OF:             :
                              :
ERLIN EVER MENCIAS AVILA,     :
                              :
          Plaintiff,          :
                              :
     v.                       :    Civil Action No.
                              :    1:15-CV-2135-TSC
DETECTIVE MATTHEW DAILEY,     :
                              :
          Defendant.          :
                              :
_____:

          Wednesday,
          July 13, 2016

          Washington, DC

DEPOSITION OF:

          ERLIN EVER MENCIAS AVILA

called for examination by Counsel for the

Defendant, pursuant to Notice of Deposition, in

the District of Columbia Office of the Attorney

General, located at 441 4th Street, N.W., Suite

630 South, when were present on behalf of the

respective parties:

1          A      With three other individuals.

2          Q      And who were these three other

3     individuals?

4          A      One was my co-worker and the plumber

5     plus two helpers.

6          Q      So including you, that was five

7     people?

8          A      No, there were four including me.

9          Q      So the co-worker and plumber, is that

10    one person?

11         A      Yes.

12         Q      And who is that person?

13         A      Olvin.  His name is Olvin.

14         Q      Can you spell his full name?

15         A      O-L-V-I-N.

16         Q      Does he have a last name?

17         A      Yes.  Nunez.

18         Q      Is that N-U-N-E-Z?

19         A      Is like this, but with a N with a dash

20    on top.

21         Q      Okay.  Got it.  Now you mentioned two

22    other workers that were with you.  What were

```
1           A      Luis.

2           Q      Does Luis have a surname?

3           A      Well, I assume he has, but I don't

4    know it.

5           Q      What about the other worker?

6           A      I didn't learn his name.

7           Q      Okay.  So from September 6th, 2014

8    until today, at no point did you learn this other

9    worker's name?

10          A      Yes.

11          Q      Okay.  Now, when I asked you earlier

12   who were you working that job with that day you

13   said, Romero.  Who is that?

14          A      I didn't work with Romero in that

15   location.

16          Q      Okay.  Because I thought you testified

17   that a Romero was working with you that day as

18   well; am I wrong?

19          A      Yeah, you were wrong.

20          Q      Okay.  Now, what's the address of this

21   house that you were renovating the basement for?

22          A      39, I don't know if it is 11 or 13,
```

1    one of the two.

2         Q    What's the street name?

3         A    Blaine Street.

4         Q    Is that B-L-A-I-N-E?

5         A    Something like that.  I'm not sure.

6         Q    Is that in Northeast D.C.?

7         A    Yes.

8         Q    Now how did you -- these two other

9    workers, how did you find them?

10        A    I picked them up at Home Depot where

11   people are picked up.

12        Q    What does that mean?  What does that

13   mean, "where people are picked up?"

14        A    There is certain locations where

15   people who are unemployed get together to find

16   work.

17             When somebody needs a worker, you're

18   looking for somebody, you go to these locations

19   to get one.

20        Q    So you go to this location to "get

21   one."  How does that process work, getting one?

22        A    Well, you go there and you run into a

1       A       Means you dig and remove dirt in order

2   to install -- we were installing drainage pipes.

3       Q       Okay.  Now did these two workers, did

4   they have distinct jobs that they were supposed

5   to do?

6       A       With me?

7       Q       Yeah.  On their jobs that day.  Like

8   both, did they have separate jobs or like was one

9   a painter, for example, and someone else was

10  bringing the materials in or out?  Like, what

11  were their jobs?

12      A       Well, the goal on that particular day

13  was to remove dirt and bring in gravel.

14      Q       And is that what these two were

15  helping you do?

16      A       Yes.

17      Q       Now, I want to draw your attention to

18  the person you identified as Luis.  How did you

19  find Luis?

20      A       Using the same example that I gave you

21  earlier.

22      Q       And did -- he told you his name was

1    while you were working the job that day, you

2    never addressed him by any name?

3         A    Yes, Luis.

4         Q    Okay.  What did you call the other

5    worker?

6         A    I don't remember.

7         Q    So you knew his name at the time, you

8    just don't remember right now?

9         A    That's right.

10        Q    How long were you guys at 3913 Blaine

11   Street that day?

12        A    Since morning hours into the afternoon

13   hours, but I wouldn't be able to tell you the

14   exact time.

15        Q    Okay.  And I want to back track a

16   little bit.  So, back to Luis.  Did Luis tell you

17   that his name was Luis or did the other worker

18   tell you that his name was Luis?

19        A    The other one.  Well, he didn't come

20   to me to tell me, "Hey, his name is Luis."  But

21   that's what I heard that they were calling each

22   other.

```
1         Q      What did Luis call the other guy?

2         A      I don't remember.

3         Q      Okay.  What did you do after you --

4    the Olvin Nunez, how -- had you worked with him

5    before September 6th, 2014?

6         A      Yes.

7         Q      About how many times have you guys

8    worked together before September 6, 2014?

9         A      Several times.

10        Q      How long had you guys been working

11   together before that day?  It doesn't have to be

12   precise.

13        A      Yeah, an exact figure.  You can't do

14   it, you can't do it like that.

15        Q      More than a year?

16        A      Well, the total amount of time, more

17   than a year.

18        Q      More than five years?

19        A      Less.

20        Q      Two years?

21        A      I mean, this question is confusing

22   because you probably are asking about how long I
```

1      A     We left the work place, heading to our

2  home.

3      Q     When you say "our home," which "home"

4  is that?

5      A     Anybody's home.

6      Q     Whose home did you go to first?

7      A     Well, the question is a little

8  confusing.

9      Q     All right.  The question was, where

10  did you go after you left 3913 Blaine Street.

11      A     Well, the answer is -- I'm going to

12  make it simpler.  We were heading home, but then

13  we stopped at the location that -- what you want

14  me to tell you that.

15      Q     Who is, "we?"

16      A     Olvin, the two workers and I.

17      Q     Did all four of you -- now when you

18  say, "this location," I assume you're talking

19  about El Torogoz, right?

20          MR. LUNA:  The interpreter needs a

21  clarification.  El Toro?

22          BY MR. CHANG:

1            MR. CHANG:  E-L  T-O-R-O-G-O-Z.  T-O-

2       R-O-G-O-Z.  I think it's a bird.

3            MR. LUNA:  T-R-O-J?

4            MR. CHANG:  Patrick, can you --

5            MR. LUNA:  So the question is, what do

6       you mean by this location, E-L T-R-O-G-O-Z [sic]?

7            BY MR. CHANG:

8       Q       Is that where you went?

9       A       Yes.

10      Q       Now did all four of you go to El

11      Torogoz?

12      A       No.

13      Q       Who didn't go to El Torogoz?

14      A       One of the workers.

15      Q       Who?

16      A       The other one, not Luis.

17      Q       Okay.  So you, Olvin, and Luis went to

18      El Torogoz?

19      A       Yes.

20      Q       And where did the other guy go?

21      A       He got off at the Metro station.

22      Q       Which Metro station?

1     A     Georgia and New Hampshire.

2     Q     So you dropped him off at the Georgia

3 Avenue Metro station and then you went, the three

4 of you went to El Torogoz?

5     A     Yes.

6     Q     Have you been to El Torogoz before?

7     A     I have.

8     Q     And by "before" I mean before

9 September 6, 2014?

10     A     Yes.  I have been there several years

11 earlier.  Once in my life.  Not once, I have been

12 there before.

13     Q     Okay.  When was the last time you were

14 at El Torogoz before September 6, 2014?

15     A     I wouldn't remember the exact day, but

16 I haven't gone there in about two years.

17     Q     So, you had not been to El Torogoz in

18 the year -- in 2013?

19     A     I don't remember.

20     Q     Well, you said you haven't been there

21 for two years, right?

22     A     Approximately a year-and-a-half or two

1          Q     Okay.  Now, what did you do when you

2    went to El Torogoz?

3          A     We will drink beer.

4          Q     And who's "we?"

5          A     Olvin and Luis.

6          Q     Okay.  But what did you guys talk

7    about?

8          A     I wouldn't be able to answer that.

9          Q     Okay.  Now at any point in that night,

10   did Luis go into the bathroom with a female

11   customer?

12         A     I don't remember.

13         Q     Okay.  And at any point that night,

14   did you get separated from Luis?

15         A     Yes.

16         Q     When?

17         A     Right inside the restaurant.

18         Q     What happened?

19         A     He stepped out.

20         Q     And what happened when he stepped out?

21         A     He sat at a chair outside of the

22   restaurant.

1      Q      Do you know who this young lady is?

2      A      No.

3      Q      Did you ever personally observe Luis

4   talking to the restaurant owner's wife before he

5   went outside?

6      A      No.  I don't remember.

7      Q      "No," or you don't remember.

8      A      I would say no because I don't

9   remember.

10     Q      Okay.  The -- while Luis was outside,

11  at any point he was outside, did you see him talk

12  to the owner's wife?

13     A      No.

14     Q      You mentioned a fight.  Tell me about

15  this fight.

16     A      Well, talking about the fight.  I was

17  inside talking to Olvin and all of a sudden we

18  noticed that there was a fight outside.

19     Q      What did you notice?

20     A      Well, the first thing was -- well,

21  hold on, they are fighting this young guy who was

22  working with us.  Well -- and when I noticed that

1      there was no fight anymore.  The fight was over

2      and he was there lying on the floor.  There was

3      still a fight.

4            Q      Okay.  While you were still inside the

5      restaurant, what is the first thing that you

6      remember seeing about the fight?

7            A      Well, when Olvin pointed towards

8      outside and he say, "Hey, they are fighting this

9      guy," and then I noticed that he was being

10     attacked.

11           Q      Where were you when you noticed that

12     he was being attacked?

13           A      Inside.

14           Q      So you saw the fight from inside?

15           A      Yes.

16           Q      From where?

17           A      I mean, I saw it from inside, but I

18     stepped out.

19           Q      Okay.  Where were you at the first

20     moment in time when you personally observed any

21     portion of this fight?

22           A      Inside, at the bar.

1       Q     And what did you see?

2       A     I saw that this young man was fighting

3  several people.

4       Q     This "young man," is that Luis?

5       A     Yes.

6       Q     And when you say "fighting several

7  people," can you particularize that in more

8  detail for me?

9       A     Well, you know when you notice -- when

10  you visualize a fight, you -- it's very easy to

11  tell who is fighting who, if one is over here and

12  there are several on the other side.

13       Q     And you were seeing all this while you

14  were still in the restaurant?

15       A     Yes.

16       Q     And did you have a clear view of the

17  fight?

18       A     Not from inside, but I did when I

19  stepped out.

20       Q     Okay.  At a certain point you stepped

21  out.  What did you see when you stepped out?

22       A     Well, the first thing that I saw is

1    that they had this guy lying down.  I don't know

2    if he had been knocked or whether he fell down,

3    but he was lying.

4         Q     "This guy," is Luis?

5         A     Yes.

6         Q     So I just want to be clear.  As soon

7    as you stepped outside of the restaurant, the

8    first thing you saw was Luis on the ground?

9         A     Well, he was lying down on the floor

10   and the other people there who were fighting,

11   they were there, obviously surrounding him.

12        Q     Well, the question was, was the first

13   thing that he saw when he stepped outside, Luis

14   on the ground?

15        A     Well, if we -- if you want me to

16   elaborate about the entire fight, I managed to

17   see a lot of the stuff over a short period of

18   time.

19        Q     Okay.  The moment you stepped outside

20   the restaurant, was Luis on the ground?

21        A     Yes.

22        Q     Okay.  Did you see Luis throw a pole

1    I didn't see that portion of the video.

2         Q     All right, that's fine.  Yeah.

3               (Off the record comments)

4               BY MR. CHANG:

5         Q     So, you stepped outside.  The first

6    thing you see is Luis on the ground.  What did

7    you see next?

8               MR. KIRKPATRICK:  Objection.  I

9    believe he mischaracterized the witness's

10   testimony.

11              MR. CHANG:  I'll rephrase.

12              BY MR. CHANG:

13        Q     When you stepped outside the

14   restaurant, was Luis on the ground?

15        A     Yes.

16        Q     Okay.  What did you see next?

17        A     That they were coming to attack him.

18        Q     Who's "they?"

19        A     Several people, clients and the staff,

20   both male and females, they were coming at him.

21        Q     When you say "several," just

22   approximately how many are "several?"

1          A      Well, when I say several; the owner,

2     his wife, a couple of -- some wait staff and two

3     customers.

4               I mean, and considering that in this

5     kind of altercation you don't have the time to

6     identify how many or who is coming.

7          Q      Right.  Did more than two people

8     attack him?

9          A      More than four were on top of him.

10         Q      More than four were on top of him?

11         A      Not on top of him, they were heading

12     to attack him.

13         Q      How do you know "they were heading to

14     attack him"?

15         A      You can visually sense when someone is

16     very furious and coming to attack somebody.

17         Q      When you say "more than four," is that

18     more than six?

19         A      Yes, six.  You have the owner, his

20     wife,  two female servers and like two clients or

21     more, about six.

22         Q      Okay.  And did any of these six, did

1    make contact with Luis?

2         A     Not after I stepped out, because I

3    intervened and I ask them not to hit this poor

4    young guy, because they were about to.

5         Q     Who did you tell don't hit this poor

6    young guy?

7         A     Well, basically all of them.  Because

8    he was lying on the floor and I was like this,

9    "Hey, don't fight.  What is going on?"  So

10   basically all of them and told them, "Hey, don't

11   fight.  This is over."

12        Q     And so typically at no point in the

13   fight was anyone actually on top of Luis?

14        A     When I step out, they didn't.  But

15   before that, I don't know because things happened

16   before I stepped out.

17        Q     And when you stepped out, Luis was on

18   the ground?

19        A     Yes.

20        Q     Okay.  And you said you -- I don't

21   think you said the word intervened, but I'll just

22   use that for my question.  When you intervened,

1      who were you addressing?

2          A      To all of them who were coming towards

3      the young guy.

4          Q      And what -- did they say anything to

5      you?

6          A      Not to me.  They were talking silly

7      things among themselves.  A lot of stuff.

8          Q      What kind of "silly things?"

9          A      I don't know.  When people fight they

10     say a lot of stuff.

11         Q      Yeah.  Okay.  You intervened.  What

12     happened next?

13         A      Well, the guy was oh so furious, he

14     wanted to keep fighting.

15         Q      What happened after that?

16         A      I mean, I opened my van door and I

17     usher him into my van and I just drove off.

18              MR. LUNA:  Interpreter correction.

19     Interpreter omitted a little portion.

20              THE WITNESS:  He wanted -- he was

21     furious and he wanted to keep fighting.  So I

22     open my van's door and I got him into the van and

1      I told him not to keep fighting because he was

2      going to get hit badly.

3              BY MR. CHANG:

4          Q      And did he -- what, if anything, did

5      he say?

6          A      I don't remember.  He said something.

7      Yeah, he must have said something, but at that

8      point in time things are so agitated that -- and

9      I even got him inside the van and then I turn on

10     the engine and then he got out of the van and I

11     had to bring him back in.

12         Q      What, okay.

13         A      He got out of the van and I had to

14     bring him back in.

15         Q      And what, if anything, did you see

16     when he got off the van?

17         A      Yes.  And this is the funny part.  And

18     I noticed that after I checked the van later that

19     he took a nail remover, but at that time I didn't

20     notice it.

21              So when I put him originally inside,

22     he looked around and, you know, there are tools

1    scattered all over.  So he got this piece -- and

2    so he got off again.  But at that time he wasn't

3    planning to fight, he was just wanted scare away

4    the attackers.

5         Q    And this -- tell me about this tool.

6    What was this tool again?

7         A    So he grabbed this and he went like

8    this, swinging his arm like, and dragging it over

9    the floor.  Right in the area where people walk,

10   like on the sidewalk, and you could see sparks

11   and when he just drag it all over quickly.

12        Q    Okay.  I understand that, but what was

13   the tool?

14        A    Well, on that particular day I didn't

15   even notice what he had actually caught.

16        Q    Okay.  But now you know, so what was

17   that tool?

18        A    Yes.  Because when I checked the van

19   later what I saw on the floor, there was this

20   nail remover and an electricity pliers,

21   electrical pliers.

22        Q    Okay.  And I'm not sure, does this

1    tool have a name?

2         A    Well, in Spanish you call it a nail

3    remover.  And the other one are like this pliers,

4    you know.

5         Q    So, he used two tools that made the

6    spark?

7         A    Yes.  I assumed he used one of the

8    two, but I'm not sure.

9         Q    Okay.  And this was one of the tools

10   that you used as part of your job?

11        A    Si.

12        Q    And it wasn't a knife?

13        A    I don't think so.  There were not

14   knives there.

15        Q    Okay.  Earlier you testified that Luis

16   got out of the van to spark this tool.  What

17   happened after he did that?

18        A    Well, he scared several of them, but

19   then he went back into the van.

20        Q    And what happened after that?

21        A    I turned on the engine and drove off.

22        Q    Okay.  Do you remember, what, if

1      Q      Well, that wasn't the question.  The

2  question was, did you see Luis throw beers --

3  grab beers from your van and throw them?

4      A      No.

5      Q      Okay.  Do you know -- do you know a

6  server at El Torogoz who goes by the name Jamilet

7  (phonetic)?

8      A      No.

9      Q      What about a Bilma Guardado

10 (phonetic)?

11     A      No.

12     Q      Okay.  And you -- so you drove away.

13 Where did you drive to?

14     A      Well, as you drive off, you basically

15 -- you have no direction in mind.

16     Q      Did you obtain a direction eventually?

17     A      Well, it occurred to me to go to

18 another restaurant.

19     Q      Okay.  What was the name of this

20 restaurant?

21     A      I don't know the name, but it's on Age

22 [sic] Street at either 4 or 5th.  I don't

1    remember.

