**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ERLIN EVER MENCIAS AVILA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 15-cv-2135 (TSC) |
| ) | |
| MATTHEW DAILEY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff brings this case pursuant to 42 U.S.C. § 1983, alleging that Defendant violated his Fourth and Fifth Amendment rights. Plaintiff has moved for partial summary judgment as to liability on the Fourth Amendment claim, and Defendant cross-moved for summary judgment as to all counts. For the reasons below, Plaintiff's motion for partial summary judgment will be GRANTED, and Defendant's cross motion for summary judgment on all counts will be DENIED.

## I.    BACKGROUND

Plaintiff Erlin Ever Mencias Avila is a home improvement contractor. He was present at the scene of an altercation on September 6, 2014 between a day laborer who went by the name Luis, who had been working with Plaintiff that day, and the owner of the restaurant El Torogoz, where they went after work. The incident concluded with Plaintiff driving his white work van, with Luis as a passenger, away from the restaurant. Later that evening the police seized Plaintiff's van, and, pursuant to a search warrant, searched it days later. The police kept possession of the van for over a year, until January 13, 2016. Plaintiff concedes that the original

1

seizure of the van was lawful, but alleges that the length of the seizure violated the Fourth

Amendment, and that he was denied due process in violation of the Fifth Amendment.  He seeks

to hold Defendant Matthew Dailey, the Metropolitan Police Department (MPD) officer who was

the lead detective on the case, liable for the violations pursuant to 42 U.S.C. § 1983.[1]

      The parties dispute the specifics of the altercation at El Torogoz, but for the most part the

exact details of the altercation do not impact the claims or the appropriateness of summary

judgment.  While there are three video clips of different security cameras' footage of the

incident, the court does not find, as Defendant asserts, that the videos "speak for themselves" or

are particularly enlightening as to the specific details of what happened.  Plaintiff and Luis went

to El Torogoz on the evening of September 6.  (Pl. Reply to Def. Suppl. Resp. to Pl. Statement of

Undisputed Material Facts ¶ 5, ECF No. 36-1).  The parties agree that at one point Plaintiff was

inside the restaurant while Luis went outside and began to argue with the restaurant's owner and

the owner's wife.  (*Id.* ¶ 7).  The video footage clearly depicts, and the parties agree, that the

argument escalated and Luis threw a stanchion and a chair toward the restaurant owner and some

---

[1] The parties agree on these basic facts.  In their cross-motions for summary judgment, the parties have presented the court with eight separate filings regarding the facts of the case: (ECF Nos. 24-1; 27-1; 27-3; 30-1; 32-1; 33-1; 36-1; and 36-2).

      Neither party has followed Local Civil Rule 7(h)(1), which requires that "[e]ach motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue," along with record citations.  Additionally, "[a]n opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  Both parties have failed to file statements of *material* disputed and/or undisputed facts, and have included legal conclusions, impressions, and beliefs as facts.  Most importantly, neither party has filed any statement of *disputed* facts in opposition to summary judgment, rather, the parties have chosen to respond and reply to each itemized list of facts instead, often using language such as "disputed to the extent that" or "undisputed as to . . . ."  The court's task at summary judgment is to determine whether there are genuine disputes as to material facts that preclude judgment at this stage; neither party has effectively assisted the court in making such a determination.  Furthermore, many of the facts addressed by the parties either have no bearing on the Fourth Amendment and Fifth Amendment claims at issue here.

other people, one of whom was struck by the chair.  (*Id.* ¶ 8).  Plaintiff, having left the restaurant at some point during the escalation of the argument, was "a spectator to the assault."  (*Id.* ¶ 7). He contends that he intervened in the situation "in an effort to stop the fight and prevent any further violence," while Defendant claims that Plaintiff "interven[ed] on the assailant's behalf." (*Id.* ¶¶ 7, 12).

Plaintiff states that he then "ushered Luis into his van and told him to stop fighting," and then got into the driver's seat, after which Luis exited the van with a metal object and scraped it across the sidewalk, creating sparks.  (*Id.* ¶ 13).  Defendant contends that the security footage shows "Plaintiff still standing next to the assailant when he scraped a metal object across the sidewalk, creating sparks."  (*Id.*)  The court finds the video footage unclear; therefore a dispute exists about whether or not Plaintiff was standing next to Luis while Luis scraped an object on the sidewalk.  Plaintiff states that he did know what the metal object was, while Defendant argues that he must have known because he was next to Luis when Luis used the object.  (*Id.* ¶ 14).  Because the footage is unclear, there is a dispute as to whether Plaintiff knew what the metal object was.  Ultimately, though, that dispute is not material here.

Defendant asserts that after Luis scraped the metal object on the sidewalk, he "opened the passenger's door to Plaintiff's van, retrieved an open case of beer, and slammed the case onto the sidewalk," after which he "picked up a full can from the ground and threw it back down, causing the can to burst before he climbed in the van."  (Pl. Am. Resp. to Def. Statement of Undisputed Facts ¶¶ 19–20, ECF No. 36-2).  Plaintiff admits that the footage depicts a person engaging in that conduct "at the top of the frame," but does not concede that it was Luis.  (*Id.*)  It is undisputed that after the scraping incident and the beer incident, Plaintiff and Luis drove away in

Luis's white van.  (Pl. Reply to Def. Suppl. Resp. to Pl. Statement of Undisputed Material Facts ¶ 15).

Plaintiff then parked his van near Ache Lounge on Kennedy Street NW, and entered Ache Lounge by himself.  (*Id.* ¶¶ 17, 19–20).  Defendant suggests that Plaintiff may not have "entered Ache Lounge without noticing the assailant leave or without any information about the assailant's whereabouts," (*id.*), but it is undisputed that Plaintiff went to Ache alone.  His van was seized that night by MPD, under Dailey's direction as lead detective.  (*Id.* ¶ 30).  When Plaintiff left Ache lounge, he encountered and spoke with several MPD members, including Detective Dailey and Detective Xanten and Officer Jordan.  (*Id.* ¶ 33).  The MPD officers told Plaintiff that his van was going to be towed.  (*Id.* ¶ 36).  There is a dispute as to the remainder of the conversation.  Defendant states that the MPD "told him that the van was towed because it was evidence in the criminal investigation," while Plaintiff maintains that he was not told specifically why the van was being seized or where it was being taken.  (*Id.*).  Plaintiff also maintains that the police implied that he could retrieve his van if he helped identify Luis, while Defendant disputes "that MPD Officers offered a strict *quid pro quo*" involving "the release of Plaintiff's van in exchange for information about Luis."  (*Id.* ¶ 37).