2         Q    Was this the Ache Lounge?

3         A    That's right.

4         Q    Ache Lounge?

5         A    Ache Lounge.

6         Q    Is that the restaurant?

7         A    Is the restaurant.

8         Q    Okay.  And what did you do at Ache

9    Lounge?

10        A    Well, I parked the van and we step

11   inside.

12        Q    So on the drive from El Torogoz to

13   Ache Lounge, what did you and Luis talk about?

14        A    Well, obviously the first question I

15   asked, "What was this fight about?"

16        Q    And what did Luis say?

17        A    He indicated that he had an argument

18   with the owner and his wife.

19        Q    What else did he say?

20        A    Well, he indicated they exchanged

21   words and they offended each other.

22        Q    Can you --

1     A     Well, he said that he had a verbal

2     altercation with the wife and the guy got mad and

3     assaulted him.

4          Q     Who is -- when you say "guy," who's

5     "guy?"

6          A     The owner of the restaurant.

7          Q     Assaulted him?

8          A     Yes.  And assaulted him because they

9     were offending each other with his wife.  You

10    know, that's what he relayed to me on the way

11    there.

12         Q     Okay.  Did you go into Ache Lounge

13    with Luis?

14         A     Yes.  We got there, I park the car.

15    I came in, I stepped in.  But I'm not sure if he

16    came in as well or whether he left after being

17    outside.  But then he eventually left.

18         Q     Okay.  So you testified you parked the

19    van near Ache Lounge?

20         A     Yes.

21         Q     Did you move that van at any point

22    before it was seized?

1      A      No.

2      Q      And what did -- so what did you do at

3  Ache Lounge?

4      A      I came in and I had a few beers.

5      Q      By yourself?

6      A      Yes, alone.

7      Q      Okay.  And what -- when's the last

8  time you saw Luis that night?

9      A      When we got off the van over there and

10  we were supposed to enter.

11      Q      You were -- so the two of you were

12  supposed to enter and then he just booked it?

13      A      Yeah, he disappeared.  But the way I

14  view things, we were supposed to come in after he

15  relaxed a little bit, because he was so agitated.

16      Q      Did he run away or did he just walk

17  away or how did he go away?

18      A      I didn't learn anything.  I mean, we

19  got out of the van and he went missing, period.

20      Q      Okay.

21      A      That's very simple.

22      Q      Where did Olvin go?

1          A       He remain at El Torogoz.

2          Q       So the only two people in the van were

3     you two guys?  Okay.

4          A       Yes.

5          Q       And what type of establishment is Ache

6     Lounge?

7          A       It's a bar.  It's a bar, but they

8     serve -- sell beers and food.

9          Q       Is there loud music?

10         A       Yes.

11         Q       The -- did you, from what you saw that

12    night, with respect to the altercation, did you

13    think that Luis would be seriously injured if you

14    didn't intervene?

15         A       Yeah, because he was beat up.  He

16    couldn't walk because of his ankle.

17         Q       Luis was beat up?

18         A       Yeah, he was beat up.

19         Q       Do you know who beat him up?

20         A       He was limping.

21         Q       Did you interact with MPD officers

22    that evening?  By "evening" I mean September 6th

1    and then going into September 7th, because I

2    think it passed midnight at a certain point.

3            A    Yes.

4            Q    Okay.  What happened?

5            A    Well, after I exited the Ache Lounge,

6    I walked towards Georgia Avenue.

7            Q    So you walked down Georgia Avenue.

8    What happened next?

9            A    Prior to Georgia Avenue, because I was

10   planning to catch a taxi to go home because I

11   felt that I was kind of drunk.  So the officers

12   stopped me.

13           Q    And where were you when they stopped

14   you?

15           A    I was walking on the street, out in

16   the street, and then they stopped me right in

17   front of a restaurant whose name was or -- or was

18   or is Odalis.

19           Q    Can you spell that?

20           A    O-D-A-L-I-S.

21           Q    O-D-A-L-I-S?

22           A    Yes.

1        Q      All right.  Is that, is Odalis on the

2   800 block of Kennedy Street?  Give or take?

3        A      I'm not sure whether it is 7th or 8th.

4        Q      Okay.  Now, you said officers stopped

5   you?  How many officers stopped you?

6        A      There were four.

7        Q      Okay.  Do you -- what are their names?

8        A      Well, at the time they stopped me I

9   had no clue who they were.  I didn't know

10  anything.

11       Q      Okay.  And what did they say to you

12  when they stopped you?

13       A      They asked me if I had been involved

14  in a fight in El Torogoz.

15       Q      And how did you respond?

16       A      I told them that there was a fight,

17  but that I didn't fight.  My role was to pick up

18  somebody who was fighting and take him away from

19  the fight.

20       Q      And what, if anything, did -- and

21  what, if anything, did these officers say in

22  response to that?

1      A      Yes.  He indicated that I could be

2  arrested because I was fighting on the street.

3      Q      Okay.  What, if anything else, did

4  Officer Jordan tell you?

5      A      Well, obviously I explained to him how

6  the fight had transpired, because he was asking

7  me.

8      Q      And what did he say?

9              MR. LUNA:  The interpreter needs

10  clarification.

11              BY MR. CHANG:

12      Q      What did Officer Jordan say?

13      A      I mean, I don't remember everything,

14  but they told me a lot of stuff.  What I do

15  recall mostly, is that he told me that my van was

16  going to be towed.

17      Q      Why?

18      A      Because he said -- I don't know how

19  the officer actually call -- they claim that the

20  van was a witness to the crime or that it can be

21  used as evidence or something along those lines.

22      Q      Evidence relating to a crime?

1    they hadn't taken it yet.  And I told them, I

2    begged them not to take the van because I didn't

3    have any other vehicle.  That if they want to

4    inquire further about the fight that they could

5    go back to the location and ask the owner and his

6    wife for them to ascertain that I was not

7    fighting.

8         Q    Okay.  But to be clear, Officer Jordan

9    told you that he was going to take the van

10   because -- or someone at MPD was going to take

11   the van because it was used as evidence relating

12   to a crime?

13        A    No.  He didn't elaborate so much or

14   give me some any explanation.  He just put it

15   very briefly, "Your van is gone."  And as soon as

16   he finish saying that to me, the crane, the tow

17   truck was right there.

18        Q    Okay.  Did he say he was taking your

19   van as evidence?

20        A    Not on that particular day.  He said

21   that another day.  And on that particular day

22   they said that it was going to be towed, period.

1    2014?

2         A    Well, I am explaining what actually

3    occurred, you know.  We're dealing here with a

4    group of police officers and they work as a team.

5    They are not a single individual, so they operate

6    as a team.

7         Q    Okay.  After that evening, what's the

8    next interaction you had with anyone from MPD?

9         A    After that evening?

10        Q    Yes.

11        A    I went to the 4th District to inquire

12   as to what was happening with my van.

13        Q    The 4th District Police Station?

14        A    The station on Georgia Avenue at

15   Peabody, I think.

16        Q    Okay.  And when was this?

17        A    The following day.

18        Q    The following day?

19        A    Yes, the following day.

20        Q    So that will be September 7th, 2014?

21        A    Yes.

22        Q    Okay.  And how did you know to go to

1     the 4th District Police Station?

2          A     Because this is the closest station to

3     where the incident occurred.

4          Q     Okay.  And did you have any

5     conversations with any MPD members while you were

6     at 4D?

7          A     Yes.  The individual, you know, the

8     caretaker who is there just when you approach the

9     --

10         Q     Receptionist?

11         A     Yes.

12         Q     What did he say -- or what did he or

13    she say?

14         A     Well, as I explained what had occurred

15    the day before, I believe on that particular day

16    she didn't give me any response.  She refer me

17    over to the Park Road Station.

18         Q     Okay.  And then she referred you over

19    to Park Road.  What happened after that?

20         A     Every time I went to a new location,

21    I had to go through the painful experience of

22    recounting the whole story.

1      Q      Okay.  Is this still on September 7th,

2   2014 at Park Road?

3      A      Yes.  That day I went to both places.

4      Q      Okay.  What else do you remember from

5   going to Park Road?

6      A      So over there they told me that I had

7   to contact Officer Jordan and that I had to

8   return the following day in the afternoon.

9      Q      Okay.  Did you return the following

10   day in the afternoon?

11      A      Yes.

12      Q      Okay.  Then what happened the

13   following day?

14      A      After, the following day I have to go

15   through the lengthy process of being bounced back

16   from Park Road to Georgia Avenue and this drag

17   on, that I don't recall how many times.

18      Q      And this was on September 8th?

19      A      And on September the 8, was the

20   starting point of the martyrdom (phonetic), of

21   seeking my -- or going after my van.

22      Q      Of the what?

1      A      That was the beginning of the

2  difficult task of tracking down my van.

3      Q      Okay.  And what else happened on

4  September 8th?

5      A      Well, eventually when I run into

6  Jordan, that afternoon, he asked me if I was

7  there to look for my van and I said that I did.

8      Q      Okay.  What happened next?

9      A      But then he said that I had to go to

10  the Georgia Avenue station, but the way he was

11  telling me I was actually thinking that I was

12  going to get my van back.  And that -- it turn

13  out that they were taking me there for a very

14  lengthy interrogation.

15      Q      Before Officer Jordan took you to get

16  interrogated, did you understand everything he

17  was saying to you at the time?

18      A      Yes, because he didn't say much.  He

19  said -- just said, "I see you at the 4 District

20  station and Georgia."

21      Q      Anything else?  Did he say anything

22  else?

1      interrogation?

2           A      I mean, what I do recall the most is

3      that they were so focused on this individual that

4      they wanted me to hand him over to them in

5      exchange for my van.

6           Q      Is that what they said to you?

7           A      Yes.

8           Q      And to be clear they said, "If you

9      tell us who Luis is, we will give you your van

10     back."  Is that what they said?

11          A      Yes.

12          Q      And what did you tell them?

13          A      They told me that if I told them who

14     Luis was, or who Luis --

15               MR. LUNA:  Interpreter needs

16     clarification.

17               THE WITNESS:  They told me that if I

18     knew where Luis was or who was Luis, that I could

19     get my van back.  Otherwise, there would be no

20     way for me to get my van back.

21               BY MR. CHANG:

22          Q      And what was your response?

1    A      Same.  I didn't know where to find

2  him.

3    Q      And what was their response to that?

4    A      There were sort of -- well, they were

5  putting pressure on me.

6    Q      How?

7    A      They were putting pressure on me, like

8  if you get asked -- if you are asked to give

9  something away that you don't have.  And that's

10  what it is.

11    Q      So, are you saying that once you told

12  them that you didn't know who Luis was that they

13  were supposed to believe you?

14    A      Whether they believe me or not, that's

15  their own business.  My job was to tell them the

16  truth.

17    Q      Okay.  How did that interrogation end?

18    A      I didn't get my van back.

19    Q      Now, what did you do after September

20  11, 2014 to get your van back?  What's the next

21  thing you did, sir?

22    A      Well, as this was a piece of evidence

1    and I don't know -- I don't know anything about

2    this kind of -- this processing, I waited a

3    couple of weeks in order to ask for it again.

4         Q     And who did you go to, to ask for it

5    again?

6         A     Well, I will go to any of the two

7    stations.  From this point forward, I don't know

8    the details because there were so many times I

9    would go either to Park Road or to the 4th

10   District.

11        Q     Okay.  And do you remember -- do you

12   remember any MPD member in particular that you

13   talked to during all these times you went to one

14   of the two stations?

15        A     No.  I actually, I don't recall.  I

16   don't remember any of them, because from that

17   time forward after the interrogation I didn't run

18   again into Jordan or Dailey.  I would usually

19   bump into some other different officers.

20        Q     Okay.  Did someone at one of these

21   stations ever give you a phone number to call to

22   get information on your van?

1          A      Yes.  On one occasion, they gave me

2     one.  It was like a few months had elapsed,

3     either one or two months, but some, yeah.  Some

4     time had passed, yes.

5          Q      And what was that phone number?

6          A      Well, I don't know if I have it.  At

7     the time, but I don't know it by heart, but I do

8     recall at the last -- the two times that I called

9     is one of those lines in which they -- there's an

10     operator who put you on hold for like five or six

11     hours.

12          Q      So, you were on hold on this line for

13     five or six hours?

14          A      Of course, I didn't wait that long.

15     I mean, probably 15 minutes.

16          Q      Okay.  Did you save this number on

17     your phone?

18          A      I don't think so.  But I tend to save

19     a lot of things.  Most likely I have it

20     somewhere.

21          Q      Okay.  Well, if you do come across it,

22     if you find it, can you give it to your attorney

1          I can't verify that right now, but I,

2     you know, I'll respect that assertion for now and

3     I won't have to ask you any more questions about

4     it.

5          A     Thank you.

6          Q     Okay.  Did you -- what if anything, do

7     you remember about -- sorry, strike that.

8               Did you talk to Detective Matthew

9     Dailey in March 2015?

10         A     We are talking about seven months later

11    after the occurrence of this incident.  It would

12    be impossible to remember.

13         Q     Remember the date?

14         A     Or whether I spoke to him or not.

15         Q     Okay.  So you don't remember if you

16    spoke with Detective Matthew Dailey at any point

17    following the initial seizure of your van?

18         A     On occasion, yes, I sought to contact

19    him by phone.

20         Q     Were you able to contact him?

21         A     Yes, I was able to talk to him.

22         Q     Was that over the phone, too?

1       A       Over the phone.

2       Q       And just roughly, when was this phone

3   call?

4               MR. LUNA:  The interpreter needs

5   clarification.

6               THE WITNESS:  When was it or the length

7   of the call?

8               BY MR. CHANG:

9       Q       When was this phone call?

10      A       Several months after September or the

11  original problem.

12      Q       Okay.  And what, if anything, do you

13  remember about this phone call?

14      A       Well, I told him that I was getting

15  ahold of him to see if he was in a position to

16  tell how to get my van or see if I -- how can I

17  get it back.

18      Q       And what was his response?

19      A       I don't remember exactly the language,

20  but I do recall the basic stuff.  But in brief he

21  relayed to me that I had not cooperated with them,

22  that my van was being withheld and that they were

1          A     He said that that cannot be the case;

2     that we have to go back and claim it back.  So he

3     accompany me to the Park Road police station.

4          Q     And just, again, it doesn't have to be

5     precise, when was this when he accompanied you to

6     the police station?

7          A     That was like seven or eight months

8     later.  I don't remember.

9          Q     Was this before or after you spoke to

10    Detective Dailey on the phone?

11         A     After I spoke to him.

12         Q     After you spoke to him.  Okay.  So how

13    -- so you said earlier -- you testified that you

14    had to back track to explain why you been up at

15    the United States Attorney's Office.  So how did

16    you end up at the United States Attorney's Office?

17         A     After we went -- after I went with my

18    friend, Romero, to the police station, I

19    eventually got some sort of case number.  So they

20    made an appointment for me to come to this

21    building.

22         Q     Okay.  So who is the one who gave you

1        some sort of case number?

2               A        An officer.

3               Q        At MPD?

4               A        Yes.

5               Q        Okay.  What was -- describe in more

6        detail what this information was that they gave

7        you.  What did they give you?

8               A        They handed me a piece of paper.  A

9        notice, and with a date for me to report over

10       here.

11              Q        Over where?

12              A        This building.

13              Q        This building?  Or the United States

14       Attorney's Office, which is a block down.

15              A        This is 455, right?

16              Q        This is 441.

17              A        Well, I'm a little confused, but it's

18       here.

19              Q        Okay.  So did you go to 555?

20              A        Yes, exactly.

21              Q        And that's where this paper told you to

22       go?

1        A      Yes.

2        Q      Okay.  And did you go?

3        A      I came.

4        Q      Okay.  And what happened next?

5        A      I went through some sort of

6    interrogation.  I was received by somebody.  A lot

7    of question and answer session.

8        Q      When you say, "interrogation," so who

9    asked these questions in this question and answer

10   session?

11       A      The gentleman who received me in that

12   office, where I was supposed to show up for the

13   appointment.  I don't even know his name or I

14   don't even recall who he was.

15       Q      Okay.  So it was the person who is

16   named on that piece of paper that told you to show

17   up to 555?

18       A      I think so, and this paper is kept.

19       Q      Right.  When you say, "question and

20   answer session," what type of questions did he ask

21   you?

22       A      He came out to ask about my job, my

1   employment, how much money I made.

2          Q      Okay.  Did you talk to him about your

3   van?

4          A      He asked me how much my van was worth.

5   The one that I had to buy due to the fact that

6   they were not returning my own van.  He asked me

7   how much money I had to spend in tools and stuff

8   like that.

9          Q      Okay.  Did you ask him how you could

10  get your van back?

11         A      On that occasion I don't think I asked

12  him, because that's what this was about.

13         Q      I don't understand that.  So did you --

14  besides telling him what the value of your van

15  was, did you discuss, for example, why the van was

16  being held?

17         A      No.  I was just trying to get my van

18  back, so I asked him how am I going to get my van

19  back.

20         Q      And what did he say when you asked him

21  that?

22         A      He began to shuffle papers and write

1   down stuff and keep asking me questions.  And at

2   a point in and time later on he -- I ask him,

3   because he was kind of coming up with an estimate.

4        Q    Estimate of what?

5        A    As to the expenses incurred.  So I

6   brought it -- I cut to the chase or and told him,

7   "Hey, but hold on, you are doing an estimate of

8   all of the stuff?"

9              And then I do have that estimate, I

10  think.  But then I eventually told hold on.  This

11  is a long list that what I had to spend on all of

12  this.  And then -- so anyway he did his own

13  estimate, he gave me a few other papers and send

14  me over to Indiana Avenue.