The van, containing Plaintiff's construction tools, was towed and taken to the Fourth District, and Officer Jordan filled out a PD Form 81 indicating that the van had been seized as evidence.  (*Id.* ¶¶ 40, 43).  Detective Xanten made an entry in the Fourth District property book asking to be contacted if Plaintiff visited the station to inquire about his van and tools.  (*Id.* ¶ 44).  It is undisputed that Plaintiff was not provided any written notice regarding the van.  (*Id.* ¶ 41).

Five days later, on September 11, 2014, Plaintiff asked Officer Jordan about his van at the Park Road substation, and then went to the Fourth District station to be questioned by Officer

Jordan and some other MPD officers. (*Id.* ¶¶ 49, 50). Defendant was not present. Officer

Jordan stated at one point during the questioning that "any assistance you can give us to close out

the case would be helpful in getting your van back." (Jordan Dep. 62–63, ECF 24-1 Ex. F).

Officer Timlick, who was involved in the interrogation, told Plaintiff: "You need your van; we

need the suspect ID'ed. That's a small price to pay to get your van back to tell us who this

suspect is." (Llewellyn Decl. ¶ 16(a), ECF No. 24-1 Ex. A).[2] He also said, "The best thing you

can do, sir, is help yourself out. The Metropolitan Police Department has your van, I believe,

most likely, as evidence. It's a procedure that the police department has to go through to get

your van back." Officer Timlick told Plaintiff that his van could be held pending a trial, which

could be a long time, and said, "if you're not trying to work with us, that might make things very

complicated for you to get your van back . . . [unless] your friend is more important than your

van, you need to tell us who your friend is." [3]

On September 23, 2014, Defendant searched the van pursuant to a search warrant that

stated he had probable cause to believe the van contained evidence that would assist MPD in

identifying and locating the suspect in the incident at El Torogoz. (Pl. Am. Resp. to Def.

Statement of Undisputed Facts ¶¶ 55–56). The affidavit in support of the warrant stated that

Defendant intended to look for "personal items of [the suspect in the assault], clothing, mail

matter, identification and DNA evidence." (Def. Ex. L). The warrant authorized a search of the

---

[2] Defendant objects to the court's consideration of Llewellyn's declaration describing the contents of the interrogation video, but has not provided the original footage, a transcript, or any other evidence that would contradict Llewellyn's characterization of the video's contents. Therefore, the court finds that Llewellyn's description of the content is undisputed. Plaintiff made the video available at http://instituteforpublicrepresentation.org/, and the court has reviewed the video and finds Llewellyn's description accurate.

[3] Interrogation footage available at http://instituteforpublicrepresentation.org/.

entire vehicle.  (*Id.*).  Defendant removed from the van a passport, 4 beer cans, and a knife.  (Pl.

Am. Resp. to Def. Statement of Undisputed Facts ¶ 57).

According to the U.S. Attorney's Office, the procedure for release of seized property is as

follows: the MPD officer "makes the decision to release the seized property," and then presents a

Form 81C to a supervisor at the USAO to sign "indicating that the USAO-DC has no objection

to that release and that said property is not needed to be retained as evidence."  The USAO's

determination is "handled on a case by case basis."  (Giovannelli Decl. ¶¶ 3–7).  Defendant does

not dispute the USAO's description of the process, only states that "MPD does not have the

authority to release property until the USAO confirms that it no longer needs it for the criminal

prosecution."  (Pl. Am. Resp. to Def. Statement of Undisputed Facts ¶ 70).  With regard to the

return of property, it is undisputed that: (1) it is MPD that initiates the process; and (2) the

USAO must sign off on it before the property can be released.  MPD General Order 601.1 also

describes MPD procedures for dealing with property and states that, in cases where property is

classified as evidence or suspected proceeds of a crime but no arrest is made, "the member first

taking the property into custody shall be responsible for obtaining a PD Form 81-C from the

appropriate prosecuting attorney and delivering it to the Court Property Control Office."  (Pl. Ex.

I).  Otherwise, "[i]n all other cases where release is required, the member handling the case in

court shall be responsible for obtaining and preparing the PD Form 81-C."  (*Id.*).

Plaintiff and Defendant spoke on the phone through an interpreter on March 3, 2015.  (*Id.*

¶ 78).  Part of the conversation related to whether Plaintiff knew the identity and whereabouts of

Luis.  (*Id.* ¶ 79).  Dailey asked Plaintiff to come to the Fourth District station, where he was

served with a subpoena to appear before a grand jury on March 13, later rescheduled to May

2015.  (*Id.* ¶ 80).  The subpoena was issued by AUSA Bruckmann, at Defendant's request.

(Dailey Dep. At 96; Def. Ex. N).  Plaintiff appeared on March 13[4] in accordance with the

subpoena and completed an application for the appointment of counsel.  (Pl. Am. Resp. to Def.

Statement of Undisputed Facts ¶ 81).  He was never asked to return to testify before the grand

jury.  (*Id.* ¶ 82).

AUSA Kara Traster took over the case in May 2015.  (Def. Reply to Pl. Resp. to Def.

Statement of Undisputed Facts ¶ 56, ECF No. 33-1).  On September 15, 2015, Defendant

emailed Traster asking for updates on four cases, one of which he referred to as the "ADW Knife

from the Latino restaurant."  (Def. Ex. P).  She responded asking if they could speak on the

phone, and wrote, "I definitely want to move forward with these cases."  (*Id.*).

Plaintiff's counsel contacted Defendant in November 2015 regarding return of the van,

and Defendant referred counsel to Traster.  (*Id.* ¶ 85).  On November 19, 2015, Traster informed

Defendant that the case was closed and asked him to initiate the process to release the van.  (*Id.* ¶

86).  On November 27, Defendant emailed AUSA John Giovannelli, copying Traster, stating that

Plaintiff was his "only avenue at identifying the suspect in this investigation," that Plaintiff had

"been uncooperative from the start," and asked if the prosecutors would obtain an arrest warrant

for Plaintiff as "an accessory to the crime."  (Pl. Mot. for Part. Summ. J. Ex. O).  Defendant

indicated that he "had no reason to believe that Plaintiff would return to the police station after

his property was released from evidence, given Plaintiff's apparent attitude toward the

investigation."  (Pl. Am. Resp. to Def. Statement of Undisputed Facts ¶ 88).  Traster declined to

seek an arrest warrant for Plaintiff.  (*Id.* ¶ 89).  Defendant prepared form 81-C for release of the

van on November 26 and sent it to the USAO, where it was signed, (*id.* ¶ 90), but Plaintiff did

---

[4] Although Plaintiff's grand jury appearance was rescheduled to May, it is undisputed that he
appeared on March 13.

not learn that his property was available for retrieval until January 7, 2016, after this lawsuit was filed.  Defense counsel ultimately informed Plaintiff's counsel that the van was available, and Plaintiff retrieved his van on January 13, 2016.  (*Id.* ¶¶ 94, 95).