15       Q    Okay.  At any point during this

16  conversation, did he tell you how you could get

17  your van back, besides crunching number, so to

18  speak, and sending you to Indiana?

19       A    Well, as far as I understood, this was

20  the process and we are going through the process

21  to get my van back.

22       Q    Okay.  And now was this conversation in

1    English or in Spanish?

2         A     I don't remember.

3         Q     Okay.  Did you go to Indiana Avenue?

4         A     Yes, I did.

5         Q     What happened there?

6         A     He actually asked me to go downstairs.

7         Q     Who is, "he?"

8         A     Yeah, the guy who handled my case.  The

9    one we are telling you about.

10        Q     All right.  And then did you go

11   downstairs?

12        A     Later on.

13        Q     And then what happened next?

14        A     I believe, according to him, I was

15   supposed to contact, like a public defender or a

16   public attorney and that would get the process

17   going to get my van back.  And then he gave me --

18   he handed me a piece of paper through, according

19   to which I was going to get $40 just for the sake

20   of showing up here.

21        Q     Okay.  The -- do you remember this

22   attorney's name?

1        A       The one that I allegedly went to get

2   down there?

3        Q       Yeah.

4        A       Of course, I do recall.

5        Q       John Macharo (phonetic)?

6        A       John Macharo, yes.

7        Q       Did he ever become your attorney?

8        A       He was assigned to me.

9        Q       But did you ever enter into an

10  attorney-client relationship with him?

11       A       I only contacted him twice over the

12  phone.

13       Q       Okay.  But was he your attorney at that

14  point?

15       A       Yes, he was assigned.  He was court

16  appointed.

17       Q       Okay.  And what was he appointed to do?

18       A       For according to them, to help me out.

19       Q       Help you out with what?

20       A       To get my van back.

21       Q       Okay.  Now after November 26, 2015, did

22  you personally reach out to Detective Dailey to

1      Q      Okay.  Of the tools that were Olvin's?

2      A      Well, I wouldn't be able to tell you

3  the percentage, but he owned a sizeable amount of

4  them and they were expensive ones.

5      Q      Okay.  Jose Romero, what information

6  does he have relating to this lawsuit.  What

7  factual information?

8      A      He witnessed the time when the police

9  stopped me and then he was there.  He actually

10  helped me -- he talked them into not arresting me

11  and he only left the scene when he was ordered by

12  an officer to walk back inside.

13      Q      Anything else?

14      A      I mean, Jose is a close friend.  He

15  know how much I suffer in order to go through all

16  of this process trying to buy new tools, car

17  rentals and projects that I lost.

18      Q      Are you -- do you have a job right now?

19      A      Yes.

20      Q      What's your job?

21      A      Home improvement.  Home remodeling.

22      Q      Do you work for somebody or is this

1          A     Yes.

2          Q     What was that car?

3          A     I had so many cars, I don't remember.

4          Q     Okay.  On September 6, 2014, how many

5    cars did you or your anyone in your immediate

6    family own?

7          A     At that time I only had the van that

8    was towed.

9          Q     So, no personal vehicle at that time?

10         A     That's why I wanted my van badly.

11         Q     Okay.  And the next personal car that

12   you got was this Chevy Tahoe?

13         A     After that date, I had the Chevy Astro,

14   and then --

15         Q     I'm talking personal cars.

16         A     Yeah, Chevy Tahoe.

17         Q     All right.  Does your wife have any

18   cars?

19         A     No.

20         Q     Okay.  You answered Interrogatory

21   Number 16, that says, "$3,452 for replacing seized

22   tools."  Which tools are these?

1    it was towed I didn't know.  I found out after the

2    van was recovered.

3          Q     "Found out" what?

4          A     That there was another passport.

5          Q     All right.  So you did find out at some

6    point that your van was searched?

7          A     After I recovered it.

8          Q     Okay.  Do you know who this passport

9    belonged to, this other one?

10          A     Yes, because I saw it.

11          Q     Okay.  Whose passport was that?

12          A     It belonged to the so-called Luis.

13          Q     Okay.  So do know who Josue Nahun Diaz-

14    Matute is?

15          A     This is the one who has been called

16    Luis all along.  Because his passport was found

17    there, right?

18          Q     There was a passport belonging to -- I

19    don't know who that is.  I just know that there

20    was a passport.

21                So your work knives.  What kind of

22    knives are these?

C E R T I F I C A T E

This is to certify that the foregoing transcript

Deposition of: Erlin Avila

In the matter of: Erlin Avila v Det. Matthew Dailey

Before: US District Court

Date: 07-13-16

Place: Washington, DC


were duly recorded and accurately transcribed under
my direction; further, that said transcript is a
true and accurate record of the proceedings; and
that I am neither counsel for, related to, nor
employed by any of the parties to this action in
which this deposition was taken; and further that I
am not a relative nor an employee of any of the
parties nor counsel employed by the parties, and I
am not financially or otherwise interested in the
outcome of the action.


-------------------------
Court Reporter

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

# *NEAL R. GROSS & CO., INC.*

1323 RHODE ISLAND AVENUE, NW
WASHINGTON, D.C.  20005
TELEPHONE (202) 234-4433.

| ERRATA | | ERRATA |

RE THE DEPOSITION OF  Erlin Ever Mencias Avila
(deponent's name)

TAKEN ON  7/13/2016 ,
(date)

IN THE MATTER OF

 Erlin Ever Mencias Avila                    v.  Matthew Dailey
(party)                                                                   (party)

DOCKET NO.  1:15-cv-02135-TSC .

IN
      United States District Court for the District of Columbia          .
(name of court)

**INSTRUCTIONS:**
1.      **Please make NO marks on the transcript.**
2.      **On this form only, at places you feel ought to be looked at: List page number, line number and proposed alternative version.**

| PAGE NO. | LINE NO. | PROPOSED CHANGE |
|---|---|---|
| Throughout | N/A | Change "Kirkpatrick" to "Llewellyn" after "Appearances" |
| 49 | 19 | "...checked the van later after retrieving it from MPD, what..." |
| 60 | 1 | "Yes. I understood that he indicated..." |
| 60 | 19 | "...they claimed at a later time that the van..." |
| 65 | 2 | Change "O'Riley's" to "Odalis" |
| 66 | 13 | "...not sure. Detective Dailey could have been one of the four officers." |
| 75 | 6 | "...right? But I don't know the names of the officers who interrogated me." |
| 93 | 5-6 | Change "Macharo" to "Machado" |
| 123 | 10 | "...per week in net income after I paid an assistant $500 a week." |
| 140 | 4 | Change "No." to "Not at this time." |

### *NEAL R. GROSS & CO., INC.*
1323 RHODE ISLAND AVENUE, NW
WASHINGTON, D.C.  20005
TELEPHONE (202) 234-4433

| PAGE NO. | LINE NO. | PROPOSED CHANGE |
|---|---|---|
| 66 | 20 | "...day, but I don't know the names of the officers I spoke to |
| | | that night except for Jordan." |
| 133 | 16-17 | "Because his passport was found in the van, and I recognized |
| | | his face in the picture when I was shown the passport in this |
| | | case." |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## AUTHENTICATION BY SIGNATURE

I, the undersigned, do hereby certify by my signature hereunder that I have read the foregoing deposition of testimony given by me on July 13, 2016, and find said transcription to be a true and accurate record, as corrected.

_____
Erlin Ever Mencias Avila

Sworn to and subscribed before me this 10th day of August, 2016.

_____
Notary Public

My commission expires 9/30/2020.

Timothy Ebron
Notary Public, District of Columbia
My Commission Expires 9/31/2020



**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

# Exhibit I

# Metropolitan Police Department □ Washington, D.C.



## GENERAL ORDER

| Subject: | Series | Number | Distribution | Change Number |
|---|---|---|---|---|
| | 601 | 1 | A | 1 |

**Recording, Handling and Disposition of Property Coming into the Custody of the Department**

Effective Date **April 30, 1992**

Revision Date

The purpose of this order is to establish the policies and procedures for members of the department relative to the recording, handling, and disposition of the various types of property coming into the custody of this department. This order consists of the following parts:

**PART I**   **Duties and Responsibilities of Members**

    **A.**   General Procedures.
    **B.**   PD Form 82 - Property Book.
    **C.**   PD Form 81 - Property Record.
    **D.**   Special Instructions.
    **E.**   Seizures for Violations of Gun Control Act.
    **F.**   Firearms.
    **G.**   Bicycles or Play Vehicles.
    **H.**   Placing Stops in Pawn Shops.
    **I.**   Court Property Control Office.
    **J.**   Disposition of Narcotics and Dangerous Drugs.

**PART II**   **Duties and Responsibilities of Station Clerks**

    **A.**   Prisoner's Property.
    **B.**   Station Duties.

**PART III**   **Classifications of Property**

    **A.**   Found.
    **B.**   Abandoned.
    **C.**   Property Set Out for Eviction.
    **D.**   Estate of Deceased Person.
    **E.**   Property of Alleged Mentally Ill.
    **F.**   Evidence and Suspected Proceeds of Crime.
    **G.**   Held for Civil Forfeiture.
    **H.**   Impounded Vehicles.
    **I.**   Safekeeping.
    **J.**   Illegal Fireworks.



DAILEY
EXHIBIT NO. _1_
5/17/16
C. CRUMP

1901

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | **1** | **2 of 37** |

PART IV      **Duties and Responsibilities of Organizational Elements**

        **A.**    **Organizational Element Property Officers.**
        **B.**    **Officials.**
        **C.**    **Commanding Officers.**

PART V      **Duties and Responsibilities of Property Division**

        **A.**    **Property Control Branch.**
        **B.**    **Director, Property Division.**

**PART I**

    **A.**    <u>**General Procedures.**</u>

      1.    The contents of this order do not cover every possible situation that may occur when handling property. When doubt or uncertainty arises as to the proper method for handling property, and the condition is not specifically covered by the provisions of this order, members shall contact the department's Property Clerk, or his/her agent for guidance.

      2.    Unless otherwise prescribed, all property shall be submitted to the organizational element's property officer with a completed PD Form 81 (Property Record). The element's property officer shall inspect the form for accuracy and ensure that in all cases the information is placed into the Property Evidence Inventory Control System (PEICS) before the property is transmitted to the Property Control Branch. He/she shall ensure that the property control number and item number are placed on the Property Book and on all other property reports relative to the recovered property. All property, before delivery to the Property Control Branch shall, whenever possible, be securely wrapped, tied, and properly marked or tagged with a PD Form 285 (Property Tag). In the case of small articles, the property shall be placed in a PD Form 14 (Property Envelope). Each individually numbered item listed on the PD Form 81 shall be packaged separately. All required information to include the property control number and the <u>item number</u> shall be entered on the PD Forms 285 and 14 to ensure easy and accurate identification of the property.

      3.    In all cases of property which comes into the possession of this department, it is the responsibility of the member who first handles the property to ensure that the property is properly recorded and processed in accordance with the procedures set forth in this order.

      4.    Property taken into custody by members of the department shall be reported on a PD Form 251 (Event Report). Property recovered after the original report (PD 251) has been submitted shall be recorded on a PD Form 252 (Supplemental Report).

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | **1** | **3 of 37** |

5.     Members shall ensure all property, which comes into their possession, is properly safeguarded until relieved of that responsibility.

6.     Property shall generally be classified in one of the following categories:

    a.     Abandoned.

    b.     Turned Over to Police for Disposal.

    c.     Suspected Proceeds of Crime.

    d.     Estate of Deceased Person.

    e.     Evidence.

    f.     Found.

    g.     Safekeeping/Recovered Stolen Auto.

    h.     Held for Civil Forfeiture.

    i.     Impounded (Motor Vehicles Only).

    j.     Removed from Impounded Vehicle.

    k.     Set Out for Eviction.

    l.     Prisoners'.

    m.     Alleged Mentally Ill.

7.     Upon learning the identity of the owner/claimant of recovered property, which was previously forwarded to the Property Control Branch, members shall bring this information to the attention of their assigned element's property officer by completing PD Form 81-D (Property Ownership/Classification Information Card).  The element property officer shall record the owner/claimant's name in PEICS, on the Property Book, and on all other property reports relative to the recovered property.  The PD Form 81-D shall be forwarded to the Property Control Branch by the next business day.  The member learning of the owner's/claimant's identity shall attempt to notify the owner/claimant of the fact that their property is in the custody of the department. Members shall maintain a complete record of each such attempt to notify the owner/claimant.

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | **1** | **4 of 37** |

8.   At the time of arrest, prisoners shall be thoroughly searched and <u>all</u> personal property, including those items (e.g., ties, belts, suspenders, scarfs, etc.) that could be used to inflict injuries upon themselves, shall be removed.  The recovering officer shall turn these items of property over to the station clerk and the procedures set forth in Part II of this order shall be followed.  Property, which is taken from a prisoner and classified as Evidence or Suspected Proceeds of Crime, shall be handled separately in accordance with the procedures set forth in this order.

B.   <u>PD Form 82 - Property Book.</u>

1.   All property that comes into the custody of a member of the department shall be recorded on the Property Book by the recovering member.  This entry shall be made as soon as practicable, but in all instances, prior to the completion of the member's tour of duty.

2.   Each organizational element shall maintain its current Property Book in the station clerk's office, and the Desk Sergeant shall be held accountable for ensuring that it is not removed from this area.

3.   The officer recording the property on the left-hand page of the Property Book shall, in addition to entering a complete description of the property, fill in the appropriate information (where applicable) as indicated by the spaces provided.  The recording officer shall ensure that the searching officer, when applicable, and the station clerk sign their names in the appropriate spaces.

4.   When corrections are made to the Property Book, a line in red ink shall be drawn through the incorrect entry.  The person who made the correction shall affix his/her initials and badge number at either end of the red line.

5.   Central Complaint Numbers (CCN) shall be recorded on the left-hand page of the Property Book in the space after "If entries on incidental or other record, give record and page."

C.   <u>PD Form 81 - Property Record.</u>

1.   PD Form 81 shall be typed or neatly <u>hand-printed</u> by the recovering member and when completed, shall be signed by an official the rank of lieutenant or above, including acting lieutenants.

2.   Continuation of the PD Form 81 statement of facts shall be hand-printed or typed on PD Form 202-A (Continuation Report).  Additional items, firearm and/or, associate information (Part I, Part IV, and Part V respectively) shall be entered on additional PD Forms 81.

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | **1** | **5 of 37** |

3.      In the case of multiple claimants, to include the "finder" of lost property, the name and address of each such claimant shall be listed in Part V (Property Ownership/Claim Information) to ensure that proper notifications may be made. Particular attention shall be given to specify exactly which item(s) each associate is associated with; e.g., Items 1, 2, and 5, rather than 3 items.

4.      A separate PD Form 81 and a separate property control number shall be required in the following circumstances <u>only</u>:

      a.      Wills;

      b.      Prisoner's Property;

      c.      Narcotics and narcotics paraphernalia as listed on the DEA-7 (Report of Drug Property Collected, Purchased, or Seized). Each DEA-7 requires a separate PD Form 81 and property control number; and,

      d.      Motor vehicles and property removed from the motor vehicles, except contraband and/or other recovered stolen property.

All other property relative to a seizure or case, regardless of classification or property type, is to be placed on the same PD Form 81 with the same property control number.

5.      Detailed instructions for the preparation of PD Form 81 are contained in Report Writing Instructions Series 91 Number 1.

**D.     Special Instructions.**

1.      Whenever locked containers come into the custody of the department, and no keys are available, the member handling the property shall notify his/her commanding officer.  The commanding officer shall decide the method to be utilized in opening the locked containers.

2.      On recovering large containers, (e.g., trunks, suitcases, boxes, lockers, etc.), in which assorted items of property are contained, members shall inventory the container and remove all items of value such as money, stocks, bonds, wills, deeds, etc.  The removed items shall be itemized on the Property Book and on the PD Form 81. Separate PD Forms 81 shall be prepared when applicable.

3.      All full bottles of alcoholic beverages shall be carefully checked to determine if the seal has been broken.  The PD Form 81 shall indicate the number of full bottles with the seal intact and the number with the seal broken or missing. Those bottles with the seal intact shall be packaged separately from those bottles with the seal broken.  (NOTE: Only one PD Form 81 need be prepared.)

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | **1** | **6 of 37** |

4.    Incendiary devices or other types of explosives as described in Part I-E, other than fireworks, shall be handled entirely by the Explosive Ordnance Disposal Section, Special Operations Division.

### E.    Seizures for Violations of the Gun Control Act.

1.    Title II of the Gun Control Act of 1968, Public Law 90-618, makes it unlawful to transport, convey, or conceal certain narcotic drugs, counterfeit money or plates, or any firearm in violation of the National Firearms Act. The Act provides for the seizure and forfeiture of any vehicle, vessel, or aircraft used while committing any of the above offenses.

2.    The Bureau of Alcohol, Tobacco and Firearms (ATF), United States Treasury Department, enforces violations of the National Firearms Act.

3.    The weapons described below, unless properly registered with the Director, ATF, are considered contraband and their possession is unlawful.

a.    Fully automatic firearms such as machine guns and machine pistols.

b.    Shotguns with barrels less than 18 inches in length.

c.    Rifles with barrels less than 16 inches in length.

d.    Any altered shotgun or rifle with an overall length of less than 26 inches (e.g., a rifle or shotgun having a shoulder stock altered to form a pistol grip and the barrel sawed off).

e.    Any weapon or device, <u>except</u> a conventional pistol or revolver, capable of firing a shot shall be classified as "any other weapon" (e.g., Ithaca Auto Burglar guns, cane guns, etc.).

f.    Pistols with shoulder stocks.

g.    Any muffling or silencing device designed for use on firearms of any type.

h.    Any destructive device (e.g., any explosive, or incendiary) such as:

(1)    Gas.