## II.     LEGAL STANDARD

Summary judgment is appropriate where there is no disputed genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  The movant must rely on materials in the record to demonstrate the absence of any genuinely disputed issues of material fact.  Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 332.  The nonmoving party, in response, must present her own evidence beyond the pleadings to demonstrate specific facts showing that there is a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 324.  A fact is material if "a dispute over it might affect the outcome of a suit," and an issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).  The non-movant is "required to provide evidence that would permit a reasonable jury to find" in his or her favor.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (citations omitted).

## III.    ANALYSIS

Plaintiff has moved for summary judgment on his Fourth Amendment claim.  Defendant has moved for summary judgment on both Plaintiff's Fourth Amendment and Fifth Amendment

claims, on grounds specific to each claim and because of qualified immunity, which Defendant argues bars both claims.

### A. Fourth Amendment Claim

Section 1983 provides a remedy where a person acting under color of state law, including District of Columbia law, deprives a person of their Constitutional rights.  42 U.S.C. § 1983.  If a local law enforcement officer conducts a search or seizure that violates the Fourth Amendment, the person searched or seized unreasonably or who had their property searched or seized unreasonably may bring a section 1983 claim against the officer.  *See Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

Plaintiff concedes that it was "likely reasonable for Det. Dailey to seize the van the night of the incident and hold it until a search warrant could be obtained and a search conducted," but argues that the subsequent duration of the continued seizure—the van was held by MPD for 15 months after it was searched—was unreasonable.  (Pl. Mot. for Summ. J. at 13–14).  In assessing the reasonableness of a seizure, a court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *Johnson v. District of Columbia*, 528 F.3d 969, 974 (D.C. Cir. 2008) (internal quotation marks and citation omitted).  The balancing inquiry applies to the seizure of persons as well as property.  A seizure that is reasonable at the outset can become unreasonable because of duration.  *Segura v. United States*, 468 U.S. 796, 812-13 (1984) (noting that "a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons," but finding no unreasonable seizure in the exclusionary rule context where law enforcement officers occupied apartment for 19 hours awaiting warrant, in part because "[t]he actual interference with [the] possessory

interests in the apartment and its contents" of the tenants, who were already in police custody elsewhere, "was, thus, virtually nonexistent.").

Plaintiff maintains that after Defendant conducted a warranted search of the van, the continued seizure of the van and its contents became unreasonable, because "neither the van nor the tools had any evidentiary value." (Pl. Mot. for Summ. J. at 14). Defendant responds that it was not he but the USAO who determined the length of the seizure because Defendant "was not responsible for prosecuting the underlying [assault with a deadly weapon], and thus did not have the legal authority to control the duration of the seizure." (Opp'n at 9). He also asserts that the van continued to have evidentiary value after the date of the search, that his original search was "limited . . . to the passenger compartment," that he could have been subject to sanctions under D.C. Superior Court Criminal Rule 16 for not preserving and retaining the vehicle for inspection by a potential criminal defendant, and that precedent suggests that the 15-month seizure was reasonable. (*Id.* at 10–13).

Defendant has not identified any legitimate basis for holding the van after he conducted the search, nor pointed to a government interest to balance against Plaintiff's interest in having and using his van. While MPD officers suggested during interrogation that they needed to hold the van until Luis was found in order to match his fingerprints with prints on the van, that explanation defies common sense. Not only could MPD have checked Luis's fingerprints against prints on the items seized from the car, but they also could have obtained prints from the van itself during the execution of the search warrant. *See*, *e.g.*, *United States v. Alexander*, 761 F.2d 1294, 1302 (9th Cir. 1985) (finding seizure of items and dusting for fingerprints within the scope of a warrant "authorizing the officers to search for items showing the identity of persons in

control of the" premises where the items were taken).  MPD did not need to retain the van in order to preserve the fingerprints, which may well have degraded over the time the van was held.

The court is persuaded by Defendant's explanations that the seizure and continued possession of the items removed from the van—the passport, knife, and beer cans—was reasonable and not in violation of the Fourth Amendment, and perhaps necessary lest he face sanctions under Rule 16.  But while those items might have potential evidentiary value in a criminal case against "Luis," the van itself would have no such value.  Defendant implies that the van might have been evidence in a case against Plaintiff for obstructing justice or acting as an accessory to Luis's crime, but there is no indication in the record that anyone at the USAO ever actually considered prosecuting Plaintiff.  Defendant's unsuccessful request in November 2015, more than one year after the incident at El Torogoz, that Traster issue an arrest warrant for Plaintiff cannot retroactively justify the MPD's retaining the van after the execution of the search warrant almost a year earlier.  The timing and language of Defendant's email suggests that he himself had not previously considered the idea that Plaintiff could be charged with a crime; rather, he came to realize ultimately that it might be the only way to get to Luis or to exact retribution on Plaintiff for his "uncooperative" attitude.  Absent evidence suggesting that a case against Plaintiff was a possibility in September 2014, there is no disputed material fact that would give the van evidentiary value beyond execution of the search warrant.  Defendant has not demonstrated the existence of a genuine dispute as to whether he maintained possession of the van in order to pursue an obstruction case against Plaintiff; in fact his deposition testimony on this point indicates as much.  (*See* Def. Dep. 29:3–15 ("Q: Is it fair to say that you thought there

might be evidence in the van that would help you identify the suspect in the incident? A: Yes. Q: Were there any other reasons that the van would have been seized? A: No."")).[5]

Even if Plaintiff had been prosecuted, Defendant has not raised a genuine issue that the van itself would have been needed as evidence.  Plaintiff did not deny that he drove the van away from the scene, and admitted that the van was his.  His presence at the scene and his ownership of the van were therefore not at issue, and the police had security camera footage of him driving the van away from El Torogoz.