(2)    Bomb.

MENCIAS 000087

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | **1** | **7 of 37** |

    **(3)**    Grenade.

    **(4)**    Rocket having a propellant charge of more than **4** ounces.

    **(5)**    Missile having an explosive or incendiary charge of more than ¼ ounce.

    **(6)**    Mine or similar device, or any type of weapon as described by Public Law 90-618.

    **4.**    An official on duty at the arresting officer's organizational element shall be immediately informed of the circumstances under which any <u>vehicle</u> comes into the custody of this department as the result of an arrest for a violation of the National Firearms Act. It shall be that official's responsibility to notify the Bureau of Alcohol, Tobacco, and Firearms as soon as possible.

    **5.**    A record of the vehicle seized shall be made <u>only</u> on the Property Book and shall be classified as "Held for Federal Authorities." The member making the notification shall list the date, time, and name of the person so notified.

    **6.**    When the agent arrives to confiscate the vehicle, he/she shall sign the Property Book on the right-hand page noting the time, date, and the name of the federal agency represented. The official identification of the agent shall be verified by the releasing official and this verification shall be noted on the Property Book.

    **7.**    It is the policy of the Bureau of Alcohol, Tobacco, and Firearms not to seize a vehicle that has less sale value than storage and other costs.

    **8.**    If the decision is made not to seize the vehicle, the classification of the vehicle shall be changed to "Prisoner's Property", or another appropriate classification. The vehicle shall then be processed in the usual manner for its classification.

**F.**    <u>Firearms.</u>

    **1.**    All firearms, classified as Evidence or Suspected Proceeds of Crime, shall be delivered to the Firearms Examination Section, Criminal Investigations Division, and the Firearms Registration Section, Identification and Records Division, on the next business day after recovery.

    **a.**    If an arrest is made, the weapon shall be processed by the arresting or recovering officer and must be accompanied by a properly prepared PD Form 81.

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 8 of 37 |

    b.    If ammunition is recovered along with the weapon, it shall be recorded as a separate item on the PD Form 81.

    c.    All other weapons shall be processed through the Firearms Examination Section and Firearms Registration Section by the officer delivering the firearm to the Property Control Branch.

    d.    If an arrest is involved, after processing the weapon(s) and papering the case  the weapon(s) shall be delivered to the Court Property Control Officer.

    2.    All firearms, except weapons that are to be fingerprinted, shall be unloaded immediately after being taken into custody.  Firearms that are to be finger-printed shall be unloaded <u>only</u> by a latent fingerprint technician when practicable.

    3.    Any weapon that cannot be unloaded because of a malfunction or for any other reason, shall be taken to the Firearms Examination Section for examination. The examination must be conducted before taking the weapon to court as evidence and prior to delivery to the Property Clerk for disposition.

    4. .    All firearms shall be forwarded to the Property Control Branch. <u>Firearms shall not be returned to the owner without the express permission of the Property Clerk or his/her agent.</u>  The name of the Property Clerk or agent authorizing the release shall be recorded on the PD Form 81 and the Property Book as well as the date and time the authorization was obtained.

    5.    All firearms shall be checked through WALES and a copy of the NCIC response attached to the PD Form 81 before being sent to the Property Control Branch.

    6.    Upon taking a rifle or shotgun into custody, members shall:

    a.    Enter the weapon on the property book, listing:

        (1)    The make (Winchester, Remington, etc.),

        (2)    The caliber (.22, 30/30, 12 gauge, etc.),

        (3)    The serial number,

        (4)    The type (double barreled shotgun, rifle, etc.),

        (5)    The color (blue steel, chrome plated, etc.), and,

        (6)    Any special markings or defects (chip or scratch on left side of stock, trigger guard broken, engraved stock, etc.)

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | **1** | **9 of 37** |

  b. Attach a PD Form 285 to the weapon's trigger guard.

  c. Place the weapon in a PD Form 86 (Rifle/Shotgun Bag).  No marks shall be made on the bag since it is intended for re-use.

  d. Under no circumstances shall members remove the weapon from the bag while on public space or while in areas exposed to public view.

  7. Members delivering weapons to the Court Property Control Office shall remove them from the organizational element's Rifle/Shotgun Bag and place them in a Property Division bag.  Court Property Control Officers will only accept weapons that are accompanied by an original PD Form 81 and have been processed in compliance with Part I-F.1. of this order.  Members shall be responsible for returning the Rifle/Shotgun Bag to their organizational element's property officer.

  8. If the rifle or shotgun is needed in court at a later date, the Property Control Branch, shall, upon proper notification, place the weapon in a Rifle/Shotgun Bag and forward it to the Court Property Control Office.

  G. **Bicycles and Play Vehicles.**

  1. All lost, stolen, and abandoned bicycles or play vehicles recovered by members of this department shall be taken to their organizational element, recorded on the Property Book, and properly tagged.  The bicycle registration number (if any), and manufacturer's serial number, located under the sprocket, shall be listed on the PD Form 81.

  2. Information concerning the ownership of bicycles in the custody of this department may be obtained through WALES, where a file is maintained on both registered and stolen bicycles.

  3. The United States Attorney has authorized the Property Clerk or his/her agent to return to owners, those bicycles or play vehicles recovered as evidence or suspected proceeds of crime when there is no arrest or suspect in the case.

  4. Officials the rank of lieutenant and above, including acting lieutenants, are authorized to return bicycles and play vehicles to the owner under the following conditions:

  a. There is only one claimant;

  b. Definite proof of ownership has been established;

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 10 of 37 |

    c.    An arrest has not been made in the case and no suspect is known; and

    d.    The property book and the PD Form 81 or 81-A (Property Released at District to Citizen) has been signed by the owner, if an adult, or if the owner is a juvenile, by a parent, guardian or other responsible adult.

    5.    Bicycles or play vehicles that cannot be returned to the owner(s) shall be processed through the Property Clerk in the manner prescribed for the class of property in which it fall.

    H.    **Placing Stops in Pawn Shops**

    1.    The District of Columbia Municipal Regulations (DCMR) Title 16 authorizes the seizure of items in the custody of Pawn Shops or secondhand dealers, which are known to be missing, or for which probable cause exists to believe that such items are stolen. In lieu of taking possession, a member may place a "stop" on the property.

    2.    A "stop" is a temporary detainer, not to exceed 60 calendar days, that may be placed on articles in the custody of pawn shops or secondhand dealers whe a seizure would otherwise be authorized. This courtesy allows the merchant to retain custody of items while an investigation is being conducted to verify the status of these items.

    3.    During the period a stop is in effect, merchants shall:

    a.    Be prohibited from selling, disposing of in any manner, or changing the identity of the property; and

    b.    Keep such items of property separate and distinct from all other property in their place of business.

    4.    Failure to comply with a police stop constitutes a violation of the DCMR. Members shall notify the Burglary, Arson, and Pawn Section immediately if a merchant refuses to comply with the requirements of a stop.

    5.    When members locate property in pawn shops or secondhand dealers which is suspected of being lost or stolen, they shall:

    a.    Advise the owner of the establishment that a stop is being placed on the item(s) in question;

    b.    Prepare a PD Form 82-B (Stop Record) in triplicate;

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | **1** | **11 of 37** |

  c. Detach and give the prepared original to the owner/manager of the establishment; and

  d. If working the day work tour of duty, notify the Burglary, Arson and Pawn Section immediately. If the stop is placed after 1600 hours, the notification shall be made by the member on the next business day.

 6. The Burglary, Arson and Pawn Section shall maintain a control log on outstanding stops and assign a control number to each stop. The member placing the stop shall record the control number in the appropriate sections of the second and third copies of the PD Form 82-B.

 7. It shall be the responsibility of the member who places the stop to conduct an investigation to determine whether or not the items in question are lost or stolen. Upon being notified by the member of the results of the investigation, an official of the Burglary, Arson and Pawn Section will then authorize the member to seize the property or discontinue the stop.

 8. If authorization is obtained to seize the item(s), the member shall:

  a. Record the name of the official authorizing the seizure in the appropriate block on the PD Form 82-B;

  b. Return to the establishment where the stop was placed and seize the items;

  c. Issue the owner/manager of the establishment a PD Form 82-A (Property Receipt); and

  d. Record the recovered property on the property book in compliance with the applicable provisions of this order and include the Burglary, Arson and Pawn Section control number (Stop Number) in Part VII (Statement of Facts) of the PD Form 81.

 9. Members shall prepare a PD Form 251 when no prior report has been made. If a PD Form 251 has been completed, a PD Form 252 shall be submitted reporting the circumstances relative to the recovery of the property. The PD Form 252 shall bear the same complaint numbers as those listed on the original report. In addition, all entries and other reports required by the applicable provisions of this order shall be completed.

 10. Property seized from pawnbrokers or secondhand dealers as indicated above shall, in most cases, be classified as Evidence or Suspected Proceeds of Crime.

MENCIAS 000092

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 12 of 37 |

11.    If an official from the Burglary, Arson and Pawn Section instructs the member to discontinue the stop, the member shall:

    a.    Record the name of the official authorizing the discontinuance in the appropriate block on the PD Form 82-B; and,

    b.    Return to the establishment where the stop was originally placed and advise the owner/manager that the stop has been discontinued.

12.    The official in charge of the Burglary, Arson and Pawn Section shall cause a member of his/her command to closely monitor the Stop Control Log to ensure that the provisions of this order relative to placing and removing a stop are complied with.

I.    **Court Property Control Office.**

1.    This department maintains a Court Property Control Office located on the C Street level of the D. C. Superior Court Building.  The Court Property Control Office is open from 0830 to 1730 hours, Monday through Friday.  This office handles, on a temporary basis, property/evidence that may be needed in court.

2.    Members retrieving items of evidence from the organizational element for presentation in court shall:

    a.    Sign for the property on the Property Book and respond to court with the appropriate original PD Forms 81.

    b.    After appearing in court, respond to the Court Property Control Office and turn the property over to the clerk, who will sign for it on the Court Property Control Office Log Book and make the necessary entries into PEICS.

    c.    If the Court Property Control Office is closed, return the property to their element's station clerk, who will sign for and take custody of the property.

3.    A firearm will not be accepted by the Court Property Control Officer unless the firearm has been processed through the Firearms Examination Section, and the member is issued a UN-89 (Firearm in Custody of the Property Division) that shall be attached to the PD Form 81.  (NOTE: Members must have the PD Form 81 with the weapon at the time of processing by the Firearms Examination Section.)

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 13 of 37 |

4.   Members who need an item of property for court presentation shall notify the Court Property Control Office or the Property Control Branch by telephone no later than 1400 hours on the "business day" prior to the date the property will be needed. Items that will be needed for court presentations on Monday shall be ordered no later then 1400 hours on the previous Friday.

5.   Members who receive continued court dates may request items of property in advance. Members shall document advanced requests for property in their personal notebooks, listing:

        a.   The date and time of the request,

        b.   The property officer contacted,

        c.   The item of property requested, and

        d.   The date needed in court.

6.   When items of property have been ordered, they will be delivered to the Court Property Control Office for availability on the requested date. These items shall be retained by the Court Property Control Office for a period not to exceed 3 days. If the member has not called for the property after 3 days, it will be returned to the Property Division. If needed in court at a later date, the member will have to again request that the property be delivered to the Court Property Control Office as outlined above.

7.   After first checking into Court Liaison, members who have ordered item(s) of property shall:

        a.   Respond to the Court Property Control Office;

        b.   Sign the Property Control Log Book, thereby accepting personal custody of the property;

        c.   Obtain a blank PD Form 81-C (Property Release); and

        d.   Ensure that the property control number and the disposition information is completed on the PD Form 81-C.

8.   Members who have obtained property from the Court Property Control Office are required to return the property to that office before checking out of court unless that office is closed. On returning property to the Court Property Control Office, members shall:

        a.   Provide the Court Property Control Officer with information as to the status of the property (e.g., introduced into evidence, etc.).

b.   If a disposition is available in the case, or the property is no longer needed for prosecution, the member shall submit a completed PD Form 81-C containing the signature of the appropriate prosecuting attorney.

c.   If no disposition is available and the case has been continued, the property may at this time be reordered.

9.   When the decision is made not to paper a case, the member shall have the reviewing attorney sign the PD Form 81-C releasing the property. The completed PD Form 81-C shall then be delivered to the Court Property Control Officer. If the Court Property Control Office is closed, members shall return the PD Form 81-C to their element's property officer for subsequent transmittal to the Property Control Branch.

10.   In cases that do not require the member to make additional appearances in court, the member shall present a completed PD Form 81-C signed by the appropriate prosecuting attorney, and submit it to the element's property officer for subsequent transmittal to the Property Control Branch.

11.   After 60 days, if there is no defendant or suspect in a case, and it is evident that the property will not be needed in court, the member who initially handled the property shall prepare and submit a properly signed PD Form 81-C to their element's property officer.

12.   In all cases, the property control number, the item number, and a brief description of the property shall be entered on the PD Form 81-C.

J.   <u>Disposition of Narcotics and Dangerous Drugs.</u>

1.   Whenever any member of the force comes into possession, in any manner, of suspected narcotics and/or dangerous drugs, he/she shall:

a.   Make the appropriate entry on the organizational element's Property Book;

b.   Prepare a separate PD Form 81 for each DEA-7 recorded seizure, ensuring that the DEA laboratory control number assigned by the Narcotics and Special Investigations Division (NSID) is recorded on the PD Form 81 in block number 7, and that the property control number is listed in the statement of facts on each DEA-7;

c.   Contact a Crime Scene Search Officer or a member of the element's vice section for assistance in processing the narcotics and/or dangerous drug; and,

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 15 of 37 |

      d.    Ensure that the suspected narcotics and/or dangerous drug is placed in a PD Form 95 (Narcotic Evidence Bag) and processed as follows:

          (1)    Utilizing a black felt tip marker, the member shall enter his/her initials, badge number, and the date inside the bag at the top edge where the seal will be applied.

          (2)    The member shall enter the top edge of the bag into the heat sealer and hold the lever down for a few seconds After removing the bag from the heat sealer, the member shall check the seal to ensure that the bag is tightly secured.

    2.    Members shall keep in mind the importance of the continuity of evidence. Members shall protect the suspected narcotic drug in every possible way, keeping it in a secure place until it is safely deposited in the narcotics evidence locker maintained at each district station.

    3.    When an arrest is made between 0800 to 1000 hours and narcotics evidence is involved, the arresting officer shall comply with the procedures outlined above, with the exception of depositing the evidence into the evidence locker. The arresting officer shall respond to the NSID, where the sealed plastic bag containing the evidence and a completed DEA-7 shall be turned over to a member of that division. The NSID member shall provide the arresting officer with a PD Form 82-A and a laboratory control number that is to be maintained as part of the arresting officer's case jacket. The PD Form 82-A shall be returned to the element and attached to the page opposite the original entry in the Property Book. The laboratory control number shall be listed in item number 7 on the original PD Form 81.

    4.    When an arrest involving narcotics evidence is made between the hours of 2400 and 0800, the arresting officer, after properly preparing the evidence, shall ascertain if the evidence contained in the evidence locker has been picked up by an NSID member. If so, the arresting officer shall hand deliver the evidence as indicated above. If not, the officer shall deposit the evidence into the evidence locker.

    5.    Between 2400-0800 hours, a member of the NSID shall respond to each district station and take possession of the suspected narcotic drugs that have been deposited into the evidence lockers. The NSID member shall sign for each sealed PD Form 95 by affixing his/her signature in the Property Book opposite each entry.

    6.    The NSID shall assign a laboratory control number to each exhibit and shall be responsible for the proper transmittal of the suspected narcotic drug to the Metropolitan Police officer assigned to the Drug Enforcement Administration laboratory for testing, safekeeping and disposal.

1915

MENCIAS 000096

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | 1 | 16 of 37 |

7.  The laboratory control number assigned to the evidence by NSID shall be forwarded to the case officer for inclusion in the case jacket and listed in item 7 on the original PD Form 81. In preparing any narcotics case for presentation in court, the property control number and the laboratory control number(s) must be included in the narrative section of PD Form 63 (Prosecution Report).

8.  Title 21, Code of Federal Regulations, sections 307.21 and 207.22, effective May 1, 1971, established a uniform method for disposal of abandoned narcotic drugs and safeguarding of narcotic drugs to be used as evidence in any criminal or administrative proceeding. Disposal cannot commence until the United States Attorney for the District of Columbia certifies that such narcotic drugs are no longer needed as evidence. The actual destruction or disposal of narcotic drugs shall only be accomplished by Property Control Branch personnel.

9.  Members needing narcotics evidence for court, after having followed the procedures outlined in Part II of this order, shall respond to the Court Property Control Office and pick up the narcotics evidence. Members shall contact the Property Control Branch, if they have questions concerning this procedure.

10. Members, upon receiving a final disposition in a narcotics case, shall prepare a PD Form 81-C and deliver it to the Court Property Control Officer or, when the office is closed, forward it through their element's property officer to the Property Control Branch.

**Part II**

A.  Prisoner's Property

1.  Station clerks shall review each entry made in the Property Book during their shift to ensure that entries have been properly recorded. This is of particular importance when prisoner's property is involved as such property may contain items of value.

2.  The recovering member shall confiscate and process **all** personal property belonging to a prisoner.

    a.  The recovering member shall conduct a field search of the prisoner and ensure that all items have been removed.

Recording, Handling and Disposition of Property Coming into Custody of the Department (General Order 601.1)
Revised April 30, 2012 – Page 16
GOC-12-03

MENCIAS 000097

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | 1 | **16a of 37** |

    b.    Prisoners:

        (1)    **Shall not** be allowed to retain **any** personal property. Personal property includes, but is not limited to, lighters, combs, matches, cell phones, billfolds, wallets, monies, personal papers and personal identification.