Defendant asserts that he only searched the passenger section of the van, and may have needed to conduct another search depending on the development of the investigation into the assault.  But the search warrant authorized a search of the entire van; if Defendant believed the

---

[5] Defendant suggests that the fact that Traster provided Plaintiff with information about obtaining counsel, and that Plaintiff filled out a request for appointment of counsel when he appeared on March 13, means that Plaintiff may have been facing a charge himself.  But Defendant's deposition testimony indicates that, although Plaintiff's conduct may have supported a charge of accessory after the fact, Defendant was aware that the OUSA did not intend to pursue any charge against Plaintiff.  (*See* Def. Dep. 100:21–101:3; 119:18–122:7) ("Q: Had you discussed obtaining an arrest warrant for Mr. Mencias with anyone at the U.S. Attorney's Office? A: I think we initially talked about whether or not he was an accessory to a crime or accessory after the fact in helping the suspect leave the scene, but at the time, we wanted to speak with him in reference to that before arresting him if we were going to do that. That was more or less the strategy as far as not arresting him and having him come in, because we didn't know whether he was a witness or actually a suspect in the case. Q: I'm a little bit confused. Was that conversation around the time of November 30, 2015 when you sent over the draft arrest warrant or are you talking about a conversation many months prior? A: Many months prior. Q: And many months prior, when you discussed that possibility, what was the outcome of that conversation? A: The outcome was to open the grand jury and move forward with the grand jury . . . Q: Have you learned any additional information since the night of September 6, 2014 that led you to believe Mr. Mencias had committed a crime? A: No. Q: Why had you not sought an arrest warrant for Mr. Mencias any time prior to November of 2015? A: Because the investigation was under the grand jury at that point. And as I said, we discussed various ways of going forward with the case, and arresting him was not at the time something that the U.S. Attorney's Office wanted to do. We wanted to move forward with the grand jury.").

The court notes that, in his pleadings, Defendant repeatedly mischaracterizes the substance of his deposition testimony.

driver's section contained evidence related to the assault, he could and should have looked for it while executing the warrant. His decision not to, despite having authorization to do so, does not justify holding the van for many months.

The continued seizure of Plaintiff's van required probable cause in order to be lawful under the Fourth Amendment. *See United States v. Place*, 462 U.S. 696 (1983) (holding that brief seizure of personal property, "[w]hen the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests," can be "based on less than probable cause," and instead requires only "reasonable, articulable suspicion" that the seized property contains contraband or evidence of a crime, but when the seizure becomes lengthy, probable cause to believe that the property contains contraband or evidence is required to justify the seizure). Defendant has not identified any such probable cause. His warrant affidavit stated that he was looking for evidence of the identity and whereabouts of Luis; he removed the items that appeared to constitute such evidence, and he had no need for anything else in the van or the van itself.

Defendant's argument that the ongoing investigation into the assault required him to continue the seizure is unavailing. While it is undisputed that AUSA Traster indicated as late as September 2015 that she was still interested in pursuing the case against Luis, Defendant has proffered no evidence to suggest that the van was pertinent to the ongoing investigation in any way other than as leverage to force Plaintiff's cooperation. Seizure of a person's property as bait or as a bargaining chip to elicit information from a third party is not lawful within the Fourth Amendment. *See*, *e.g.*, *Segura*, 468 U.S. at 808 (property seizure requires "probable cause to believe that that property is associated with criminal activity"). Designating the van as evidence does not make it so for purposes of the Fourth Amendment. Traster's email may have justified

continued seizure of the knife, beer cans, and passport, but not of the van, and Defendant has pointed to nothing suggesting otherwise.

Although Defendant claims he "knew that the AUSA assigned to th[e] case was leading the criminal investigation by grand jury, and that Plaintiff's van remained classified as evidence under the prosecutor's discretion," (Def. Statement of Material Facts ¶ 53), his deposition testimony does not does not support that claim.  In the cited portions of his testimony, Defendant states that John Giovannelli told him that the USAO wanted to hold the van until MPD talked to Plaintiff; that the grand jury investigation was active some time before March and up to November 2015; and that after Plaintiff appeared pursuant to the grand jury subpoena in March 2015, Defendant was "working with the U.S. Attorney's Office and trying to develop witnesses and develop more evidence in the case."  (*Id.* (citing Def. Dep. 79:17–81:19; 86:1–88:19; 105:6 –13)).  Defendant also testified that the USAO had placed an "evidentiary hold" on Plaintiff's property, and that there was no distinction between an evidentiary hold on the seized contents of the van and an evidentiary hold on the van itself.  (Def. Dep. 79:17–81:19).  Defendant's deposition testimony suggests that the grand jury investigation was initiated before Plaintiff was interrogated at the Fourth District on September 11.  (*See* Def. Dep. 51:19–20 (stating that Defendant learned of the September 11 interrogation within approximately one week of its occurrence); 55:12–21 (stating that Defendant did not watch the video of the interrogation when he learned that it had occurred, because "there was a grand jury that was opened in that case.")).  If Defendant believed that Giovannelli placed an evidentiary hold on the van when the grand jury investigation was initiated, in order to get Plaintiff in to the MPD to discuss the incident (*see* Def. Dep. 80:8–81:4), Defendant has not indicated that he believed the USAO's evidentiary hold applied after Plaintiff *did* come in and speak with the police, on September 11, 2014.  His

attempt to transfer blame to the USAO and reduce his role to "deferring to the United States' ongoing criminal prosecution and determination that it had a continued need for Plaintiff's van," (Def. Reply at 1), is both unsupported by the record and legally insufficient to rebut Defendant's liability.  Reliance on another official's apparent ratification of an unlawful search or seizure does not remove a law enforcement officer's responsibility under section 1983, where a reasonable officer in his position would know that the search or seizure he undertook was unlawful.  *See Malley v. Briggs*, 475 U.S. 335, 345 (1986).

Moreover, Defendant has not pointed to any evidence that the van was "classified as evidence" after the search warrant was executed.  The court cannot find that there is a disputed issue of material fact based on Defendant's claim that the van was "classified as evidence" when that claim is not supported by his deposition testimony or anything else in the record.  As Plaintiff points out, the document that "classified" the van as evidence was the PD 81 form that was filled out at the time of seizure.  It is undisputed that it is MPD that fills out a PD 81-C form, and then presents that form to the USAO, which ultimately decides whether to release seized property that has been classified as evidence.  Defendant's argument that the continued seizure was warranted because the van was classified as evidence, given that the responsibility for classifying something as evidence lies with the MPD, is circular.

 Detective Dailey did not testify that he had any reason to believe the USAO was interested in continued seizure of the van for evidentiary purposes.  In fact, his testimony suggests the opposite.  When asked if, following Defendant's conversation with Giovannelli after the search of the van, Giovannelli indicated that the USAO had a continued need for the van, Defendant answered: "[w]e discussed the case and we found that there was a continued need based on that we wanted to speak with Mr. Mencias before releasing it."  (Def. Dep. 7:9–21).  He

added that he and the USAO wanted "further information about the contents of the van," because they "didn't know . . . what belonged to him and what may have belonged to the suspect."  (*Id.*). Defendant has not explained why holding on to the van was necessary in order to determine which of its contents belonged to the suspect and which belonged to Plaintiff; Defendant could have asked Plaintiff about the contents of the van without maintaining possession of it.  MPD had removed the items from the van that it believed had evidentiary value, and had no valid reason under the Fourth Amendment to hold the van.  A "continued need" based on a desire to question Plaintiff again does not convert the retention of the van into a valid seizure within the meaning of the Fourth Amendment.  Defendant's statement that "[w]ithout further investigation, neither Detective Dailey nor the USAO could reasonably determine the evidentiary value of the remaining items" in the car, (Def. Opp'n at 10), reveals that Defendant did not have probable cause to believe the van contained evidence.  A valid seizure requires an affirmative belief that evidence might be present, not an absence of definitive knowledge that evidence is not present.