        (2)    May retain the following items:

                (a)    Religious head coverings [e.g., a kippah (yarmulke), kufi, hijab, taqiyah, or turban], in accordance with SO-12-03 (Religious Head Covers and Other Articles of Faith).

                (b)    Medical equipment once inspected thoroughly for contraband and weapons by recovering members (e.g., wheelchairs, oxygen tanks, canes, crutches, knee braces, and medical alert necklaces/bracelets).

                    NOTE: When a prisoner requires medical attention and/or medication, a PD Form 313 (Arrestee's Injury/Illness Report) shall be completed by the member for transport to the hospital, in accordance with GO-PCA-502.07 (Medical Treatment and Hospitalization of Prisoners).

                    Members who have questions regarding whether or not an item should be confiscated shall consult with their supervisor.

# THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK

MENCIAS 000098

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 17 of 37 |

    c.    If the entries are accurate and coincide with the property received, sign the entry as accepting station clerk and have the recovering member sign the entry as the "Searching Officer";

    d.    Place the items into a PD Form 14, listing on the envelope all property placed inside. Those items that will not fit into a property envelope shall be properly tagged, secured, and retained by the organizational element;

    e.    Prepare a PD Form 58 (Prisoner's Property Receipt); give the original to the prisoner and place the copy in the property envelope;

    f.    As a safeguard against another person, other than the owner, gaining possession of a receipt and presenting him/herself as the owner, or to assist in returning personal property should a prisoner lose his/her copy of the receipt, or the prisoner not have any documented identification (e.g., drivers license, work identification, etc.), station clerks shall note on the back of the element's copy of the PD Form 58, personal information that would generally be known only to the person from whom the property was taken (e.g., name of father or mother, date of birth, etc.); and,

    g.    Make booking function entries in the Criminal Justice Information System (CJIS) "Property Book" and "Page" fields to record any prisoner's personal property which remains at the booking element after the prisoner is transported to another location. The name and badge number of the station clerk approving the Property Book entry shall be entered in the "Approving Officer" and "Badge" fields.

    3.    All perishable personal property belonging to prisoners shall be handled in accordance with the guidelines set forth in Title 4-162 of the D. C. Code and DCMR Title 6A (Police Personnel), Chapter 8, Section 804.5.

    4.    When a prisoner is being released from custody and all personal property is returned, the prisoner shall affix his/her signature in the appropriate block on the Property Book. The station clerk returning the property shall complete all other necessary entries to indicate that all property was returned to the prisoner. The station clerk shall sign his/her name as a witness to the signature of the prisoner. The prisoner's copy of the PD Form 58 and the original property receipt shall then be destroyed.

MENCIAS 000099

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | **1** | **18 of 37** |

5.    When a prisoner is sent to court or to another place of confinement, and part of his/her personal property is not returned, the station clerk shall list such property on the Property Book (as indicated in "c." below) and advise the prisoner of what steps must be taken to recover the remainder of the property.

a.    All personal property, except that property which can be maintained inside of a property envelope, shall be retained at the element.

b.    The property that was returned to the prisoner shall be crossed out on the property receipt and property envelope. The member returning the property shall place his/her badge number, initials, and the date of the partial return on both copies of the property receipt.

c.    The prisoner shall sign the Property Book after the station clerk has checked the space indicating "All Property Returned Except:" and has listed those items that cannot be sent along with the prisoner.

d.    The property envelope shall be released by the station clerk to the transporting members who shall be responsible for delivering the property to the member who takes custody of the prisoner. The transporting members shall note the person's name who takes custody of the property on the PD Form 775 (Daily Vehicle Inspection and Activity Report). <u>At no time will the contents of the property be turned over to the prisoner while he/she remains in custody.</u>

6.    Personal property that is not returned shall be retained at the element where the prisoner was booked. The station clerk shall advise the prisoner that he/she or a person designated by him/her must claim the remaining property within 90 days. After 90 days, the property shall be forwarded, with PD Form 81, to the Property Control Branch for disposition.

7.    Property that is not called for at the Property Control Branch within 90 days shall be classified as Abandoned and disposed of in accordance with the provisions of Title 4 of the D. C. Code.

B.    <u>Station Duties.</u>

1.    Station clerks shall review each entry made on the Property Book during their tour of duty to ensure that the provisions of this order have been complied with.

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 19 of 37 |

    2.    During periods when the organizational element's property office is closed, station clerks shall:

        a.    Ensure that property held by their element is properly stored, secured, and that the necessary entries into PEICS have been made.

        b.    Return to the claimant, personal property that can be released as authorized by the appropriate provisions of this order, making the necessary entries into PEICS.

    3.    If unable to contact the owner of property that can be released at the element (e.g., Found Property), station clerks shall:

        a.    If the element's property officer is on duty, transfer the property and PD Form 81 to his/her custody. The property officer shall then be responsible for making all notifications and entries on the appropriate reports.

        b.    During the hours when the element's property office is closed, the responsibility for notifying the owner shall be turned over to the oncoming station clerk. This effort will continue until either the owner is notified or the property is turned over to the element's property officer.

    4.    All property, other than prisoner's property taken from individuals when arrested, shall be forwarded to the Property Control Branch on the next scheduled delivery day. A property delivery for each patrol district shall be scheduled once a week. Property held at the element shall be forwarded to the Property Control Branch unless retention is expressly authorized by the Property Clerk or his/her agent. If authorization is obtained to retain property at the element, a notation to this effect shall be noted on the PD Form 81.

    5.    In those cases involving John/Jane Doe arrests, the station clerk shall, upon being notified of the defendant's true name by the Central Cell Block, list this information in the appropriate space on the Property Book. This information shall also be forwarded to the element's property officer.

    6.    In those instances where a PD Form 81 has been forwarded to the Property Control Branch, station clerks shall direct owners who seek to claim their impounded vehicle to report to the Property Control Branch for payment of the required fees.

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 20 of 37 |

## PART III

### A.   Found Property.

1.    Whenever found property is turned over to a member of the department by a citizen, the member shall provide the citizen with a PD Form 82-A.  All members shall carry a sufficient number of PD Forms 82-A with them at all times when assigned to street duty.  Members shall not indicate that the finder has any right or claim to the found property.

2.    Upon completion of the PD Form 82-A, the original shall be provided to the citizen and the copy shall be placed in a special file maintained by the organizational element's property officer.  The appropriate entry in the Property Book shall be made and a PD Form 251 and a PD Form 81 shall be prepared.

3.    Any information that is not available at the time the receipt is issued (e.g., Property Book, page number, CCN, etc.) shall be recorded on the element's copy of the PD Form 82-A prior to the conclusion of the member's tour of duty.

4.    Found property may be returned to the owner at the scene of recovery if all of the following conditions are met:

a.    The claimant produces satisfactory proof of ownership;

b.    The release of the property is approved by an official the rank of lieutenant or above, including acting lieutenants;

c.    An explanation is provided on the PD Form 251 relative to the circumstances resulting in the return of the recovered property; and,

d.    The owner signs a PD Form 82-A.

5.    If property is released to the owner at the scene, members shall, as soon as practicable, respond to their element and make the appropriate entry in the Property Book.  The member shall print "RETURNED ON SCENE" in bold face red letters on the face of the PD Form 82-A and attach both copies to the Property Book.

6.    If the property is not released at the scene, and the owner can be identified, the recovering officer shall attempt to notify the owner.  If unable to contact the owner by the expiration of the tour of duty, the member shall inform the station clerk who shall then be responsible for making the notification and the additional entries on the PD Forms 251, 81, and the Property Book.  If the station is unable to notify the owner, the property shall be turned over to the element's property officer.

1920

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 21 of 37 |

7.    Members shall follow the procedures outlined above for property found in public vehicles except that the D.C. Taxicab Commission shall be notified and provided with a complete description of the item(s) recovered.  The name of the person notified and the date and time of the notification shall be included in the PD Form 251.

8.    Property found in or on Metrorail trains, stations or parking lots by members of the department shall be turned over to the Metrorail employee manning the station keyhouse located in the lobby of the Metrorail station.  Upon receiving the property, the Metrorail employee will issue the member a receipt.

9.    Property found on a Metrobus shall be turned over to the bus operator who will in turn issue the member a receipt for the property.

10.    All receipts for found property issued to members by Metro Transit employees shall be submitted to the station clerk at their respective element after the member:

a.    Makes an entry on the Property Book listing a brief description of the property that was found and turned over to the Metro Transit employee; and,

b.    Completes a PD Form 251, classified as Found Property, indicating that the property was turned over to the Metro employee.

11.    Property turned over to members at the scene of a fire shall be classified as Found Property.

B.    **Abandoned Property.**

1.    Abandoned property shall be processed in the same manner as Found Property , except it shall be classified as Abandoned Property.

2.    An "abandoned vehicle" is any motor vehicle:

a.    Parked in the same place on public space for more than 72 hours;

b.    Whose owner cannot be reasonably located;

c.    To which a Warning Notice to Remove Abandoned Vehicle has been affixed; and,

d.    That remains parked in the same place on public space for at least 72 hours after the notice has been affixed.

1921

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | **1** | **22 of 37** |

3. A "junk or scrap vehicle" is any motor vehicle which is in a wrecked, dismantled or irreparable condition, and whose owner cannot be reasonably located.

4. The Office of Unified Communications (OUC) shall screen calls concerning vehicles to determine if a violation requires police action or if the vehicle is abandoned/junk. Station clerks who receive calls of this nature shall refer them to the OUC.

5. Members handling abandoned or junk vehicles shall:

   a. Perform a thorough investigation to determine ownership, to include:

      (1) A canvass of the immediate vicinity in which the vehicle was found, and

      (2) A check of the license plate and vehicle identification number, if any.

   b. Forward all information by telephone to Abandoned Vehicle Operations, Department of Public Works (DPW), on 673-6833.

6. Abandoned Vehicle Operations, has been granted the authority to remove abandoned and junk vehicles from public and private property.

C. Property Set Out for Eviction

1. Property that is placed on public space as a result of eviction shall be removed only when it creates a hazard to public travel and the owner cannot be located or refuses to have the property removed.

2. The removal of property outlined above shall be the responsibility of DPW.

3. **Only** when property placed on public space poses an imminent danger and with the concurrence of the Watch Commander shall members take any items into police custody.

4. It shall be the responsibility of the Watch Commander on duty in each organizational element to make the determination as to whether or not the property should be taken into police custody.

Recording, Handling and Disposition of Property Coming into Custody of the Department (General Order 601.1)
Revised September 12, 2011 – Page 22

MENCIAS 000104

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | 1 | **23 of 37** |

5.     If the Watch Commander determines that property placed on public space as a result of eviction must be safeguarded, he/she shall contact DPW at the number listed in Part III.B.5.b of this directive.

D.     Estate of Deceases Person

1.     Commanding officers, upon determining that the property of a deceased person is totally without adequate safeguards and a search for a relative or responsible person to accept custody of it has failed, shall arrange through the Director, Property Division, to have the property moved to a private storage or warehouse facility. These arrangements shall be coordinated with the Director, Office of Finance and Resource Management, when removal of the property requires resources outside those available within the Department. In the absence of the Commanding Officer, the Watch Commander on duty shall determine whether or not the property is without adequate safeguards.

MENCIAS 000105

2.    In instances where a person dies at a location other than their residence, and it becomes necessary for the department to assume responsibility for any personal property, the commanding officer handling the investigation of the death shall advise the commanding officer of the district where the deceased person's property is located and provide a brief account of the case. The commanding officer so notified shall then become responsible for ensuring that the property is adequately safeguarded.

3.    In all cases where a member of the immediate family is not present, a search of the premises shall be made for a will, money, and other items of value that could be easily converted. These items of value shall be taken into custody and shall be immediately forwarded to the Property Clerk. Upon completion of the search, the premises shall be left secured.

4.    Moving van personnel sent by the department's Property Clerk to the residence of a deceased person shall be assisted by the organizational element's property officer, who shall make an inventory of each item on PD Form 81 before the property is removed from the premises. The element's property officer shall not interfere with the packing of the property.

5.    A copy of the PD Form 81 shall be given to the van driver for delivery to the Property Division and the original shall be retained by the element's property officer for entry into PEICS. The original shall then be forwarded by the element's property officer to the Property Control Branch.

6.    A deceased person's vehicle(s) shall not be impounded if a relative or responsible person can assume custody. Members shall not permit such vehicles to be left at locations for extended periods of time where they might be exposed to theft or damage.

7.    Although a PD Form 81 is required, the property of the deceased person shall not be listed on the element's Property Book. Instead, a notation shall be made on the left-hand page of the element's Property Book as follows:

a.    In the space provided for other types of property, the class of property shall be Estate of Deceased Person and the name and address of the deceased person shall be noted on the line after "Taken From" and "Address."

b.    On the space marked "Searching Officer", delete the word "Searching" and insert "Listing", and indicate the name of the member that listed and handled the property.

c.    The element's station clerk shall sign the Property Book wt he/she receives and checks the PD Form 81.

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | **1** | **25 of 37** |

8.    Valuables found among the personal effects of a deceased person shall be packaged separately, listed as a separate item on the same PD Form 81, and forwarded to the Property Clerk.  Wills found among the personal effects of a deceased person shall be listed on a separate PD Form 81.

9.    When baggage checks are found among the property of a deceased person, the member taking inventory of the property shall redeem the baggage check. The property shall then be taken to the member's element for processing and forwarding to the Property Clerk.  When applicable, a notation shall be made on the PD Form 81 to the effect that:  An expenditure of _____ was made by _____ of the _____ District to redeem the property held on the(se) baggage check(s).

10.    When a death occurs in a hotel/motel room, members who have been directed to inventory the property at that location shall permit an authorized representative of the hotel/motel to be present during the inventory unless his/her presence would defeat the ends of justice.

11.    When property of a deceased person is forwarded to the Property Clerk, the date the property is forwarded shall be inserted on the right-hand page of the Property Book and the commanding officer shall sign the Property Book to indicate proper disposition.

12.    Relatives wishing to claim the property of a deceased person shall be instructed to contact the Property Control Branch by mail or telephone.

E.    **Property of Alleged Mentally Ill.**

1.    Insofar as the provisions are applicable, commanding officers who find it necessary to safeguard the property of an alleged mentally ill person shall do so in the same manner as described for Estate of Deceased Person property.  The property shall not be taken into custody without prior authorization from the Property Clerk or his/her agent.

2.    Members shall bear in mind that when such property is taken into custody by the department, an expense is incurred by the District of Columbia. Therefore, every effort shall be made to locate a relative or other responsible party to take custody of the property.

3.    It is the duty of the staff members at any District of Columbia hospital or mental health facility to search for and safeguard the personal property of persons to be admitted, when such persons are transported by members directly to the hospital/facility from locations other than a police facility.  This responsibility does not relieve the transporting members from taking the necessary precautions to ensure their safety or the safety of others.

4.   Persons who are arrested and thought to be mentally ill shall be handled in accordance with General Order 308.4 (Processing of Suspected Mentally Disturbed Persons), and property seized as the result of such arrests shall be handled in accordance with this order.

F.   Evidence and Suspected Proceeds of Crime

1.   When evidence or suspected proceeds of a crime are taken from a person at the time of arrest, separate entries shall be made on the left-hand page of the Property Book. Property classified as Evidence or Suspected Proceeds of Crime shall be kept separate from personal property taken from a person at the time of arrest. The appropriate classification block on the Property Book shall be checked to indicate the type of property seized.

2.   When Items of property are classified as Evidence or Suspected Proceeds of Crime:

   a.   Members shall mark Part I.E of the PD Form 81 with the code "E/C."

   b.   <u>The recovering member shall mark the property</u> in a manner that does not deface or alter it's appearance, but will allow for easy identification by the member at a later date. The location and manner in which the item is marked shall be described in the narrative of the PD Form 81.

      (1)   All pistols shall be marked by removing the grips from the frame of the weapon and making the appropriate marks beneath the grips.

      (2)   If a question arises as to how an item of property should be marked, the member shall consult a Crime Scene Search Officer for guidance.

      (3)   After processing, the property shall be turned over to the custody of the station clerk.

3.   When property classified as Evidence or Suspect Proceeds of Crime is removed from a person by members of other than those conducting the search, the entry on the Property Book shall signed by the member taking possession of property.

4.   In cases of evidence or suspected proceeds of crime where no arrest is made, the member first taking the property into custody shall be responsible for obtaining a PD Form 81-C from the appropriate prosecuting attorney and delivering it to the Court Property Control Office, <u>except</u> in the cases being handled by an investigator who shall then be responsible for obtaining the release. In all other cases where release is required, the member handling the case in court shall be responsible for obtaining and preparing the PD Form 81-C.

MENCIAS 000108

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | 1 | **27 of 37** |

5.      The classification Suspected Proceeds of Crime is primarily a holding classification for the purposes of investigation, and **not** a final classification.

NOTE: Members are reminded that possession of a large amount of currency, in and of itself, is not a sufficient justification to seize the currency as suspected proceeds of crime.

a.      Within ten (10) days, in cases involving property classified as Suspected Proceeds of Crime, the organizational element's property clerk shall notify the recovering member and the member's official that the recovering member must release or reclassify the property.

b.      The recovering member shall within five (5) days:

1.      Change the classification of the property, (e.g., Found, Safekeeping, Abandoned) by completing a PD Form 81-D; or

2.      Secure a PD Form 81-C from the appropriate prosecuting attorney and release the property to the owner; or

3.      Submit an extension request with justification to the Department Property Clerk through the chain of command.  The Department Property Clerk is authorized to grant or deny extension requests.

c.      Members shall contact the Asset Forfeiture Unit, Narcotics and Special Investigations Division, for guidance prior to changing a classification from "Suspected Proceeds of Crime" to "Held for Civil Forfeiture".

d.      The element property clerk shall forward each such PD Form 81-C or 81-D to the Evidence Control Branch.

e.      If the recovering member does not respond to the property clerk within five (5) days, the property clerk shall email the member's District/Division Commander for resolution.