Defendant also acknowledges that he did not have any specific conversations about the van with anyone at the USAO.  (*See* Def. Dep. 109:10–17 ("We had discussions about Mr. Mencias in general, which the van was part of those conversations, but, I mean, it wasn't the focus of the conversation. Q: What were those conversations about Mr. Mencias and the van? A: It was essentially trying to get him to come in and talk to us.")).  Although he stated that "[w]e needed this van still as evidence in the case until [the USAO] told me it wasn't needed anymore, and then I would release the van or release property," (Def. Dep. 116:19–22), other portions of his deposition testimony contradict his statement that the USAO believed the van needed to be held as evidence.  Defendant does not claim that he ever received a specific instruction about the van from anyone at the USAO.

Defendant argues that he did not have legal authority to control the duration of the seizure, but whether he had such unilateral authority is not the appropriate inquiry under section 1983.  The Supreme Court has identified the type of causal link required between the officer's act and the deprivation in the section 1983 context as similar to the type of causation required for tort liability.  *See Malley v. Briggs*, 475 U.S. at 344 n.7 ("It should be clear . . . that . . . we read § 1983 as recognizing the same causal link" as the link in the common law between submission of a complaint and an ensuing arrest)*; see also Monroe v. Pape*, 365 U.S. at 187 (§ 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.").

It is undisputed that Defendant was responsible for the original seizure of Plaintiff's van.  It is undisputed that MPD initiates release of seized property by filling out a form PD 81-C and submitting it to the USAO to sign.  The fact that the USAO would have had to sign the form before the van could be released does not break the causal chain making Defendant responsible for the ongoing seizure.  Had Defendant sent the form to the USAO and the USAO refused to sign it, the causal link would be broken and Defendant would not be liable under section 1983.  Defendant has not proffered any evidence that the USAO was interested in retaining the van and is therefore responsible for the ongoing seizure within the meaning of section 1983.

D.C. Superior Court Criminal Rule 16 fails to provide Defendant with support.  Rule 16(a)(E) reads:

> Documents and Objects. Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
> (i) the item is material to preparing the defense;
> (ii) the government intends to use the item in its case-in-chief at trial; or
> (iii) the item was obtained from or belongs to the defendant.

17

D.C. Super. Ct. Crim. Rule 16(a)(E).  Defendant argues that he could have been subject to sanctions under the Rule had he released Plaintiff's van.  But the court has determined that the van was not being held as evidence.  Any criminal prosecution of Luis would not have required the government to provide defense counsel access to Plaintiff's van; it would have required the government to provide access to the items removed from the van.  The USAO's lack of interest in retaining the van confirms that it would not have been material to preparing a defense, nor would have been used by the government in its case in chief, nor did it belong to Luis.  Defendant cites a unique D.C. case in which an MPD officer was admonished for releasing a car in which a murder took place, which the court called a "preserved crime scene."  *Williams v. United States*, 77 A.3d 425, 438 (D.C. 2013).  The D.C. Court of Appeals refused to overturn the district court's decision not to dismiss the criminal case based on the release of the car and the defendant's inability to examine it.  *Id.  Williams*, however, is inapplicable here, because the assault under investigation did not take place in Plaintiff's van.

Even taking into account Defendant's argument that evidence is normally kept until the close of criminal proceedings, and assuming that the van itself was somehow evidence, the Fourth Amendment requires balancing the government's interest with the Plaintiff's.  Plaintiff's interest here so clearly outweighs the government's so as to make the continued seizure objectively unreasonable.  It was clear to MPD that Plaintiff needed his van for his livelihood, and that its absence was causing him undue expense: he informed the MPD officers of that fact during the September 11 interrogation.  MPD's only possible *evidentiary* interest in the van was some slight chance that the van might contain more items with evidentiary value that MPD did not detect during the first search.  A general policy of keeping seized property until the close of criminal proceedings cannot overcome that the balance clearly weighed in favor of Plaintiff,

whose interest was much greater than the government's, making the ongoing seizure unreasonable and a violation of the Fourth Amendment.

Defendant's reliance on a single Eastern District of New York case for the proposition that there is settled case law allowing seizures of property for durations similar to that in this case is unavailing.  In *United States v. Eight Autos. With Fraudulently Obtained Ohio & N.Y. State Div. of Motor Vehicle Titles*, 356 F. Supp. 2d 223 (E.D.N.Y. 2005) (Def. Opp'n at 13), as in *Williams*, the cars at issue were actually evidence of a crime—a scheme to fraudulently resell wrecked automobiles containing stolen parts.  That is not the case here.

In sum, Defendant, who was responsible for the continued seizure of Plaintiff's van, has pointed to no record evidence (his own deposition testimony or otherwise) indicating that the USAO expressed any interest in holding the van as evidence, or that he had probable cause to believe the van contained any evidence beyond the items removed during the warrant search, and the duration of the seizure and Plaintiff's strong interest in his van overcome any minimal interest the government may have had.  Therefore, summary judgment for Plaintiff is appropriate on the Fourth Amendment claim.

### B.  Fifth Amendment claim

Defendant moves for summary judgment on Plaintiff's Fifth Amendment claim, arguing that Plaintiff was not entitled to pre-deprivation due process and that the availability of post-deprivation remedies under District of Columbia law preclude the constitutional due process claim.

A claim for a procedural due process violation requires a showing that (1) an official has deprived the plaintiff (2) of liberty or property (3) without "providing appropriate procedural protections."  *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009).  Here, Plaintiff's property interest is not at issue, nor is whether an official deprived him of his property

(aside from Defendant's previously-discussed argument, rejected by the court, that he lacked the legal authority to return Plaintiff's property).  In determining whether the process was sufficient, a court must balance the public's or government's interest in the deprivation, the individual's private interest in avoiding the deprivation, and the "probable value, if any, of additional procedural safeguards."  *Mathews v. Eldridge*, 424 U.S. 319, 343 (1976).  Where procedures exist under state law that "could have fully compensated the [plaintiff] for the property loss he suffered," and the property loss is a result of "random, unauthorized" conduct not sanctioned by state law, there is no procedural due process claim under section 1983.  *Parratt v. Taylor*, 451 U.S. 527, 544 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *Zinermon v. Burch*, 494 U.S. 113, 138 (1990); *see also Hudson v. Palmer*, 468 U.S. 517 (1984).