6.      In situations involving "fresh pursuit" of a suspect from another jurisdiction, vehicles and all items contained within the vehicles may be released at the scene of the apprehension should the stop and apprehension be made by a law enforcement officer from the jurisdiction in which the pursuit was initiated. The suspect, however, shall be handled in accordance with General Order 301.3 (Operation of Emergency Vehicles, Fresh Pursuit, and Vehicular Pursuit).

7.      When a suspect being pursued from another jurisdiction is stopped and apprehended by a member of this department, neither the vehicle nor any item contained within the vehicle shall be released at the scene of the apprehension. All items shall be processed in accordance with the provisions of this order. Members from the jurisdiction in which the pursuit was initiated shall be directed to contact the Property Control Branch as to their requirements for gaining custody of the evidence.

8.      Requests received from other jurisdictions for evidence in custody of this department shall be referred to the Evidence Control Branch. The Evidence Control Branch shall, in conjunction with the Office of the General Counsel, ensure that all legal requirements have been satisfied prior to releasing the evidence.

9.      When cases are disposed of in court either by dismissal of the charges or conviction of the defendant, the member handling the case shall advise the claimant(s) to make arrangements for return of the property with the Property Clerk.

10.      Property in possession of this department, classified as Suspected Proceeds of Crime, cannot ordinarily be released by the Property Clerk to the claimant until a property release has been obtained from the court or the investigating officer has changed the classification. This applies even though there are no arrests or suspects in the case. Exceptions are made in cases of automobiles, bicycles and play vehicles which may be released, under certain circumstances, as outlined in other appropriate sections of this order.

Recording, Handling and Disposition of Property Coming into Custody of the Department (General Order 601.1)
Revised July 9, 2013 – Page 27
GOC-13-04

MENCIAS 000109

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | 1 | **28 of 37** |

G.  Held for Civil Forfeiture

1.  Property that is seized in connection with a narcotics or gambling violation and is the subject of a forfeiture action shall be classified as Held for Civil Forfeiture.

   a.  Members shall mark Part I.E of the PD Form 81 with the code "E/H."

   b.  The Property Clerk is responsible for instituting the administrative forfeiture process against money and other property seized by the Department for violations of narcotic laws.

   c.  The Special Litigation Section, OAG, is responsible for prosecuting civil forfeiture actions against money and other property seized by the Department for violation of gambling laws, and those narcotic seizures not subject to the administrative forfeiture process.

   d.  Members shall be responsible for establishing the connection between the seizure of property and a narcotics or gambling violation. The connection between the seized property and the violation must be specific. A PD Form 163 or PD Form 854 (Investigative File Report) must be attached to the PD Form 81 and forwarded to the Property Control Branch. <u>An omission of relevant and necessary information may prevent or delay the civil action, which results in the mandatory return of property.</u>

   <u>NOTE</u>:  Members who require additional information shall refer to General Order 601.3 (Handling and Accounting for Seized and Forfeited Property).

H.  Impounded Vehicles

1.  Impounded vehicles shall be handled in accordance with General Orders 303.2 (Notices of Infraction Procedures), 303.3 (Tow Crane Operation and Enforcement) and 401.1 (Field Reporting System). Impounded vehicles shall be inventoried in accordance with the procedures outlined in General Order 602.1 (Automobile Searches and Inventories). In addition to these requirements, the impounding member shall:

   a.  Notify OUC, as to the description of the vehicle, the location from which the vehicle was removed, and the impoundment location;

MENCIAS 000110

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 601.1** | **April 30, 1992** | **1** | **29 of 37** |

b.   Be responsible for ensuring that all appropriate reports and notifications are made.  This responsibility applies to the impounding member, regardless of his/her assignment, and includes those instances where a vehicle is impounded at a facility other than the impounding member's organizational element; and,

c.   During periods of the year when radiators and engine blocks are subject to freezing temperatures, the impounding member shall drain the radiator and engine block unless one of the following circumstances exists:

(1)   The member has been informed by the owner, or person who has knowledge of the vehicle, that there is sufficient antifreeze solution in the vehicle to prevent possible damage by freezing;

(2)   There is attached to the vehicle, a currently dated tag indicating that the vehicle is equipped with permanent type antifreeze; or,

(3)   A check by the impounding member indicates that a sufficient amount of antifreeze is present in the radiator to prevent freeze-up.  This check shall be made with the antifreeze hydrometer distributed by the Property Division.  The antifreeze solution must show a reading of at least +5 degrees to be considered as adequate protection.

2.   If the radiator is drained, members shall attach a PD Form 117 (Warning Notice) and a PD Form 285 to the steering wheel of the vehicle.

3.   Members shall attempt to notify owners that their vehicles have been impounded and explain the procedures the owner must follow in order to reclaim the vehicle.  When an impoundment fee exists for those vehicles impounded at the districts for traffic violations, the fee must be paid at the Bureau of Adjudication, Department of Public Works, before the vehicle can be released.

4.   If unable to contact the owner, the member shall turn the PD Form 81 over to the oncoming station clerk at the expiration of his/her tour of duty.  The station clerk shall then be responsible for notifying the owner and making the appropriate notation on the PD Form 81.

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 30 of 37 |

5.    If an impounded vehicle remains unclaimed for 24 hours, the impounding officer shall notify the Auto Theft Desk and that office shall conduct an investigation to determine whether the vehicle is stolen. The time, date, and name of the person notified shall be entered in the narrative of the appropriate police reports.

6.    Members who impound vehicles as evidence shall classify those vehicles as "Impounded/Evidence" on the Property Book. Before the PD Form 81 is forwarded to the Property Control Branch, the recovering member shall confer with an Assistant United States Attorney or Assistant Corporation Counsel to determine if the vehicle shall be held as evidence. The name of the attorney shall be entered on the PD Form 81.

7.    If the vehicle is needed as evidence, a line shall be drawn through the word "Impounded" on the corresponding entry of the Property Book. If the vehicle is not needed as evidence, a line shall be drawn through the word "Evidence" on the Property Book. The member making the change shall affix his/her initials and badge number next to the changes made. The member shall ensure that the unit's property officer is advised of any changes in classification by completing PD Form 81-D in order that any necessary hanges to PEICS can be made.

8.    When a recovered stolen motor vehicle is transported on a flatbed vehicle directly from the street to the Blue Plains Impounding Lot, the vehicle shall be accompanied by a completed PD Form 81.

9.    When stolen motor vehicles are recovered, the recovering member shall immediately notify the owner or person reporting the vehicle stolen. If unable to contact the owner or reporting person, a notation of the attempt shall be made on the PD Form 251 or 252 as appropriate. This fact shall be brought to the attention of the element's station clerk who shall then be responsible for completing the notification. In instances where the owner or person reporting the vehicle stolen resides outside the District, and cannot be reached by telephone without expense to the District of Columbia, the recovering member shall make the long distance notification in compliance with General Order 302.3 (Department Telephones).

10.    In a case where the interstate transportation of a stolen motor vehicle is involved, the recovering member shall notify the Auto Theft Desk and that section shall be responsible for notifying the Federal Bureau of Investigation. The Auto Theft Desk shall also be notified in all cases of recovered motor vehicles where an arrest is made at the time of recovery.

11.    Information relative to the recovery of stolen motor vehicles shall be transmitted by teletype to the Telecommunications Branch, Communications Division An entry shall be made on the teletype message and on the recovery report, listing the t date, and name of persons notified by the recovering member.

12.     The United States Attorney for the District of Columbia has authorized the Property Clerk to return to the owner, without separate release for each automobile, those automobiles reported stolen and recovered by the police, including those in which an arrest is made.

13.     Citizens, who submit requests to elements for repossession of impounded vehicles to which delinquent liens exist, shall be advised to contact the Property Control Branch.

I.     **Safekeeping.**

1.     Occasionally, members will take unattended property into custody so that it may be safeguarded until the owner is located. This property shall be classified as being held for Safekeeping and handled in the same manner as Found Property.

2.     Members, or station clerks when applicable, shall make every effort to notify the owner.

J.     **Illegal Fireworks.**

1.     Members recovering illegal fireworks shall, in addition to recording the property on the Property Book, prepare a PD Form 81 and complete all other required reports.

2.     The recovering member shall notify the Explosive Ordnance Disposal Section (EOD), Special Operations Division, of such recovery between the hours of 0700 and 2300, Monday through Friday  After 2300 hours and on weekends this notification shall be made to the watch commander, Communications Division, who will then notify the standby technician.  The standby technician will contact the recovering member and make appropriate arrangements for disposal.  The time, date, and name of the technician shall be included in the narrative of the PD Forms 81 and 251.

3.     After the notification has been made, the member shall turn the fireworks over to the organizational element's station clerk, who will ensure that the name of the EOD technician to whom the fireworks are released is noted on the Property Book.

4.     With respect to storage limitations and safety factors, all explosive and incendiary materials coming into the custody of the EOD shall be destroyed immediately.  Members handling court cases involving illegal fireworks shall have the technician involved subpoenaed in order that expert testimony may be provided in lieu of physical evidence.

MENCIAS 000113

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 32 of 37 |

5.    All fireworks coming into the possession of this department shall be carefully wrapped in packages by the recovering member. Each package shall be clearly marked "FIREWORKS-USE CAUTION", in addition to all other required identifying information.

**PART IV**

A.    Element Property Officers.

1.    Organizational element property officers shall be responsible for the security and safekeeping of property held at their elements and for the proper transfer of property to the Property Control Branch. Unless otherwise prescribed in this order, all property, except prisoners' personal property, shall be transferred to the Property Control Branch on the next regularly scheduled delivery day. The property shall be accompanied by the original and the numbers one and two copies of the PD Form 81.

2.    Element property officers shall forward all properly signed and approved PD Forms 81-C received from members handling cases in court to the Property Control Branch. The PD Form 81-C must contain the property control number and the disposition if an arrest was made in the case.

3.    It shall be the responsibility of the element's property officer to no owners relative to the recovery of property whenever the recovering officer or station clerk has been unable to make such notification. The element's property officer shall ensure that this notification is noted on all applicable reports.

4.    Element property officers shall notify the Auto Theft Desk when automobiles remain unclaimed for 24 hours.

5.    In cases involving property classified as Suspected Proceeds of Crime, after a 60 day period has elapsed the element's property officer shall require the recovering member to:

a.    Change the classification of the property (e.g., Found, Safekeeping, Abandoned, etc.) by completing a PD Form 81-D; or

b.    Secure a PD Form 81-C from the appropriate prosecuting attorney.

c.    The element property officer shall forward each such PD Form 81-C or 81-D to the Property Control Branch.

6.    Element property officers shall ensure that all property that is to transferred to the Property Control Branch is properly recorded on a PD Form 81, and that the necessary signatures have been entered on the Property Book.

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 33 of 37 |

7.   Element property officers shall ensure that all data from the PD Form 81 is accurately entered in the PEICS. They shall record the property control numbers on the PD Form 81 and on the corresponding entry in the Property Book.

8.   Element property officers shall forward all unclaimed recovered property (except prisoners' property) to the Property Control Branch on their designated delivery day each week.  Should the need arise to retain the property at the element beyond the designated delivery day, permission shall be obtained from the Property Control Branch.  The member authorizing the temporary retention, as well as the date and time the authorization is received, shall be noted on the PD Form 81.

9.   When a large amount of money is recovered by members of the department, the money shall be transported by at least two officers directly to the Property Division during normal business hours where it will be counted by a member of the Property Control Branch in the presence of the delivering members.  During other times when the Property Control Branch is closed, the element's watch commander shall ensure that the money is safeguarded.

10.   To ensure accuracy, large sums of money recovered and in the custody of this department shall be counted by at least two members.  The total sum shall be indicated on the PD Form 81 and the Property Book.

11.   Between the hours of 0800 to 1400, Monday through Friday, the money and the PD Form 81 shall be hand carried to the Property Control Branch where the total sum will be verified by an automatic money counter.

12.   When the Director, OFRM, dispatches moving vans to a location for the purpose of removing property (e.g., eviction, deceased, or alleged mentally ill person) the element's property officer shall respond and take inventory of the property using the proper number of PD Forms 81.  The element's property officer shall ensure that all appropriate entries are made in the PEICS and on the Property Book.

13.   Element property officers shall, in addition to any other duties assigned, be responsible for:

      a.   Maintaining custody and control over all property held at the element;

      b.   Safeguarding all evidence so as to maintain a proper chain of custody for court;

      c.   Reviewing all PD Forms 81 and property listed thereon for accuracy and completeness;

1933

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 34 of ? |

    d.    Ensuring that miscellaneous property such as clothing, tools, and other loose items are securely wrapped or boxed with a PD Form 285 attached;

    e.    Ensuring that all serial numbers and identification numbers are correctly entered on the PD Form 81 and in the PEICS.; and,

    f.    Continually reviewing the Property Book to ensure that all items are listed accurately, and that the property control numbers are listed for all items.

    14.    All property listed on the PD Form 81 that has been forwarded and transferred within the PEICS to the Property Control Branch will become the responsibility of that branch, regardless of the fact that the property may remain in the physical custody of the element.

    15.    Each element which handles property on a regular basis shall set aside a secure space for the temporary storage of evidence/property by the element's property officer. Access to this storage area shall be strictly limited to ensure the integrity of evidence that may later be introduced in court.

    B.    **Officials.**

    1.    Officials, the rank of lieutenant and above, including acting lieutenants, are authorized to release property (other than firearms, evidence*, or suspected proceeds of crime*) being held at an organizational element when all of the following circumstances exist:

    a.    The property is still in the custody of the element;

    b.    There is only one claimant and he/she can provide positive identification and definite proof of ownership; and,

    c.    If the claimant is not the owner, the Property Clerk may be contacted, during normal business hours, for authority to release.

    NOTE:    *Bicycles, play vehicles, and impounded vehicles may be released in accordance with other provisions of this order.

    2.    To complete this type of property release transaction, the Property Book and the PD Form 81 or 81-A must be signed by the claimant. Juvenile claimants must be accompanied by a parent, guardian, or other responsible adult when claiming property.

1934

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order 601.1 | April 30, 1992 | 1 | 35 of 37 |

3.    Upon release of the property, the signed PD Forms 81 or 81-A shall be forwarded to the element property officer who shall then make the necessary disposition entry into the PEICS.

4.    Impounded vehicles can be released at the element to claimants in possession of a PD Form 147-A (Property Release Card) provided by the Property Control Branch.  Vehicles shall not be released after the date indicated on the release card. Should the claimant appear at the element after the date indicated on the release card, he/she shall be instructed to report to the Property Control Branch to determine if additional storage fees are due.

5.    Once the impounded vehicle has been released, the PD Form 147-A will be given to the element's property officer who shall attach the form alongside the appropriate entry in the Property Book.

6.    Whenever an item of property listed on the Property Book is discovered to be lost or missing, an official of the element shall immediately bring the matter to the attention of the watch commander who shall conduct an immediate and thorough investigation.

7.    Motor vehicles in the custody of this department create serious problems of processing and storage.  Therefore, the element property officer's immediate supervisor shall ensure that impounding members utilize every authorized method available to effect the release of impounded vehicles to their rightful owners.

C.    **Commanding Officers.**

1.    Commanding officers shall assign an official of their command, the rank of lieutenant or above, to check the Property Book at least once each day.  This provision shall not relieve other officials from the responsibility of ensuring that all property entered on the Property Book is handled in accordance with the guidelines set forth in this order.

2.    Commanding officers shall ensure that the property of a deceased or alleged mentally ill person, without adequate safeguards or a lawful claimant, is taken into custody for safekeeping.  Whenever possible, the removal of the property shall be coordinated with the Property Clerk.

3.    In such cases, commanding officers shall exhaust all other means available for safeguarding a decedent's estate or the property of an alleged mentally ill person before ordering the removal of the property to the property warehouse.  Members must remember that this department no longer provides free moving and storage services.  Therefore, all costs incurred as the result of this service must be assumed by the claimants of the impounded property.

4.      Property placed on public space as the result of an eviction shall be ordered removed only when it creates a hazard to public travel and the owner cannot be located or refuses to have the property removed, or because the property's significant value dictates that it should be safeguarded.

5.      Commanding officers shall decide the method to be utilized to open locked containers.

6.      Commanding officers shall notify the Property Clerk of the names of members of their elements requiring password access to the PEICS. When the need for access is no longer required, they shall notify the Property Clerk so that the names may be removed from the PEICS access table.

**PART V**

A.    <u>Property Control Branch.</u>

1.      The Property Control Branch shall be responsible for the proper receipt, recording, and safe storage of all property forwarded to the custody of the Property Clerk.

2.      Property in the custody of the Property Control Branch shall be released only upon authorization of the Property Clerk or his/her designee.

3.      · The Property Control Branch shall accept all fees resulting from the storage of property.

4.      Members assigned to the Property Control Branch shall:

a.      Thoroughly inspect all property before assuming custody;

b.      Ensure that the property has been listed properly on the PD Form 81;

c.      Ensure that the data is correctly entered into the PEICS; and,

d.      If the property, the PD Form 81, or the PEICS data, is unacceptable, advise the organizational element's property officer of any discrepancies. The element property officer shall then make the necessary corrections and have the property ready for transfer to the Property Control Branch on the next scheduled delivery day.