Because Plaintiff has not argued that pre-deprivation process was necessary, the court will analyze only whether available post-deprivation state remedies were sufficient.  Defendant argues that Plaintiff could have brought an action *in detinue*, a request for return of the seized items under D.C. Code § 5-119.06, or a motion for return of property under Federal Rule of Criminal Procedure 41(e), or its state court analog, D.C. Superior Court Criminal Rule 41(g).  He argues all are adequate remedies available under state law that preclude the section 1983 claim. Defendant has not described an action *in detinue* or explained the content of D.C. Code § 5-119.06, even on reply after Plaintiff pointed out that Defendant had not included anything other than a cursory reference to the two remedies.  The court need not consider conclusory arguments with no explanation or support, *see*, *e.g.*, *POM Wonderful, LLC v. F.T.C.*, 777 F.3d 478, 499 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1839 (2016), but has nonetheless separately determined that neither option presents an adequate state-law remedy.

It is not clear that the largely antiquated remedy of an action *in detinue* is adequate for addressing seizures by law enforcement where property ownership is not in question.  The court has only located one instance of an action *in detinue* being brought against D.C. law enforcement or government, *Lewis v. Aderholdt*, 203 A.2d 919, 922 (D.C. 1964), in which the D.C. Court of Appeals found MPD's and a locker-company's seizure of burglary-related cash from a locker to be appropriate.  In *Aderholdt*, and other D.C. cases involving actions *in detinue*, the focus was on determining rightful ownership of property, not whether the seizure of the property were lawful. *See*, *e.g.*, *Reliance Ins. Co. v. Mkt. Motors, Inc.*, 498 A.2d 571, 572 (D.C. 1985) (plaintiff sued insurance company that claimed title and took possession of car); *Schmiedigen v. C. G. Sloane & Co.*, 204 A.2d 702, 703 (D.C. 1964) (estate of one sister sued other sister for selling jointly-owned furniture); *Becton v. Walker-Thomas Furniture Co.*, 192 A.2d 125, 126 (D.C. 1963) (plaintiff sued furniture company over repossession of items after default on lease-purchase contract).  The courts finds the remedy of *in detinue* could not have compensated Plaintiff for his loss.  Not only does the remedy appear inapplicable; even if it were applicable in theory, the absence of any examples of its successful use precludes its adequacy.  *See Zinermon*, 494 U.S. at 124 ("§ 1983 was intended not only . . . to provide a remedy for violations of civil rights 'where state law was inadequate,' but also to provide a federal remedy 'where the state remedy, though adequate in theory, was not available in practice.'") (quoting *Monroe v. Pape*, 365 U.S. at 174).

Neither does D.C. Code § 5-119.06 constitute an adequate post-deprivation remedy.  The statute "requires the property clerk to return property to its owner unless the property was feloniously obtained, is the proceeds of a crime, or is needed as evidence in the prosecution of a crime." *Kuhn v. Cissel*, 409 A.2d 182, 185–86 (D.C. 1979).  The statute prohibits "deliver[y] within 1 year after the date of receipt of said property or money by the Property Clerk unless the

United States Attorney in and for the District of Columbia shall certify that such property or money is not needed as evidence in the prosecution of a crime." D.C. Code § 5-119.06. In other words, the statute does not provide the Property Clerk with authority to review the constitutionality of the seizure of property by MPD; the Clerk defers to the USAO—by way of the process in which MPD completes a Form 81-C. Plaintiff would have been unable to avail himself of § 5-119.06 for at least one year after the seizure; the remedy was therefore not adequate to provide Plaintiff with procedural due process. [6]

Neither does Federal Rule of Criminal Procedure 41(g) nor D.C. Superior Court Rule of Criminal Procedure 41(g) provide an adequate remedy. First, the federal rule is not a state-law remedy that precludes finding a procedural due process violation. *Parratt* and *Hudson* do not take federal remedies into account in determining whether a state provides adequate process. *See Zinermon*, 494 U.S. at 126 ("to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate"). Second, it is unclear whether, under D.C. law, a person who is not a defendant in a criminal case can bring a Rule 41(g) case in Superior Court. The Rule allows "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property" to move for return of the property. Under the Rule, "[t]he court must receive evidence on any factual issue necessary

---

[6] *C.f. Dickson v. Mattera*, 38 F. App'x 21, 22 (D.C. Cir. 2002), a one-page unpublished *per curiam* order finding a due process claim unavailable because of the existence of the adequate D.C. post-deprivation remedies of *in detinue* and D.C. Code §§ 5-119.05–.06. While Rule 32.1(b)(1)(B) of the D.C. Circuit Rules allows citation to unpublished decisions and orders entered after January 1, 2002, as precedent, Rule 36(e) states that "a panel's decision to issue an unpublished disposition means that the panel sees no precedential value in that disposition." Additionally, Federal Rule of Appellate Procedure 32.1 differentiates between unpublished opinions issued before and after January 1, 2007, prohibiting a court from restricting citation to the latter but not the former. The court finds *Dickson* does not have precedential value impacting its finding.

to decide the motion.  If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings."  Defendant has cited only federal cases involving the Federal Rule, not the D.C. analog; D.C. cases describe a Rule 41(g) motion as "ancillary to the criminal proceeding in which it is brought."  *District of Columbia v. Dunmore*, 749 A.2d 740, 742 (D.C. 2000); *see also Cousart v. Metro Transit Police Chief*, 101 F. Supp. 3d 27, 29 (D.D.C. 2015) ("Under D.C. Superior Court Rule of Criminal Procedure 41(g), [plaintiff] can move in the Superior Court for the return of property seized as part of a criminal action.").   Because Plaintiff was not a defendant in a criminal proceeding, nor was there any criminal proceeding at all, Rule 41(g) did not provide him with an adequate remedy for the seizure of his van.

Plaintiff argues that Defendant denied him due process by failing to inform him promptly that his van was seized as evidence, and affirmatively misleading him as to what would be required to retrieve his property.   Plaintiff states that he was not informed for five days that the van had been seized as evidence, and that Defendant told him the police could sell his van and that the only way he could retrieve it would be to give the police information about Luis.  (*See* P. Dep. 63:18–21 ("Did he say he was taking your van as evidence?  A: Not on that particular day. He said that another day."); 76:17–20 ("They told me that if I knew where Luis was or who was Luis, that I could get my van back.  Otherwise, there would be no way for me to get my van back."); 83:20–84:1 ("[Detective Dailey] relayed to me that I had not cooperated with them, that my van was being withheld and that they were entitled to sell it at an auction.")).