MENCIAS 000118

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **GENERAL ORDER 601.1** | **SEPTEMBER 7, 1994** | **2** | **37 OF 37** |

**B.    Director, Property Division.**

1.    The Director of the Property Division is designated as the Metropolitan Police Department's Property Clerk and is governed by all requirements and provisions in D.C. Code Title 4-151, et. seq.

2.    During periods of civil disorder, the Director, Property Division, shall activate an Emergency Property Receiving Office.  Sufficient personnel shall be requested by the Director to perform clerical functions and to establish 24-hour security at the warehouse.  The property warehouse shall remain open on a 24-hour basis during the emergency in order to sort, record, and identify all recovered property.  Personnel assigned to this facility shall prepare all PD Forms 81, make all necessary entries into the PEICS, and record the property in a Property Book especially maintained for this purpose.

3. Additional members shall be assigned to the Emergency Property Receiving Office for the purpose of locating lawful owners of the recovered property.

4.    The Property Clerk shall be held responsible for resolving all disputed claims arising over the ownership of property in the custody of this department. Hearings are conducted to resolve such disputes and members notified to appear before these hearings are obligated to appear.

Fred Thomas
Chief of Police

FT:RDG:blh

1938

# Exhibit J

# GENERAL ORDER



**METROPOLITAN**

# POLICE

**DISTRICT OF COLUMBIA**

| Subject | | |
|---|---|---|
| **Duties, Responsibilities and Conduct of Members of the Department** | | |
| **Topic** | **Series** | **Number** |
| PER | 201 | 26 |

**Effective Date**

**April 5, 2011**

**Rescinds:**
General Order 201.26 (Duties, Responsibilities and Conduct of Members of the Department) Effective Date November 10, 1976
CIR-03-12 (Police Inquiries into the Citizenship, Immigration or Residency Status of Individuals) Effective Date July 25, 2003
Teletype 09-070-07 (Alcohol Consumption Policy) Effective Date September 21, 2007

**Related to:**
GO-PCA-501.02 (Handling Interactions with Transgender Individuals) Effective Date October 126, 2007
Special Order 10-04 (Patrol Sergeants General Duties and Responsibilities) Effective Date May 3, 2010

| | | | | |
|---|---|---|---|---|
| I. | Background | | Page | 1 |
| II. | Policy | | Page | 1 |
| III. | Definitions | | Page | 2 |
| IV. | Regulations | | Page | 2 |
| V. | Roles and Responsibilities | | Page | 2 |
| V.A | Members | | Page | 2 |
| V.B | Sworn and Reserve Corp Members | | Page | 5 |
| V.C | Conduct Towards the Public | | Page | 8 |
| V.D | Conduct in Arrest Procedures | | Page | 9 |
| V.E | Citizen Police Relationships | | Page | 11 |
| VI. | Cross References | | Page | 12 |

## I.   BACKGROUND

The power of the Metropolitan Police Department (MPD) to fulfill its functions and duties is dependent on public approval of its existence, actions, and behavior and on its ability to secure and maintain public respect.

Members shall recognize their responsibility as public servants and shall be particularly attentive to citizens seeking assistance, information, and who desire to register complaints, or give evidence.  Further, members must observe, uphold, and enforce all laws without bias or prejudice, and without regard to the individual or individuals involved.

## II.   POLICY

It is the policy of the MPD to ensure its members preserve the peace, protect life and property, prevent crime, apprehend offenders, recover property and enforce all laws and ordinances of the District of Columbia and the United States of America.



DAILEY
EXHIBIT NO. 5
5/17/16
C. CRUMP

III.   **DEFINITIONS**

When used in this directive, the following terms shall have the meanings designated:

1.   Immediate Family — Member's spouse [including a person identified by a member as his/her "domestic partner," as defined in D.C. Official Code § 32-701 (2001 Edition) and related laws], and parents thereof; children (including adopted and foster children and children of whom the member is the legal guardian and spouses thereof), parents, grandparents and grandchildren, brothers and sisters, and spouses thereof.

2.   Member — Sworn or civilian MPD employee or MPD Reserve Corps Member.

IV.   **REGULATIONS**

In accordance with D.C. Official Code § 2-1401, et.seq. (District of Columbia Human Rights Act), members shall not discriminate, either in the enforcement of the law, or in the provision of police service, on the basis of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity and expression, familial status, family responsibilities, matriculation, political affiliation, genetic information, disability, source of income, status as a victim of an intra-family offense and place of residence or business.

V.   **ROLES AND RESPONSIBILITIES**

A.   Members shall:

1.   Conduct their private and professional lives in such a manner as to avoid bringing discredit upon themselves, MPD, or the District of Columbia.

2.   Check their MPD e-mail at least once during their tour of duty for CANS and other correspondence.

3.   Not utilize their privately owned mode of transportation for official business unless approved by a superior in accordance with GO-PER-301.07 (Use of Privately Owned Vehicles for Official Metropolitan Police Department Business).

4.   Avoid regular or continuous associations or dealings with persons or places whom/where they know, or should have known, are persons or places under criminal investigation or indictment, or who/that have a reputation in the community or the Department for present involvement in felonious or criminal behavior, except as necessary in the performance of official duties, or where unavoidable because of immediate familial relationships.

5.   Not conduct themselves in an immoral, indecent, lewd, or disorderly manner or in manner which might be construed by an observer as immoral, indecent, lewd or disorderly.

6.   Not accept a gift or a gratuity from organizations, businesses or individuals with whom he/she has or could reasonably be expected to have an official relationship or business with the District of Columbia Government.

    a.   Members are prohibited from accepting personal or business favors (e.g., social courtesies, loans, discounts, services or other considerations of monetary value) which might influence or be reasonably suspected of influencing their decisions as representative of the District of Columbia Government.

    b.   Members shall guard against any relationships which may be construed as evidence of favoritism, collusion or a conflict of interest.

7.   Refrain from political or religious discussions while on duty or in uniform unless they are directly related to police business.

8.   Whether on duty or off duty, **not**:

    a.   Engage in political activity while wearing an official uniform.

    b.   Display political buttons, bumper stickers, posters or other political material at work, including in a government office or common area of a government building, and on government vehicles.

    c.   Engage in political activity while using any government vehicle.

    d.   Engage in political activity in any government office.

    e.   Solicit, accept, or receive political contributions unless both individuals are members of the same federal labor organization or employee organization and the member solicited is not a subordinate employee.

    f.   Be a candidate for public office in partisan elections.

    g.   Use official authority or influence to interfere with an election.

9.   While on duty, members shall not:

    a.   Engage in any political activity; and/or

    b.   Place political material on personal equipment (for example, clipboards) used while on duty.

10.   Not suggest, recommend, advise, or otherwise counsel citizens concerning the retention of an attorney, bondsman, tow crane operator or any other person coming to their attention as a result of police business.

NOTE: This does not apply when a relative of the member seeks such advice.

11.   Not question persons about residency or immigration status unless the member is investigating crimes involving the criminal smuggling and harboring of immigrants or other crimes in which immigration status is an element.

12.   Not make inquiries into the immigration status for the purpose of determining whether an individual has violated the civil immigration laws and enforcing those laws.

13.   Not make any inquiry through any database **solely** for the purpose of inquiring about an individual's immigration status.

NOTE: A WALES inquiry initiated to reveal an individual's criminal status may divulge irregularities in his/her residency or immigration status. This type of inquiry, in and or itself, is not a violation of this order.

14.   Not operate any MPD mode of transportation (e.g., automobiles, vans, buses, motor scooters, motorcycles, Segways™, bicycles, boats) either on-duty or off-duty, within eight (8) hours after consuming **any amount** of alcohol or restricted over-the-counter (OTC) medications and or prescription (Rx) drugs which may induce drowsiness, sleepiness or dizziness.  This includes vehicles owned, leased or operated by MPD.

15.   Not create, submit or sign an official report for another member unless authorized to do so by the member or a MPD official.

16.   Not interview subject(s)/suspect(s), conduct any investigation or initiate any inquires into the case of another member without the consent of that member or authorization from the Commanding Officer.

17.   Immediately report each instance of their use of force and/or a use of force committed by another member to a superior officer consistent with GO-RAR-901.08 (Use of Force Investigations).

18.   Immediately report to their supervisor any violations of the rules and regulations of the MPD committed by any other member(s).

19.   Respond truthfully when questioned by superior officers in matters relating to the official business of the MPD.  Members, during the

course of an investigation, shall respond truthfully to questions asked by any agent or official of the Internal Affairs Division (IAD), even if the IAD agent is not of superior rank.

20.   Forward through channels, via a memorandum, requests to personally meet with the Chief of Police or Bureau Head relating to MPD or other matters. This provision is not applicable to incidental contacts in the course of business.

NOTE: All non-exigent internal matters or inquiries (e.g., leave requests) which require the review and/or approval of an official, **must** go through the chain of command to that official/rank.

21.   Whether in uniform or civilian clothes, exercise sound judgment and tact when speaking to, conversing with or acknowledging other member(s) in civilian attire.

NOTE: This provision **must be strictly observed** so as not to place any member working in a confidential or sensitive assignment in jeopardy.

22.   Report to the appropriate government agency any incidentals such as street lights out, traffic signs down, broken fire hydrants or dangerous roadway or sidewalk conditions.

a.   Report any violations of plumbing, building or health codes to the appropriate agency.

b.   Should the member be unable to identify the correct agency, he/she shall request that a notification be made to the Mayor's Command Center through the Command Information Center (CIC) or the Office of United Communications (OUC).

23.   When coming in contact with individuals and/or situations under the care, supervision, monitoring, or authority of another D.C. Agency (e.g., Department Mental Health, DYRS, Animal Control, ABRA)  make appropriate notifications to the agencies and document on appropriate forms [e.g., PD Form 251 (Incident-Based Event Report)] and field notebooks.

24.   Whether on or off-duty, address superior officers by the appropriate rank.  Superior officers, on official business shall address subordinate members by the appropriate rank.

B.   Sworn Members and Reserve Corp Members, **in addition to Part V.A of this order**, shall:

1.   Familiarize themselves with the laws and regulations they are required to enforce.

2.  Provide themselves with field notebooks and shall make note of matters coming to their attention within the scope of their duties.

    a.  Field notebooks shall be carried at all times when on duty and are subject to inspection at any time by a MPD official.

    b.  Field notebooks and the contents may be discoverable/Jenks material, and as such, shall be retained for a period of no less than three (3) years after the field note book is completed in accordance with GO-SPT-601.02 (Preservation of Potentially Discoverable Material).

3.  Maintain a valid operator's license issued by the jurisdiction in which they reside. Members who are authorized to use MPD vehicles shall notify their Commanding Official, through the chain of command, **immediately, but no later then the next scheduled tour of duty of any change in the status of their driver's license, including suspension or revocation**.

4.  Report to roll call on time, properly equipped and shall give full attention to the official in charge. Members shall record in their field notebooks items of importance from teletypes, clipboards, roll call training and other official communications.

5.  When directed to take their assignment, do so by the most expedient route and method.

6.  Make contact with the member(s) being relieved and ascertain any issues of police importance or community concerns.  If the member being relieved is unavailable, the relieving member shall contact the check-off official for this information.

7.  Respond to their assigned area in a timely manner and patrol their area.  Members assigned to a footbeat shall patrol their beat on foot or on a Police Segway™.

8.  Become thoroughly acquainted with every part of their element's area of responsibility, familiarize themselves with the residents, business owners, streets, alleys and general topography of the assigned area.

9.  Familiarize themselves with individuals who have, are suspected of, or display a propensity to violate the law.

10. Give special attention to locations known or suspected to foster criminal activity and check abandoned buildings regularly.

11. Investigate all suspicious vehicles in their assigned area.

12.   Constantly patrol their assigned area unless otherwise directed and shall not return to the station except on official business and approved by an official.

13.   Be limited to one (1) meal break, not to exceed thirty (30) minutes in any one (1) tour of duty.  Members may not request a meal break during the morning and evening rush hours (0630-0930 and 1530-1830 hours) or during the last hour of their tour of duty.

14.   Monitor the police radio and:

    a.   Keep the dispatcher advised of his/her location at all times.

    b.   Advise the dispatcher of any assigned details, or when arriving on a scene or clearing a scene.

    c.   Provide a disposition(s) and go out of service with the dispatcher at the end of the tour of duty.

15.   When in full uniform, to include uniform hat, render a hand salute during:

    a.   The presentation of the Nations Colors;

    b.   The playing of the National Anthem; or

    c.   The raising or lowering of the United States Flag.

16.   When in uniform, to include the uniform hat, during any of the events described in Part V.B.15, stand at attention and render the right hand salute with the index finger of the right hand touching the brim of their hat, elbow at a forty-five (45) degree angle. The salute shall:

    a.   Commence once the Colors are presented (visible to the member) and continue until the Nations Colors are secured in place, or in the event of a parade, the salute shall commence when the Colors are six (6) paces from the member and be held until the Colors are six (6) paces past the member.

    b.   Commence at the first note of the National Anthem and continue until the final note is played.

    c.   Commence once the flag begins its ascent/decent and continue until the flag is secured in place or secured by the bearer.

17.   Members in uniform without the uniform hat, or members in civilian attire without a hat shall, during any of the events described in Part V.B.15, stand at attention and place their right hand over the their heart.

18.   When in civilian attire with a hat during any of the events described in Part V.B.15 stand at attention, remove the hat and place their right hand over their heart.

19.   Not leave their assigned District without the approval of a MPD official and not leave the District of Columbia without the approval of the Watch Commander except in exigent circumstances.

C.   Conduct Toward the Public

**All** members shall:

1.   Be courteous and orderly in their dealings with the public.

   a.   Members shall perform their duties quietly, remaining calm regardless of provocation to do otherwise.

   b.   Members shall be attentive to, and take suitable action on, reports and complaints by a citizen except when circumstances make it necessary for them to report the matter, or refer the complaint to a more suitable member, or other agency.

   c.   Members shall fulfill proper requests for information or assistance, or they shall aid the person in otherwise obtaining the requested information or assistance.

   d.   Members shall avoid giving the impression that they are evading the performance of their duty, or that they are not interested in the problems of persons who are referred elsewhere for service.

   e.   When requested to do so, members shall give their first and last name and badge numbers in a respectful and polite manner.

2.   Be courteous, civil and respectful to their superiors, associates, and others whether on or off-duty. They shall be quiet, orderly and attentive and shall exercise patience and discretion in the performance of their duties.

3.   Refrain from harsh, violent, coarse, profane, sarcastic, or insolent language. Members shall not use terms or resort to name-calling, which might be interpreted as derogatory, disrespectful, or offensive to the dignity of any person.

4.   Not question persons about their residency status in this country as enumerated in Part V.A.11 and 12 of this order.

5.   Respond without delay to all calls for police assistance from citizens or other members.

    a.    Emergency calls shall take precedence; however, all calls shall be answered as soon as possible consistent with normal safety precautions and in observance of all vehicle laws.

    b.    Failure to promptly answer a call for police assistance, without justification, shall constitute neglect of duty.

6.    When answering a MPD telephone members shall respond promptly by giving the command to which they are assigned, their rank, and their surname and shall offer assistance in accordance with SOP 05-01 (Customer Service Standards and Testing).

7.    Not willfully depart from the truth either in giving testimony, or in connection with any legal official order received by them or in their official duties.

8.    Avoid engaging in idle conversations on racial, religious, political, or other controversial subjects.

9.    Refrain from public discussion of the merits of any law or ordinance, except:

    a.    In prepared testimony, authorized by the Chief of Police to City Council.

    b.    In prepared remarks, authorized by their Commanding Officer disseminated at PSA meetings or to other community groups.

D.    Conduct in Arrest Procedures

1.    **All** members shall:

    a.    Not use unnecessary force in making arrests or in dealing with prisoners or any other persons.

        (1).    Prisoners and suspects shall be treated in a fair and humane manner; they shall not be humiliated, ridiculed, taunted, or embarrassed.

        (2).    Members shall be guided by GO-RAR-901.07 (Use of Force) and GO-RAR-901.08 (Use of Force Investigations) when handling use of force incidents.

    b.    In the arrest, transportation, and detention of prisoners, members shall take precautions to prevent escape, injury to themselves or others, and damage to property. When making arrests, members shall search prisoners carefully and shall immediately take possession of all weapons and evidence.

    c.    Upon an arrest being recorded, prisoners may be permitted to make a phone call provided the call is made from a secure area

and the call does not incur a toll or a long distance charge. Members are cautioned that when arrestee's communication could jeopardize an ongoing investigation, they should consult a detective or official prior to allowing telephone calls.

d.   When a prisoner is unconscious from any cause, members should immediately try to restore consciousness and call for an ambulance. An unconscious person shall not be placed in a cell but shall be immediately transported to a medical facility for examination by a doctor.

e.   Each prisoner booked shall be immediately examined and, if he/she has any bruises, cuts, or other injuries requiring medical attention, a PD Form 313 (Arrestees Injury or Illness Report and Request for Examination and Treatment) shall be prepared and the prisoner shall be delivered to the appropriate hospital in accordance with GO 502.07 (Medical Treatment and Hospitalization of Prisoners).

f.   Members shall not normally search persons of the opposite sex who are in custody or under the care of the MPD.  Members searching transgender prisoners shall adhere to the requirements outlined in GO-PCA- 501.02 (Handling Interactions with Transgender Individuals).