Although law enforcement officers are not required to inform people from whom they seize property of the available procedures for retrieving that property, "due process requires them to take reasonable steps to give notice that the property has been taken so the owner can pursue

available remedies for its return." *City of West Covina v. Perkins*, 525 U.S. 234, 240 (1999).

The Supreme Court did not state in *Perkins*, nor has it clarified since, exactly what type of notice

is required. *Id.* ("we need not decide how detailed the notice of the seizure must be or when the

notice must be given").  But the notice must be prompt. *See*, *e.g.*, *Stypmann v. City & County of*

*San Francisco*, 557 F.2d 1338, 1344 (9th Cir. 1977) ("A five-day delay in justifying detention of

a private vehicle is too long.  Days, even hours, of unnecessary delay may impose onerous

burdens upon a person deprived of his vehicle.").  And it must serve to provide the property

owner with sufficient information about the seizure to enable to owner to identify for himself the

available remedies to recover it.  *Perkins*, 525 U.S. at 240.

The court finds that Plaintiff has identified disputes of material fact that preclude

summary judgment as to his Fifth Amendment claim.  First, there is a dispute as to whether he

received notice that was sufficiently prompt and sufficiently informative, letting him know the

purpose of the seizure.[7]  If a jury were to find that Plaintiff was not informed for five days that

his van was to be held as evidence until a search could be performed, that may well constitute a

procedural due process violation.  Although seizure of a vehicle that may contain evidence of a

crime, without contemporaneous notice, is not a Fourth Amendment violation, five days without

notice has been found to be too long.  *Stypmann*, 557 F.2d at 1344, *see also Lee v. Thornton*, 538

F.2d 27, 33 (2d Cir. 1976) ("some kind of hearing on probable cause for the detention" of a

vehicle seized by U.S. customs officials "should be provided within 72 hours").  Defendant

claims that Plaintiff's knowledge at the time of seizure that (1) the seizure was taking place, and

---

[7] There are contested issues of fact as to what Plaintiff was told about the van, when, and by whom.  The September 11 interrogation video is unclear as to whether Plaintiff was provided notice that the van was originally seized as "evidence," as the footage shows Officer Timlick stating, "[t]he Metropolitan Police Department has your van, I believe, *most likely*, as evidence" (emphasis added).

(2) it was conducted by MPD, is sufficient.  But the court finds that those two facts alone would not enable a reasonable person to research his rights using "published, generally available state statutes and case law."  *Perkins*, 525 U.S. at 241.  Proper notice under *Perkins* requires notice of the reason for the seizure, because without that information a plaintiff is not equipped to pursue remedies.  *See, e.g.*, *Brown v. District of Columbia*, 115 F. Supp. 3d 56, 69 (D.D.C. 2015) (finding notice sufficient under *Perkins* that explicitly informed plaintiffs that their property was seized through administrative forfeiture and including the applicable D.C. code provision).

Second, there is a disputed issue of fact as to whether Defendant made affirmative misrepresentations which interfered with Plaintiff's ability to pursue available remedies for the return of his van.  Plaintiff claims that even if he received sufficient notice of the original seizure, he was subsequently informed that his van was being held not as evidence, but as a *quid pro quo* for information about Luis.  Under Plaintiff's version of events—that he was told the only way he could retrieve his van was by providing information, and that MPD could sell his van—Defendant's actions would violate the requirements of *Perkins* and constitute a deprivation of procedural due process.  Providing Plaintiff with false information interfered with Plaintiff's ability to take advantage of the procedures for return of his property.  Plaintiff would have no reason to believe that a Federal Rule of Criminal Procedure 41(g) motion, or any other remedy, would be effective if he had been told that he had to provide information about Luis in order to get his property back.

The court therefore finds that summary judgment is inappropriate on Plaintiff's Fifth Amendment claim because there exists a genuine dispute as to whether Plaintiff received sufficient notice at the outset about the seizure, and whether Defendant made misrepresentations to Plaintiff that deprived him of procedural due process.

### C. Qualified immunity

Police officers are immune from suit where their actions did not violate clearly established law.  *Pearson v. Callahan*, 555 U.S. 223, 243–44 (2009).  Qualified immunity "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."  *Id.* at 244.  The court conducts a two-step analysis, determining "(1) whether the facts in the record show the officers' conduct violated a constitutional right, and if so, (2) whether the constitutional right was clearly established at the time of the incident." *Corrigan v. District of Columbia*, 841 F.3d 1022, 1029 (D.C. Cir. 2016).  In determining what constitutes "clearly established" law at the time of the incident, the court looks to "cases of controlling authority in [its] jurisdiction," and if there are none, the court looks for "a consensus of cases of persuasive authority."  *Youngbey v. March*, 676 F.3d 1114, 1117 (D.C. Cir. 2012) (internal quotation marks and citations omitted).  The court need not rely on cases involving "materially similar" facts; it is enough to "show that the state of the law [at the time of the incident] gave [the officer] fair warning that [his alleged misconduct] ... was unconstitutional." *Lash v. Lemke*, 786 F.3d 1, 7 (D.C. Cir. 2015) (citation omitted).  A section 1983 plaintiff bears the burden of demonstrating that the defendant violated a right that was clearly established at the time of the violation.  *See Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015).

At the summary judgment stage on a claim of qualified immunity, the facts are viewed in the light most favorable to the party opposing qualified immunity—in this case, Plaintiff.  *Id.* Any determination that Defendant is entitled to qualified immunity must rest on undisputed facts or the Plaintiff's version of the facts.  *See*, *e.g.*, *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th Cir. 2010) (affirming denial of qualified immunity based on "[plaintiff's] 'facts'"); *Lewis v. Charter Twp. of Flint*, 660 F. App'x 339, 347 (6th Cir. 2016) (affirming denial of

qualified immunity where genuine issue of material fact existed as to whether police officer's actions were objectively reasonable).

### i. Fourth Amendment claim

The court has determined that summary judgment is appropriate as to Defendant's violation of Plaintiff's constitutional right to be free from unreasonable seizures; what remains is to assess whether that right was clearly established during the time that MPD held Plaintiff's van between September 2014 and January 2016. The court finds that it was.