2.   Sworn Members and Reserve Corp Members in **addition to Part V.D.1 of this order** shall:

a.   Except when impractical, unfeasible, or where their identity is obvious, members shall identify themselves by displaying their badge or identification folder before taking police action. At the time of an arrest, the person arrested shall be advised of the reason for the arrest, unless such a notification may jeopardize an investigation, endanger potential witnesses or compromise sources of information.

b.   Members shall make diligent efforts to arrest or locate wanted persons and to recover stolen and lost property.

c.   Members shall observe and investigate all persons, whether on foot or in vehicles, whose appearance, actions, or presence at a particular location seems suspicious.

d.   When a member has probable cause to believe that a felony has been committed and that a person (s) is guilty of that felony, the person(s) shall be taken into custody, if appropriate.

e.   Members engaged with suspects shall use tact and good judgment in speech and conduct and remain cautious and alert at all times to the possibility of attack or flight by the suspect.

f.    In cases of minor violations of the law (e.g., violation of District of Columbia Municipal Regulations) and, in the judgment of the member, the circumstances surrounding the incident are such that a verbal warning would best serve the interest of the community, the member may issue such a warning as the proper enforcement action.

NOTE: In more serious or aggravated types of incidents, or those which indicate a serious disregard for the safety or welfare of others, or those in which the member has reasonable grounds to believe that the individual concerned will ignore the warning, the appropriate enforcement action would be an arrest.

g.    In the event that the activities of a congregation of persons involved in the exercise of constitutionally protected rights such as freedom of speech, religion, or assembly, members shall endeavor to protect the participants and prevent any violence from occurring.

h.    Prior to investigative questioning of an arrested person, the member conducting the interview shall warn the person of his/her rights using a PD Form 47 (Warning as to Your Rights) as required.

i.    Members shall not conduct their interrogations of suspects in a manner that would tend to compel a confession. They shall not use physical violence on the suspect or the threat of such abuse, nor shall they make any promise of immunity or lesser degree of prosecution, or hold out any other inducement to a defendant for the purpose of obtaining a confession.

j.    The arresting member shall be responsible for the security of the personal property in the possession of, or under the control of, the arrested person at the time of arrest and record all items on the prisoners' property book. The arresting member shall only relinquish these items to a station clerk or property officer.

E.    Citizen-Police Officer Relationships

1.    It is expected that every member of this Department is keenly aware of the fact that public support and cooperation is essential if members are to effectively fulfill their police responsibilities. The extent to which the public will cooperate with the MPD is dependent upon its respect for, and confidence in, the MPD and its members.

2.    In any effort to strengthen the citizen-police officer relationship, the personal conduct and attitude of the police officer is of paramount importance. Members must understand that the basis of a professional attitude is a desire and a willingness to serve the public. However,

members must distinguish between service and servility and between courtesy and softness.

3.  In the performance of their duty, members should develop a disposition that is pleasant and personable in nonrestrictive situations, and firm and impartial in situations calling for regulation and control. They must observe, uphold, and enforce all laws without bias or prejudice and without regard to individual or individuals involved.

4.  Members should familiarize themselves with the members of the community, businesses, and neighborhoods in which they patrol. Members should develop relationships and foster open communication with community members.

5.  Members of Congress, and all other elected or appointed federal, state, or local officials are subject to arrest for the commission of criminal offenses [except those parking privileges granted to members of the Congress as described in the D.C. Code and to elected city officials in accordance with GO-SPT-303.1 (Traffic Enforcement)] to the same extent and in the same manner as all other citizens.

V.  **CROSS REFERENCES**

A.  General Order 301.07 (Use of Privately Owned Vehicles for Official Metropolitan Police Department Business.)

B.  General Order 303.1 (Traffic Enforcement)

C.  GO-PCA-501.02 (Handling Interactions with Transgender Individuals)

D.  GO-PCA-502.07 (Medical Treatment and Hospitalization of Prisoners)

E.  GO-RAR-901.07 (Use of Force)

F.  G O-RAR-901.08 (Use of Force Investigations)

G.  D.C. Official Code § 2-1401 (District of Columbia Human Rights Law)

H.  D.C. Official Code § 32-701 (Health Care Benefits Expansion)

I.  SOP 05-01 (Customer Service Standards and Testing)

*Cathy L Lanier*

Cathy L. Lanier
Chief of Police

CLL:PAB:MOC:CC

# Exhibit K

10546229

DC #1

DC_000045

# PROPERTY RECORD
Metropolitan Police Department – Property in the Custody of the Property Division – Washington, D.C.

| 1 Property Control No. | 2. Receiving Elem. 4D | 3. Property Book & Page No. 1528/351 | 4. CCN 14136017 | Page 1 of 2 | 5. No. of Items Number of items below | 6. No. of Associates Form part 5 below persons | 7 DEL Lab Number |
|---|---|---|---|---|---|---|---|

| 8 CSES Number | 9 Name of Member Recovering Property Jordan, J | Badge No. 3606 | 10. Name of Member Preparing Return Jordan, J | Badge No. 3606 |
|---|---|---|---|---|

## Part I – Description of Property

Use the following codes to classify property in item E below

A = Abandoned
B = Turned Over to Police for Destruction
C = Suspected Proceeds of Crime
D = Estate of Deceased
E = Evidence

F = Found
G = Safekeeping – Recovered Stolen Auto
H = Held for Civil Forfeiture
I = Impounded
J = Removed from Impound Vehicle

K = Set Out for Eviction
L = Prisoner's Property
M = Alleged Mentally Ill

| 1. Date Recovered | 2. Where was property found? |
|---|---|
| 9/7/2014 | 400 Kennedy NW |

THIS SECTION TO BE COMPLETED BY PROPERTY DIVISION

| A. Item No. | B. Description of item | C. Color | D. Serial No. | E. Classification | F Quantity | G. Storage Facility | H. Storage Location | I. Intake Person | J. Forfeiture Value |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Motor vehicle | wht | | evidenc | 1 | | | | |

## Part II – Motor Vehicles Impounded or in Custody

| Tag Number 7BP9677 | Registration State/Year MD/ 2014 | Body Style van | No. of Tires 4 | Make Chevy | Year of Manufacture 2001 | Vehicle Identification Number 1GCFG15W011190192 |
|---|---|---|---|---|---|---|

| Anti-freeze in veh de? ☐ Yes ☐ No | Radiator tagged and drained? (Date) ☐ Yes ☒ No | Auto Theft Notified? (Name, date & time) | Teletype notified (Name, date & time) Owner notified |
|---|---|---|---|

## Part III – Description of Firearms

| Item No | Brand Name | Type | Model No. | Serial Number | Caliber | Barrel | No. of Shots | Alteration indicated | Firearms Identification Number |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ☐ Yes ☐ No | |

| Name of Person Making Notification(s) | Date | Was NCIC Check Made? ☐ Yes (attach copy of N |
|---|---|---|

**METROPOLITAN POLICE DEPARTMENT**

Barcode: 10546229
Old PCN:   Items #: 1
Packaging Code: Vehicle  Prop. Class: E=Evidence
Event Type: ASSAULT  Property Type: Automobile
Recover By:
Desc: OFC JORDAN, J #3606/ 2001 WHITE CHEVY VAN VIN#

**CCN: 2014136017**

## Part IV – Court Disposi

| Docket Number | | ☐ There is no objection on disposition of the property accordance with the Dist |
|---|---|---|
| Disposition | | ☐ The property may be released photographed with the d |
| Is Case on Appeal? ☐ Yes ☐ No | | ☐ Other special conditions |

ATTN: PROSECUTOR – Property may not be released while case is on appeal unless photographs of property is authorized to the right.



DAILEY
EXHIBIT NO. 2
5/17/16
C. CRUMP

*Doc # ( Cont.*

DC_000046

P.D. 81  REV. 03/06                    *** REVERSE CARBON AND COMPLETE REVERSE ***                    EVIDENCE CONTROL

## Part V – Property Ownership/Claim Information

Use the following codes in Item B [Type of Associate]  O = Owner  C = Claimant  D = Defendant  L = Lienholder  F = Finder

| A. Item Nos. | B. Type of Associate | C. Name of Associate | D. Address (include zip code) | E. Social Security No. | F. Telephone | ARREST INFORMATION | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | G. Charge | H. Arrest No | I. Disp. |
| 1 | O | | 3106 KELLIHER Hyattsville, MD HYATTSVILLE | | (202)327-3295 | | | |

## Part VI – Statement of Facts
### (Enter a complete statement of facts surrounding the recovery of the property)

On the listed date, and at the listed location the aforementioned property was taken in reference to an ADW knife that occurred in the 4200 block of 9th st NW and placed on the 4D property book for evidence.

LAMOR'S                    9/7/14

Signature of Commanding Officer                    Date

## Part VII – Property Release Information

| Item No. | Release to (Signature) | Address | Return by (initials) | Date of Release | Method of Disposition | Sale Price | Fees to DC Treasury |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

# Exhibit L

P D 81-C
Rev 11/82

## Metropolitan Police Department
## Washington, D. C.

**PROPERTY RELEASE**

| 1. Property release initiated by (check one) | | 2. Date initiated |
|---|---|---|
| ☑ United States Attorney for the District of Columbia | ☐ Office of the Attorney General for the District of Columbia | 9/26/2015 |

3.

Property Clerk
Metropolitan Police Department
17 DC Village Lane SW
Washington DC 20032

This is to advise you that the property described below will not be needed as evidence in the case designated nor in any other case the Police Department has brought to our attention. Therefore, (*Prosecutor must initial one or more boxes.*):

☑ There is no objection on the part of this Office to disposition of the property by the Property Clerk in accordance with the District of Columbia Code.

☐ The property may be released only after it is photographed with the claimant.

☐ Other special conditions of release of property:

| 4. DESCRIPTION OF PROPERTY | 5. EVIDENCE | |
|---|---|---|
| 2001 Chevy Van | a. Criminal Docket Number Assigned By (Court) | |
| State of Maryland Registration: | b. Central Complaint Number 14-136017 | |
| 7BP9677 | c. Case Name | |
| VIN: 1GCFG15W011190192 | d. Charge | |
| | e. Disposition N/A | |
| | f. Is Case on Appeal? ATTN: Prosecutor Property may not released released While on appeal unless photograph of property is authorized above | ☐ Yes ☑ No |
| Register Number 10546229 | g. Release Authorized by (Signature of US Attorney or Asst. Attorney General) Sign Name Clearly ▶ | |
| 6. Date Property Acquired 9/06/2014 | 7. Officer's Full Name Dailey, M. | 8. Badge Number D2-1371 | 9. Organizational Element CID |

Distribution: Original copy to the prosecuting attorney at the time the case is papered

. **NOTE: NOT TO BE ACCEPTED WITHOUT CRIMINAL DOCKET NUMBER**



DAILEY
EXHIBIT NO. 23
5/17/16
C. CRUMP

DC_000039

# Exhibit M

METROPOLITAN POLICE DEPARTMENT-RECEIPT OF PROPERTY

Case No. 14-135608

This property is (check one) : Prisoners_____ Date 9/6/14
Crime _____ Abandoned _____ Found _____ Evidence ✓
Suspected Proceeds of
If found, state by whom and address

If other, state class _____

other record, give record and page _____ If entries on incidental or

Taken from RODGERS, BENICA LAVANNE Address 1807 KEOKEE ST HYATTSVILLE MD

Property listed below: (Use entire page, if necessary) Estimated Value $ _____

BLUE 1995 FORD MUSTANG
MD TAG 9BP7954
VIN# 1FALP4048SF194219

Searching
Officer DELAURI RUSSELL #2737   Station
Clerk _____

Case No. _____ Date _____

This property is (check one) : Prisoners_____
Crime _____ Abandoned _____ Found _____ Evidence _____
Suspected Proceeds of
If found, state by whom and address

If other, state class _____

other record, give record and page _____ If entries on incidental or

Taken from _____ Address _____

Property listed below: (Use entire page, if necessary) Estimated Value $ _____

Searching
Officer _____   Station
Clerk _____

Case No. 14135915   Date 9/6/14

This property is (check one) : Prisoners_____
Crime _____ Abandoned _____ Found _____ Evidence _____
Suspected Proceeds of
If found, state by whom and address

B Safekeeping

If other, state class _____

other record, give record and page _____ If entries on incidental or

Taken from Public Space

Property listed below: (Use entire page, if necessary) Address 4920 Amy Branch Ra NW Estimated Value $ _____

Chrysler SUV

Searching
Officer Ricks, Vincent   Station
Clerk _____ 2/33

Case No. 14136017   Date 9/5/14

This property is (check one) : Prisoners_____
Crime _____ Abandoned _____ Found _____ Evidence X
Suspected Proceeds of
If found, state by whom and address

If other, state class _____

other record, give record and page _____ If entries on incidental or

Taken from Morcias-Avila Edin Address 3106 Kallihor st Hyattsville MD

Property listed below: (Use entire page, if necessary) Estimated Value $ _____

Motor vehicle wht chevy van

Searching
Officer Jordan   Station
Clerk _____

Received the p_____
Witness_____
Property liste_____

Vehicle
To

Property liste_____
Witness_____
All Property_____
Register No._____

Received the property describ_____
Witness_____
Property listed below sent to F_____

Property listed above received_____

Witness_____
All Property Returned ☐
Register No._____

Received the property described_____
Witness_____
Property listed below sent to Prop_____

Property listed above received on_____

Witness_____
All Property Returned ☐
Register No._____

Received the property described direc_____
Witness_____
Property listed below sent to Prop_____

1054622q

Property listed above receive_____

Witness_____
All Property Returned ☐
Register No._____

DC_000154

CEIPT OF PROPERTY

te 9/6/14

e ☐ Suspected Proceeds of
nd, state by whom and address

_____If entries on incidental or

1807 KEOKEE ST HYATTSVILLE MD
ated Value $ _____

ate _____
e ☐ Suspected Proceeds of
nd, state by whom and address

_____If entries on incidental or

ated Value $ _____

ate 9/6/14
ce ☐ Suspected Proceeds of
nd, state by whom and address

_____If entries on incidental or

4920 Ferry Branch Rd NW
ated Value $ _____

ate 9/5/14
ce ☐ Suspected Proceeds of
nd, state by whom and address

_____If entries on incidental or

3106 Kelliher St, Hyattsville
ated Value $ _____
Van

---

## METROPOLITAN POLICE DEPARTMENT–DISPOSITION OF PROPERTY
WASHINGTON, DC 20018

0008

Received the p_____  Date 9/6/14
Witness _____
Property listed _____

Customer name _____  Phone _____
Address _____
Vehicle towed from _____
To _____
Description of disabled vehicle _____  D.C. Rates

Property listed _____

Witness _____
All Property _____
Register No. _____  Commanding Officer _____

Date _____

Received the property described directly opposite, except as noted below:
Witness _____  Owner _____
Property listed below sent to Property Clerk on _____

Property listed above received on _____

Owner or Property
Witness _____  Clerk's Agent _____
All Property Returned ☐
Register No. _____  Commanding Officer _____

Date _____

Received the property described directly opposite, except as noted below:
Witness _____  Owner _____
Property listed below sent to Property Clerk on _____

Property listed above received on _____

Owner or Property
Witness _____  Clerk's Agent _____
All Property Returned ☐
Register No. _____  Commanding Officer _____

Date _____

Received the property described directly opposite, except as noted below:
Witness _____
Property listed below sent to Prop_____

1054629

PLEASE call me if
owner shows up

WILLIAM A. XANTEN III
DETECTIVE

METROPOLITAN POLICE DEPARTMENT
CRIMINAL INVESTIGATIONS DIVISION
HOMICIDE

Property listed above receive_____

Witness _____
All Property Returned ☐
Register No. _____  Commanding Officer _____

Schedule of Towing Fees

TOTAL TOWING DUE

DC_0001.67

# Exhibit N

**Dailey, Matthew (MPD)**

| | |
|---|---|
| **From:** | Traster, Kara M. (USADC) <Kara.M.Traster@usdoj.gov> |
| **Sent:** | Thursday, November 19, 2015 1:46 PM |
| **To:** | Dailey, Matthew (MPD) |
| **Subject:** | Can you give me a call |

Re the vehicle in the ADW case.  Can you send me a PD-81C to sign off on?  Per John Giovannelli, we've closed out the case and the USAO will sign off on releasing the car.  Thanks,  Kara

Kara Martin Traster
Assistant U.S. Attorney
555 4ᵗʰ Street, NW
Washington, D.C. 20530
(202) 252-6734 (office)
Kara.M.Traster@usdoj.gov



DAILEY
EXHIBIT NO. 19
5/17/16
C. CRUMP

1

# Exhibit O

## Dailey, Matthew (MPD)

| | |
|---|---|
| **From:** | Giovannelli, John (USADC) <John.Giovannelli@usdoj.gov> |
| **Sent:** | Monday, November 30, 2015 1:04 PM |
| **To:** | Dailey, Matthew (MPD) |
| **Cc:** | Traster, Kara M. (USADC) |
| **Subject:** | RE: 81C and Warrant review |
| **Attachments:** | DeclinedAW.Avilla.11.30.15.pdf |

Thanks, John

**From:** Dailey, Matthew (MPD) [mailto:matthew.dailey@dc.gov]
**Sent:** Friday, November 27, 2015 5:01 PM
**To:** Giovannelli, John (USADC)
**Cc:** Traster, Kara M. (USADC)
**Subject:** 81C and Warrant review

I would like to see if we can go a different way with this. This guy is my only avenue at identifying the suspect in this investigation. He has been uncooperative from the start. He was appointed an attorney and as far as I know they have blown us off and the grand jury is closed. He is an accessory to the crime to include obstructed justice after the fact. I have included the 81c and a draft arrest warrant for him. Can we go this way?

*Matthew Dailey*
Detective II
Metropolitan Police Department
4th District Detectives Unit
6001 Georgia Avenue, NW
Washington, DC 20011
Office: 202-715-7506
Desk: 202-715-7464



1

DC_000126