Defendant argues that he is entitled to qualified immunity because "no reasonable officer would assume that he had the constitutional obligation to return Plaintiff's property *sua sponte*, without approval from the USAO to declassify the property as evidence," and that "no reasonable officer would assume he had a duty to advocate on Plaintiff's behalf." (Def. Opp'n at 21). But Plaintiff's claim that his constitutional rights were violated does not depend on either assumption. Rather, Plaintiff's claim is that Defendant's failure to initiate return of the van, by filling out a Form 81-C and submitting it to the prosecutor—when Plaintiff had requested return of the van and Defendant no longer had probable cause to retain the van—violated his constitutional rights. The court has previously rejected Defendant's explanation that he retained the van in order to differentiate between Plaintiff's belongings and Luis's belongings, because that would not constitute probable cause. Whether or not it was "reasonable for [Defendant] to discredit Plaintiff's recitation of reality," (*id.* at 22), is therefore immaterial to deciding qualified immunity; even if Plaintiff had lied about who owned the items found in the van, Defendant has not created a genuine dispute as to whether he had probable cause to retain the van. Plaintiff's representations about ownership of the van's contents would not have given Defendant further probable cause; Defendant had probable cause and the opportunity at the time of the original search to remove any item reasonably related to Luis's crime. Absent probable cause, the

retention was objectively unreasonable, regardless of Plaintiff's credibility.  Undisputed facts show Defendant was focused on whether Plaintiff had more information that might be valuable to MPD; despite Defendant's attempt to characterize his deposition testimony otherwise, Defendant stated that he kept the van in order to obtain information from Plaintiff.  No reasonable law enforcement officer would believe that keeping a vehicle that has already been searched, and its contents with evidentiary value removed, in order to coerce its owner into providing information to the police, is lawful.

It is well established that seizure of property requires probable cause, and that continued seizure requires continued probable cause.  *See*, *e.g.*, *United States v. Place*, 462 U.S. at 709 (finding original seizure of criminal defendant's luggage based on reasonable suspicion permissible, but finding 90-minute detention unreasonable absent probable cause, and noting the intrusive effect of seizure of personal luggage).  It is also settled law that a Fourth Amendment seizure is not reasonable where the interests of the property's owner clearly outweigh the government's interests.  *See Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("there is no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails" (internal quotation marks omitted)).

There is also a consensus among courts that individuals have a strong interest in their vehicles.  *See*, *e.g.*, *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 100–01 (D.D.C. 2012) ("An individual has a strong interest in his car . . . In addition, the length of the deprivation increases the weight of the individual's interest in possessing the vehicle"); *Krimstock v. Kelly*, 306 F.3d 40, 61 (2d Cir. 2002) ("An individual has an important interest in the possession of his [or her] motor vehicle, which is often his [or her] most valuable possession") (internal quotation marks and citations omitted); *Coleman v. Watt*, 40 F.3d 255, 260–61 (8th Cir. 1994) (finding

seven-day delay between impoundment of car and post-seizure hearing violated due process, noting, "[a]utomobiles occupy a central place in the lives of most Americans, providing access to jobs, schools, and recreation as well as to the daily necessities of life"); *Stypmann,* 557 F.2d at 1342 ("The private interest in the uninterrupted use of an automobile is substantial.").  In this case, Plaintiff's interest in his van was particularly strong, since it was vital to his livelihood as a contractor, and contained his work tools.  (Pl. Reply to Def. Suppl. Resp. to Pl. Statement of Undisputed Material Facts ¶ 43).

It is clear, then, that Fourth Amendment principles require both that there be probable cause for a seizure and that the seizure be otherwise reasonable when balancing the private and government intrusions; and that seizure of a vehicle requires a strong government interest in order to outweigh the inherent private interest.  Defendant notes the Supreme Court's repeated admonition to lower courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015).  But the alleged violation at issue here—continued seizure of property without probable cause—is nothing like the "hazy legal backdrop" regarding use of force in a high-speed chase at issue in *Luna.  Id.* at 309.  These facts and circumstances, and the relevant cases, are straightforward.  Defendant knew or should have known that his conduct was unconstitutional.  Defendant cites *United States v. Hubbard,* 650 F.2d 293 (D.C. Cir. 1980) for the proposition that "[p]roperty lawfully seized may be retained pending exhaustion of its utility in criminal prosecutions," and indeed, *Hubbard* indicates that it was clearly established at the time of Defendant's conduct that property can only be retained as long as it has utility in a criminal prosecution. *Hubbard,* 650 F.2d at 303 n.26.  It is undisputed that Plaintiff's van itself had no utility for any criminal prosecution; Defendant searched it and

removed any items of potential evidence, and could have retained those until the close of any criminal case.

Because Defendant was responsible for the continued seizure of Plaintiff's van despite there no longer being probable cause, and because seizure of a personal vehicle requires a strong government interest which Defendant has failed to show, Defendant is not entitled to qualified immunity.[8]

Defendant's alleged deference to the OUSA, if credited by a jury, would not create a disputed issue of fact as to qualified immunity.  The Supreme Court explained in *Malley v. Briggs* that a police officer who applied for a warrant with facts he believed to be true, but which he knew did not constitute probable cause, was not shielded from immunity for the unlawful search by the magistrate judge's authorization of the warrant.  475 U.S. at 345.  The Court found the relevant inquiry to be "whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant."  *Id.*  Defendant similarly cannot be shielded from liability where a reasonable officer in his position would have known that the seizure was unlawful, even if, as he claims, he perceived the OUSA's conduct or statements as ratification of the seizure.

### ii.  Fifth Amendment

Defendant's sole argument for qualified immunity from Plaintiff's Fifth Amendment claim is that Plaintiff has not stated a claim for a procedural due process violation.  As discussed above, the court finds that there exists a dispute as to facts that would, if true, constitute a

---

[8] The court notes that the relevance of MPD policy in General Order 601.1 pertaining to seized property is not to show what is "clearly established" constitutional law, but to show Defendant's role in the deprivation of a constitutional right. The court agrees that the order does not have any bearing on the standard for objective reasonableness under the Fourth Amendment.

deprivation of procedural due process in the form of denying Plaintiff reasonable notice regarding the seizure of his van by providing him with misleading and untrue information instead.  It is clearly established that due process requires reasonable notice in the event of property seizure, *see Perkins*, 525 U.S. at 234, and Defendant cannot in any seriousness claim that it is objectively reasonable for law enforcement officers to affirmatively mislead property owners with deliberately false information.  Disputed issues of fact therefore preclude qualified immunity on Plaintiff's Fifth Amendment claim.

## IV.    Conclusion

For the reasons set forth above, Plaintiff's motion for partial summary judgment will be GRANTED and Defendant's cross-motion for summary judgment will be DENIED.

A corresponding order will issue separately.


Dated: March 30, 2017

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge